UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

NICOLÁS MADURO MOROS, and
CILIA FLORES DE MADURO,

Defendants.

S4 11 Cr. 205 (AKH)

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Kaylan E. Lasky
Henry L. Ross
Kevin T. Sullivan
Kyle A. Wirshba
Assistant United States Attorneys
    *-Of Counsel-*

TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................. 1

BACKGROUND .................................................................................................................... 1

    I.    OFAC and U.S. Sanctions Policy ............................................................ 1

    II.    OFAC's Venezuela Sanctions.................................................................. 3

    III.    OFAC Licenses Generally ...................................................................... 5

    IV.    OFAC's Practices Regarding Criminal Defense .................................... 7

    V.    The Indictments and Arrests .................................................................. 8

    VI.    The Defendants' Applications for OFAC Licenses................................. 8

ARGUMENT ........................................................................................................................ 9

    I.    The Sixth Amendment Claim................................................................ 10

        A.    The Government Has Not Engaged in Unjustified Interference...............11

        1.    Applicable Law......................................................................11

        2.    Discussion ............................................................................ 13

        B.    The Defendants Had No Reasonable Expectation that the Third-Party Funds Would Be Available for Their Defense ................................ 17

        1.    Applicable Law...................................................................... 17

        2.    Discussion ............................................................................ 17

    II.    The Fifth Amendment Claim ................................................................ 20

    III.    Dismissal Is Not the Appropriate Remedy........................................... 21

CONCLUSION................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albright v. Oliver*,
510 U.S. 266 (1994)........................................................................................ 20

*Buie v. Sullivan*,
923 F.2d 10 (2d Cir. 1990) .............................................................................. 13

*Caplin & Drysdale, Chartered v. United States*,
491 U.S. 617 (1989)..............................................................................11, 16, 20

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ........................................................................................ 21

*Graham v. Connor*,
490 U.S. 386 (1989) ........................................................................................ 20

*In re Claims Against the Valero-Petrocedeño Account*,
20 Misc. 249 (S.D.N.Y. Mar. 11, 2026) ........................................................... 5

*Lafler v. Cooper*,
566 U.S. 156 (2012)................................................................................... 21, 22

*Luis v. United States*,
578 U.S. 5 (2016).............................................................................................11

*S.E.C. v. FTC Cap. Markets, Inc.*,
No. 09 Civ. 4755 (PGG), 2010 WL 2652405 (S.D.N.Y. June 30, 2010) ........... 13, 17

*SEC v. Platinum Mgmt. (NY) LLC*,
No. 16 Civ. 6848 (BMC), 2018 WL 6172404 (E.D.N.Y. Nov. 25, 2018).............. 14

*Taylor v. Illinois*,
484 U.S. 400 (1988)........................................................................................ 13

*United States v. Bonventre*,
No. 10 Cr. 228 (LTS), 2011 WL 1197853 (S.D.N.Y. Mar. 30, 2011) ................. 20

*United States v. Carmichael*,
216 F.3d 224 (2d Cir. 2000) ............................................................................ 22

*United States v. Dupree*,
781 F. Supp. 2d 115 (E.D.N.Y. 2011) ......................................................... 12, 14

*United States v. Emor*,
794 F. Supp. 2d 143 (D.D.C. 2011) ............................................................ 12, 13

*United States v. Fattah*,
    858 F.3d 801 (3d Cir. 2017) ............................................................... 12

*United States v. Jones*,
    381 F.3d 114 (2d Cir. 2004) ............................................................... 10

*United States v. Kolfage*,
    537 F. Supp. 3d 559 (S.D.N.Y. 2021) ....................................... 12, 13, 16

*United States v. Locascio*,
    6 F.3d 924 (2d Cir. 1993) .....................................................................11

*United States v. Medunjanin*,
    752 F.3d 576 (2d Cir. 2014) ............................................................... 20

*United States v. Stein*,
    435 F. Supp. 2d 330 (S.D.N.Y. 2006) .............................................. 12, 17

*United States v. Stein*,
    495 F. Supp. 2d 390 (S.D.N.Y. 2007) .............................................. 21, 22

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008) ....................................................... passim

*United States v. Tucker*,
    No. 16 Cr. 91 (PKC), 2024 WL 3983410 (S.D.N.Y. Aug. 29, 2024)....................................... 14

*United States v. Valencia-Trujillo*,
    No. 02 Cr. 329 (EAJ), 2005 WL 8156428 (M.D. Fla. Dec. 9, 2005)....................................... 16

*United States v. Williams*,
    205 F.3d 23 (2d Cir. 2000) ............................................................... 13

*Via v. Cliff*,
    470 F.2d 271 (3d Cir. 1972) ............................................................... 12

*Wheat v. United States*,
    486 U.S. 153 (1988).............................................................................11

**Statutes**

18 U.S.C. § 924(c)(1)(A) ............................................................................ 8

18 U.S.C. § 924(c)(1)(B) ............................................................................ 8

18 U.S.C. § 924(o) ...................................................................................... 8

21 U.S.C. § 960a ......................................................................................... 8

21 U.S.C. § 963 ........................................................................................... 8

50 U.S.C. § 1701(a) ................................................................................................. 3

50 U.S.C. §§ 1701-1706 .......................................................................................... 2

50 U.S.C. §§ 4301-4341 .......................................................................................... 2

**Regulations**

31 C.F.R. § 510.508(a) ............................................................................................ 6

31 C.F.R. § 510.508(a)(3) ....................................................................................... 6

31 C.F.R. § 515.512(e)(1) ....................................................................................... 6

31 C.F.R. § 525.508(a)(1) ....................................................................................... 6

31 C.F.R. § 526.508(a)(1) ....................................................................................... 6

31 C.F.R. § 528.507(a)(1) ....................................................................................... 6

31 C.F.R. § 536.507(a)(1) ....................................................................................... 6

31 C.F.R. § 546.508(a)(1) ....................................................................................... 6

31 C.F.R. § 547.508(a)(1) ....................................................................................... 6

31 C.F.R. § 548.508(a)(1) ....................................................................................... 6

31 C.F.R. § 549.508(a)(1) ....................................................................................... 6

31 C.F.R. § 550.507(a)(1) ....................................................................................... 6

31 C.F.R. § 551.508(a)(1) ....................................................................................... 6

31 C.F.R. § 552.508(a)(1) ....................................................................................... 6

31 C.F.R. § 553.508(a)(1) ....................................................................................... 6

31 C.F.R. § 558.508(a)(1) ....................................................................................... 6

31 C.F.R. § 560.553(b)(1) ....................................................................................... 6

31 C.F.R. § 569.507(a)(1) ....................................................................................... 6

31 C.F.R. § 570.508(a)(1) ....................................................................................... 6

31 C.F.R. § 578.508(a)(1) ....................................................................................... 6

31 C.F.R. § 579.507(a)(1) ....................................................................................... 6

31 C.F.R. § 582.507(a)(1) ....................................................................................... 6

31 C.F.R. § 583.508(a)(1) .................................................................................. 6

31 C.F.R. § 584.508(a)(1) .................................................................................. 6

31 C.F.R. § 585.507(a)(1) .................................................................................. 6

31 C.F.R. § 587.507(a)(1) .................................................................................. 6

31 C.F.R. § 587.508(a)(1) .................................................................................. 6

31 C.F.R. § 588.508(a)(1) .................................................................................. 6

31 C.F.R. § 589.507(a)(1) .................................................................................. 6

31 C.F.R. § 590.508(a)(1) .................................................................................. 6

31 C.F.R. § 591.312 .......................................................................................... 7

31 C.F.R. § 591.506 .......................................................................................... 6

31 C.F.R. § 591.507 ...................................................................................... 16, 21

31 C.F.R. § 591.507(a)(1) .................................................................................. 7

31 C.F.R. § 594.517(a)(1) .................................................................................. 6

31 C.F.R. § 597.513(a)(1) .................................................................................. 6

31 C.F.R. § 598.508(a)(1) .................................................................................. 6

31 C.F.R. § 599.507(a)(1) .................................................................................. 6

## Other Authorities

Exec. Order No. 13692, 80 Fed. Reg. 12747 (Mar. 11, 2015) .................................... 3

Exec. Order No. 13884, 84 Fed. Reg. 38843 (Aug. 7, 2019) .................................... 4, 5

Clare Seelke, CONG. RSCH. SERV., IF10715,
    *Venezuela: Overview of U.S. Sanctions Policy* (2026) ........................................... 3

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendants Nicolás Maduro Moros's and Cilia Flores de Maduro's motions to dismiss Superseding Indictment S4 11 Cr. 205 (AKH) (the "Fourth Superseding Indictment"). (*See* Dkts. 289, 292). The defendants argue that their inability to access certain third-party funds to pay for their legal fees violates the Fifth and Sixth Amendments. The defendants and their former regime have been sanctioned by the United States for many years. In light of their pending case in this District, and in accordance with the Office of Foreign Assets Control's ("OFAC") well-established sanctions regulations and licensing practices, OFAC has granted the defendants an exception to those sanctions: authorization to use their *personal* (and joint) funds to pay their attorneys' fees. OFAC, however, has denied the defendants' request for an additional exception: to allow them to pay their legal fees from a slush fund controlled by a sanctioned government. That is because OFAC regulations expressly prohibit using a *sanctioned entity*'s funds to pay a separate sanctioned person's attorneys' fees. OFAC's denial of that request does not, as the defendants contend, mean the Government interfered with the defendants' right to counsel or that it violated the defendants' due process rights. The motions to dismiss should be denied.[1]

## BACKGROUND

### I.    OFAC and U.S. Sanctions Policy

For more than two centuries, the United States Department of the Treasury (the "Treasury Department") has administered sanctions against foreign adversaries in service of American national security and foreign policy interests. *See* "About OFAC," OFAC, *available at* https://ofac.treasury.gov/about-ofac; (Exhibit A, Decl. of Sara Thannhauser, dated Mar. 13, 2026

---

[1] The Government takes no position on counsel's requests, in the alternative, for leave to withdraw.

("OFAC Decl.") ¶ 4). During the Second World War, for example, a predecessor to OFAC—the agency of the Treasury Department that administers and enforces sanctions—used sanctions to apply economic pressure against Nazi Germany and other Axis powers. *See* "About OFAC," OFAC, *available at* https://ofac.treasury.gov/about-ofac. In 1950, following Chinese intervention in Korea, President Truman declared a national emergency and OFAC began administering controls over Chinese and North Korean assets. *Id.* Over the ensuing decades and across presidential administrations, OFAC has continued to block funds belonging to the world's most dangerous actors, including narcotics traffickers, terrorists, human rights violators, and corrupt governments and their *de facto* leaders. *See generally* "Sanctions Programs and Country Information," OFAC, *available at* https://ofac.treasury.gov/sanctions-programs-and-country-information.

Today, OFAC administers over 35 economic sanctions programs, (OFAC Decl. ¶ 4), several of which are designed to weaken hostile regimes, such as those in Iran and North Korea. *See* "Where is OFAC's Country List? What countries do I need to worry about in terms of U.S. sanctions?" OFAC, *available at* https://ofac.treasury.gov/sanctions-programs-and-country-information/where-is-ofacs-country-list-what-countries-do-i-need-to-worry-about-in-terms-of-us-sanctions. There are currently more than 17,000 individuals and entities, commonly referred to as Specially Designated Nationals ("SDNs"), blocked pursuant to these programs. *See id.*

Congress has repeatedly authorized the Treasury Department's administration of such programs, most notably through the Trading with the Enemy Act of 1917, 50 U.S.C. §§ 4301-4341, and the International Emergency Economic Powers Act of 1977 ("IEEPA"), 50 U.S.C. §§ 1701-1706. IEEPA grants to the President of the United States certain authorities to deal "with any unusual and extraordinary threat, which has its source in whole or substantial part outside the

United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

## II.    OFAC's Venezuela Sanctions

In December 2014, President Barack Obama signed the Venezuela Defense of Human Rights and Civil Society Act of 2014 (the "2014 Act"), authorizing, among other things, sanctions against individuals responsible for ongoing human rights violations in Venezuela. In March 2015, President Obama issued Executive Order 13692 (the "2015 Executive Order"), pursuant to the 2014 Act, IEEPA, and other authorities, declaring a national emergency with respect to the deteriorating human rights situation in Venezuela and finding that:

> the situation in Venezuela, including the Government of Venezuela's erosion of human rights guarantees, persecution of political opponents, curtailment of press freedoms, use of violence and human rights violations and abuses in response to antigovernment protests, and arbitrary arrest and detention of antigovernment protestors, as well as the exacerbating presence of significant public corruption, constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States.

Exec. Order No. 13692, 80 Fed. Reg. 12747 (Mar. 11, 2015). Subsequently, OFAC designated both defendants as SDNs and blocked their personal assets pursuant to the 2015 Executive Order: OFAC designated Maduro Moros on July 31, 2017, citing, among other things, elections held by Maduro Moros's government the previous day that "aspire[d] illegitimately to usurp the constitutional role of the democratically elected National Assembly, rewrite the constitution, and impose an authoritarian regime on the people of Venezuela." Press Release, TREASURY DEPARTMENT, "Treasury Sanctions the President of Venezuela" (July 31, 2017), *available at* https://home.treasury.gov/news/press-releases/sm0137. In connection with these sanctions, the United States called on the Maduro regime to "allow Venezuela's democratic processes and institutions to function as intended." *Id.* OFAC designated Flores de Maduro on September 25,

2018, alongside other members of Maduro Moros's regime. Press Release, TREASURY DEPARTMENT, "Treasury Targets Venezuelan President Maduro's Inner Circle and Proceeds of Corruption in the United States" (Sep. 25, 2018), *available at* https://home.treasury.gov/news/press-releases/sm495. At that time, Secretary of the Treasury Department Steven T. Mnuchin stated:

> President Maduro relies on his inner circle to maintain his grip on power, as his regime systematically plunders what remains of Venezuela's wealth. We are continuing to designate loyalists who enable Maduro to solidify his hold on the military and the government while the Venezuelan people suffer. . . . Treasury will continue to impose a financial toll on those responsible for Venezuela's tragic decline, and the networks and front-men they use to mask their illicit wealth.

*Id.*

Following Maduro Moros's illegitimate declaration of victory in a disputed and internationally condemned election in December 2018, the United States and more than 50 other countries refused to recognize Maduro Moros as Venezuela's head of state. *See, e.g.*, Press Statement, U.S. DEPARTMENT OF STATE, "Recognition of Juan Guaido as Venezuela's Interim President" (Jan. 23, 2019), *available at* https://2017-2021.state.gov/recognition-of-juan-guaido-as-venezuelas-interim-president/. In August 2019, President Donald J. Trump issued Executive Order 13884 (the "2019 Executive Order"), pursuant to IEEPA and other authorities, freezing assets of the Maduro regime in the United States and prohibiting U.S. persons from engaging in transactions with the Maduro regime.[2] Exec. Order No. 13884, 84 Fed. Reg. 38843 (Aug. 7, 2019).

---

[2] The 2019 Executive Order defines the term "Government of Venezuela" to include "the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime." E.O. No. 13884. This definition is limited to the scope of the 2019 Executive Order, and does not imply recognition of Maduro Moros as the Head of State of Venezuela. (OFAC

The 2019 Executive Order was issued to "take additional steps with respect to the national emergency declared in [the 2015 Executive Order]," and was based on

> the continued usurpation of power by Nicolas Maduro and persons affiliated with him, as well as human rights abuses, including arbitrary or unlawful arrest and detention of Venezuelan citizens, interference with freedom of expression, including for members of the media, and ongoing attempts to undermine Interim President Juan Guaido and the Venezuelan National Assembly's exercise of legitimate authority in Venezuela.

*Id.*

The 2015 and 2019 Executive Orders, and other Venezuela-related sanctions, are implemented by the regulations (the "Venezuela Sanctions Regulations") contained within Title 31, Code of Federal Regulations, Part 591. (OFAC Decl. ¶ 14). Those sanctions continue to apply to the Interim Government. *See supra* at 4-5 n.2.

## III.    OFAC Licenses Generally

OFAC has the authority to issue licenses to allow U.S. persons to engage in certain transactions with a sanctioned party. (OFAC Decl. ¶ 15). General OFAC licenses provide public authorization for a class of otherwise-prohibited transactions; specific OFAC licenses provide authorization for a particular U.S. person or entity—generally upon application by that person or entity—to engage in an otherwise-prohibited transaction. (OFAC Decl. ¶¶ 15, 19).

---

Decl. ¶ 13 n.3). On March 10, 2026, the U.S. Department of State notified the U.S. Attorney's Office that the United States has formally recognized Delcy Rodriguez as Venezuela's sole Head of State, and that its nonrecognition of Maduro Moros remains unchanged. *See* Letter from Ambassador Michael G. Kozak to U.S. Attorney Jay Clayton dated Mar. 10, 2026, *In re Claims Against the Valero-Petrocedeño Account*, 20 Misc. 249 (S.D.N.Y. Mar. 11, 2026), Dkt. 228-1. It further stated: "[W]hile we are normalizing diplomatic and consular relations with Venezuela, we continue to closely scrutinize transactions with the interim authorities and will use [IEEPA] and other available tools to work toward a better future for the Venezuelan people." *Id.* at 3. The government led by Delcy Rodriguez (the "Interim Government") remains sanctioned pursuant to the 2019 Executive Order. *Id.*

As with most OFAC-administered sanctions programs, the Venezuela Sanctions Regulations include a general license authorizing the provision of certain legal services in the United States to blocked persons, and receipt of payment for those services, subject to certain restrictions. *See* 31 C.F.R. §§ 591.506, 591.507; (OFAC Decl. ¶ 16). Those restrictions include a standard requirement[3] that the sanctioned individuals' funds for their legal services *do not* originate from:

(i)      A source within the United States;

(ii)     Any source, wherever located, within the possession or control of a U.S. person; or

---

[3] Similar or identical provisions appear in numerous other sanctions regulations. *See, e.g.*, 31 C.F.R. § 510.508(a) (North Korea Sanctions Regulations); 31 C.F.R. § 515.512(e)(1) (Cuban Assets Control Regulations); 31 C.F.R. § 525.508(a)(1) (Burma Sanctions Regulations); 31 C.F.R. § 570.508(a)(1) (Libyan Sanctions Regulations); 31 C.F.R. § 582.507(a)(1) (Nicaragua Sanctions Regulations); 31 C.F.R. § 588.508(a)(1) (Western Balkans Stabilization Regulations); 31 C.F.R. § 548.508(a)(1) (Belarus Sanctions Regulations); 31 C.F.R. § 553.508(a)(1) (Central African Republic Sanctions Regulations); 31 C.F.R. § 599.507(a)(1) (Illicit Drug Trade Sanctions Regulations); 31 C.F.R. § 598.508(a)(1) (Foreign Narcotics Kingpin Sanctions Regulations); 31 C.F.R. § 536.507(a)(1) (Narcotics Trafficking Sanctions Regulations); 31 C.F.R. § 594.517(a)(1) (Global Terrorism Sanctions Regulations); 31 C.F.R. § 597.513(a)(1) (Foreign Terrorist Organizations Sanctions Regulations); 31 C.F.R. § 578.508(a)(1) (Cyber-Related Sanctions Regulations); 31 C.F.R. § 547.508(a)(1) (Democratic Republic of the Congo Sanctions Regulations); 31 C.F.R. § 550.507(a)(1) (Ethiopia Sanctions Regulations); 31 C.F.R. § 579.507(a)(1) (Foreign Interference in U.S. Elections Sanctions Regulations); 31 C.F.R. § 583.508(a)(1) (Global Magnitsky Sanctions Regulations); 31 C.F.R. § 585.507(a)(1) (Hong Kong-Related Sanctions Regulations); 31 C.F.R. § 526.508(a)(1) (Hostages and Wrongful Detention Sanctions Regulations); 31 C.F.R. § 528.507(a)(1) (International Criminal Court-Related Sanctions Regulations); 31 C.F.R. § 560.553(b)(1) (Iranian Transactions and Sanctions Regulations); 31 C.F.R. § 587.508(a)(1) (Iraq Sanctions Regulations); 31 C.F.R. § 549.508(a)(1) (Lebanon Sanctions Regulations); 31 C.F.R. § 584.508(a)(1) (Magnitsky Sanctions Regulations); 31 C.F.R. § 510.508(a)(3) (North Korea Sanctions Regulations); 31 C.F.R. § 569.507(a)(1) (Promoting Accountability for Assad and Regional Stabilization Sanctions Regulations); 31 C.F.R. § 587.507(a)(1) (Russian Harmful Foreign Activities Sanctions Regulations); 31 C.F.R. § 551.508(a)(1) (Somalia Sanctions Regulations); 31 C.F.R. § 558.508(a)(1) (South Sudan Sanctions Regulations); 31 C.F.R. § 546.508(a)(1) (Sudan Stabilization Sanctions Regulations); 31 C.F.R. § 590.508(a)(1) (Transnational Criminal Organizations Sanctions Regulations); 31 C.F.R. § 589.507(a)(1) (Ukraine-/Russia-Related Sanctions Regulations); 31 C.F.R. § 552.508(a)(1) (Yemen Sanctions Regulations).

(iii)    Any individual or entity, other than the person on whose behalf the legal services . . . are to be provided, whose property and interests in property are blocked pursuant to any part of this chapter or any Executive order or statute.

31 C.F.R. § 591.507(a)(1); (OFAC Decl. ¶ 16). Thus, the Venezuelan Sanctions Regulations permit blocked persons to use *their own* funds to pay for legal services—provided those funds are "fresh funds," *i.e.*, located outside the United States and not belonging to a U.S. person—and explicitly bar blocked persons from having their legal services paid for by another blocked individual or entity. (OFAC Decl. ¶¶ 17-18).

At various times during the Biden and first and second Trump Administrations, OFAC has granted, revoked, and modified commercial OFAC licenses in connection with negotiations between the United States and Venezuela. *See generally* Clare Seelke, CONG. RSCH. SERV., IF10715, *Venezuela: Overview of U.S. Sanctions Policy* (2026). Those licenses most commonly relate to the oil and gas sector, and in all cases do not relate to the provision of legal services, as described above.

## IV.    OFAC's Practices Regarding Criminal Defense

OFAC may grant specific licenses to permit a sanctioned criminal defendant to use his or her own non-U.S. funds to pay legal fees, on a case-by-case basis. (OFAC Decl. ¶ 20). This practice is intended to "mirror[] the terms and conditions of the legal services general licenses" by ensuring that defendants who have become "U.S. persons"[4] by virtue of their presence in the United States to stand trial do not thereby lose their ability "to take advantage of the full scope of the legal services general licenses." (OFAC Decl. ¶ 21).

---

[4] "U.S. person" means "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or *any person in the United States*." 31 C.F.R. § 591.312 (emphasis added).

By contrast, it is exceedingly rare for OFAC to issue a specific license authorizing a blocked person to have his or her attorneys' fees paid for by another blocked entity or person. (OFAC Decl. ¶ 22). OFAC is not aware of a single instance in which it has granted the authorization that the defendants sought here: a blocked foreign government's proposed payment of attorneys' fees on behalf of a separately blocked person. (OFAC Decl. ¶ 23).

## V.    The Indictments and Arrests

On December 23, 2025, a grand jury sitting in this District returned the Fourth Superseding Indictment, charging Maduro Moros, Flores de Maduro, and several co-defendants with cocaine importation conspiracy, in violation of 21 U.S.C. § 963; and possession of machineguns and destructive devices and conspiracy to commit the same, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii), and 924(o); and also charging Maduro Moros and several co-defendants with narco-terrorism conspiracy, in violation of 21 U.S.C. § 960a.[5] (Dkt. 260). The Fourth Superseding Indictment alleges each count from in or about 1999 through in or about 2025. (*Id.*).

On January 3, 2026, Maduro Moros and Flores de Maduro were apprehended and brought to the Southern District of New York to face the charges contained in the Fourth Superseding Indictment.

## VI.    The Defendants' Applications for OFAC Licenses

In January 2026, counsel for the defendants submitted applications for OFAC licenses. (OFAC Decl. ¶ 26). Those applications sought the authorization that OFAC generally grants: for the defendants to use their own funds (including their jointly held funds) to pay the costs of their legal defense, as well as an additional authorization that, as discussed above, is highly unusual: for

---

[5] Maduro Moros had been previously charged in superseding indictment S2 11 Cr. 205 (AKH), returned in March 2020.

a sanctioned government to pay the costs of their legal defense. (OFAC Decl. ¶¶ 22, 23, 26). On January 9, 2026, OFAC issued licenses that authorized not only the standard authorization sought by the defendants to use their own funds to pay the costs of their legal defense, but also, due to administrative error, the extraordinary authorization, for a sanctioned government to pay the costs of their legal defense, as described above. (Dkts. 290-3 at 5-6; 293-3 at 5-6; OFAC Decl. ¶¶ 28, 30). Each license stated that it could be "revoked or modified at any time." (Dkts. 290-3 at 5; 293-3 at 5).

After becoming aware of the administrative error, OFAC issued an amended license to counsel for each of the defendants: for Maduro Moros, later the same day, January 9, 2026; for Flores de Maduro, on February 28, 2026.[6] (*See* Dkts. 290-3 at 9; 293-3 at 9; OFAC Decl. ¶ 30). Consistent with the provisions governing payment for legal services in the Venezuela Sanctions Regulations, the defendants' current OFAC licenses (the "OFAC Licenses") permit them to use their own funds—including their jointly held funds—to pay the costs of their legal defense. (*See* Dkts. 290-3 at 9; 293-3 at 9).

## ARGUMENT

OFAC's longstanding sanctions regime predated the initiation of the criminal charges the defendants now face and was instituted for purposes completely separate from the criminal charges currently pending before this Court. The defendants' attempts to portray OFAC's sanctions as a targeted attack on the defendants and their rights are misleading and undermined by the facts and chronology of this case and OFAC's independent decision-making. In fact, the defendants are seeking to use for their own defense funds in the possession of third parties, which have generally

---

[6] OFAC became aware of the error as to Flores de Maduro's original license only after it had further correspondence with counsel for Maduro Moros. (OFAC Decl. ¶ 30).

been blocked from use by any U.S. person, including in U.S. criminal proceedings, since at least 2019—months before defendant Maduro Moros was first indicted in indictment S2 11 Cr. 205 (AKH) and more than five years before defendant Flores de Maduro was indicted in the Fourth Superseding Indictment. Given the well-established, legitimate basis for the blocking of those funds, OFAC has not illegitimately prevented the defendants from accessing funds to which they are entitled, and the defendants could not reasonably have expected to have access to such funds in these proceedings. Because the Government did not interfere with the defendants' Fifth or Sixth Amendment rights, and because, in any event, dismissal would not be the appropriate remedy for any violation, the motions to dismiss should be denied.

## I.    The Sixth Amendment Claim

Despite the ability to access their own funds, and funds jointly held, the defendants claim a Sixth Amendment violation based on their inability to access funds from a particular source: another sanctioned entity. (Dkt. 290 ("Maduro Moros Br.") at 6-9).[7]

The Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right to counsel generally encompasses "an individual's right to choose the lawyer or lawyers he or she desires and to use one's own funds to mount the defense that one wishes to present." *United States v. Stein*, 541 F.3d 130, 151 (2d Cir. 2008) (internal citations and quotation marks omitted).

As the Second Circuit and the Supreme Court have recognized, however, "the right to choose one's own counsel is not absolute." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004)

---

[7] Flores de Maduro requests to join Maduro Moros's motion, asserting that the relevant facts and legal arguments are "identical" to those of Maduro Moros's. (Dkt. 293 ("Flores de Maduro Br.") at 3). Accordingly, citations herein are to only Maduro Moros' Brief.

(citing *Wheat v. United States*, 486 U.S. 153, 159 (1988); *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993)); *see also Stein*, 541 F.3d at 156 ("The government is sometimes allowed to interfere with defendants' choice or relationship with counsel . . . ."). A defendant need only be given "a *fair opportunity* to secure counsel of his own choice." *Luis v. United States*, 578 U.S. 5, 11 (2016) (emphasis added). Thus, for example, "an indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice." *Id.* And a defendant "has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989); *see also id.* at 628 ("There is no constitutional principle that gives one person the right to give another's property to a third party, even where the person seeking to complete the exchange wishes to do so in order to exercise a constitutionally protected right.").

In *Stein*, the Second Circuit recognized a narrow exception to these general principles, holding that a Sixth Amendment claim lay in the unusual circumstances where prosecutors (i) engaged in *unjustified* interference with the defendants' ability to pay legal fees by (ii) targeting third party funds that the defendants had a *reasonable expectation* of receiving. 541 F.3d at 151, 155-56. Neither of those circumstances are present here.

### A.    The Government Has Not Engaged in Unjustified Interference

#### 1.    Applicable Law

"[T]he Sixth Amendment protects against *unjustified* governmental interference with the right to defend oneself using whatever assets one has or might reasonably and *lawfully* obtain." *Stein*, 541 F.3d at 156 (emphasis added); *see also id.* (holding that interference with "the supply of defense resources" violates the Sixth Amendment "unless the government's interference was justified"). In *Stein*, prosecutors pressured an accounting firm that was seeking to cooperate with

the Government to limit the firm's advancement of legal fees to former employees who had been charged in connection with the same investigation. *See id.* at 136-39. While a possible justification for pressuring the accounting firm was to prevent it from "pretend[ing] cooperation while 'circling the wagons,'" the Second Circuit suggested this justification was illegitimate and, in any event, was weakened in light of testimony by prosecutors that they were not in fact concerned about the accounting firm "circling the wagons."[8] *Id.* at 156-57.

Thus, "courts read *Stein* to have held that the Sixth Amendment right to counsel is violated when the government, *without other justification*, intervenes to prevent a corporation under investigation from advancing legal fees to indicted employees." *United States v. Kolfage*, 537 F. Supp. 3d 559, 565 (S.D.N.Y. 2021) (cleaned up) (emphasis in original); *accord United States v. Emor*, 794 F. Supp. 2d 143, 147 (D.D.C. 2011); *United States v. Dupree*, 781 F. Supp. 2d 115, 142-43 (E.D.N.Y. 2011); *see also United States v. Fattah*, 858 F.3d 801, 809 (3d Cir. 2017) (distinguishing *Stein* on the grounds that, "[u]nlike [in] *Stein*, the Government . . . undisputedly lacked any 'desire' or 'purpose' to 'deliberately interfere' with counsel.").[9]

---

[8] The extent of that justification was further described by the district court in *Stein*, which explained that "[i]nterference with these rights [to choice of counsel] is improper if the government's actions are 'wrongfully motivated or without adequate justification.'" *United States v. Stein*, 435 F. Supp. 2d 330, 367 (S.D.N.Y. 2006) (quoting *Via v. Cliff*, 470 F.2d 271, 274-75 (3d Cir. 1972)), *aff'd*, 541 F.3d 130 (2d Cir. 2008); *see also id.* at 369 ("[T]he fact that advancement of legal fees occasionally might be part of an obstruction scheme or indicate a lack of full cooperation by a prospective defendant is insufficient to justify the government's interference with the right of individual criminal defendants to obtain resources lawfully available to them in order to defend themselves.").

In *Stein*, the Government was operating under a version of the Principles of Federal Prosecution of Business Organizations (the "Thompson Memorandum"), that included that a corporation's cooperation would be assessed based in part on whether "the corporation appears to be protecting its culpable employees and agents." *Stein*, 541 F.3d at 148. The Thompson Memorandum was subsequently rescinded.

[9] In assessing other Sixth Amendment claims, courts similarly consider whether government action potentially implicating a Sixth Amendment right had a legitimate justification, or, instead, was undertaken to gain a strategic advantage or for some other improper purpose. For example, when

2.    **Discussion**

The Government has not unjustifiably interfered with the defendants' right to counsel. OFAC adhered to the 2015 and 2019 Executive Orders, the Venezuela Sanctions Regulations, and its customary practices in granting the personal-funds authorizations and denying the extraordinary sanctioned-third-party authorizations sought by the defendants. Those Executive Orders, Regulations, and customary practices predate the charges against the defendants, undermining any notion that the Government was seeking to hamstring the defense in a future criminal case. *Cf. Stein*, 541 F.3d at 153 (quoting the district court's statement that the Sixth Amendment is offended when the Government takes actions "prior to indictment with the object of having, or with knowledge that they were likely to have, an unconstitutional effect"). Further undermining such a notion is the fact that OFAC has, in granting the defendants' licenses, authorized them to use their own funds—indicating that OFAC was not seeking to impede their ability to defend themselves in this case. These circumstances contrast sharply with those at issue in *Stein*, where the Second Circuit held that the prosecutors responsible for the criminal investigation "conducted [themselves] in a manner that evidenced a desire to minimize the involvement of defense attorneys."[10] *Stein*,

_____

government action results in the unavailability of a potential defense witness, a defendant "must show bad faith on the part of the government," among other things, to establish a violation of the Sixth Amendment's Compulsory Process Clause. *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000); *see also id.* ("The right to present a defense, and its concomitant right to compulsory process, are not unqualified; they are subject to countervailing public interests." (quoting *Buie v. Sullivan*, 923 F.2d 10, 11 (2d Cir. 1990), *and Taylor v. Illinois*, 484 U.S. 400, 414 (1988))).

[10] *S.E.C. v. FTC Cap. Markets, Inc.*, No. 09 Civ. 4755 (PGG), 2010 WL 2652405 (S.D.N.Y. June 30, 2010), does not compel a different result. There, the Court held, in a U.S. Securities and Exchange Commission ("SEC") enforcement action, that the SEC's seizure of corporate funds not traceable to fraud must be unfrozen for fees in a parallel criminal proceeding under the Sixth Amendment. 2010 WL 2652405, at *8-9. While the Court in *FTC Cap. Markets, Inc.* declined to analyze whether the Government's actions were "unjustified and improper," *id.* at *4, that decision (i) is not binding on this Court; and (ii) is contrary to other district court cases to consider the issue; *see Kolfage*, 537 F. Supp. 3d at 565 ("[T]he *Stein* court focused on the purposeful, unjustified governmental interference with the relationship between defendant and counsel."); *Emor*, 794 F.

541 F.3d at 143; *see also SEC v. Platinum Mgmt. (NY) LLC*, No. 16 Civ. 6848 (BMC), 2018 WL 6172404, at *4 (E.D.N.Y. Nov. 25, 2018) ("The point of *Stein*'s holding is that government prosecutors cannot prosecute and simultaneously use the prosecution to prevent defendants from hiring the lawyer of their choice. That is not what is happening here."). Moreover, whereas in *Stein* the complained-of actions were brought by the prosecutors directly involved in the criminal case, here OFAC is a separate government agency that is not part of the prosecution team, and the law does not "attribut[e] actions by one federal agency to a local USAO simply because the two are part of the Executive Branch of government." *United States v. Tucker*, No. 16 Cr. 91 (PKC), 2024 WL 3983410, at *9-10 (S.D.N.Y. Aug. 29, 2024) (rejecting Sixth Amendment choice-of-counsel claim based on *Stein*, brought via a Section 2255 petition, that invoked an asset freeze obtained by the Federal Trade Commission ("FTC"), and observing that there was "no evidence" that the asset freeze "was sought by the FTC or the USAO-SDNY in order to aid the USAO-SDNY's prosecution of [the defendant] or disadvantage [the defendant] in defending the case").

Moreover, OFAC's adherence to the Executive Orders and Regulations in denying the defendants' extraordinary requests serves a legitimate and compelling government purpose. The Executive Orders were validly issued pursuant to IEEPA, to further U.S. national security interests and foreign policy objectives in the face of Venezuela's descent into authoritarianism. (OFAC Decl. ¶¶ 9-12). The Venezuela Sanctions Regulations, which implement the Executive Orders, provide protections for payments of legal services that are substantially similar to those authorized

---

Supp. 2d at 147 (distinguishing *Stein* because, among other things, "there is no creditable evidence of prosecutorial misconduct in this case"); *Dupree*, 781 F. Supp. 2d at 142-43 ("[T]he defendants have not established any misconduct, much less misconduct similar to what transpired in the *Stein* cases."). Moreover, the government action in *FTC Cap. Markets, Inc.*, freezing of funds in a parallel SEC enforcement action against the same defendant based on the same misconduct, was far more closely related to the criminal case than the 2019 Executive Order and OFAC actions are to the criminal case here.

by numerous other OFAC sanctions programs. (*See supra* at 6 n.3). And OFAC's customary practice of granting specific licenses for the use of personal funds ensures that a defendant's access to funds is not prejudiced by the fact of his or her presence in the United States to stand trial. Thus, any incidental interference with the defendants' ability to access third-party funding here is the result of a sanctions regime implemented for national security and foreign policy reasons, which aims to "impose a financial toll on those responsible for Venezuela's tragic decline, and the networks and front-men they use to mask their illicit wealth." Press Release, TREASURY DEPARTMENT, "Treasury Targets Venezuelan President Maduro's Inner Circle and Proceeds of Corruption in the United States" (Sep. 25, 2018), *available at* https://home.treasury.gov/news/press-releases/sm495. By contrast, the Second Circuit held that the only proffered rationale advanced by the Government in *Stein*—to prevent the companies and individuals under investigation from "circling the wagons"—had been undercut by the prosecutors' own testimony, and was, in the Second Circuit's view, of dubious legitimacy in any event. *See Stein*, 541 F.3d at 156-57.

The defendants misleadingly claim that the challenged denials "stand[] in stark contrast to OFAC's historical practice." (Maduro Moros Br. at 5). To the contrary, the defendants' OFAC Licenses provide them the same authorization generally available to OFAC-sanctioned defendants in federal courts throughout the United States: the right to use their own funds toward the payment of legal fees. OFAC is unaware of a single instance in which the special treatment the defendants seek—authorization, as blocked persons, to receive funds from a sanctioned foreign government— has been granted. (OFAC Decl. ¶ 23). And authorizations for blocked third parties to pay the attorneys' fees of a blocked person are extremely uncommon. (OFAC Decl. ¶ 22). That is hardly surprising: the Venezuela Sanctions Regulations, consistent with numerous other sanctions

regulations, prohibit sourcing legal fees from "[a]ny individual or entity . . . whose property and interests in property are blocked." 31 C.F.R. § 591.507(a)(1)(iii). Accordingly, OFAC declining to depart from the longstanding policies established by the Executive Orders, the Venezuela Sanctions Regulations, and its customary practices was not "without other justification." *Kolfage*, 537 F. Supp. 3d at 565; *see also United States v. Valencia-Trujillo*, No. 02 Cr. 329 (EAJ), 2005 WL 8156428, at *5 (M.D. Fla. Dec. 9, 2005) (noting that accepting the defendant's Sixth Amendment argument would "thwart the specific licensing requirements for payment of attorneys' fees established in OFAC's regulations").

Finally, the recently issued general licenses relating to the Venezuelan oil and gas sector cited by the defendants (*see* Maduro Moros Br. at 6-7), reflect foreign policy judgments that have nothing to do with the provision of legal services, much less with the constitutionality of OFAC's regulations and policies governing payment of attorneys' fees. *See, e.g.*, Press Release, U.S. DEPARTMENT OF STATE, "Actions to Implement President Trump's Vision for Venezuelan Oil" (Feb. 13, 2026), *available at* https://www.state.gov/releases/office-of-the-spokesperson/2026/02/actions-to-implement-president-trumps-vision-for-venezuelan-oil (describing issuances of "several general licenses . . . for oil and gas companies to make unprecedented investments in Venezuela's energy infrastructure"). That foreign policy choice no more entitles the defendants and their counsel than it would any other market participant, in any other sector, "to complete [a financial] exchange . . . in order to exercise a constitutionally protected right." *Caplin & Drysdale,* 491 U.S. at 628; *see also id.* ("If defendants have a right to spend [government-restricted] assets on attorney's fees, why not on exercises of the right to speak, practice one's religion, or travel?").

**B.**    **The Defendants Had No Reasonable Expectation that the Third-Party Funds Would Be Available for Their Defense**

A defendant cannot claim a deprivation of the right to counsel where he or she has no reasonable expectation that certain funds would be available for defense counsel. Given that the Venezuela sanctions program unambiguously barred the defendants from receiving funds for legal fees from the Maduro regime well before they were indicted, neither defendant can reasonably have expected to defend a criminal case in a U.S. court with those funds.

**1.**    **Applicable Law**

"[T]he Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." *Stein*, 541 F.3d at 156. A defendant "has a Sixth Amendment claim to [third party] funds to the extent that she had a valid expectation that her defense costs in the criminal action would be advanced." *FTC Cap. Markets, Inc.*, 2010 WL 2652405, at *4. The "benefits that would have flowed from that expectation" are treated as the defendants' property for the purposes of the Sixth Amendment analysis. *United States v. Stein*, 435 F. Supp. 2d 330, 367 (S.D.N.Y. 2006), *aff'd,* 541 F.3d 130 (2d Cir. 2008). In analyzing whether an expectation of funds for attorneys' fees is reasonable, courts examine closely, for example, corporate practice, *Stein*, 541 F.3d at 155, or state law governing indemnification and advancement of fees, *FTC Cap. Markets, Inc.*, 2010 WL 2652405, at *5.

**2.**    **Discussion**

Any purported expectation the defendants may have had regarding the payment of their legal fees is not reasonable. The funds at issue have generally been unable to be used to make payments to any U.S. person since 2019. Ignoring that the defendants themselves are also SDNs,

17

their expectation that money would be able to be transferred to the United States, to U.S. lawyers, to defend criminal cases in U.S. court cannot be credited.

The defendants argue that their expectation stems from "the laws and practices of Venezuela." (Maduro Moros Br. at 2). In support of this assertion, the defendants submitted declarations from the "Chief of Litigation" for the "Attorney General's Office of Venezuela." (Dkts. 290-1; 293-1). Those declarations purport to assert what "Venezuelan constitutional and administrative law" and "Venezuelan jurisprudence" require, without citation to any specific law, regulation, or rule. (*See* Dkts. 290-1 ¶¶ 4-6; 293-1 ¶¶ 4-9). The declarations do not, however, even endeavor to explain how those obligations are supposed to apply in U.S. courts in light of the 2019 Executive Order and Venezuela sanctions regime. Because it is illegal under U.S. law for funds possessed by a sanctioned entity to pay for the defendants' defense, and has been since before the defendants were indicted, the defendants' purported understanding of the laws of Venezuela are of no moment and do not give rise to a valid expectation of payment.

This conclusion *might* be different if OFAC routinely permitted exceptions to its general sanctions regime through licenses for sanctioned governments—or even for sanctioned third parties—to pay for other sanctioned parties' legal defense, and the defendants could demonstrate that they were aware of this. As discussed above, however, no such routine practice exists. (*See supra* at 15-16). The defendants submit declarations in which an attorney asserts "I am familiar with cases where a sanctioned employer wished to pay for the representation of a sanctioned employee in U.S. proceedings and . . . OFAC has, in my experience and observation, granted such license applications . . . ," without citing to any particular instances and despite the Government's subsequent request for defense counsel to identify those instances. (*See* Decl. of Timothy P. O'Toole, dated Feb. 19, 2026, Dkt. 290-4 ¶ 10). Such extraordinary cases are so rare that they

could not possibly give rise to a reasonable expectation of payment here. Instead, the defendants could have reasonably expected, at most, that OFAC would follow its practice of granting licenses to sanctioned defendants facing U.S. criminal charges to allow the use of their own funds—precisely what occurred here.

Moreover, while both defendants claim that they are entitled to funds under the Venezuelan constitution (Dkts. 290-1 ¶ 4; 293-1 ¶ 4), both defendants also surely knew that the U.S. Government did not consider them to hold legitimate positions within Venezuela under that constitution. In other words, in the view of the U.S. Government at least, the defendants would not be entitled to any legitimate Venezuelan government benefits because they were not legitimate officers or employees of Venezuela. This is true irrespective of whether the defendants believed they were the rightful rulers of Venezuela. Because the defendants must have known that the U.S. Government viewed them as illegitimate, they could not reasonably have expected the U.S. Government to create an exception to a generally applicable sanctions regime, a purpose of which was to eject them from illegitimate power.[11]

To the extent the defendants argue that a reasonable expectation arose from the administrative errors by OFAC that resulted in issuance of the initial licenses (*see* Maduro Moros Br. at 11), that argument should be swiftly rejected. Maduro Moros's initial license was revoked after just three hours; Flores de Maduro's was revoked within weeks.[12] The mistaken, temporary

---

[11] The defendants will surely assert that they exercised legitimate authority in Venezuela. As the defendants' motions indicate, Maduro Moros's purported status as head of state is likely to be the subject of future litigation. (*See* Maduro Moros Br. at 2 n.1). The Court, however, need not weigh that issue now to find that Maduro Moros and Flores de Maduro could not have reasonably expected OFAC to grant them a license based on their claim to legitimate Venezuelan authority that the U.S. has, since 2019, maintained was false.

[12] Flores de Maduro claims her counsel has expended resources in reliance on OFAC's licensing error, (Flores de Maduro Br. at 2); however, she does not identify any way in which her criminal

issuance of licenses stating that they could be "revoked or modified at any time," cannot reasonably give rise to an expectation of payment that would have the effect of preventing the revocation or modification of the licenses for all time.

## II.    The Fifth Amendment Claim

The defendants also argue that their Fifth Amendment due process rights were violated when they were barred from accessing Interim Government funds for their defense. (Maduro Moros Br. at 7, 9-10). But "[t]he Fifth Amendment does not provide a right to counsel. The right to counsel in a criminal proceeding is conferred by the Sixth Amendment." *United States v. Medunjanin*, 752 F.3d 576, 590 (2d Cir. 2014). As the Supreme Court has noted,

> [w]here a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."

*Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Thus, any Fifth Amendment right-to-counsel considerations are subsumed by the Sixth Amendment analysis set forth above, and the Due Process Clause does not provide a separate mechanism for analyzing the defendants' right-to-counsel claims. *See, e.g.*, *Medunjanin*, 752 F.3d at 590-91; *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2011 WL 1197853, at *5 n.4 (S.D.N.Y. Mar. 30, 2011) ("The Supreme Court has expressed doubt that a due process claim 'adds anything to [a] Sixth Amendment claim, because, while the Constitution guarantees a fair trial through the Due Process Clauses . . . it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment.' " (quoting *Caplin & Drysdale,* 491 U.S. at 633)).

---

defense would be adversely impacted in the event that her counsel is not able to recoup all of those expenses.

To the extent the defendants argue, as did the defendants in *Stein*, that the Government's conduct independently violates the Due Process Clause because it "shock[s] the conscience," *United States v. Stein*, 495 F. Supp. 2d 390, 412 (S.D.N.Y. 2007) ("*Stein IV*"), that argument is meritless. As set forth above: *First*, the relevant aspects of the Venezuela sanctions program, including the legal services provisions of the Venezuela Sanctions Regulations, predated the defendants' arrest by years and were not motivated by any improper purpose. (*See supra* at 13-14); *see also* 31 C.F.R. § 591.507 (first issued July 10, 2015); *cf. Stein*, 541 F.3d at 136-42 (prosecutors personally interfered with the payment of attorneys' fees at a time when the employees and their employer were under criminal investigation). *Second*, those aspects of the Venezuela sanctions program are justified by compelling U.S. national security and foreign policy interests. (*See supra* at 14-15); *cf. Stein* 541 F.3d at 156-57 (Government failed to identify a legitimate reason for its interference). And *third*, OFAC acted in accordance with the Venezuela Sanctions Regulations, other sanctions regulations, and its longstanding practice in permitting the defendants access to their personal funds and denying them access to the funds of a sanctioned government. (*See supra* at 18-19); *cf. Stein*, 541 F.3d at 136-42 (prosecutors acted pursuant to since-withdrawn Justice Department policy). The Government's conduct therefore was entirely proper, and certainly was not "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" and thereby warrant the extraordinary remedy of dismissal. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

## III. Dismissal Is Not the Appropriate Remedy

Even if the defendants' constitutional rights were violated—which they were not—dismissal of the indictment would be far too drastic a remedy. "Sixth Amendment remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012) (internal quotation

marks omitted). "Thus, a remedy must neutralize the taint of a constitutional violation, while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the [Government] properly invested in the criminal prosecution." *Id.* (internal quotation marks omitted). The appropriate remedy for a Sixth Amendment violation is "one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error." *Stein*, 541 F.3d at 146 (quoting *United States v. Carmichael*, 216 F.3d 224, 227 (2d Cir. 2000)). The defendants have suggested no remedies other than outright dismissal, yet have provided no information about how their financial condition affects their purported inability to fund their defense, or why Criminal Justice Act counsel would be inadequate. *See Stein IV*, 495 F. Supp. 2d at 419-21. If the Court were to find a Sixth Amendment violation, the Court would require such information, and more, in order to fashion a remedy that "restores the defendant[s] to the circumstances that would have existed" before the alleged constitutional violations. *Stein*, 541 F.3d at 146.

(continued on next page)

**CONCLUSION**

Accordingly, for the reasons set forth above, the Court should deny the defendants' motions

to dismiss the Fourth Superseding Indictment on Fifth and Sixth Amendment grounds.


Dated:     New York, New York
           March 13, 2026

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney
                                        Southern District of New York


                              By:    _____/s/_____

                                        Kaylan E. Lasky
                                        Henry L. Ross
                                        Kevin T. Sullivan
                                        Kyle A. Wirshba
                                        Assistant United States Attorneys