**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

NICOLÁS MADURO MOROS, *et al.*,

Defendants.

S4 11-CR-205 (AKH)

# MEMORANDUM OF LAW IN SUPPORT OF MOTION OF NICOLÁS MADURO MOROS TO DISMISS THE FOURTH SUPERSEDING INDICTMENT BASED ON SOVEREIGN IMMUNITY

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND AND ALLEGATIONS IN THE INDICTMENT ..... 4

A. Mr. Maduro's Presidency ..... 4

B. The Allegations in the Indictment ..... 9

1. The Government Concedes Mr. Maduro Is Venezuela's *De Facto* Head of State. ..... 10

2. The Indictment's Allegations Against Mr. Maduro Are Based on His Performance of Official Duties, His Official Acts, and His Use of State Instrumentalities. ..... 11

LEGAL STANDARD ..... 13

SEQUENCE OF MOTIONS ..... 15

ARGUMENT ..... 16

I. DISMISSAL IS REQUIRED BECAUSE MR. MADURO IS ENTITLED TO HEAD-OF-STATE IMMUNITY. ..... 17

A. Absolute Immunity for Heads of State Like Mr. Maduro Is a Long-Settled Principle of Common Law and International Customary Law. ..... 18

B. Mr. Maduro Is Venezuela's Head of State, and the Executive Branch's Counterfactual Non-Recognition Is Irrelevant. ..... 21

II. DISMISSAL IS INDEPENDENTLY REQUIRED BECAUSE MR. MADURO IS ENTITLED TO CONDUCT-BASED IMMUNITY ..... 30

A. Common Law Conduct-Based Immunity Shields Foreign Officials Acting in Their Sovereign Capacity. ..... 30

B. The Indictment Bases the Charges on Official Acts for Which Mr. Maduro Is Entitled to Conduct-Based Immunity. ..... 32

C. The Court Should Not Extend its Denial of Immunity to Defendant Cordones to Mr. Maduro. ..... 40

III. THE COURT SHOULD NOT DEFER TO THE EXECUTIVE BRANCH'S VIEWS ON MR. MADURO'S IMMUNITY ..................................................... 42

A. No Deference Is Owed to Executive Branch Immunity Decisions That Are In Derogation of Common Law................................................ 43

B. Strict Deference to Executive Branch Immunity Decisions Is Inconsistent With the Common Law and Separation of Powers. ............. 44

CONCLUSION ........................................................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
425 U.S. 682 (1976) ..... 47

*Arnold v. Lucks*,
392 F.3d 512 (2d Cir. 2004) ..... 14

*Berizzi Brothers Co. v. The Pesaro*,
271 U.S. 562 (1926) ..... 45

*Bradley v. Fisher*,
80 U.S. 335 (1871) ..... 38

*Brzak v. United Nations*,
597 F.3d 107 (2d Cir. 2010) ..... 39

*Cave v. E. Meadow Union Free Sch. Dist.*,
514 F.3d 240 (2d Cir. 2008) ..... 14

*Celestin v. Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) ..... 41

*Coleman v. Tennessee*,
97 U.S. 509 (1878) ..... 18

*Doe 1 v. Buratai*,
318 F. Supp. 3d 218 (D.D.C. 2018) ..... 38

*Dorman v. Higgins*,
821 F.2d 133 (2d Cir. 1987) ..... 38

*Dow v. Johnson*,
100 U.S. 158 (1879) ..... 18

*Eliahu v. Jewish Agency for Isr.*,
919 F.3d 709 (2d Cir. 2019) ..... 14, 40, 42

*Ex parte McCardle*,
74 U.S. (7 Wall.) 506 (1868) ..... 14

*Franchise Tax Bd. of California v. Hyatt*,
587 U.S. 230 (2019) ..... 18, 19

*Gregoire v. Biddle*,
177 F.2d 579 (2d Cir. 1949) ........................................................................................ 37

*Guaranty Trust Co. v. United States*,
304 U.S. 126 (1938)........................................................................................................ 27

*Hatch v. Baez*,
7 Hun. 596 (N.Y. Sup. Ct. 1876) ........................................................................ 31, 32, 41

*Heaney v. Gov't of Spain*,
445 F.2d 501 (2d Cir. 1971) ................................................................................ 33, 38, 42

*In re Est. of Ferdinand E. Marcos Hum. Rts. Litig.*,
978 F.2d 493 (9th Cir. 1992) ........................................................................................ 20

*In re Grand Jury Investigation of the Shipping Indus.*,
186 F. Supp. 298 (D.D.C. 1960)................................................................................... 45

*In re Investigation of World Arrangements*,
13 F.R.D. 280 (D.D.C. 1952)................................................................................... 22, 45

*In re Sealed Case*,
131 F.3d 208 (D.C. Cir. 1997)....................................................................................... 14

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019) ........................................................................................... 41

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000) ............................................................................................ 4

*Matar v. Dichter*,
563 F.3d 9 (2d Cir. 2009) .................................................................................... 31, 39, 42

*Nankivel v. Omsk All-Russian Gov't.*,
237 N.Y. 150 (N.Y. 1923) ............................................................................................. 22

*Nat'l City Bank of N.Y. v. Rep. of China*,
348 U.S. 356 (1955)........................................................................................................ 15

*People v. McLeod*,
25 Wend. 483 (N.Y. Sup. Ct. 1841) ........................................................................ 31, 45

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
162 F.3d 748 (2d Cir. 1998) ..................................................................................... 15, 42

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004)........................................................................................................ 20

*Republic of Hungary v. Simon*,
604 U.S. 115 (2025) .......... 18

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945) .......... 27, 45, 46

*Rubin v. Islamic Republic of Iran*,
583 U.S. 202 (2018) .......... 18

*Ruggiero v. Compania Peruana de Vapores Inca Capac Yupanqui*,
639 F.2d 872 (2d Cir. 1981) .......... 18

*Rusesabagina v. Republic of Rwanda*,
652 F. Supp. 3d 1 (D.D.C. 2023) .......... 14

*Samantar v. Yousuf*,
560 U.S. 305 (2010) .......... 17, 19

*SEC v. Jarkesy*,
603 U.S. 109 (2024) .......... 47

*Tachiona v. Mugabe*,
169 F. Supp. 2d 259 (S.D.N.Y. 2001) .......... 20

*Tenney v. Brandhove*,
341 U.S. 367 (1951) .......... 39

*The Paquete Habana*,
175 U.S. 677 (1900) .......... 20

*The Pesaro*,
277 F. 473 (S.D.N.Y. 1921) .......... 45

*The Schooner Exchange v. McFaddon*,
11 U.S. (7 Cranch) 116 (1812) .......... 18, 19, 20, 44

*Trump v. United States*,
603 U.S. 593 (2024) .......... 35, 38, 39

*Underhill v. Hernandez*,
65 F. 577 (2d Cir. 1895), *aff'd*, 168 U.S. 250 (1897) .......... 31, 32, 36

*United States v. Bankasi*,
120 F.4th 41 (2d Cir. 2024) .......... 33, 43

*United States v. Cordones*,
No. 11 Cr. 205 (AKH), 2022 WL 815229 (S.D.N.Y. March 17, 2022) .......... 15, 40, 41

*United States v. Khobragade*,
15 F. Supp. 3d 383 (S.D.N.Y. 2014) ........ 14, 30, 45

*United States v. Navarro*,
551 F. Supp. 3d 380 (S.D.N.Y. 2021) ........ 1

*United States v. Noriega*,
117 F.3d 1206 (11th Cir. 1997) ........ 28

*United States v. Noriega*,
746 F. Supp. 1506 (S.D. Fla. 1990) ........ 27, 28

*United States v. Smith*,
18 U.S. (5 Wheat.) 153 (1820) ........ 20, 48

*United States v. Toscanino*,
500 F.2d 267 (2d Cir. 1974) ........ 16

*United States v. Turkiye Halk Bankasi A.S.*,
16 F.4th 336 (2d Cir. 2021) ........ 13

*United States v. Turkiye Halk Bankasi A.S.*,
598 U.S. 264 (2023) ........ passim

*Upper Skagit Indian Tribe v. Lundgren*,
584 U.S. 554 (2018) ........ 48

*Verlinden B.V. v. Central Bank of Nigeria*,
461 U.S. 480 (1983) ........ 47

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000) ........ 15

*Victory Transport, Inc. v. Comisaria General*,
336 F.2d 354 (2d Cir. 1964) ........ 33

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*,
493 U.S. 400 (1990) ........ 41

*Waltier v. Thomson*,
189 F. Supp. 319 (S.D.N.Y. 1960) ........ 37

*Wulfsohn v. Russian Socialist Federated Soviet Republic*,
234 N.Y. 372 (N.Y. 1923) ........ 21, 22, 25

*Wultz v. Bank of China Ltd.*,
32 F. Supp. 3d 486 (S.D.N.Y. 2014) ........ 38

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ... 27

**International Cases**

*Aguilar-Amory & Royal Bank of Can. Claims (Gr. Brit. v. Costa Rica)*,
1 R.I.A.A. 369 (1923) ... 22

*Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.)*,
Judgment, 2002 I.C.J. 3 (Feb. 14) ... 20

*Bank of Ethiopia v. National Bank of Egypt and Liguori*,
31 Am. J. Int'l L. 742 (1937) ... 24

Cass. pen. [Court of Cassation], sez. I, June 28, 1985, n. 1981,
109 Foro it. 277 (1986) (It.) ... 25

Cass. pen. [Court of Cassation], sez. III, Sept. 17, 2004, n. 49666,
129 Foro it. 253 (2006) (It.) ... 24

*Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France)*,
Judgment, 2008 I.C.J. 177 (June 4) ... 21

Cour de cassation [Cass.] [supreme court for judicial matters] ass. plén.,
July 25, 2025, No. C 24-84.393 (Fr.) ... 24

*Duke of Brunswick v. King of Hanover*,
[1848] 2 H.L. Cas. 1 ... 36, 40, 41, 42

*In re Suarez*,
[1918] 1 Ch. 176 (Eng. C.A.) ... 23

*R. v. Bow St. Metro. Stipendiary Magistrate, Ex p. Pinochet Ugarte (No. 3)*,
[2000], 1 A.C. 147 (H.L.) ... 20

*The Charkieh*,
[1873] L.R. 4 A. & E. 59 (Eng. High Ct. Adm.) ... 23

*Trendtex Trading Corp. v. Central Bank of Nigeria*,
[1977] Q.B. 529 (Eng. C.A.) ... 19

**Books, Articles, & Periodical Materials**

1 William Blackstone, Commentaries (1765) ... 19, 20

4 William Blackstone, Commentaries (1769) ... 19

A.B. Lyons, *The Conclusiveness of the Foreign Office Certificate*,
23 Brit. Y.B. Int'l L. 240 (1946) ... 23

Alejandra Jaramillo & Chris Lau, *Six Americans Freed in Venezuela After Trump Envoy Meets with Maduro*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/02/01/americas/americans-freed-in-venezuela-intl-hnk/index.html ........ 26

Angus Berwick, *Venezuela's Maduro Names Delcy Rodriguez as Vice President*, Reuters (June 14, 2018), https://www.reuters.com/article/world/venezuelas-maduro-names-delcy-rodriguez-as-vice-president-idUSKBN1JA2M7/ ........ 5

Babak Dehghanpisheh, *Nicolás Maduro Is Still the 'Legitimate President' of Venezuela, Acting Leader Delcy Rodríguez Says*, NBC News (Feb. 12, 2026), https://www.nbcnews.com/world/venezuela/maduro-legitimate-president-venezuela-delcy-rodriguez-interview-trump-rcna258687 ........ 7, 28

Camilo González Posso, *Negotiations with the FARC: 1982-2002*, Conciliation Resources, Accord Issue 14 (Feb. 2004), https://www.c-r.org/accord/colombia/negotiations-farc-1982-2002 ........ 34

Chimène I. Keitner, *The Forgotten History of Foreign Official Immunity*, 87 N.Y.U. L. Rev. 704 (2012) ........ 44

Coleman Phillipson, *Wheaton's Elements of International Law* (5th ed.1916) ........ 19

Dave Lawler, *U.S. No Longer Recognizes Guaidó as Venezuela's President, Biden Official Confirms*, Axios (Jan. 4, 2023), https://www.axios.com/2023/01/04/us-stops-recognizing-juan-guaido-venezuela ........ 6

*Delcy Rodriguez Formally Sworn In as Venezuela's Interim President*, Reuters (Jan. 5, 2026), https://www.reuters.com/world/americas/delcy-rodriguez-formally-sworn-venezuelas-interim-president-2026-01-05/ ........ 7

*FARC Members Take Seats in Colombian Congress*, Just. for Colom. (July 23, 2018), https://justiceforcolombia.org/farc-members-take-seats-in-colombian-congress/ ........ 35

*France Backs Chavez-Farc Talks*, Al Jazeera (Nov. 23, 2007), https://www.aljazeera.com/news/2007/11/23/france-backs-chavez-farc-talks ........ 34

G. Edward White, *The Transformation of the Constitutional Regime of Foreign Relations*, 85 Va. L. Rev. 1 (1999) ........ 44

Ingrid Wuerth, *Foreign Official Immunity Determinations in U.S. Courts: The Case Against the State Department*, 51 Va. J. Int'l L. 915 (2011) ........ 44

John O'Brien, *International Law* (2001) ........ 19

José Luis Granados Ceja, *Venezuela: Guaidó Increasing Isolated as UN Recognizes Maduro Gov't in 'Resounding' Vote*, Venezuelanalysis (Dec. 8, 2021), https://venezuelanalysis.com/news/15405/ ........ 6

Julie Turkewitz, *As Venezuelan Antagonists Talk, the U.S. Softens Its Stance*, N.Y. Times (Nov. 25, 2022), https://www.nytimes.com/2022/11/25/world/americas/venezuela-maduro-talks.html ............ 26

*Maduro Declared Victor of Venezuela's Disputed Presidential Election*, Al Jazeera (July 29, 2024), https://www.aljazeera.com/news/2024/7/29/nicolas-maduro-declared-winner-of-closely-fought-venezuela-election ............ 6

Philip C. Jessup, *Has the Supreme Court Abdicated One of Its Functions?*, 40 Am. J. Int'l L. 168 (1946) ............ 46

*Venezuela's Interior Minister Says 100 People Died in U.S. Attack*, Reuters (Jan. 8, 2026) https://www.reuters.com/world/americas/venezuelas-interior-minister-says-100-people-died-us-attack-2026-01-08/ ............ 7

Vibhu Mishra, *Maduro Seized, Norms Tested: Security Council Divided as Venezuela Crisis Deepens*, UN News (Jan. 5, 2026), https://news.un.org/en/story/2026/01/1166706 ............ 8

*What are Colectivos? An Essential Clarification*, PSUV (Oct. 28, 2014), http://www.psuv.org.ve/opiniones/%C2%BFque-son-colectivos-una-aclaratoria-imprescindible/ ............ 13

**Other Authorities**

1 Op. Att'y Gen. 45 (1794) ............ 31

1 Op. Att'y Gen. 81 (1797) ............ 31

Antony J. Blinken, U.S. Sec'y of State, Revocation of the Terrorist Designations of the Revolutionary Armed Forces of Colombia (FARC) and Additional Terrorist Designations (Nov. 30, 2021), https://2021-2025.state.gov/revocation-of-the-terrorist-designations-of-the-revolutionary-armed-forces-of-colombia-farc-and-additional-terrorist-designations/ ............ 35

Clare Ribando Seelke, Cong. Rsch. Serv., IN11024, Venezuela: U.S. Recognizes Interim Government (2019) ............ 5

Constitución de la República Bolivariana de Venezuela 1999 (as amended 2009) (Venez.) ............ 33, 34

Exec. Order No. 13857, 84 Fed. Reg. 509 (Jan. 30, 2019) ............ 25

Int'l Law Comm'n, Draft Articles on the Responsibility of States for Internationally Wrongful Acts, with Commentaries, U.N. Doc. A/56/10, (2001), https://untreaty.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf ............ 37

June S. Beittel, Cong. Rsch. Serv., R42982, Colombia's Peace Process Through 2016 (updated Dec. 31, 2016) ............ 34

*Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcomm. on Admin. Law and Governmental Relations of the H. Comm. on the Judiciary*, 94th Cong. 27 (1976) .......... 47

Leticia Chacon & Clare Ribando Seelke, Cong. Rsch. Serv., IN12354, Venezuela's 2024 Presidential Election (2024) .......... 7

Mark P. Sullivan, Cong. Rsch. Serv., R42989, Hugo Chávez's Death: Implications for Venezuela and U.S. Relations (2013) .......... 4

Mark P. Sullivan, Cong. Rsch. Serv., R43239, Venezuela: Issues for Congress, 2013-2016 (2017) .......... 5

Press Release, U.S. Dep't of State, Resumption of Operations at U.S. Embassy Caracas (Mar. 30, 2026), https://www.state.gov/releases/office-of-the-spokesperson/2026/03/resumption-of-operations-at-u-s-embassy-caracas .......... 8

Restatement (Second) of Foreign Relations Law § 66 (Am. L. Inst. 1965) .......... 20

Restatement (Third) of Foreign Relations Law § 111 (Am. L. Inst. 1987) .......... 20

The Federalist No. 81 (Alexander Hamilton) .......... 19

Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0001, Exp. No. 26-0001 (Jan. 3, 2026) (Venez.), historico.tsj.gob.ve/decisiones/scon/enero/352131-0001-3126-2026-26-0001.HTML .......... 7

U.N. GAOR, 74th Sess., 51st plen. mtg., U.N. Doc. A/74/PV.51 (Dec. 18, 2019) .......... 5

U.N. SCOR, 10085th mtg., *Threats to International Peace and Security*, U.N. Audiovisual Library (Jan. 5, 2026), https://media.un.org/avlibrary/en/asset/d352/d3523110 .......... 8

U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, Venezuela 2020 Human Rights Report (2021), https://www.state.gov/wp-content/uploads/2021/10/VENEZUELA-2020-HUMAN-RIGHTS-REPORT.pdf .......... 25

U.S. Dep't of State, Secretary Kerry's Meetings with Colombian Government and FARC Negotiators (Mar. 21, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/03/254896.htm ... 34

## PRELIMINARY STATEMENT

President Nicolás Maduro Moros has pled not guilty and vehemently denies the allegations against him. If this case were to proceed to trial, it would be apparent that he has been falsely accused. But Mr. Maduro is not permitted to test the evidence at this stage in the proceedings. *See United States v. Navarro*, 551 F. Supp. 3d 380, 388 (S.D.N.Y. 2021) (court "may not consider the sufficiency of the evidence" on a pretrial motion to dismiss). Rather, this Motion demonstrates that because the allegations fail as a matter of law, the case must be dismissed.

No American court has ever presided over the criminal trial of a foreign leader who was recognized by their own country as the sitting head of state at the time the charges were brought. That is not an accident of history. It reflects a rule older than the common law: heads of state are exempt from the criminal process of any national court but their own. That immunity flows not from goodwill that can be withdrawn on a whim, but from the perfect equality and absolute independence of sovereigns. Thus, this Court lacks jurisdiction with respect to Mr. Maduro, who is recognized by the Bolivarian Republic of Venezuela as its head of state.

Further, even if Mr. Maduro were not entitled to sovereign immunity as the head of state, the case against him nonetheless would need to be dismissed since he is also entitled to conduct-based sovereign immunity from the charges against him. The Fourth Superseding Indictment, ECF 260 ("the Indictment"), bases its charges on official acts he took on behalf of the Government of Venezuela in his capacities as a Member of the National Assembly, Foreign Minister, Vice President, and President. The official character of these acts—such as issuing diplomatic passports, deploying the military, and announcing Venezuelan foreign policy—is apparent from the face of the Indictment. Because these actions were undertaken in his official capacity on behalf of a foreign sovereign, he may not be required to respond in this Court to the Indictment's

characterizations of his motives and intent in taking these actions. Just as this Court has no jurisdiction to require a foreign government to justify its actions, this Court equally lacks jurisdiction to require an official of that government to answer for his acts on behalf of that government. There is no reason to depart from the foundational rule of sovereign immunity.

This Court cannot defer to the Executive Branch's apparent view that Mr. Maduro is not entitled to sovereign immunity—either status or conduct-based. Although the Second Circuit has held that the Executive Branch is entitled to complete deference in immunity decisions that *are consistent with* the common law, it has explicitly declined to hold, nor has any other court held, that courts must defer to the Executive Branch where its immunity determination would be in "derogation of common law." Because this unprecedented prosecution violates the absolute immunity from criminal jurisdiction to which heads of state and foreign officials acting in their official capacities have been entitled for hundreds of years, the Executive Branch's immunity determination is entitled to no deference. This Court lacks jurisdiction based both on head-of-state and conduct-based immunity and, accordingly, the case against Mr. Maduro must be dismissed.

**Head-of-State Immunity**

Complete immunity for sovereign heads of state is a bedrock principal of customary international law and is firmly embedded within the common law. Foreign official immunity is analyzed through the application of common law. This unprecedented prosecution is in flagrant violation of common law principles. The government apparently based the Indictment on the implicit contention that Mr. Maduro is not entitled to immunity because, since 2019, while the Executive Branch continued to recognize Mr. Maduro as Venezuela's *de facto* head of state, it has labeled him as "illegitimate."

The government's chilling belief that it can deprive any sitting head of state of immunity through the unilateral, political act of labeling him "illegitimate," has no merit. It is beside the point that the Executive Branch has nominatively declined to recognize Mr. Maduro as *de jure* head of state because—under both early common law and present-day international customary law—formal recognition is not required for head-of-state immunity. For immunity purposes, it is enough that Mr. Maduro exercises the powers of the Venezuelan presidency as, at minimum, the *de facto* head of state. The Indictment concedes that Mr. Maduro exercises that power. Consequently, this Motion does not ask the Court to second-guess the Executive Branch's *political views* on Venezuela's *de jure* head of state. Instead, the Motion asks the Court to address the *legal consequences* of the Indictment's own allegations.

**Conduct-based Immunity**

Mr. Maduro is entitled to immunity for yet another reason: The acts the government charges were, by the Indictment's own telling, undertaken through Mr. Maduro's exercise of official powers and state instrumentalities. Under the common law, the incontrovertible principle that courts may not adjudicate the actions of a foreign nation performed in its sovereign capacity extends to officials acting *on the state's behalf*.

The Indictment contains no allegation of private conduct by Mr. Maduro. To the contrary, the government's core theory of criminality is that Mr. Maduro used state instrumentalities and powers afforded to him by his official positions, as a Member of the National Assembly, Foreign Minister, Vice President, and President of Venezuela, in a manner that violated U.S. law. The government appears to take the view that Mr. Maduro is not entitled to conduct-based immunity because he and the other defendants "corrupted" the "once-legitimate institutions" they served.

These accusations are beside the point, however, because under common law, conduct-based immunity applies without evaluation of the lawfulness, motive, or intent of the official act.

Thus, the fact that the United States believes the acts of the Venezuelan government were illegal or motivated by a desire for self-enrichment, does not, under applicable common law, make such acts any less undertaken on behalf of the sovereign Venezuelan state. The very reason for common law immunity for conduct undertaken in an official capacity on behalf of a sovereign is to protect the sovereign and the officials acting on its behalf from having to defend themselves against allegations that they undertook official actions for an improper or unlawful purpose. Each alleged act the Indictment attributes to Mr. Maduro was his exercise of sovereign authority. Under such circumstances, the government is seeking to prosecute Mr. Maduro for "official acts" for which he is entitled to conduct-based immunity. For this independent reason, this prosecution cannot proceed.

The Court should dismiss the charges against Mr. Maduro with prejudice.

## FACTUAL BACKGROUND AND ALLEGATIONS IN THE INDICTMENT[1]

### A. Mr. Maduro's Presidency

Mr. Maduro has occupied top level positions within Venezuela's government for more than two decades. He held a seat in the National Assembly from 2000 to 2006, acted as Minister for Foreign Affairs from 2006 to 2013, and became Vice President in 2013. *See* ¶ 5 ("¶ XX" will refer to the Indictment); *see also* Mark P. Sullivan, Cong. Rsch. Serv., R42989, Hugo Chávez's Death: Implications for Venezuela and U.S. Relations, at 1 (2013). On March 5, 2013, Mr. Maduro became interim President of Venezuela upon former president Hugo Chávez's death, per

[1] A court may rely on matter outside of the indictment in resolving a motion to dismiss for lack of jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

constitutional succession. ¶ 5. In April 2013, Maduro won the Presidency in a special election and was sworn in before the National Assembly. *See* Mark P. Sullivan, Cong. Rsch. Serv., R43239, Venezuela: Issues for Congress, 2013-2016, at 11 (2017). From 2013 to 2018, Mr. Maduro was recognized as internationally, including by the United States, as the legitimate and uncontested Venezuelan head of state.

In 2018, Mr. Maduro was re-elected to the presidency. He appointed Delcy Rodríguez to serve as his vice president. Angus Berwick, *Venezuela's Maduro Names Delcy Rodriguez as Vice President*, Reuters (June 14, 2018), https://www.reuters.com/article/world/venezuelas-maduro-names-delcy-rodriguez-as-vice-president-idUSKBN1JA2M7/. Prior to Mr. Maduro's inauguration, Juan Guaidó was sworn in as the leader of the National Assembly. Following the election, Mr. Guaidó invoked Article 233 of Venezuela's Constitution, which provides for the temporary transfer of powers to the president of the National Assembly in the absence of a duly elected president. Mr. Guaidó declared himself interim president of Venezuela on January 23, 2019. Clare Ribando Seelke, Cong. Rsch. Serv., IN11024, Venezuela: U.S. Recognizes Interim Government, at 1-2 (2019).

The Venezuelan Supreme Court ruled that Mr. Guaidó and his party had acted outside of the law and voided his actions. *Id.* at 2. That same day, the first Trump Administration formally recognized Mr. Guaidó as interim president, making the United States the first nation to reject the ongoing legitimacy of Mr. Maduro's presidency. The position of the United States, however, was hardly universally followed. Indeed, the United Nations General Assembly (UNGA), through its Credentials Committee, consistently accepted the credentials submitted by the Maduro government as the legitimate representative of Venezuela. This occurred at every relevant session from 2019 onward. *See, e.g.*, U.N. GAOR, 74th Sess., 51st plen. mtg., U.N. Doc. A/74/PV.51

(Dec. 18, 2019) (describing adoption of resolution of the U.N. Credentials Committee recognizing Mr. Maduro's government as representative of Venezuela). For example, in December 2021, the UNGA voted to recognize the credentials of the Maduro government as the legitimate representative of Venezuela, with only sixteen countries voting against. *See, e.g.*, José Luis Granados Ceja, *Venezuela: Guaidó Increasing Isolated as UN Recognizes Maduro Gov't in 'Resounding' Vote*, Venezuelanalysis (Dec. 8, 2021), https://venezuelanalysis.com/news/15405/ (describing vote by the United Nations General Assembly to recognize Mr. Maduro as the legitimate representative of Venezuela).

Throughout the period of Mr. Guaidó's putative presidency, Mr. Maduro retained *de facto* control over Venezuela as President. Indeed, when the United States government indicted Mr. Maduro in March 2020 and offered a $15 million bounty for his arrest, the United States government conceded that Mr. Maduro was the *de facto* ruler of the country. ECF 11 ¶ 7; *see also* ¶¶ 2, 5.

In December 2020, Mr. Guaidó lost his position as head of the National Assembly following Venezuela's legislative elections, and in December 2022 the National Assembly voted to formally dissolve the supposed "interim government" headed by Mr. Guaidó, prompting the European Union, and eventually the United States, to concede Mr. Guaidó could not be regarded as Venezuela's head of state. *See* Dave Lawler, *U.S. No Longer Recognizes Guaidó as Venezuela's President, Biden Official Confirms*, Axios (Jan. 4, 2023), https://www.axios.com/2023/01/04/us-stops-recognizing-juan-guaido-venezuela.

In July 2024, Mr. Maduro was again re-elected president, with the results recognized by the government of Venezuela. *Maduro Declared Victor of Venezuela's Disputed Presidential Election*, Al Jazeera (July 29, 2024), https://www.aljazeera.com/news/2024/7/29/nicolas-maduro-

declared-winner-of-closely-fought-venezuela-election. Nonetheless, the United States continued to withhold formal recognition of Mr. Maduro on the basis that the results of the election were, supposedly, illegitimate. *See* Leticia Chacon & Clare Ribando Seelke, Cong. Rsch. Serv., IN12354, Venezuela's 2024 Presidential Election, at 3 (2024).

On January 3, 2026, United States armed forces forcibly abducted Mr. Maduro and First Lady Cilia Flores de Maduro, killing at least 100 people in the process. *See Venezuela's Interior Minister Says 100 People Died in U.S. Attack*, Reuters (Jan. 8, 2026) https://www.reuters.com/world/americas/venezuelas-interior-minister-says-100-people-died-us-attack-2026-01-08/. Following Mr. Maduro's abduction, his Vice President Delcy Rodríguez, who was appointed to her position by Mr. Maduro, was sworn in as acting President, pursuant to an order of Venezuela's highest court. The court did not determine that the office had become vacant, but instead decided that for continuity of government someone else should be provided the ability to govern during Mr. Maduro's absence. *See* Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0001, Exp. No. 26-0001 (Jan. 3, 2026) (Venez.), historico.tsj.gob.ve/decisiones/scon/enero/352131-0001-3126-2026-26-0001.HTML (unofficial English translation attached as Exhibit 1 to the September 2, 2026 Declaration of Barry J. Pollack, attached as Exhibit A ("Pollack Decl.")); *Delcy Rodriguez Formally Sworn In as Venezuela's Interim President*, Reuters (Jan. 5, 2026), https://www.reuters.com/world/americas/delcy-rodriguez-formally-sworn-venezuelas-interim-president-2026-01-05/.

Ms. Rodríguez and other representatives of Venezuela's government made clear that Mr. Maduro remained the legitimate Venezuelan head of state and that the United States had violated Venezuela's sovereignty by kidnapping him. *See, e.g.*, Babak Dehghanpisheh, *Nicolás Maduro Is Still the 'Legitimate President' of Venezuela, Acting Leader Delcy Rodríguez Says*, NBC News

(Feb. 12, 2026), https://www.nbcnews.com/world/venezuela/maduro-legitimate-president-venezuela-delcy-rodriguez-interview-trump-rcna258687; Vibhu Mishra, *Maduro Seized, Norms Tested: Security Council Divided as Venezuela Crisis Deepens*, UN News (Jan. 5, 2026), https://news.un.org/en/story/2026/01/1166706. For example, during an emergency session at the U.N. Security Council, Venezuela's Permanent Representative to the United Nations, Ambassador Samuel Moncada, implored the Council to ensure "that the government of the United States of America be demanded to fully respect" Mr. Maduro's immunity and immediately release him to return to Venezuela. U.N. SCOR, 10085th mtg., *Threats to International Peace and Security*, U.N. Audiovisual Library (Jan. 5, 2026), https://media.un.org/avlibrary/en/asset/d352/d3523110 at 1:50:00-1:52:22 (remarks of Ambassador Samuel Moncada).

Following Mr. Maduro's abduction, the United States recognized Ms. Rodríguez as Venezuela's acting head of state and resumed diplomatic relations with Venezuela, even though no new presidential election has been held and Ms. Rodríguez's position flows directly from Mr. Maduro appointing her after the supposedly "illegitimate" 2018 and 2024 elections. *See* Notice of Suggestion of Immunity, *Kenemore v. Maduro Moros*, No. 1:25-cv-23652 (S.D. Fla., July 20, 2026), ECFs 75 & 75-1; Press Release, U.S. Dep't of State, Resumption of Operations at U.S. Embassy Caracas (Mar. 30, 2026), https://www.state.gov/releases/office-of-the-spokesperson/2026/03/resumption-of-operations-at-u-s-embassy-caracas (citing goal "to engage directly with Venezuela's *interim* government") (emphasis added).

Despite the incongruous position of the United States, recognizing Ms. Rodríguez, whom Mr. Maduro appointed vice president following his re-election in 2018, as head of state while not recognizing Mr. Maduro as such since the 2018 election, the United States has never contested that, regardless of his *de jure* status, Mr. Maduro remained the *de facto* head of state continuously

since 2013. Indeed, the Indictment states, Mr. Maduro "is now, having remained in power despite losses in recent elections, the *de facto* but illegitimate ruler of the country." ¶ 5.

**B. The Allegations in the Indictment**

This action was initiated in early 2011 with the filing of a sealed indictment that did not name Mr. Maduro as a defendant. *See* ECF 2. Mr. Maduro was first charged in a Second Superseding Indictment, filed in March 2020. *See* ECF 11.

In the operative Fourth Superseding Indictment, the government alleges that "for over 25 years, leaders of Venezuela have abused their positions of trust and corrupted once-legitimate institutions to import tons of cocaine into the United States." ¶ 1. The Indictment further alleges that Mr. Maduro has utilized "his illegally obtained authority" to carry out his alleged crimes. ¶ 2. The Indictment charges Mr. Maduro with four counts: narco-terrorism conspiracy (Count One), cocaine importation conspiracy (Count Two), possession of machineguns and destructive devices (Count Three), and conspiracy to possess machineguns and destructive devices (Count Four). *See* ¶¶ 22-35.

The Indictment's allegations are vague and sweeping. The Indictment claims that "[s]tarting in or about 1999, Venezuela became a safe haven for drug traffickers willing to pay for protection and support corrupt Venezuelan civilian and military officials, who operated outside the reach of Colombian law enforcement and armed forces bolstered by United States anti-narcotics assistance." ¶ 17. It further alleges that Mr. Maduro and "corrupt members of the regime"—including family members—"facilitated the empowerment and growth of violent narco-terrorist groups" by cooperating with and offering protection and support to these groups, who then "sent profits to high-ranking Venezuelan officials." ¶¶ 19-20. The Indictment alleges that the narco-terrorist groups the defendants supported include five organizations that the State Department designated as foreign terrorist organizations: (1) the FARC, a leftist Columbian guerrilla group,

and certain of its successors (¶ 11); (2) the ELN, a "Colombian terrorist group . . . dedicated to the violent overthrow of the democratically elected government of Colombia" (¶ 12); (3) the Sinaloa Cartel (¶ 13); (4) the Zetas, a Mexican drug trafficking organization (¶ 14); and (5) TdA, "a criminal organization that originated as a prison gang" in Venezuela (¶ 15). The government did not designate the Sinaloa Cartel, the Zetas, or TdA as foreign terrorist organizations until February 2025, more than twenty-five years after the alleged conspiracy began. *See* ¶¶ 13-15.

### 1. The Government Concedes Mr. Maduro Is Venezuela's *De Facto* Head of State.

The Indictment alleges that Mr. Maduro legitimately "succeeded to the Venezuelan presidency," following years holding other top-level positions in Venezuela's government, "after former President Hugo Chávez died in or about 2013." ¶ 5. With minimal explanation, however, the Indictment (which was returned on December 23, 2025 and unsealed on January 3, 2026) characterizes Mr. Maduro as merely having "*previously*" been "the president of Venezuela." *Id.* (emphasis added). That label apparently flows from the Indictment's allegation that, following the contested 2018 election, the United States and other countries "refuse[d] to recognize [Mr. Maduro] as Venezuela's head of state." *Id.*

The Indictment acknowledges that even after 2019, Mr. Maduro continued to "exercise the powers of the Venezuelan presidency." *Id*. Indeed, the Indictment alleges that Mr. Maduro was Venezuela's "*de facto* ruler." ¶ 2; *see also* ¶ 5. Likewise, the Indictment concedes that Mr. Maduro "sits atop" the Venezuelan government, led the "ruling regime," and leveraged his "government power" to commit his alleged crimes. ¶¶ 2-3; *see also* ¶ 16 (describing a system run by those "at the top").

### 2. The Indictment's Allegations Against Mr. Maduro Are Based on His Performance of Official Duties, His Official Acts, and His Use of State Instrumentalities.

The Indictment's acknowledgment that Mr. Maduro is Venezuela's *de facto* head of state and previously occupied other high-ranking positions is unsurprising because the government's theory of criminal liability is *expressly premised* on Mr. Maduro's exercise of sovereign authority through state instrumentalities. The Indictment alleges that Mr. Maduro became a government official in 2000, when he began serving as a Member of the National Assembly, and does not allege any overt act attributed to Mr. Maduro prior to 2000. ¶¶ 2, 5, 21. Rather, it alleges that Mr. Maduro held and purportedly abused a continuous succession of official positions from 2000 onward, through the period of the claimed criminal conspiracy, which the government alleges began during the presidency of Hugo Chávez. ¶¶ 1, 5, 21.

Each of Mr. Maduro's alleged criminal acts flows from the official positions he held in Venezuelan government. Indeed, the Indictment begins with alleging that "leaders of Venezuela" have improperly used their "positions of public trust" and the state's "institutions" to engage in the illegal activity. ¶ 1. It next charges that Mr. Maduro specifically "use[d] his . . . authority and the [state's] institutions" for such purposes. ¶ 2. It alleges that his supposed criminal conduct occurred through "public office[s] he has held":

> *As a member of Venezuela's National Assembly*, MADURO MOROS moved loads of cocaine under the protection of Venezuelan law enforcement. *As Venezuela's Minister of Foreign Affairs*, MADURO MOROS provided Venezuelan diplomatic passports to drug traffickers and facilitated diplomatic cover for planes used by money launderers to repatriate drug proceeds from Mexico to Venezuela. *As Venezuela's President and now-de facto ruler*, MADURO MOROS allows cocaine-fueled corruption to flourish . . .

*Id*. (emphasis added).

The Indictment's theory of criminality stems from the claim that Mr. Maduro *misused* his official authority for criminal purposes, and its allegations are based on the exercise of official power attached to Mr. Maduro's government positions. The government's theory explicitly depends on a showing that Mr. Maduro "leveraged government power to protect and promote illegal activity." ¶ 3. Each of the alleged overt acts involving Mr. Maduro relate to him undertaking official actions through the exercise of his official position.

- Paragraph 21(a) alleges that, "[b]etween approximately 2006 and 2008, while acting as Venezuela's Minister of Foreign Affairs," Mr. Maduro "sold Venezuelan diplomatic passports" and "facilitated the movement of private planes under diplomatic cover" to assist illegal activity. It further alleges that as Minister of Foreign Affairs, Mr. Maduro "called the Venezuelan embassy in Mexico to advise that a diplomatic mission would be arriving by private plane" and used his diplomatic cover to return the plane to Venezuela. ¶ 21(a).

- Paragraph 21(d) covers the period from 2004-2015, ¶ 21(d), when Mr. Maduro served as a Member of the National Assembly, Minister of Foreign Affairs, Vice President, and President. ¶ 5. During this same period, Ms. Flores de Maduro similarly was acting as a state official, namely, a Member of the National Assembly, President of the National Assembly, Attorney General, and First Lady. ¶ 8. Paragraph 21(d) alleges that Mr. Maduro and Ms. Flores de Maduro, "with the assistance of armed military escorts," trafficked narcotics "which had been previously seized by Venezuelan law enforcement." It further alleges that Mr. Maduro and Ms.

Flores de Maduro maintained "*colectivos*" and "ordered" attacks against others as part of their illegal activity. ¶ 21(d).[2]

- Paragraph 21(i) alleges that in September 2013, as the President of Venezuela and at a time he was recognized as such by the United States, Mr. Maduro "convened a meeting with" Cabello Rondón (then-President of Venezuela's National Assembly) and Carvajal Barrios (then-director of the General Directorate of Military Counterintelligence), and that shortly afterwards Mr. Maduro "and others authorized the arrests of certain Venezuelan military officials." ¶ 21(i).

- Paragraph 21(m) alleges that Mr. Maduro, as (at minimum, *de facto*) President, met with FARC leaders, including "at Miraflores, the presidential palace in Caracas, as well as at Fuerte Tiuna, the chief military complex in Caracas and headquarters of Venezuela's Ministry of Defense." ¶ 21(m).

- Paragraph 21(n) alleges that Mr. Maduro, as (at minimum, *de facto*) President, announced at a "videotaped press conference . . . that the FARC and its leaders were welcome in Venezuela." ¶ 21(n).

## LEGAL STANDARD

Foreign sovereign immunity, including foreign official immunity (which encompasses both head-of-state and conduct-based immunities), raises a threshold jurisdictional question "distinct from the merits of the charges at issue." *United States v. Turkiye Halk Bankasi A.S.*, 16

[2] According to the PSUV (the political party that has been in power in Venezuela since 2007) "colectivos" are "organized groups of people who work to preserve, enforce, and expand the rights enshrined in the Constitution" who dedicate themselves to a diversity of goals, including political, educational, and cultural, and can be "guided by the government." *See What are Colectivos? An Essential Clarification*, PSUV (Oct. 28, 2014), http://www.psuv.org.ve/opiniones/%C2%BFque-son-colectivos-una-aclaratoria-imprescindible/ (describing colectivos as "defenders of . . . the revolutionary government of President Maduro") (unofficial English translation attached as Exhibit 2 to the Pollack Decl.).

F.4th 336, 344 (2d Cir. 2021) ("*Halkbank I*"), *aff'd in part, vacated in part, remanded*, 598 U.S. 264 (2023) ("*Halkbank II*"). Two types of foreign official immunity are applicable here: head-of-state immunity and conduct-based immunity.

Head-of-state immunity is absolute—it divests a court of jurisdiction whether the defendant's alleged acts were official or private. This status-based immunity "*ratione personae*" attaches to foreign officials by virtue of their official role, regardless of whether the acts in question were performed in an official or private capacity.

A finding of foreign sovereign immunity—including foreign official immunity—deprives the court of jurisdiction to resolve the merits of any claims against a defendant. *See, e.g.*, *Eliahu v. Jewish Agency for Isr.*, 919 F.3d 709, 712 (2d Cir. 2019); *Rusesabagina v. Republic of Rwanda*, 652 F. Supp. 3d 1, 6 (D.D.C. 2023). A federal court has an independent obligation to assure itself of its own jurisdiction at all times, *Arnold v. Lucks*, 392 F.3d 512, 517 (2d Cir. 2004), and must examine its "own subject-matter jurisdiction in criminal cases as well as civil cases." *In re Sealed Case*, 131 F.3d 208, 210 (D.C. Cir. 1997). If jurisdiction is lacking at any stage of the proceeding, the court must dismiss: "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008); *United States v. Khobragade*, 15 F. Supp. 3d 383, 387 (S.D.N.Y. 2014) ("[C]riminal immunity precludes the exercise of jurisdiction by the courts over an individual whether the incident occurred *prior to* or during the period in which such immunity exists."). Thus, dismissal is required if head-of-state immunity applies at the time the charges were brought. *See, e.g.*, *Khobragade*, 15 F. Supp. 3d at 387 (collecting cases and holding that dismissal for lack of

jurisdiction was required because the defendant had full immunity at the time she was indicted, even assuming she had lost the immunity by the time dismissal was sought).

Conduct-based immunity "*ratione materiae*" protects officials, even after the official is no longer in office, for official acts, which are attributed to the state. *See, e.g.*, *United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *4 (S.D.N.Y. March 17, 2022) ("Customary international law has long distinguished between two types of immunities: status-based immunity, afforded to sitting heads of state, and conduct-based immunity, afforded to other foreign officials, past or present, acting on behalf of a foreign government.").

Sovereign immunity protects someone to whom it attaches from having to defend himself against allegations of wrongdoing and precludes a court from requiring him to participate in litigation raising such allegations. *See Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) ("Sovereign immunity is an immunity from trial *and the attendant burdens of litigation*.") (emphasis added); *Nat'l City Bank of N.Y. v. Rep. of China*, 348 U.S. 356, 358 (1955) (a foreign sovereign's immunity protects it "from being haled into court.").[3]

**SEQUENCE OF MOTIONS**

It is because sovereign immunity protects them from prosecution and the burdens of litigation that Mr. Maduro and Ms. Flores de Maduro requested a bifurcated motions schedule. Mr.

[3] Even if the Court were to consider sovereign immunity as raising a question of personal jurisdiction rather than subject matter jurisdiction, *see Halkbank II*, 598 U.S. at 282 (Gorsuch J., concurring), the result would be the same, because "jurisdiction over the person (as opposed to subject-matter jurisdiction) is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 779 (2000) (cleaned up).

Maduro has sovereign immunity. The case against him should be dismissed without requiring him to litigate other motions.

Nonetheless, since the initial motions deadline under the bifurcated motions schedule arguably applies to all motions challenging the four corners of the Indictment (*see* ECF 316), not just the sovereign immunity motion, Mr. Maduro files an additional motion, a motion to dismiss Count One of the Indictment because it fails to allege the necessary jurisdictional element and, because it fails to allege conduct aimed at the United States, violates the Due Process and Foreign Commerce Clauses.

Other motions are not based solely on the Indictment but rather in part based on the discovery produced by the government, a process that is not yet completed. Under the bifurcated motions schedule, such motions are to be filed at a later date. Discovery related to the outrageous circumstances of the violent abduction of Mr. Maduro and Ms. Flores de Maduro through a military invasion resulting in mass casualties is relevant to a motion to challenge the Court's lack of jurisdiction on that separate basis. *See United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974). Accordingly, Mr. Maduro is not raising that issue at this time but fully preserves his right to bring such a challenge should the case against him otherwise proceed.

## ARGUMENT

The application of common law sovereign immunity for foreign officials in criminal proceedings has never been abrogated or restricted by any statute. While some courts previously analyzed foreign officials' claims of immunity from criminal prosecution through application of the Foreign Sovereign Immunities Act (FSIA), the Supreme Court has now clarified that claims of sovereign immunity by individual government officials, and from criminal prosecution, are

governed by common law. *Samantar v. Yousuf*, 560 U.S. 305, 324 (2010); *Halkbank II*, 598 U.S. at 281.

Applying common law principles, Mr. Maduro is entitled to both: (1) absolute status-based immunity by virtue of his position as Venezuela's head of state; and (2) conduct-based immunity, because the Indictment alleges criminal conduct by Mr. Maduro in his official capacity as a Venezuelan official.[4]

## I. DISMISSAL IS REQUIRED BECAUSE MR. MADURO IS ENTITLED TO HEAD-OF-STATE IMMUNITY.

Under foundational common law and international law principles, heads of state are entitled to *absolute immunity* from civil and criminal suits in the courts of a foreign nation. This unprecedented prosecution is in flagrant contravention of that immunity.

The government cannot dispute that head-of-state immunity is a bedrock principle of international law. Instead, the Indictment appears to be premised on the idea that Mr. Maduro has no immunity because the Executive Branch has unilaterally deemed him and his government "illegitimate" (*e.g.*, ¶ 3), while conceding that Mr. Maduro came to power lawfully and "continued to exercise the powers of the Venezuelan presidency" (¶ 5), and even though the Executive Branch now recognizes the vice president Mr. Maduro appointed as acting *de jure* head of state. The government's argument defies both the common law and customary international law principles incorporated into the common law. Consequently, dismissal for want of jurisdiction is mandated.

[4] In addition to the arguments set forth below, Mr. Maduro adopts and incorporates by reference those arguments applicable to him raised by Ms. Flores de Maduro in support of her Motion to Dismiss the Fourth Superseding Indictment Based on Sovereign Immunity.

### A. Absolute Immunity for Heads of State Like Mr. Maduro Is a Long-Settled Principle of Common Law and International Customary Law.

1. The absolute immunity owed to foreign sovereigns is older than the Nation itself. The Founders believed sovereign immunity shielded sovereigns "from being amenable to process in any court without their consent." *Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230, 238 (2019). In The Federalist No. 81, Alexander Hamilton wrote: "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind." *Id*. Thus, during its early history, the "the United States adhered to the 'classical' or 'absolute' theory of foreign sovereign immunity. Accordingly, 'foreign states were generally granted complete immunity from suit' in United States courts." *Republic of Hungary v. Simon*, 604 U.S. 115, 119 (2025); *see also Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018) ("[F]oreign states enjoyed absolute immunity from *all* actions in the United States.") (emphasis added); *Ruggiero v. Compania Peruana de Vapores Inca Capac Yupanqui*, 639 F.2d 872, 879 (2d Cir. 1981) (Friendly, J.) ("[U]nder the common law in 1791," "a suit against a foreign government . . . could not be maintained at all.").

Sovereign immunity extended to criminal as well as civil cases. *See The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812); *Dow v. Johnson*, 100 U.S. 158, 165 (1879); *Coleman v. Tennessee*, 97 U.S. 509, 515, 516 n.1 (1878). Thus, in *Schooner Exchange*—the seminal early United States decision on foreign sovereign immunity—Chief Justice Marshall held that even though "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute," every sovereign waives the exercise of its jurisdiction for certain classes of cases involving foreign sovereigns. 11 U.S. at 136-37. The first of these classes was "the exemption of the *person of the sovereign from arrest or detention* within a foreign territory." *Id.* at 137 (emphasis added). This exception to jurisdiction was necessary, Chief Justice Marshall

wrote, to avoid subjecting a foreign sovereign to a "jurisdiction incompatible with his dignity, and the dignity of his nation." *Id.* Following *Schooner Exchange*, United States courts uniformly recognized a sovereign's absolute immunity from this nation's territorial jurisdiction. *Samantar*, 560 U.S. at 311 (the rule from *Schooner Exchange* was "virtually absolute immunity to foreign sovereigns").

2. In fact, sovereign immunity is older than the common law itself. *See* John O'Brien, *International Law* 294 (2001) ("The doctrine of sovereign immunity constitutes one of the older doctrines of public international law."). This is because the doctrine of foreign sovereign immunity is embodied in the general "law of nations," *i.e.*, "international customary law." *See, e.g.*, Coleman Phillipson, *Wheaton's Elements of International Law* 261 (5th ed. 1916) (recognizing that sovereigns "enjoy equality before international law"). Blackstone described the notion that "[t]he king can do no wrong"—from which sovereign immunity is derived—as an "ancient and fundamental maxim." 1 William Blackstone, Commentaries *238-39 (1765); *see also id.* at *235 ("[N]o suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him."). The Founders agreed—they believed that sovereign immunity derived from both "the common law" *and* the "law-of-nations" *Franchise Tax Bd.*, 587 U.S. at 238; *see also* The Federalist No. 81 (Alexander Hamilton) (describing sovereign immunity as "the general sense, and the general practice of mankind.").

As Blackstone explained, the "law of nations" is embodied into modern common law except where it conflicts with an act of legislation. 4 William Blackstone, Commentaries *67 (1769) ("The law of nations . . . is here adopted in its full extent by the common law, and is held to be a part of the law of the land."); *see also Trendtex Trading Corp. v. Central Bank of Nigeria*, [1977] Q.B. 529, 553-54 (Eng. C.A.) ("[T]he rules of international law are incorporated into

English law automatically and considered to be part of English law."). The Supreme Court has also long sought to ensure that the federal common law of foreign sovereign immunity in the United States reflects and incorporates the immunity granted by the law of nations and is consistent with "the usages and received obligations of the civilized world." *See, e.g.*, *Schooner Exch.*, 11 U.S. at 137.[5]

3. As a personification of the sovereign, a head of state is "treated as the state itself and entitled to the same immunities." *R. v. Bow St. Metro. Stipendiary Magistrate, Ex p. Pinochet Ugarte (No. 3)* [2000], 1 A.C. 147, 155 (H.L.). "Both doctrinally and in practice, because the sovereign and the head-of-state were deemed to be the same, the fusion translated into a principle of immunity that, under customary international law, developed and was recognized as similarly unitary and coextensive." *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 269 (S.D.N.Y. 2001); *see also, e.g.*, Restatement (Second) of Foreign Relations Law § 66 (Am. L. Inst. 1965) ("The immunity of a foreign state under the rule stated in § 65 extends to . . . its head of state."). In fact, the broader doctrine of sovereign immunity traces its roots to head-of-state immunity, not the other way around. 1 Blackstone, Commentaries *238.

Thus, in the United States and elsewhere, absolute sovereign immunity applies to foreign heads of state in both civil cases, *see, e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677, 688 (2004), and criminal cases, *see, e.g.*, *Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.)*, Judgment, 2002 I.C.J. 3, ¶ 51 (Feb. 14) ("[I]n international law it is firmly established that . . .

[5] *See also*, *e.g.*, *In re Est. of Ferdinand E. Marcos Hum. Rts. Litig.*, 978 F.2d 493, 502 (9th Cir. 1992) ("It is also well settled that the law of nations is part of federal common law.") (citing *The Paquete Habana*, 175 U.S. 677, 700 (1900) and *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160-61 (1820)); Restatement (Third) of Foreign Relations Law § 111 cmt. d (Am. L. Inst. 1987) ("[C]ustomary international law, while not mentioned explicitly in the Supremacy Clause, [is] also federal law . . . .").

certain holders of high-ranking office in a State, such as the Head of State . . . enjoy immunities from jurisdiction in other States, both civil and criminal."); *see also Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France)*, Judgment, 2008 I.C.J. 177, ¶ 170 (June 4).

### B. Mr. Maduro Is Venezuela's Head of State, and the Executive Branch's Counterfactual Non-Recognition Is Irrelevant.

The government cannot dispute Mr. Maduro's status, in every real-world sense, as Venezuela's head of state. Indeed, the Indictment acknowledges that Mr. Maduro was legitimately elected to the presidency in 2013 and "exercise[d] the powers of the Venezuelan presidency" even after 2019, when he remained *de facto* ruler of Venezuela. ¶ 5. Nonetheless, the Indictment characterizes Mr. Maduro as having "previously" been "the President of Venezuela," *id.*, apparently because the United States has questioned Mr. Maduro's re-election victories and has, on that basis, refused to recognize Mr. Maduro as *de jure* head of state. Labels aside, however, the Executive Branch's non-recognition of Mr. Maduro's status is irrelevant to the immunity question, because pursuant to both early common law and present-day customary international law (which as set forth above is incorporated into federal common law), the sovereign status of states and their officials was determined *independently* by the judiciary based on *de facto* realities rather than *de jure* recognition by the forum's Executive Branch.

1. Early American common law decisions reflect that formal recognition by the Executive Branch was not a prerequisite to immunity where the putative foreign sovereign's *de facto* governmental power was not subject to reasonable dispute (or as here, conceded). In *Wulfsohn v. Russian Socialist Federated Soviet Republic*, for example, the New York Court of Appeals held that The Russian Federated Soviet Republic was immune from suit as a foreign sovereign despite that "it ha[d] not been recognized by the government of the United States." 234 N.Y. 372, 374 (N.Y. 1923). The plaintiff—like the Indictment here—conceded that the Soviet

Republic was "the existing de facto government of Russia" but argued that its suit could nonetheless be maintained "because of nonrecognition by the United States." *Id.* at 374-75. The court squarely rejected the argument:

> The result we reach depends upon more basic considerations than recognition or nonrecognition by the United States. Whether or not a government exists, clothed with the power to enforce its authority within its own territory, obeyed by the people over whom it rules, capable of performing the duties and fulfilling the obligations of an independent power, able to enforce its claims by military force is a fact, not a theory.

*Id.* at 375. The court went on to explain that a foreign sovereign could not be subject to the court's jurisdiction except on consent, and that "recognized or not, the evil of [] an attempt" to hail a foreign sovereign into court "would be the same." *Id.* at 376; *see also Nankivel v. Omsk All-Russian Gov't.*, 237 N.Y. 150, 157 (N.Y. 1923) ("[L]ack of recognition obviously was pleaded on the theory that immunity comes only with recognition, and the analogy is fallacious.").

Subsequent immunity decisions have likewise observed that "[f]oreign governments have been held immune from suits *even though they had never been recognized by the Government of the United States.*" *In re Investigation of World Arrangements*, 13 F.R.D. 280, 290 (D.D.C. 1952) (recognizing immunity of sovereign instrumentality in criminal investigation) (emphasis added). Similarly, in an early international arbitration, Chief Justice (and former President) Taft recognized that the evidentiary value of the Executive Branch's decision not to recognize a foreign government is of little probative value to the courts on the question of sovereignty when—as is the case here—the non-recognition decision is based on a normative belief that the foreign government is "illegitimate," rather than based on an analysis of the foreign government's "*de facto* sovereignty and complete governmental control." *Aguilar-Amory & Royal Bank of Can. Claims (Gr. Brit. v. Costa Rica)*, 1 R.I.A.A. 369, 381 (1923) (Costa Rican government unrecognized by the United

States and other countries nonetheless "was an actual sovereign government."). Early international law scholars were in accord. *See id.* at 378 (collecting scholarly authorities).

Likewise, under early English common law, recognition of status entitling a defendant to sovereign immunity by the forum's Executive Branch was regarded as, at most, of evidentiary value, rather than as conclusively dictating whether a sovereign or its head of state was entitled to immunity. For example, in *The Charkieh*, [1873] L.R. 4 A. & E. 59 (Eng. High Ct. Adm.), the English High Court of Admiralty, Sir Robert Phillimore, considered whether it had jurisdiction to entertain a suit against a vessel—The Charkieh—belonging to the Khedive of Egypt. The court heard evidence that The Charkieh was not entitled to immunity because the Khedive of Egypt was "without many of the powers and rights usually possessed by sovereigns." *Id.* at 70. Ultimately, the court engaged in its own extensive investigation of the extent of the Khedive's *de facto* control over Egypt. Pointing to the public law of the Ottoman Empire "whose authority upon this point appears to be paramount," the court concluded that Egypt was merely a province of the Ottoman Empire and that the Khedive had no power to control an independent army or navy, to impose taxes in the name of Egypt itself, or to maintain independent diplomatic relations. *Id.* at 83-84. Although the court noted that the Foreign Office did not regard the Khedive as sovereign, it did so only as an afterthought. *Id.* at 86; *cf. also In re Suarez*, [1918] 1 Ch. 176, 195 (Eng. C.A.) (Warrington, L.J.) (referring to letter from Foreign Office regarding status of foreign diplomat as "evidence" on question of immunity).

While in later years, English courts gradually began to hold that formal recognition by the Executive Branch could mandate a finding of immunity (*see generally*, A.B. Lyons, *The Conclusiveness of the Foreign Office Certificate*, 23 Brit. Y.B. Int'l L. 240 (1946)), English courts continued to hold that a recognized *de facto* Government "must for all purposes, while continuing

to occupy its *de facto* position, be treated as a duly recognized foreign sovereign state." *Bank of Ethiopia v. National Bank of Egypt and Liguori*, 31 Am. J. Int'l L. 742, 746 (1937).

Similarly, under customary international law (part of the common law), sovereign immunity is owed to an effective head of state regardless of whether the forum state recognizes the defendant's status. For example, the French Cour de Cassation (France's highest court) recently considered a motion to quash an arrest warrant issued against former Syrian President Bashar al-Assad for complicity in 2013 chemical weapons attacks. *See* Cour de cassation [Cass.] [supreme court for judicial matters] ass. plén., July 25, 2025, No. C 24-84.393 (Fr.) (official English translation available at https://www.courdecassation.fr/getattacheddoc/68836da7c6072b5ce8fd57b5/e3460c517b35deb55fd71a3dc9e0011f). The court squarely rejected the argument that Assad had lost head-of-state immunity because France ceased to recognize him as legitimate head of state before the warrant was issued:

> The purpose of personal immunity, thus defined, requires that it not be linked to the recognition of the status of Head of State by the *forum* State or to the existence of diplomatic relations between the two States. The recognition of a government is a unilateral, political act by which a State grants that government rights in their bilateral relations. *Customary international law does not prescribe an obligation of recognition and does not regulate either the conditions or the effects on immunities of such a discretionary act*. If personal immunity were to be made conditional on recognition, the result would be to confer on each State, whether democratic or not, the discretionary power to authorise criminal proceedings in its courts against a foreign Head of State. This would undermine the very substance of personal immunity.

*Id.* at ¶¶ 16-18 (emphasis added). As discussed *infra* at Point III, permitting nations such "discretionary power" over immunity questions would be flatly contrary to common law.

Recent decisions of other national courts are in accord. For instance, Italy's highest court recently held that with respect to immunity "[r]ecognition of a state by another state is, in fact, an act devoid of legal consequences (*just like non-recognition*)." *See, e.g.*, Cass. pen. [Court of

Cassation], sez. III, Sept. 17, 2004, n. 49666, 129 Foro it. 253, 259 (2006) (It.) (emphasis added) (original Italian decision and unofficial English translation attached as Exhibit 3 to Pollack Decl.). Rather, "[a]ccording to the rules of general international law . . . a governmental organization that effectively and independently exercises its power over a territorial community automatically becomes a subject of international law. . . ." *Id.*; *cf. also* Cass. pen. [Court of Cassation], sez. I, June 28, 1985, n. 1981, 109 Foro it. 277 (1986) (It.) (original Italian decision and unofficial English translation attached as Exhibit 4 to Pollack Decl.) (assessing Yasser Arafat's claim of immunity based on *de facto* considerations).

2. In *Wulfsohn*, it was both "admitted by the [government]" and "a matter of common knowledge," 234 N.Y. at 374, that the defendant was *de facto* the sovereign despite United States non-recognition. The same is true here. The Indictment admits Mr. Maduro "exercise[d] the powers of the Venezuelan presidency." ¶ 5; *see also* ¶ 2 (describing Mr. Maduro as Venezuela's "now-*de facto* ruler"). This concession in the Indictment that Mr. Maduro remained, at a minimum, the *de facto* head of state is likewise a matter of common knowledge. The Executive Branch itself has, since 2019, acknowledged Mr. Maduro as *de facto* head of state in a variety of ways.

For example, a January 2019 Executive Order (13857) issued by President Trump defined "Government of Venezuela" to include "the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof . . . and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, *including as a member of the Maduro regime*." Exec. Order No. 13857, 84 Fed. Reg. 509 (Jan. 30, 2019) (emphasis added). A 2021 report by the State Department conceded that Mr. Maduro remained in power despite supposedly lacking democratic legitimacy. U.S. Dep't of State, Bureau of Democracy, Human

Rights and Labor, Venezuela 2020 Human Rights Report (2021), https://www.state.gov/wp-content/uploads/2021/10/VENEZUELA-2020-HUMAN-RIGHTS-REPORT.pdf.

In October 2022, the United States granted clemency to two nephews of Mr. Maduro's wife, Ms. Flores de Maduro, in exchange for the release of seven Americans held in Venezuela, a direct executive-to-executive transaction that required engaging with Mr. Maduro's government as the operative counterparty controlling Venezuelan territory and detainees. Julie Turkewitz, *As Venezuelan Antagonists Talk, the U.S. Softens Its Stance*, N.Y. Times (Nov. 25, 2022), https://www.nytimes.com/2022/11/25/world/americas/venezuela-maduro-talks.html. Indeed, as recently as January 2025, President Trump's former special envoy, Richard Grenell, traveled to Caracas and personally met with Mr. Maduro, resulting in the negotiated release of six Americans who had been detained in Venezuela. Alejandra Jaramillo & Chris Lau, *Six Americans Freed in Venezuela After Trump Envoy Meets with Maduro*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/02/01/americas/americans-freed-in-venezuela-intl-hnk/index.html.

Further, as noted above, numerous other countries have also engaged in diplomatic relations with Mr. Maduro's government since 2019, and many countries and international bodies have formally recognized Mr. Maduro as *de jure*, as well as *de facto*, head of state. The United States has resumed diplomatic relations with Venezuela, even though there has been no election of a new president since Mr. Maduro was kidnapped.

Additionally, since Mr. Maduro was abducted, the United States has recognized Ms. Rodríguez as acting President, first informally and then formally, even though her position flows directly from Mr. Maduro's re-election to the presidency in 2018 and his subsequent re-election in 2024, each of which the Executive Branch claims was "illegitimate."

In sum, the Indictment admits what is common knowledge. Even though the United States ceased recognizing him as *de jure* president years ago, Mr. Maduro continued to be recognized internationally as, at a minimum, the *de facto* head of state. Indeed, even the Executive Branch itself, by its actions, repeatedly acknowledged, either explicitly or implicitly, that Mr. Maduro remained the *de facto* head of state.

3. For this reason, a ruling that Mr. Maduro is entitled to immunity as Venezuela's *de facto* head of state would not constitute a judicial intrusion on any Executive Branch function. *Cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 22 (2015). While it may be the Executive Branch's prerogative to determine who the United States will recognize *politically* as head of state, it is *conceded* in the Indictment that Mr. Maduro is Venezuela's *de facto* head of state. Determining the consequences that flow from that concession is squarely the domain of the judiciary. *See, e.g.*, *Guaranty Trust Co. v. United States*, 304 U.S. 126, 138 (1938) (courts "are free to draw for themselves" the "legal consequences" of Executive Branch recognition decisions).

This Motion does not ask this Court to second-guess any Executive Branch decision regarding who is, or was, the *de jure* or "legitimate" President of Venezuela. Rather, the Court is called upon only to determine the legal consequences that flow from Mr. Maduro's *undisputed* status, acknowledged in the Indictment itself, as Venezuela's *de facto* leader. A determination that Mr. Maduro is entitled to immunity therefore poses no risk of "embarrass[ing] the executive arm in its conduct of foreign affairs." *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945).

4. As noted above, this prosecution is unprecedented. Possibly the closest historical analogy for such a prosecution might be the prosecution of Manuel Antonio Noriega Moreno. But that prosecution was distinct from the prosecution of Mr. Maduro and scrutiny of that prosecution only reinforces why the outcome must be different here. Noriega was a military officer who took

power in a coup. He never occupied either of the two executive positions under Panama's constitution. *United States v. Noriega*, 746 F. Supp. 1506, 1519 (S.D. Fla. 1990). Noriega ruled *through* the elected Panamanian heads of state, not *as* a head of state. Noriega therefore had to concede that "he [did] not fit within traditional notions of a head of state as defined by customary international law." *Id.* at 1520. The Eleventh Circuit confirmed that the Executive Branch's determination that Noriega was not a head of state and therefore not entitled to immunity was supported by extant legal norms, not just the Executive Branch's say-so, explaining that if the court were to "make an independent determination regarding the propriety of immunity in this case," the immunity claim would fail. *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997).

On appeal, the question was not whether the Executive Branch could deprive a sovereign head of state of immunity by declaring him "illegitimate" and refusing to recognize his government politically. *See id.* As the Eleventh Circuit explained, it was *undisputed* that "Noriega never served as the constitutional leader of Panama," and that Panama itself had not sought immunity or taken the position that Noriega was head of state. *Id.* at 1212.

By contrast, the United States recognizes that Mr. Maduro was *de jure* leader of Venezuela from at least 2013 through 2019. ¶ 5. It also recognizes Mr. Maduro remained the *de facto* head of state even after the United States ceased recognizing him as such and that the Venezuelan government did not recognize anyone else as the head of state. Venezuela's acting leader publicly took the position that Mr. Maduro remained President after he was kidnapped and the Indictment was unsealed. *See, e.g.*, Babak Dehghanpisheh, *Nicolás Maduro Is Still the 'Legitimate President' of Venezuela, Acting Leader Delcy Rodríguez Says*, NBC News (Feb. 12, 2026), https://www.nbcnews.com/world/venezuela/maduro-legitimate-president-venezuela-delcy-rodriguez-interview-trump-rcna258687. Unlike in *Noriega*, the Executive Branch does not dispute

that Mr. Maduro was Venezuela's head of state, but instead merely claims that, after 2019, he did not occupy that position *legitimately*.

* * *

Under common law and international customary law, the Indictment's premise that Mr. Maduro, who it concedes was Venezuela's lawfully elected president, did not remain head of state "legitimately" is irrelevant to the immunity question. A contrary rule would be wholly incompatible with the doctrine of sovereign immunity. It would permit any nation to withdraw political recognition on the basis of a claimed lack of "legitimacy" (or for any other reason) and then freely arrest and prosecute a foreign head of state, in flagrant violation of well-established international law. Indeed, this result would render head-of-state immunity in criminal cases a nullity. If the fact that the Executive Branch did not recognize the person as *de jure* head of state were dispositive, sovereign immunity would be nothing more than prosecutorial discretion. Courts would have no need to analyze the applicability of status-based immunity in criminal cases. They would simply declare such immunity unavailable because the Executive Branch has decided to prosecute. It is not surprising that no court has ever taken this approach, because it would functionally give the Executive Branch complete discretion over who is entitled to sovereign immunity as head of state (and who is entitled to every other status-based immunity), contrary to the common law and customary international law imported into it, both as it existed when this Nation was founded and has it has continually existed since, as discussed *infra* at Point III. This Court should not be the first.

Nor can the government plausibly argue that immunity should not apply because while he was *de facto* head of state when the charges were brought, Mr. Maduro ceased to be head of state once he was kidnapped and detained by the United States. If any nation could deprive a foreign

leader of immunity by violently invading sovereign territory and forcible removing the head of state, then the immunity would be illusory. In any case, that is not the law: as discussed above, because Mr. Maduro unquestionably was *de facto* head of state at the time the Indictment was filed, dismissal is mandated even if he subsequently ceased to be immune. *See, e.g.*, *Khobragade*, 15 F. Supp. 3d at 387.

There is no basis effectively to abrogate hundreds of years of legal precedent. The Indictment concedes, as it must, that Mr. Maduro was the *de facto* head of state. That concession necessarily deprives this Court of jurisdiction and warrants immediate dismissal of the Indictment against Mr. Maduro, with prejudice.

## II. DISMISSAL IS INDEPENDENTLY REQUIRED BECAUSE MR. MADURO IS ENTITLED TO CONDUCT-BASED IMMUNITY.

Even if Mr. Maduro were not entitled to absolute status-based immunity as Venezuela's head of state, he would be entitled to conduct-based immunity. The Indictment makes clear that his alleged criminal acts were performed in his official capacity and allegedly undertaken through Mr. Maduro's exercise of official powers and state instrumentalities. Because such actions are attributable to the Venezuelan state itself, permitting the prosecution to proceed violates the axiomatic principle that courts may not adjudicate the actions of a foreign nation performed in its sovereign capacity. Mr. Maduro is entitled to conduct-based immunity. The Indictment must be dismissed with prejudice on that basis as well.

### A. Common Law Conduct-Based Immunity Shields Foreign Officials Acting in Their Sovereign Capacity.

Common law foreign sovereign immunity extends to current and former foreign officials insofar as the conduct that forms the basis of the allegations against them is undertaken on the sovereign's behalf, and therefore attributable to the state. This "conduct-based immunity" is, like head-of-state immunity, older than this country: Early in the Nation's history, opinions of the

Attorney General recognized the principle "that a person acting under a commission from the sovereign of a foreign nation is not amenable for what he does in pursuance of his commission, to any judiciary tribunal in the United States." 1 Op. Att'y Gen. 81 (1797) (discussing suit brought against privateer acting under a commission from the British government); *see also* 1 Op. Att'y Gen. 45, 46 (1794) (discussing suit brought against former Governor of Guadeloupe; "[I]f the seizure of the vessel is admitted to have been an official act, done by the defendant by virtue, or under color, of the powers vested in him as governor, that it will of itself be a sufficient answer to the plaintiff's action . . . the defendant ought not to answer in our courts for any mere *irregularity* in the exercise of his powers").

Thus, it is axiomatic that both current and former officials enjoy "immunity from suits brought in foreign tribunals for acts done within their own States, in the exercise of sovereignty thereof." *Hatch v. Baez*, 7 Hun. 596, 600 (N.Y. Sup. Ct. 1876) (the fact that the defendant, the former president of the Dominican Republic, had "ceased to be president . . . [did] not destroy his immunity" because such immunity "springs from the capacity in which the acts were done, and protects the individual who did them"); *see also Underhill v. Hernandez*, 65 F. 577 (2d Cir. 1895), *aff'd*, 168 U.S. 250 (1897) (Venezuelan military general accused of false imprisonment, assault, and battery entitled to "[t]he immunity of public agents from suits brought in foreign tribunals for acts done within their own states in the exercise of the sovereignty thereof"); *accord Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) ("Common law recognizes the immunity of former foreign officials . . . for acts performed in [their] official capacity." (quotations omitted)).

Conduct-based immunity applies to criminal as well as civil cases. *See People v. McLeod*, 25 Wend. 483, 598 & a1 (N.Y. Sup. Ct. 1841) (letter from Secretary of State Daniel Webster noting that criminal defendant was entitled to conduct-based immunity because his alleged crime was "a

public transaction, authorized and undertaken by the British authorities," such that "by the principles of public law, and the general usage of civilized states" he could not "be holden personally responsible in the ordinary tribunals of law.").

The rationale for conduct-based immunity is practical: "the acts of the official representatives of the state are those of the state itself," such that a suit targeting official acts is equivalent to a suit against the sovereign directly. *Underhill*, 65 F. at 579; *see also Hatch*, 7 Hun. at 599 ("To make [former head of state] amenable to a foreign jurisdiction for [official] acts, would be a direct assault upon the sovereignty and independence of his country."). The same considerations of international comity and sovereign equality of the states that underlie status-based immunity thus apply to conduct-based claims. *See Underhill*, 65 F. at 579 ("Considerations of comity" require that the conduct of states "should not be called in[to] question by the legal tribunals of another jurisdiction."); *see also Hatch*, 7 Hun. at 599 ("[B]y the universal comity of nations and the established rules of international law, the courts of one country are bound to abstain from sitting in judgment on the acts of another government done within its own territory.").

**B. The Indictment Bases the Charges on Official Acts for Which Mr. Maduro Is Entitled to Conduct-Based Immunity.**

**1. The Indictment Alleges Official Acts.**

The Indictment's theory of liability against Mr. Maduro is based on his exercise of sovereign authority through state instrumentalities—*i.e.*, official acts that are attributable to the Venezuelan state. Consequently, he is entitled to conduct-based immunity under the common law principles discussed above.

Indeed, an examination of the overt acts allegedly taken by Mr. Maduro demonstrates that the conduct charged is inextricably bound to, and follows from, his exercise of sovereign authority. *See id*. ¶ 21(a), (d), (i), (m), and (n); *see also* Background B.2.

*First*, ¶ 21(a) relates to issuing diplomatic passports, coordinating diplomatic missions, directing an embassy, and routing aircrafts under diplomatic cover. Each are functions that Mr. Maduro could perform only by virtue of his official position as Minister of Foreign Affairs. These "acts concerning diplomatic activity" are categorically political acts attributable to the sovereign and thus entitled to immunity. *United States v. Bankasi*, 120 F.4th 41, 56 (2d Cir. 2024) ("*Halkbank III*") (quoting *Victory Transport, Inc. v. Comisaria General*, 336 F.2d 354, 358 (2d Cir. 1964)); *see also Heaney v. Gov't of Spain*, 445 F.2d 501, 503 n.3 (2d Cir. 1971) (the term "diplomatic" in *Victory Transport* is "obviously intended in the broad sense" and "not meant to be limited to the activities of diplomatic missions").

*Second*, ¶ 21(d) alleges unlawful conduct that necessarily involves the exercise of state authority, namely, the "assistance of armed military escorts." *See Halkbank III*, 120 F.4th at 56 ("acts concerning the armed forces" are "strictly political or public acts"). Paragraph 21(d) further alleges that Mr. Maduro maintained "*colectivos*" as part of the illegal activity. As explained above, these organizations help to effectuate the goals of *the Venezuelan government*.

*Third*, ¶ 21(i) alleges that Mr. Maduro, as the President of Venezuela, "convened a meeting with" high-ranking government officials (*i.e.*, the President of the National Assembly and director of the General Directorate of Military Counterintelligence), and that shortly afterwards Mr. Maduro "authorized the arrests" of certain "military officials." These alleged acts are quintessentially presidential. *See, e.g.*, Constitución de la República Bolivariana de Venezuela 1999 (as amended 2009), art. 236 (Venez.), §§ 2 (granting President broad duty to "direct the activity of the Government"), 5, 6 (President serves as Commander in Chief of National Armed Forces, can direct and "exercise supreme command" over its activities, including with regard to

personnel decisions), 16 (granting President authority to "remove [] officials") (English translation available at https://www.constituteproject.org/constitution/Venezuela_2009).

*Fourth*, ¶ 21(m) alleges that Mr. Maduro met with FARC leaders at the presidential palace and the chief military complex. Such meetings, held on state property, under color of authority as the President of Venezuela are inherently official acts. As head of state, Mr. Maduro was empowered to meet with foreign political actors, to direct foreign policy, and to address matters of national security. *See, e.g.*, Venez. Const. art. 236, § 4 (granting President duty to "direct the international relations of the Republic"). These actions form the core of sovereign authority, to which immunity is attached.

Indeed, throughout the period charged in the Indictment, meeting with FARC leaders was a recognized act of state diplomacy. Colombia's own president met personally with the FARC's supreme commander during this period. Camilo González Posso, *Negotiations with the FARC: 1982-2002*, Conciliation Resources, Accord Issue 14 (Feb. 2004), https://www.c-r.org/accord/colombia/negotiations-farc-1982-2002. And in 2007, at the Colombian government's invitation, former Venezuelan President Chávez negotiated with the FARC for the release of hostages—receiving FARC representatives at Miraflores, the same presidential palace referenced in ¶ 21(m) of the Indictment. *France Backs Chavez-Farc Talks*, Al Jazeera (Nov. 23, 2007), https://www.aljazeera.com/news/2007/11/23/france-backs-chavez-farc-talks. From 2012 through 2016, Cuba and Norway hosted the FARC's leadership for peace negotiations with Colombia—negotiations Venezuela was formally designated to "accompany," *see* June S. Beittel, Cong. Rsch. Serv., R42982, Colombia's Peace Process Through 2016, at 19 (updated Dec. 31, 2016).

Indeed, in March 2016, the United States Secretary of State personally met with FARC leaders in Havana. U.S. Dep't of State, Secretary Kerry's Meetings with Colombian Government

and FARC Negotiators (Mar. 21, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/03/254896.htm. Those negotiations produced the "peace accords" the Indictment references, ¶ 21(n), under which the FARC disarmed and became a legal political party holding guaranteed seats in Colombia's Congress, *FARC Members Take Seats in Colombian Congress*, Just. for Colom. (July 23, 2018), https://justiceforcolombia.org/farc-members-take-seats-in-colombian-congress/, and which ultimately led the United States to remove the FARC from its list of designated foreign terrorist organizations, as the Indictment concedes. ¶ 11; Antony J. Blinken, U.S. Sec'y of State, Revocation of the Terrorist Designations of the Revolutionary Armed Forces of Colombia (FARC) and Additional Terrorist Designations (Nov. 30, 2021), https://2021-2025.state.gov/revocation-of-the-terrorist-designations-of-the-revolutionary-armed-forces-of-colombia-farc-and-additional-terrorist-designations/. When other foreign heads of state and the United States Secretary of State received FARC leaders, they were exercising diplomacy in their official capacities; similarly, the allegation that Mr. Maduro did so constitutes an exercise of sovereign authority.

*Fifth*, ¶ 21(n) relates to statements made by Mr. Maduro regarding the FARC, as (at minimum *de facto*) President, during a "videotaped press conference." A presidential press conference providing the public with information regarding the nation's diplomatic relationships is unambiguously an exercise of official authority—it is a public declaration of national policy made by the head of state on behalf of the state itself. *See Trump v. United States*, 603 U.S. 593, 629 (2024) ("[M]ost of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities.").

Each of these alleged acts, on their face, constitutes an act taken in Venezuela, by someone acting under color of Venezuelan law, in his capacity as a government official. It is axiomatic that

agents of foreign governments cannot be held responsible in any court of the United States for acts done within their own states in the exercise of the sovereignty thereof. *Underhill*, 65 F. at 579.

**2. The Indictment's Allegations of Unlawful Conduct and Criminal Intent Do Not Defeat Sovereign Immunity.**

The Indictment alleges, even though Mr. Maduro's acts were undertaken on behalf of the state, using state privileges and apparatus, he and his alleged co-conspirators' conduct was "corrupt" and self-interested. *See supra* at Background B.2. The Indictment alleges that Mr. Maduro undertook these actions with criminal intent and to further a criminal purpose. ¶¶ 24, 27-30, 32, 35. Under the common law, however, it is irrelevant that the Indictment alleges that Mr. Maduro undertook the acts alleged with criminal intent or to further a criminal objective. No court has ever held that sovereign immunity is unavailable in criminal cases. Indeed, conduct-based immunity would be meaningless if it only protected officials who were not accused of any wrongdoing.

a. Any civil or criminal action against a foreign official necessarily challenges the lawfulness of that official's acts. To find that an allegation of unlawfulness renders the official's conduct inherently private and unofficial would thus eviscerate the immunity. Under English common law, the official act inquiry turns on attribution, not lawfulness. The 1848 decision by the U.K. House of Lords in *Duke of Brunswick v. King of Hanover* is instructive. [1848] 2 H.L. Cas. 1. There, the House of Lords held that the defendant, who was both a private citizen of Britain and a foreign official, was exempt from jurisdiction for "an act done in his sovereign character in his own country; whether it be an act right or wrong, whether according to the constitution of that country or not." *Id*. at 17. Taking the allegations in the bill of complaint on their face, the House of Lords concluded that the alleged improper conduct "could not have been done . . . in any private

character" but instead arose from "acts of persons claiming to have the right so to act by virtue of their sovereign authority." *Id*. at 18-20.

The principle that the conduct of an individual official is attributable to the state even when it was unlawful or unauthorized is also embodied in international customary law. In 2001, the International Law Commission adopted the Draft Articles on the Responsibility of States for Internationally Wrongful Acts ("Articles of Responsibility"), which offers guidance on the attribution of official acts to foreign sovereigns. *See* Int'l Law Comm'n, Draft Articles on the Responsibility of States for Internationally Wrongful Acts, with Commentaries, U.N. Doc. A/56/10, (2001), https://untreaty.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf. Article 4 of the Articles of Responsibility provides that the "conduct of any State organ"—which includes "any person or entity which has status in accordance with the internal law of the State"—"shall be considered an act of that State." *Id.* at 40. Commentary 13 to this Article illustrates the point:

> It is irrelevant for this purpose that the person concerned may have had ulterior or improper motives or may be abusing public power. Where such a person acts in an apparently official capacity, or under colour of authority, the actions in question will be attributable to the State.

*Id.* at 42. Likewise, Article 7 instructs that an individual official's conduct is attributable to the state "even if [the official] exceeds [his] authority or contravenes instructions." *Id.* at 45.

b. American courts have, therefore, rejected the notion that allegations of unlawful acts can deprive a defendant of immunity. *See Waltier v. Thomson*, 189 F. Supp. 319, 321 n.6 (S.D.N.Y. 1960) (rejecting suggestion that alleged conduct was not within the foreign official's duties "since wrongdoing is never authorized") (citing *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand, C.J.) ("[I]t can be argued that official powers, since they exist only for the

public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine.")); *cf. Trump*, 603 U.S at 619 ("Nor may courts deem an action unofficial merely because it allegedly violates a generally applicable law. Otherwise, Presidents would be subject to trial on 'every allegation that an action was unlawful,' depriving immunity of its intended effect.").

The application of conduct-based immunity to official acts without regard to their propriety is consistent with the purpose of foreign sovereign immunity. It would be incongruous for a doctrine designed to "offer[] broad protection from a district court's jurisdiction" to depend on judicial determinations of the propriety of the alleged conduct. *Wultz v. Bank of China Ltd.*, 32 F. Supp. 3d 486, 496 (S.D.N.Y. 2014); *see also Heaney*, 445 F.2d at 504 ("[T]o condition a foreign sovereign's immunity on the outcome of a preliminary judicial evaluation of the propriety of the political conduct . . . would frustrate the very purpose of the doctrine itself."). To permit an exception to the immunity for criminal conduct would thus "eviscerate any protection that foreign official immunity affords" because it would require "the merits [to] be reached." *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 234 (D.D.C. 2018).

Courts have long held that *motive* is generally irrelevant to the application of absolute immunities that attach to performance of official acts. In *Bradley v. Fisher*, for example, the Supreme Court made clear that judicial immunity "cannot be affected by any consideration of the motives with which the acts are done." 80 U.S. 335, 354 (1871). The Court reasoned that, because an "allegation of malicious or corrupt motives could always be made," any inquiry into such motive would subject the defendant "to the same vexatious litigation" that the immunity is designed to prevent. *Id.*; *see also Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987) ("[S]ince

absolute immunity spares the official any scrutiny of his motives, an allegation that an [official] act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity.”). Similarly, the “claim of an unworthy purpose does not destroy [legislative] privilege,” otherwise “the privilege would be of little value.” *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).

The Supreme Court recently upheld this principle in the context of Presidential immunity for official acts. *Trump*, 603 U.S. at 618. The Court held that “courts may not inquire into the President’s motives” when distinguishing between official and unofficial conduct, as this inquiry “risk[s] exposing . . . official conduct to judicial examination on the mere allegation of improper purpose.” *Id*. The same reasoning applies with equal force here. Accordingly, this Court must determine whether Mr. Maduro is entitled to conduct-based immunity “without judging whether the underlying conduct actually occurred, or whether it was wrongful.” *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010) (former diplomatic officials entitled to functional immunity).

There is no divergence between conduct-based immunity as applied by United States courts and the English common law and principles of international law that United States courts apply. It is the nature of the acts alleged, not the purported motive or intent behind them, that subjects them to conduct-based immunity. If a foreign government official allegedly undertakes official conduct, a United States court has no more jurisdiction to question his motives or intent in doing so than it does to question the foreign sovereign itself. Indeed, in this Circuit, that is true even where, unlike the crimes alleged in the Indictment, the official acts violated *jus cogens* (universally accepted) principles of international human rights law such as acts of torture, slavery, and mass murder. *Matar*, 563 F.3d at 15 (“A claim premised on the violation of *jus cogens* does not withstand foreign sovereign immunity.”)

c. The Indictment unambiguously proceeds on the theory that Mr. Maduro is criminally liable for conduct that followed from the manner in which he allegedly used public positions and state instrumentalities. The Indictment does not allege that Mr. Maduro was acting outside the scope of his authority in a private capacity. Quite the opposite, the Indictment alleges that Mr. Maduro used his "authority and the [state's] institutions" to effectuate the alleged illegal conduct, ¶ 2 and "leveraged government power" for illegal purposes, ¶ 3; *see supra* at Background B.2.

The Indictment does not allege that these were the *ultra vires* acts of a rogue public official. In fact, the Indictment alleges the opposite: that the Venezuelan state was permeated by a "culture of corruption" endorsed not only by Mr. Maduro and the other Venezuelan government defendants, but also President Chávez before them, a corrupt system of government that serves to enrich not just "Venezuelan elites," but also "rank-and-file" officials. ¶ 16. These alleged acts, *whether right or wrong*, are attributable to the state, such that immunity attaches. *See Duke of Brunswick*, 2 H.L. Cas. at 21 ("It is true, the bill states that the instrument was contrary to the laws of Hanover and Brunswick, but, notwithstanding that it is so stated, still if it is a sovereign act, then, whether it be according to law or not according to law, we cannot inquire into it."); *accord Eliahu*, 919 F.3d at 712-13 (affirming dismissal of claims against Israeli officials accused of abusing power for unlawful ends, finding that, "[e]ven assuming the officials' challenged conduct was improper under Israeli law, there is no doubt the conduct was official in nature").

### C. The Court Should Not Extend its Denial of Immunity to Defendant Cordones to Mr. Maduro.

The Court previously denied the motion of Defendant Cliver Antonio Alcalá Cordones to dismiss based on conduct-based immunity. *See Cordones*, 2022 WL 815229. That decision and its reasoning should not be extended to Mr. Maduro.

*First*, *Cordones* rested in large part on the Court's holding that *Halkbank I* required the Court to defer to the Executive Branch's implicit determination that no immunity applied to Mr. Cordones. *Id.* at *5 ("[T]he Government has brought charges against Defendant and his coconspirators, thereby manifesting its view that Defendant is not entitled to immunity. . . . under [*Halkbank I*], I must reject . . . immunity"). As explained more fully below, however (*see infra* at Point III.A), since the Court decided *Cordones*, both the Supreme Court and the Second Circuit have indicated—in *Halkbank II* and *Halkbank III*—that deference to the Executive Branch is *not* owed where the Executive Branch's sovereign immunity determination is in "derogation of the common law." The Executive Branch's decision to prosecute Mr. Maduro on the theory that he "leveraged government power" for illegal purposes, ¶ 3, is precisely within the scope of conduct that common law conduct-based immunity is designed to protect, *see, e.g.*, *Hatch*, 7 Hun. at 599; *Duke of Brunswick*, 2 H.L. Cas. at 21. Accordingly, the Executive Branch's determination to prosecute Mr. Maduro is not entitled to deference.

*Second*, *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60-61 (2d Cir. 2019), which the Court relied on in *Cordones*, does not support a finding that alleged violations of United States and Venezuelan law cannot constitute "official acts" for purposes of conduct-based sovereign immunity. *Kashef* was decided based on the act of state doctrine and did not address a government official's entitlement to sovereign immunity. As the Second Circuit explained subsequent to *Cordones*, the act of state doctrine is "not a principle of abstention, [or] a grant of immunity." *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 137-39 (2d Cir. 2022). Unlike sovereign immunity, the act of state doctrine operates *on the merits*—it "does not shield foreign official conduct from being 'impugned' . . . in the courts," "[n]or does it bar an inquiry into the 'motivation' for . . . a foreign sovereign act.'" *Id.* 138-39 (quoting *W.S. Kirkpatrick & Co. v. Env't Tectonics*

*Corp., Int'l*, 493 U.S. 400, 407-08 (1990)). Sovereign immunity, in contrast, is "an immunity from trial and the attendant burdens of litigation," *Rein*, 162 F.3d at 756 (quotations and alterations omitted). As discussed above, it does not permit "judicial evaluation of the propriety of its political conduct." *Heaney*, 445 F.2d at 504. Accordingly, where a defendant's acts follow from sovereign authority, the immunity attaches, regardless of whether that act violated the laws of the foreign state, the laws of the United States, or even (in the Second Circuit) constitutes a universally recognized crime against humanity. *See Duke of Brunswick*, 2 H.L. Cas. at 21; *Eliahu*, 919 at 712-13; *Matar*, 563 F.3d at 15.

The Indictment expressly alleges that Mr. Maduro headed a "government that, for decades, has *leveraged government power*" to achieve unlawful ends. ¶ 3 (emphasis added). As explained *supra* at Background B.2), each overt act involved the exercise of authority within the scope of Mr. Maduro's delineated powers. Because Mr. Maduro is alleged to have acted under color of authority, such conduct is attributable to the state and subject to immunity—regardless of Mr. Maduro's alleged improper motivations or the allegedly "corrupt" nature of his "regime." The allegations on their face show entitlement to immunity. *See Heaney*, 445 F.2d at 504 (plaintiff's concession that defendant was "at all relevant times 'an employee and agent of the . . . Spanish Government'" would be sufficient to dispose of the claim against him pursuant to conduct-based immunity).

## III. THE COURT SHOULD NOT DEFER TO THE EXECUTIVE BRANCH'S VIEWS ON MR. MADURO'S IMMUNITY.

The Court should not permit this unprecedented prosecution to proceed based on deference to the Executive Branch's implicit position, as evidenced by attempting to prosecute him, that Mr. Maduro is not entitled to immunity. That position is in derogation of the venerable common law principles discussed above that, absent waiver by the foreign sovereign (which has not occurred),

heads of state—including *de facto* heads of state—and other foreign officials acting in their official capacity are immune from suit in a foreign nation's national courts. As a result, with respect to the issue of immunity, no deference is owed to the Executive Branch's decision to prosecute Mr. Maduro.

### A. No Deference Is Owed to Executive Branch Immunity Decisions That Are In Derogation of Common Law.

Although the Second Circuit has held that courts should *generally* defer conclusively to the Executive Branch's "determination as to whether a party should" receive criminal immunity, it has explicitly declined to hold—and there would be no basis for such a holding—that deference should "apply to the Executive's determination regarding foreign sovereign immunity *if that determination in a particular case were in derogation of the common law*." *Halkbank III*, 120 F.4th at 44, 46 (emphasis added). That is plainly the case here.

The Supreme Court has, likewise, indicated that an Executive Branch immunity determination is owed no deference if it is in derogation of common law immunity principles. In *Halkbank II*, after the Supreme Court held that the FSIA did not provide the defendant with immunity, it remanded for further consideration of whether common law immunity applied *even though the government had argued that* "the common law does not provide for foreign sovereign immunity when, as here, the Executive Branch has commenced a federal criminal prosecution." *Halkbank II*, 598 U.S. at 280. The Supreme Court's remand would have been utterly unnecessary if the Executive Branch was owed complete deference on the immunity question, because the Executive Branch's position that the defendant was not immune was manifest in the prosecution itself.

Moreover, the suggestion that the Executive Branch is entitled to absolute deference in criminal immunity decisions—even where the Executive Branch's immunity determination is, as

here, clearly contrary to the common law—defies common sense. If that were true, then a criminal defendant could *never* raise sovereign immunity as a defense, because the government's decision to prosecute would be conclusive evidence of the position of the Executive Branch. No court has *ever* endorsed that extreme position.

### B. Strict Deference to Executive Branch Immunity Decisions Is Inconsistent With the Common Law and Separation of Powers.

1. Rather than merely deferring to the Executive Branch, federal courts have a long history of resolving issues of foreign state and foreign official immunity. "[N]ineteenth-century foreign sovereign immunity decisions took as a given that courts could make independent determinations on whether a foreign sovereign was immune from suit in a particular set of circumstances." G. Edward White, *The Transformation of the Constitutional Regime of Foreign Relations*, 85 Va. L. Rev. 1, 134-35 (1999); *see also* Ingrid Wuerth, *Foreign Official Immunity Determinations in U.S. Courts: The Case Against the State Department*, 51 Va. J. Int'l L. 915, 924-25 (2011) ("During the nineteenth and early twentieth centuries, both state and federal courts generally made immunity determinations by relying in part on customary international law. . . . [They] did not view themselves as bound by the executive's suggestion of immunity.").[6]

As a leading academic has explained, the notion of complete deference to the Executive Branch is inconsistent with *Schooner Exchange* itself. *See* Wuerth, *supra*, at 926. In *Schooner Exchange*, Chief Justice Marshall considered the Executive Branch's views, but only after he defined foreign sovereign immunity as "a principle of public law," which he explained he was

[6] Cases dating back to the late 1790's demonstrate that courts were not bound by Executive Branch determinations regarding the immunity of foreign officials. In fact, the Executive Branch frequently *disclaimed* any ability to bind the judiciary to its views as to immunity. *See* Chimène I. Keitner, *The Forgotten History of Foreign Official Immunity*, 87 N.Y.U. L. Rev. 704, 713-49 (2012) (describing eighteenth-century suits in federal courts against "current or former [foreign] officials" in which the Executive Branch "repeatedly explain[ed] its inability to intervene").

independently "appl[ying] to the case at bar." 11 U.S. at 145-47. And in *Berizzi Brothers Co. v. The Pesaro*, 271 U.S. 562 (1926), the Supreme Court afforded the defendant sovereign immunity, *id.* at 576, notwithstanding that the Executive Branch took the position that the defendant was *not* immune, *The Pesaro*, 277 F. 473, 479 n.3 (S.D.N.Y. 1921) (lower court decision noting the State Department's view that The Pesaro was not immune); *cf. McLeod*, 25 Wend. at 598 & a1 (refusing to dismiss prosecution against British sheriff despite clear evidence that the Executive Branch's position was that "by the principles of public law" and "the law of nations," the defendant was immune).

As Justice Gorsuch explained in his *Halkbank II* partial concurrence, "the strong deference cases didn't appear until the 20th century." 598 U.S. at 286 (Gorsuch, J., concurring in part). Even in more recent criminal cases, however, courts have declined to defer blindly to Executive Branch decisions regarding foreign official immunity. *E.g.*, *Khobragade*, 15 F. Supp. 3d at 387 (dismissing indictment based on defendant's immunity over the government's objection "that the Indictment should not be dismissed because Khobragade did not have diplomatic immunity at the time of her arrest, and has no immunity at the present time."); *In re Investigation of World Arrangements*, 13 F.R.D. at 291 ("[T]he interpretation of the correspondence [asserting immunity] is a judicial function and does not depend for finality upon advice or interpretation from the executive."); *In re Grand Jury Investigation of the Shipping Indus.*, 186 F. Supp. 298, 318-20 (D.D.C. 1960) (reserving decision on motion to quash subpoena and requiring the government to make a more fulsome showing that immunity did not apply, notwithstanding that "[t]he State Department refused to recognize or allow the [foreign sovereign's] claim of immunity.").

2. *Hoffman*, 324 U.S. at 32, 36 (1945), is not to the contrary. There, the Supreme Court analyzed the question whether a merchant vessel "owned though not possessed by a friendly

foreign government" was entitled to "immunity from a suit in rem." *Id.* at 31. The Court held that the defendant was not immune and noted that "an important reason" to deny immunity was "that the State Department has declined to recognize it." *Id.* at 35 n.1. The Court also observed that "the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction." *Id.* at 35.

The Court did not, however, conclude that the judiciary had no role in immunity determinations. Rather, the Court merely noted, in *dicta*, that courts should not "deny an immunity which our government has seen fit to allow, or to allow an immunity *on new grounds which the government has not seen fit to recognize*." *Id.* (emphasis added). The Court did not say, even in *dicta*, that the Executive Branch has complete discretion to withdraw immunities that have long been recognized in the United States and elsewhere under common law and customary international law (which is embodied therein).[7]

Nor has the Supreme Court said anything of the sort since. Indeed, in *Halkbank II*, the Supreme Court indicated just the opposite by remanding for consideration of "the parties' common law arguments" on whether immunity applied in the face of the government's evident view that it did not. 598 U.S. at 281.

In fact, only a few years after *Hoffman*, in 1952, the State Department itself rejected the notion that *Hoffman*'s *dicta* represented a consensus, or even majority, view: In the famous "Tate Letter," which announced the United States' adoption of a narrower approach to sovereign immunity for commercial conduct, the State Department concluded by observing: "It is realized

[7] Contemporary scholarship from the period also confirms that *Hoffman*'s dicta was anomalous. *E.g.*, *See* Philip C. Jessup, *Has the Supreme Court Abdicated One of Its Functions?*, 40 Am. J. Int'l L. 168, 168-69 (1946) (arguing that the *Hoffman* Court abdicated one of its functions by deferring to the Executive Branch instead of deciding immunity issues.).

that a shift in policy by the executive *cannot control the courts* but it is felt that the courts are *less likely* to allow a plea of sovereign immunity where the executive has declined to do so. There have been indications that at least *some* Justices of the Supreme Court feel that in this matter courts should follow the branch of the Government charged with responsibility for the conduct of foreign relations." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 714 (1976) (reproducing the Tate Letter) (emphases added).[8]

3. Nor would it accord with basic principles of fairness or separation of powers to defer conclusively to the Executive Branch in a criminal case. In no other area of federal criminal practice are the Executive Branch's views afforded conclusive deference. "[C]oncentrat[ing] the roles of prosecutor, judge, and jury in the hands of the Executive . . . is the very opposite of the separation of powers that the Constitution demands." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024). Granting absolute deference to the Executive Branch "risks relegating courts to the status of potted plants, inconsistent with their duty to say what the law is." *Halkbank II*, 598 U.S. at 286 (Gorsuch, J. concurring in part).

[8] Congress subsequently repudiated *Hoffman*'s questionable *dicta* when it enacted the FSIA, the purpose of which was "to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to assure litigants that decisions are made on purely legal grounds and under procedures that insure due process." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983) (cleaned up). The FSIA was enacted with the support of the State Department, which explained: "In virtually every other country in the world, *sovereign immunity is a question of international law decided exclusively by the courts* and not by institutions concerned with foreign affairs." *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcomm. on Admin. Law and Governmental Relations of the H. Comm. on the Judiciary*, 94th Cong. 27 (1976) (statement of Monroe Leigh, Legal Adviser, U.S. Dep't of State) (emphasis added).

Granting conclusive deference to the Executive Branch would flout the separation of powers upon which our government is based. It is antithetical to our system of divided government for courts to "abdicate their judicial duty to decide the scope of . . . immunity." *Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 574 (2018) (Thomas, J., dissenting). Granting conclusive deference to the Executive Branch would also invade on the functions of Congress. Sovereign immunity is part of the customary international law that courts have traditionally interpreted and applied. *See Smith*, 18 U.S. at 160 ("[T]he law of nations . . . may be ascertained by consulting . . . the general usage and practice of nations . . . ."). It is the job of Congress, not the Executive Branch, to decide if, and when, to diverge from the law of nations.

## CONCLUSION

Mr. Maduro is entitled to sovereign immunity. The Indictment itself concedes that he exercised the powers of several official positions including Venezuela's Presidency and remained, at minimum, the country's *de facto* head of state, notwithstanding the Executive Branch's subsequent political non-recognition of his *de jure* status. The alleged conduct on which the charges rest consists of acts attributable to Mr. Maduro's official positions and state powers, including diplomatic functions, military and law-enforcement authority, use of state facilities, and public statements regarding national policy. Common law sovereign immunity deprives the Court of jurisdiction to adjudicate charges against Mr. Maduro as both a sovereign head of state and a foreign official prosecuted for acts attributable to the sovereign. The Executive Branch's decision to bring this unprecedented prosecution derogates long-settled principles of common law and of the customary international law on which it is based. The Court would lack jurisdiction over Mr. Maduro if he were entitled to either status-based sovereign immunity as head of state or were entitled to conduct-based sovereign immunity because the Indictment is premised on his official

governmental acts. He is entitled to both. The Court lacks jurisdiction over the prosecution of Mr. Maduro and must dismiss the Indictment against him, with prejudice.

Dated: September 2, 2026

Respectfully submitted,

*/s/ Barry J. Pollack*

Barry J. Pollack
HARRIS TRZASKOMA LLP
1300 19th Street, NW, Suite 700
Washington, D.C. 20036
(934) 667-3824
bpollack@harristrz.com

Anna Estevao
HARRIS TRZASKOMA LLP
125 Broad Street, 10th Floor
New York, NY 10004
(212) 970-6465
aestevao@harristrz.com

*Counsel for Nicolás Maduro Moros*