# EXHIBIT 3

**CORTE DI CASSAZIONE;** sezione III penale; sentenza 17 settembre 2004; Pres. SAVIGNANO, Est. FRANCO, P.M. FRATICELLI (concl. conf.); ric. P.m. in c. Djukanovic. *Annulla Trib. Napoli, ord. 18 maggio 2004.*

**Diritto internazionale pubblico — Soggettività giuridica internazionale degli Stati — Riconoscimento costitutivo — Necessità — Esclusione** (Cost., art. 10).

**Competenza e giurisdizione penale — Immunità di capi di Stato esteri — Organi della Repubblica del Montenegro — Esclusione** (Cost., art. 10; cod. pen., art. 3).

*Perché uno Stato possa dirsi sovrano e abbia quindi soggettività giuridica internazionale, non è necessario il suo riconoscimento da parte degli altri Stati, ma occorre che sia dotato di una organizzazione di governo che eserciti in modo effettivo e indipendente il proprio potere su una comunità territoriale.* (1)

*L'immunità dalla giurisdizione penale italiana è riconosciuta ai capi di Stato e di governo e ai ministri degli esteri degli Stati che sono soggetti di diritto internazionale, tra i quali non rientrano gli Stati che compongono un'unione federale privi di autonoma sovranità (nella specie, la corte ha annullato l'ordinanza del tribunale del riesame che, a conferma della decisione del g.i.p., aveva rigettato, sul rilievo di tale immunità, una richiesta di misura cautelare, avanzata nei confronti del presidente della Repubblica del Montenegro, sul presupposto che soggetto di diritto internazionale è soltanto lo Stato Unione di Serbia e Montenegro).* (2)

---

(1-2) I. - La decisione in rassegna (riportata anche in *Dir. e giustizia*, 2005, fasc. 11, 28, con nota di MILLER, *Personalità dello Stato, dottrina smentita, il riconoscimento internazionale è inutile*) si pone in consapevole contrasto con l'orientamento giurisprudenziale che ha talora affermato, ai fini dell'immunità penale per i vertici istituzionali, la necessità del riconoscimento della sovranità dello Stato da parte degli altri soggetti statali della comunità internazionale.

Nel corpo della motivazione sono citati i precedenti rinvenibili al riguardo, segnalando che in essi si manifesta adesione, sia pure in *obiter dictum*, alla contraria tesi. Mentre, però, nella prima delle decisioni in questione (Cass. 16 luglio 1980, Bacchelli, *Foro it.*, Rep. 1982, voce *Legge penale*, n. 10, nonché *Giust. pen.*, 1981, II, 616) si era posta a base della personalità giuridica internazionale dello Stato il fatto che questo sia riconosciuto dai suoi pari così da poter porre in essere autonomamente, nell'ambito delle relazioni internazionali, rapporti obbligatori tali da dar luogo a situazioni soggettive attive e passive, nel secondo degli arresti menzionati (Cass. 28 giugno 1985, Arafat, *Foro it.*, 1986, II, 277) era stato negato, a ben vedere, ogni effetto di natura costitutiva a un simile riconoscimento. La corte, in quella occasione, negando che potesse individuarsi nell'Organizzazione per la liberazione della Palestina un soggetto di diritto internazionale, con conseguente esclusione dall'immunità dalla giurisdizione penale del suo capo Yasser Arafat, si era indotta a negare espressamente «al riconoscimento, concesso da qualche governo statale, valore costitutivo della personalità internazionale, appartenendo esso alla sfera politica e risultando, quindi, privo di conseguenze sul piano giuridico». Si trattava, naturalmente, di un caso in cui era rinvenibile un riconoscimento parziale e non generalizzato da parte della comunità degli Stati, ma la corte mostrò di condividere pienamente l'opposta tesi, ripetendo che, per parlare di soggetto giuridico relativamente all'ordinamento interstatuale, doveva esclusivamente riscontrarsi la sussistenza dei tre classici elementi, popolo, governo e territorio, associati ai caratteri dell'effettività e indipendenza di esercizio di quella sovranità sulla comunità territoriale venuta in rilievo.

Negli anni '90 la corte regolatrice (Cass. 17 marzo 1997, Ghiotti, *id.*, Rep. 1998, voce cit., n. 10) ha fatto invece riferimento alla ricostruzione per cui l'attività degli Stati volta a riconoscere un altro soggetto come persona dell'ordinamento internazionale, sarebbe necessaria a che quest'ultima possa configurarsi (per la dottrina, in argomento, v., *infra*, § III).

La stessa giurisprudenza, inoltre, ha avuto modo di rilevare che le immunità di diritto internazionale riguardano solo i capi di Stato, sicché le ulteriori ipotesi di esenzione dalla sanzione penale «non possono sorgere che da specifiche norme legislative, le quali non solo devono formulare il collegamento tra l'organo e la sua qualità di rappresentante dello Stato straniero, ma devono altresì specificare se l'esonero è generale, ovvero limitato ai fatti commessi nell'esercizio delle loro funzioni» (Cass. 17 marzo 1997, Ghiotti, cit.).

II. - Le immunità dell'ordinamento internazionale, che quale risultato ultimo hanno la sottrazione del soggetto all'applicabilità delle sanzioni penali e che per questo sono spesso descritte, come nella sentenza in rassegna, quali eccezioni all'obbligatorietà dell'azione penale (v., in generale, PAGLIARO, *Immunità* (dir. pen.), voce dell'*Enciclopedia del diritto*, Milano, 1970, XX, 113, nonché, da ultimo, riassuntivamente, MANZIONE, in *Codice penale* a cura di PADOVANI, Milano, 2005, *sub* art. 3, 37), possono essere ricondotte al diritto consuetudinario o a specifiche convenzioni tra Stati. In entrambi i casi sono ritenute preordinate al mantenimento delle relazioni internazionali, e quindi, sia che siano considerate cause di giustificazione (MANTOVANI, *Diritto penale*, parte generale, Padova, 1988, 790), sia che siano valutate come limitazioni all'esercizio della giurisdizione (ROMANO, *Commentario sistematico al codice penale*, Milano, 1987, I, 79; FIANDACA-MUSCO, *Diritto penale*, parte generale, Bologna, 1989, 120), devono qualificarsi norme di diritto internazionale generalmente riconosciute e recepite dall'ordinamento giuridico italiano per effetto dell'art. 10 Cost. (CASSESE, in AA.VV., *Principî fondamentali*, in *Commentario della Costituzione* a cura di BRANCA, Bologna, 1975, *sub* art. 10, 498).

Oltre alle immunità concernenti i capi di Stato, possono ricordarsi tra le più significative: quelle proprie degli (altri) organi di Stato esteri, limitate alle funzioni ma perduranti dopo la loro cessazione (art. 39 della convenzione di Vienna 18 aprile 1961; art. 54 della convenzione di Vienna 24 aprile 1963, entrambe recepite con l. 9 agosto 1967 n. 804); quelle degli agenti diplomatici e consolari accreditati, membri del personale amministrativo e tecnico della missione e membri conviventi delle loro famiglie (art. 31 e art. 37 della convenzione di Vienna 18 aprile 1961, art. 43 della convenzione di Vienna 24 aprile 1963), che per gli agenti hanno estensione anche extrafunzionale ma sono destinate a cessare al termine dell'incarico, e per i funzionari sono legate all'esercizio delle incombenze dell'ufficio (v., sul punto, Cass. 19 marzo 2002, De Beausse, *Foro it.*, Rep. 2003, voce *Competenza penale*, n. 14; 12 novembre 1993, Bevilacqua, *id.*, Rep. 1994, voce *Agente diplomatico*, n. 1); quelle dei giudici della Corte dell'Aia e della Corte europea dei diritti dell'uomo, di tipo funzionale (art. 2a del quarto protocollo addizionale all'accordo generale sui privilegi e le immunità del consiglio d'Europa 16 dicembre 1961, ratificato con l. 29 marzo 1966 n. 350; nonché art. 4 del sesto protocollo addizionale all'accordo generale sui privilegi e le immunità del consiglio d'Europa, ratificato con l. 28 agosto 1997 n. 303); quelle di cui sono titolari i membri del parlamento europeo (art. 10 del protocollo di Bruxelles 8 aprile 1965, ratificato con l. 3 maggio 1966 n. 437), i quali si avvalgono nel paese di origine delle stesse immunità riconosciute ai parlamentari nazionali, e negli altri paesi dell'esenzione da ogni procedimento giudiziario; quelle relative ai corpi e ai reparti dei militari stranieri Nato in Italia che, nei casi previsti dalla convenzione di Londra 15 giugno 1951, ratificata con l. 30 novembre 1955 n. 1335, sono assoggettati alla giurisdizione dello Stato di origine: la legittimità di tale previsione è stata confermata dalla Corte costituzionale sul presupposto che la nostra Carta fondamentale non vieta la rinuncia alla giurisdizione in vista del raggiungimento di obiettivi di collaborazione tra Stati, anche in materia penale, così che non può invocarsi, al riguardo, il principio della precostituzione del giudice, che presiede alla sola disciplina delle competenze interne all'ordinamento (Corte cost. 12 ottobre 1990, n. 446, *id.*, 1991, I, 1314).

III. - In dottrina, relativamente all'attribuzione della personalità internazionale, si confrontano tre opinioni (analizzate, da ultimo, in TREVES, *Diritto internazionale, problemi fondamentali*, Milano, 2005, 56 ss.).

Secondo una più risalente impostazione, alla base della personalità internazionale non può che trovarsi un accordo, necessariamente reciproco, in cui la detta titolarità viene fondata attraverso il suo riconoscimento, mentre prima di esso vi sarebbe solo «la possibilità della personificazione dello Stato» (ANZILOTTI, *Corso di diritto internazionale*, Roma, 1912, I, 84): naturale conseguenza di questo assunto, peraltro carica di implicazioni, si risolve nel fatto che la personalità sussisterebbe solo nell'ambito dei rapporti tra gli Stati che si sono reciprocamente dati atto della loro attitudine ad imbastire relazioni internazionali con atti idonei a vincolarsi e cioè dotati di efficacia cogente (nello stesso senso, con varie prospettive, tra gli altri, v. KELSEN, *Recognition in International Law: Theoretical observations*, in *American Journal of International Law*, 1941, 605; OTTOLENGHI, *Lezioni di diritto internazionale pubblico*, Torino, 1947, 101; GUGGENHEIM, *Traité de droit international public*, Génève, 1953-1967, I, 188; VERHOEVEN, *Relations internationales de droit privé en l'absence de reconnaissance d'un Etat, d'un gouvernement ou d'une situation*, in *Recueil des Cours de l'Acadèmie de Droit International de la Haye*, 1985, III, 9). In quest'ordine di idee può collocarsi Trib. Bolzano 21 maggio 1971 (*Foro it.*, 1972, I,

*Svolgimento del processo.* — Il pubblico ministero presso il Tribunale di Napoli chiese l'applicazione della misura cautelare della custodia in carcere nei confronti di Djukanovic Milo, presidente della Repubblica del Montenegro, in relazione ai reati di associazione per delinquere finalizzata alla importazione ed al traffico di tabacchi lavorati esteri di contrabbando e di concorso in più episodi di contrabbando di tabacchi lavorati esteri.

Il giudice per le indagini preliminari del Tribunale di Napoli, con ordinanza del 19 giugno 2003, rigettò la richiesta ritenendo

Case 1:11-cr-00205-AKH Document 321-4 Filed 09/02/26 Page 3 of 11



l'indagato soggetto immune quale presidente del Montenegro, parte costituente del soggetto di diritto internazionale «Repubblica federale di Jugoslavia».

L'ordinanza non venne impugnata.

Successivamente, in data 23 gennaio 2004, espletata nuova attività istruttoria, acquisiti nuovi pareri del ministero degli affari esteri ed altra documentazione, rilevato che la posizione dell'indagato era mutata essendo stato nominato presidente del consiglio dei ministri del Montenegro, il pubblico ministero chiese di nuovo la misura cautelare per i medesimi fatti.

Con ordinanza del 16 aprile 2004 il giudice per le indagini preliminari del Tribunale di Napoli rigettò di nuovo la richiesta, ravvisando l'immunità internazionale dell'indagato quale presidente del consiglio dei ministri del Montenegro, che manteneva una sua autonomia internazionale nell'esercizio della sovranità interna.

---

226, con nota di Bernardini, *«Sedicenti» sentenze estere o «pseudo-sentenze» italiane di divorzio*) secondo cui, non essendo allora riconosciuta la Repubblica democratica tedesca, ne doveva derivare l'inesistenza di «un così definito *Amtsgericht*» (tribunale) e quindi l'inesistenza del divorzio da esso pronunciato e di cui si chiedeva il riconoscimento in Italia.

La dottrina critica verso questa impostazione (v., ad esempio, in Italia, Conforti, *Diritto internazionale*, Napoli, 2002, 16; Cassese, *Diritto internazionale. Lineamenti*, Bologna, 2003, I, 89, nonché Treves, *Diritto internazionale, problemi fondamentali*, cit., 60) fa notare come il carattere meramente dichiarativo del riconoscimento ai fini dell'acquisizione della personalità giuridica internazionale trova, invece, vari riscontri positivi: nell'ambito dell'opera di codificazione del diritto internazionale compiuta dagli Stati americani, esso si rinviene sancito dalla convenzione sui diritti e i doveri degli Stati, adottata a Montevideo il 26 dicembre 1933 (Société des Nations, *Recueil des Traités et des engagements internationaux enregistrés par le Secrétariat de la Société des Nations*, vol. 165, 19), e nella carta dell'organizzazione degli Stati americani (art. 12), firmata a Bogotà il 30 aprile 1948 (Nations unies, *Recueil des traités*, vol. 119, 49); in ambito più generale, lo stesso principio è affermato dall'Institut de Droit International, all'art. 1 della risoluzione sul riconoscimento dei nuovi Stati e dei nuovi governi del 1936 (I.D.I., *Tableau général des résolutions*, 1873-1956, Bâle, 1957, 11). La stessa dottrina argomenta che la finalità eminentemente politica del riconoscimento, e quindi la sua estraneità all'acquisto della personalità giuridica internazionale, riceve supporto anche dai casi in cui la possibilità di ottenere un simile riconoscimento è stata condizionata pattiziamente ad alcuni requisiti del nuovo soggetto: è il caso della dichiarazione firmata il 16 dicembre 1991 dai ministri degli esteri degli allora dodici membri della Comunità europea (*Bollettino delle Comunità europee*, 1991, 1.4.5, nonché in *European Journal of International Law*, 1993, vol. 4, 74-77), nelle cui linee guida sul riconoscimento dei nuovi Stati nell'Europa orientale e nell'Unione sovietica e, distintamente, in relazione alla nascita degli Stati dalla ex Jugoslavia, si stabilì che, per essere riconosciuti dalla Comunità, avrebbero dovuto essere rispettate le disposizioni della carta delle Nazioni unite, l'atto finale di Helsinki e la carta di Parigi, relativamente allo Stato di diritto, alla democrazia e ai diritti dell'uomo, e avrebbero dovuto, altresì, essere garantiti i diritti dei gruppi etnici e nazionali e delle minoranze, rispettata l'inviolabilità delle frontiere, accettati gli obblighi in materia di non proliferazione nucleare, sicurezza e stabilità regionale, nonché l'impegno al ricorso all'arbitrato per le controversie in tema di successione tra Stati. Peraltro va segnalato che una parte della dottrina (Dupuy, *Droit international public*, Paris, 2002, 93), in relazione a tale dato, ha prospettato, di recente, la formazione di una norma di diritto internazionale in forza della quale il riconoscimento, non più atto libero, sarebbe vietato in assenza della prova del rispetto dei caratteri democratici dell'ordinamento interno e degli obblighi internazionali. Ma, in contrario, può rilevarsi che la commissione arbitrale prevista dalla menzionata dichiarazione dei dodici, nell'opinione n. 10 del 4 luglio 1992 (*European Journal of International Law*, 1993, vol. 4, 90) precisò: «Mentre il riconoscimento non è un prerequisito per la nascita di uno Stato e ha un effetto puramente dichiarativo, esso è nondimeno un atto discrezionale che gli altri Stati possono compiere e con modalità da tali Stati prestabilite, ed è soggetto all'unica condizione di rispettare le regole imperative del diritto internazionale generale, in particolare quelle che proibiscono l'uso della forza nelle relazioni internazionali o che sono poste a garanzia dei diritti delle minoranze etniche, religiose o linguistiche».

Per superare questi dubbi e i dubbi più in generale inerenti la configurabilità di una soggettività relativa (ai singoli riconoscimenti), un secondo gruppo di studi ha ipotizzato che la personalità giuridica internazionale dipenda da una specifica norma (v., fra gli altri, sul punto, Biscaretti di Ruffia, *Contributo alla teoria giuridica della formazione degli Stati*, Milano, 1938, *passim*; Biscottini, *Sulla formazione dello Stato*, in *Riv. dir. internaz.*, 1939, 378; Balladore Pallieri, *Diritto internazionale pubblico*, Milano, 1962, 20; Kelsen, *Principles of International Law*, New York, 1967, 387; Crawford, *The Creation of States in International Law*, Oxford, 1979, *passim*), o, secondo quella che può ritenersi una variante di questo orientamento, dalla sinergia dell'insieme delle norme internazionali generali (Ziccardi, *La costituzione dell'ordinamento giuridico internazionale*, Milano, 1943, 264; Perassi, *Lezioni di diritto internazionale*, Padova, 1955, I, 57; Reuter, *Principes de droit international public*, in *Recueil des Cours de l'Acadèmie de Droit International de la Haye*, 1961, II, 499; Morelli, *Nozioni di diritto internazionale*, Padova, 1967, 106; O'Connell, *International Law*, London, 1970, I, 80 e 165; Arangio Ruiz, *Stati e altri enti* (soggettività internazionale), voce del *Novissimo digesto*, Torino, 1972, XVIII, 22 ss.).

Ad avviso di queste tesi, dunque, ad attribuire la discussa personalità è una norma di base, che dovrebbe logicamente presupporsi, o, comunque, la complessiva considerazione dell'ordinamento internazionale.

La più moderna dottrina, invece, prendendo spunto da quest'ultima osservazione, tende ad affermare che essa dimostra solo che le regole internazionali presuppongono gli enti che si volgono a disciplinare: la nascita della persona giuridica internazionale, per questa via, è individuata come fenomeno essenzialmente politico e cioè pregiuridico (Treves, *Diritto internazionale, problemi fondamentali*, cit., 56), in questo traducendosi il significato che all'effettiva sovranità territoriale di una certa organizzazione viene dato ai fini in questione.

IV. - Nel *decisum* espresso dalla seconda massima la Cassazione, dopo aver affermato che per potersi parlare di soggetto internazionale deve riscontrarsi un governo sovrano sugli individui localizzati in un dato territorio, esclude che una simile verifica possa dirsi positiva nel caso della Repubblica montenegrina. Giungendo a questa conclusione, d'altra parte, il giudice nomofilattico nega personalità giuridica internazionale autonoma allo Stato federato per assegnarla, unicamente, alla Repubblica Unione di Serbia e Montenegro, nella cui Costituzione trova conforto esegetico. L'art. 14 della Carta costituzionale serbomontenegrina, infatti, enuncia che l'Unione di Serbia e Montenegro è «una singola personalità di diritto internazionale», precisando, al 2° comma, che gli Stati che la compongono possono partecipare alle organizzazioni sopranazionali che non richiedano «la personalità internazionale quale requisito per l'insieme dei membri».

Non si rinvengono precedenti giurisprudenziali nazionali che affrontino *ex professo* il problema del rapporto tra soggettività giuridica internazionale e Stato federale.

V. - Non risulta revocato in dubbio da alcuno che i rapporti tra Stato membro e federazione siano rapporti di diritto interno, così come i rapporti tra gli Stati membri fra loro, anche quando questi ultimi siano disciplinati mediante rinvio a norme internazionali (v., in argomento, Ballarino, *Soggetti di diritto internazionale*, voce dell'*Enciclopedia giuridica Treccani*, Roma, 1993, XXIX, 6).

L'analisi dell'assetto costituzionale dello Stato federale è in ogni caso necessaria, posto che esso può consentire agli Stati membri un'autonoma attività internazionale, lasciando spazio, in tal senso, ad ipotesi di distinte soggettività. Ad esempio l'art. 32, § 3, della Costituzione della Germania (*Grundgesetz*), consente ai singoli *Länder*, ma con il consenso del governo federale, di concludere trattati nelle materie in riferimento alle quali siano titolari di competenza legislativa. La Costituzione federale svizzera, analogamente, consente ai cantoni, aggettivati all'art. 2 come «sovrani», di siglare convenzioni internazionali, relativamente al proprio ambito operativo territoriale, in materia di pubblica economia, traffico vicinale e polizia, derogando all'art. 8 che assegna un simile potere «esclusivamente» alla federazione: ma resta necessaria l'approvazione del consiglio federale. Al contrario, negli Stati uniti d'America, il *treaty making power* è prerogativa del governo federale, ed infatti la dottrina nega che i singoli membri di questa unione abbiano soggettività internazionale: v. Treves, *Diritto internazionale, problemi fondamentali*, cit., 69 s., che rammenta, a sostegno generale della tesi per cui si tratterebbe sempre di un fatto interno allo Stato federale, che la conferenza di Vienna sul diritto dei trattati (Nations unies, *Conférence des Nations Unies sur le droit des traités. Documents Officiels, 2éme session*, New York, 1970, 5) ha avuto modo di respingere la proposta di un articolo, avanzata dalla commissione del diritto internazionale, volta a sancire che gli Stati membri delle unioni federali potessero «avere la capacità di stipulare trattati, se ammessa dalla Costituzione federale e nei limiti previsti».

Con specifico riferimento allo Stato federale di Serbia e Montenegro, va ricordato, infine, che la Corte internazionale di giustizia, anche di recente, ha riconosciuto la soggettività giuridica internazionale dell'unione e, nella ricostruzione dei rapporti, in termini di successione o autonomia, con la precedente Repubblica federativa socialista di Jugoslavia, ha mostrato di prendere in considerazione quale soggetto di diritto internazionale solo la federazione stessa e non i singoli Stati che la compongono (Corte internazionale di giustizia 3 febbraio 2003, *Jugoslavia c. Bosnia Erzegovina*, in *Foro it.*, Rep. 2003, voce *Diritto internazionale pubblico*, n. 89, e *Riv. dir. internaz.*, 2003, 467; la decisione può leggersi anche all'indirizzo <www.icj.cij.org>).

Case 1:11-cr-00205-AKH Document 321-4 Filed 09/02/26 Page 4 of 11



Il pubblico ministero propose appello, che venne respinto dal Tribunale di Napoli con ordinanza del 18 maggio 2004 (*Foro it.*, Rep. 2004, voce *Competenza penale*, n. 11). Osservò il tribunale che il Djukanovic conservava l'immunità internazionale quale presidente del consiglio dei ministri del governo del Montenegro, parte dell'Unione di Stati serbo-montenegrina; che infatti ciascuno dei due Stati di questa unione manteneva una piena autonomia governativa, come risultava dalla Costituzione dell'unione e dal fatto che ciascuno dei due governi poteva stipulare separatamente accordi internazionali; che in ogni caso, dato il tempo trascorso dai fatti contestati, vi erano seri dubbi sulla sussistenza attuale di esigenze cautelari, tenuto anche conto sia della posizione istituzionale dell'indagato in relazione ai reati contestati (che non concernevano fattispecie criminose di riconosciuta universale antigiuridicità, ma fattispecie dirette a tutelare interessi finanziari del singolo Stato e sulla cui antigiuridicità un altro Stato può diversamente determinarsi, specie se persegue il fine di promuovere i traffici internazionali e l'osmosi economica) sia del fatto che il fenomeno del contrabbando sembrava essere in fase di regresso.

Il pubblico ministero presso il Tribunale di Napoli propone ricorso per cassazione deducendo:

*a*) assenza di immunità. Ricorda innanzitutto che sulla posizione dell'indagato il ministero degli affari esteri ha inviato una serie di pareri, i primi dei quali, del 2002, escludevano che il Montenegro fruisse della qualifica di soggetto di diritto internazionale, le cui attività erano invece riconducibili alla sola Repubblica federale di Jugoslavia, mentre gli ultimi, del 2003, pur ribadendo la precedente opinione, facevano presente che la soggettività internazionale del Montenegro poteva essere stata rafforzata da una richiesta congiunta delle due repubbliche di essere ammesse all'Interpol separatamente. Sottolinea quindi che è pacifica l'assenza di una consuetudine internazionale che ritenga immune il capo del governo dello Stato membro di uno Stato federale. Ricorda ancora che, in assenza di una disposizione scritta al riguardo, la norma che prevede l'immunità penale per i capi di Stato e di governo trova la sua fonte in una consuetudine internazionale, confermata anche dalla convenzione di Vienna del 1961 sulle relazioni diplomatiche. Si tratta tuttavia di una norma eccezionale, in quanto derogante al principio di uguaglianza, e che riguarda esclusivamente i capi di Stato e di governo riconosciuti come sovrani dallo Stato italiano. Attualmente, però, manca un riconoscimento da parte dell'Italia dello Stato del Montenegro come Stato sovrano. Si tratta infatti di uno Stato federale, ai cui vertici istituzionali non può essere riconosciuta l'immunità di diritto internazionale. D'altra parte, trattandosi di una norma di fonte consuetudinaria, la eventuale incertezza circa l'esistenza di un uso generalizzato e l'inesistenza di una prassi rivelatrice del medesimo, si traducono inevitabilmente nell'assenza di una consuetudine, ed a maggior ragione di una consuetudine in deroga ad una norma fondamentale di ogni ordinamento giuridico.

Osserva poi che sulla base delle convenzioni internazionali deve escludersi che al Montenegro possa riconoscersi la veste di Stato riconosciuto come sovrano dall'Italia e dalla comunità internazionale. Infatti, in tutti quei trattati e convenzioni internazionali, originanti le diverse organizzazioni tra Stati, cui risultino aver partecipato gli Stati di Serbia e di Montenegro, questi lo hanno fatto come Unione serbo-montenegrina, escludendo qualsiasi riconoscimento al singolo Stato membro. Il difetto di rappresentatività dei singoli Stati membri della federazione, poi, risulta anche dalla Carta costituzionale dell'Unione serbo-montenegrina, ed in particolare dagli art. 14, 5, 7, 6, 19, ecc. Diversamente opinando, infatti, dovrebbe dirsi affermato un nuovo principio secondo cui un medesimo Stato potrebbe vedersi riconosciuta una triplice rappresentanza in campo internazionale (nella specie, quella dell'Unione serbo montenegrina, dello Stato serbo e dello Stato montenegrino).

Pertanto, in assenza di una consuetudine internazionale che statuisca l'immunità per l'indagato, deve ritenersi sussistente la giurisdizione italiana e l'assenza di qualsiasi impedimento processuale all'adozione della misura cautelare;

*b*) in ordine alle esigenze cautelari osserva che nella specie è evidente il pericolo di reiterazione di condotte analoghe e la sussistenza delle esigenze special-preventive, come è dimostrato dalla continuativa attività criminale svolta dall'indagato attraverso i suoi uomini nel garantire stabilmente basi logistiche ai correi, nel selezionare i contrabbandieri in funzione della professionalità nel delitto e favorirli mediante la creazione di monopoli illegali. Sussiste inoltre un evidente pericolo di inquinamento probatorio, come si evince dalla preparazione di falsi documenti e dalla spregiudicatezza ed insidiosità dimostrate nell'operare per ottenere informazioni utilizzabili al fine di garantire l'impunità. La misura richiesta è resa poi necessaria dal carattere transnazionale dell'organizzazione criminale e dall'attitudine dei singoli gangli alla sopravvivenza anche a dispetto delle evenienze riguardanti i singoli aderenti.

Osserva quindi che sono contraddittorie ed illogiche le considerazioni circa la peculiarità della posizione istituzionale dell'indagato in relazione ai titoli di reato contestati. Invero, la peculiarità della posizione istituzionale è invece idonea ad attualizzare il *periculum libertatis* in considerazione della indiscutibile capacità di interferire ed ingerirsi in future condotte delittuose. È poi erroneo ed inconferente l'argomento della opinabilità della antigiuridicità della condotta quale fattore ipoteticamente elidente la pericolosità, in quanto è proprio l'eventuale minor coscienza della reprensibilità della condotta ad incrementare il bisogno cautelare.

*Motivi della decisione.* — Il primo motivo è fondato.

È pacifica l'esistenza di una norma di diritto internazionale che assicura ai capi di Stato, ai capi di governo ed ai ministri degli esteri di uno Stato sovrano l'inviolabilità personale, ossia la sottrazione a tutti i provvedimenti limitativi della libertà personale, nonché l'immunità dalla giurisdizione penale per qualsiasi attività essi pongano in essere, nell'esercizio o meno delle loro funzioni. La *ratio* di tale norma viene individuata nella considerazione che tali misure costituirebbero un impedimento a svolgere le funzioni ufficiali, dato che queste necessariamente comportano frequenti viaggi ufficiali all'estero. L'inviolabilità e l'immunità, peraltro, spettano anche nell'ipotesi in cui i suddetti organi istituzionali si trovino nel territorio del proprio Stato e non in quello dello Stato estero che emana l'atto autoritativo. La norma internazionale prevede tuttavia che la inviolabilità e la

---

Il criterio dell'effettività, comunque, domina anche la valutazione dell'eventuale capacità giuridica soggettiva internazionale dello Stato federato, come dimostra l'esempio storico delle repubbliche che facevano parte dell'Urss, le quali non erano considerate soggetti di diritto internazionale nonostante la Costituzione sovietica del 1936, confermata da quella del 7 ottobre 1977, riconoscesse loro uno *status* internazionale, comprensivo del diritto di scambiare rappresentanti diplomatici e consolari, nonché di recedere dall'unione (v., in argomento, BALLARINO, *Soggetti di diritto internazionale*, cit., 6 s.).

VI. - Oltre a quello degli Stati federati, altro esempio di enti infrastatuali per cui è stato posto il quesito della capacità di diritto internazionale pubblico sono, in particolare in tempi recenti, le regioni italiane. La l. cost. 18 ottobre 2001 n. 3 ha mutato profondamente il contenuto dell'art. 117 Cost., stabilendo, all'ultimo comma, con riferimento alle materie in cui si ammette, in via esclusiva o concorrente, la potestà legislativa regionale, che «nelle materie di sua competenza la regione può concludere accordi con Stati e intese con enti territoriali interni ad altro Stato, nei casi e con le forme disciplinati dalle leggi dello Stato». La Consulta (Corte cost. 19 luglio 2004, n. 238, *Foro it.*, 2004, I, 2925, con nota di ROMBOLI), nel vagliare la legittimità della l. 5 giugno 2003 n. 131, attuativa del nuovo assetto, ha affermato che «le nuove disposizioni costituzionali non si discostano dalle linee fondamentali già enunciate in passato da questa corte: riserva allo Stato della competenza sulla politica estera; ammissione di un'attività internazionale delle regioni; subordinazione di questa alla possibilità effettiva di un controllo statale sulle iniziative regionali, al fine di evitare contrasti sulla politica estera nazionale. La novità che discende dal mutato quadro normativo è essenzialmente il riconoscimento a livello costituzionale di un 'potere estero' delle regioni, cioè della potestà, nell'ambito delle proprie competenze, di stipulare, oltre ad intese con enti omologhi di altri Stati, anche veri e propri accordi con altri Stati, sia pure nei casi e nelle forme determinati da leggi statali (art. 117, 9° comma). Tale potere estero deve peraltro essere coordinato con l'esclusiva competenza statale in tema di politica estera, donde la competenza statale a determinare i 'casi' e a disciplinare le 'forme' di questa attività regionale, così da salvaguardare gli interessi unitari che trovano espressione nella politica estera nazionale. Le regioni, nell'esercizio della potestà loro riconosciuta, non operano dunque come 'delegate' dello Stato, bensì come soggetti autonomi che interloquiscono direttamente con gli Stati esteri, ma sempre nel quadro di garanzia e di coordinamento apprestato dai poteri dello Stato». In ragione di questa persistente subordinazione, la dottrina nega ogni ipotesi di soggettività giuridica internazionale delle regioni (v., da ultimo, TREVES, *Diritto internazionale, problemi fondamentali*, cit., 71 e 683). [P. PORRECA]

immunità si applichino sempre che l'ente sia qualificabile come organizzazione sovrana, equivalente, per requisiti di struttura, componenti personali e spaziali e per connotati di effettività, al tipo statuale. Si richiede cioè che sia presente la triade popolo-governo-territorio e, quindi, necessariamente che la componente della popolazione e l'apparato di governo da essa espresso ricadano su un luogo di esercizio di tale governo e dell'attività dei soggetti (28 giugno 1985, Yasser Arafat, *id.*, 1986, II, 277).

La norma internazionale in questione è una norma di fonte consuetudinaria, e quindi, trattandosi di una norma di diritto internazionale generale, entra a far parte automaticamente dell'ordinamento giuridico italiano ed è in esso immediatamente efficace in forza del rinvio disposto dall'art. 10, 1° comma, Cost. e rende operante, per i casi da essa previsti, la deroga alla sottoposizione alla legge penale italiana stabilita dall'art. 3 c.p.

Secondo una risalente decisione di questa Suprema corte, in gran parte condivisa dalla dottrina, perché un ente di diritto internazionale possa poi dirsi sovrano, con la conseguenza della immunità dalla giurisdizione penale per i suoi vertici istituzionali e per il suo ministro degli esteri, occorre che esso abbia la c.d. capacità giuridica internazionale, cioè sia riconosciuto dagli altri Stati come pari e indipendente, sia titolare di un potere di disposizione relativamente ai propri elementi costitutivi e possa porre in essere nell'ambito delle relazioni internazionali rapporti obbligatori tali da dar luogo a situazioni soggettive attive o passive, con la correlativa possibilità, nell'ambito dell'interno dell'ente stesso, di vincolare questo e le sue componenti alle dette situazioni con atti aventi forza cogente (16 luglio 1980, Bacchelli, *id.*, Rep. 1982, voce *Legge penale*, n. 10).

Va tuttavia precisato, a questo proposito, che non può condividersi l'opinione espressa, sia pure *incidenter tantum*, dalle due citate decisioni di questa Suprema corte e ribadita da Cass. 17 marzo 1997, Ghiotti, *id.*, Rep. 1998, voce cit., n. 10 (opinione fatta propria anche dal pubblico ministero ricorrente), secondo cui affinché uno Stato possa considerarsi sovrano ai fini della immunità penale nel nostro ordinamento per i suoi vertici istituzionali occorrerebbe che esso fosse riconosciuto come sovrano dallo Stato italiano e dagli altri Stati. Secondo le norme di diritto internazionale generale — che fanno parte dell'ordinamento italiano in forza dell'art. 10, 1° comma, Cost., e sulla cui esistenza concorda la dottrina internazionalistica — infatti, l'organizzazione di governo che eserciti effettivamente ed indipendentemente il proprio potere su una comunità territoriale diviene soggetto di diritto internazionale in modo automatico. Uno Stato sovrano, quindi, sussiste come soggetto autonomo di diritto internazionale in presenza della triade territorio-popolo-governo ed in presenza dei requisiti della effettività ed indipendenza. Non è invece necessario che la detta organizzazione di governo sia riconosciuta dagli altri Stati. Il riconoscimento di uno Stato da parte di un altro Stato, infatti, è un atto privo di conseguenze giuridiche (al pari del non-riconoscimento) ed appartiene alla sfera della politica, in quanto rivela null'altro che l'intenzione di stringere rapporti amichevoli, di scambiare rappresentanze diplomatiche e di avviare forme più o meno intense di collaborazione mediante la conclusione di accordi. Esso pertanto non ha valore costitutivo della personalità di diritto internazionale. Come osserva la dottrina internazionalistica, altrimenti opinando si verrebbe ad ammettere che, una volta affermatasi una nuova organizzazione di governo con i caratteri della effettività e della indipendenza, gli Stati preesistenti possano esercitare nei suoi confronti, mediante il riconoscimento, una sorta di potere di ammissione nella comunità internazionale.

Nel caso in esame, pertanto, è del tutto irrilevante che l'Italia (come altri Stati) abbia riconosciuto o meno il Montenegro come Stato sovrano al fine del riconoscimento della immunità penale ai suoi vertici istituzionali.

Sempre in via preliminare va anche precisato, in primo luogo, che l'immunità, che comporta la sottrazione per taluni soggetti all'applicabilità delle sanzioni penali, costituendo un'eccezione al principio di obbligatorietà della legge penale, è insuscettibile di applicazioni estensive ed analogiche, come del resto avverte l'art. 3 c.p. nel limitarla ai soli casi stabiliti dal diritto pubblico interno e dal diritto internazionale (Cass. 17 marzo 1997, Ghiotti, cit.). Esattamente il pubblico ministero ricorrente osserva che l'eventuale incertezza sull'esistenza di un generalizzato uso e l'inesistenza di una prassi rivelatrice del medesimo, si traducono inevitabilmente nell'assenza di una consuetudine e ciò a maggior ragione nel caso di consuetudine in deroga ad una norma generale e cardine di ogni ordinamento giuridico.

In secondo luogo, va precisato che, essendo pacifiche le norme di fonte atto e di fonte fatto che disciplinano la materia, ed essendo irrilevante la presenza o l'assenza di un atto di riconoscimento del Montenegro da parte del governo italiano e degli altri governi, la questione se all'odierno indagato spetti o meno, quale capo del governo del Montenegro, l'immunità penale, si risolve nella questione di fatto se il Montenegro abbia o meno la natura di Stato sovrano nell'ambito della comunità e del diritto internazionali.

Pur non essendo costitutivi di detta personalità e di detta natura, rappresentano tuttavia elementi significativi, da prendere in considerazione per risolvere il problema, sia la Costituzione del Montenegro e dell'Unione serbo-montenegrina, sia l'atteggiamento tenuto dagli altri Stati nei confronti del Montenegro e viceversa, ed in particolare la partecipazione a trattati o convenzioni internazionali o ad organizzazioni tra Stati, sia i pareri espressi dall'autorità che nel nostro ordinamento è deputata ai rapporti internazionali ed alla osservazione e raccolta di dati ed elementi rilevanti nel diritto internazionale, ossia il ministero degli affari esteri.

Per quanto riguarda questi pareri, va ricordato che, con nota del 29 maggio 2002, il servizio del contenzioso diplomatico comunicò che allo stato attuale il Montenegro non aveva la qualifica di soggetto di diritto internazionale, la quale spetta allo Stato-organizzazione, perché, quando si ricollega la soggettività internazionale al criterio dell'effettività, ossia dell'esercizio effettivo della potestà di governo, si ha riguardo all'insieme degli organi statali. Sono infatti gli organi statali che contribuiscono alla nascita delle norme internazionali; è agli organi statali che si rivolge il contenuto delle norme materiali internazionali, tutte dirette a limitare o disciplinare la potestà di governo; e infine sono gli organi statali, e solo essi, che, con la loro condotta, possono ingenerare la personalità internazionale dello Stato. Concludeva la nota osservando che le attività internazionali relative al territorio del Montenegro sono riconducibili alla Repubblica federale di Jugoslavia e ai suoi organi statali.

Con nota del 31 maggio 2002, il servizio del contenzioso diplomatico e dei trattati ribadì che il Montenegro non è uno Stato sovrano ed indipendente, ma è parte costituente del soggetto internazionale Repubblica federale di Jugoslavia, precisando peraltro che per rispondere al quesito sulle immunità penali dei membri del governo del Montenegro occorreva conoscerne le specifiche cariche, potendo essi avere agito nella veste di organi dello Stato della federazione iugoslava.

È appena il caso di osservare che i dubbi prospettati da questa nota sono inconferenti nel caso in esame, in quanto al Djukanovic non sono state contestate condotte tenute nell'esercizio di funzioni ufficiali (sì che occorra stabilire se abbia agito nella qualità di organo del Montenegro o della federazione) bensì attività criminali che esulano dalle attività di governo. Ciò che rileva ai fini dell'immunità, quindi, è soltanto la sua posizione di capo del governo del Montenegro e perciò la natura di Stato sovrano di quest'ultimo.

Con nota del 30 giugno 2003, sempre il servizio del contenzioso diplomatico e dei trattati premise che l'immunità penale internazionale trova applicazione ai soggetti che svolgono funzioni nell'ambito di Stati indipendenti e sovrani e non anche degli Stati membri di unioni statuali. Precisò peraltro che il Montenegro, ancorché federato con la Serbia nella nuova Repubblica federale di Jugoslavia, aveva assunto un profilo di peculiare indipendenza, sancito nell'adesione alla vigente unione. Infatti, quando nella Costituzione di quest'ultima gli Stati si riservino una evidenza di carattere internazionale, ossia una rappresentanza internazionale della unione stessa, il sistema delle immunità potrebbe ritenersi estensibile anche ai capi di Stato e di governo degli Stati membri dell'unione.

È quindi evidente come da questa nota non possa ricavarsi alcun indizio in favore della pretesa immunità penale dei Djukanovic, in quanto in essa si esprimono esclusivamente dei dubbi e delle possibilità di applicazione analogica della norma che sancisce l'immunità penale internazionale anche ad alcuni casi di Stati membri di unione che si riservino una evidenza di carattere internazionale, mentre, come si è dianzi rilevato, la norma consuetudinaria che prevede l'immunità, quale norma eccezionale, è di stretta interpretazione e non è applicabile in via analogica o estensiva a soggetti diversi dai vertici di Stati so-

vrani ed indipendenti, ancorché abbiano una qualche evidenza di carattere internazionale.

Con successiva nota del 24 ottobre 2003, il medesimo servizio confermò i precedenti pareri, osservando però che vi erano stati alcuni elementi di fatto che sembrerebbero rafforzare la soggettività internazionale di ciascuna repubblica facente parte dell'Unione di Serbia e Montenegro, e precisamente l'esercizio di propri diritti ed interessi da parte della Serbia in sede di negoziati relativamente al Kossovo e la richiesta avanzata congiuntamente dalla due repubbliche per essere ammesse separatamente all'Interpol.

È evidente come anche da questa nota non possa ricavarsi alcun indizio a favore di un'immunità penale del Djukanovic, giacché con essa ci si limita soltanto ad esprimere alcuni dubbi su un possibile «rafforzamento» della soggettività internazionale degli Stati membri dell'Unione serbo-montenegrina, mentre per il riconoscimento dell'immunità occorre che vi sia la prova certa — che non può sicuramente essere ricavata da questi dubbi e da queste mere possibilità, peraltro relativi a semplici negoziati ed alla adesione ad un'organizzazione con specifiche finalità — che il Montenegro abbia acquistato la natura di Stato sovrano ed indipendente di diritto internazionale.

Con nota del 7 dicembre del 2003, infine, la direzione generale per i paesi dell'Europa del ministero si limitò a trasmettere copia della nota del 24 ottobre 2003.

In conclusione, secondo la valutazione del ministero degli affari esteri, ossia dell'organo competente in materia di rapporti internazionali e deputato istituzionalmente all'acquisizione di dati rilevanti nel diritto internazionale, il Montenegro non è uno Stato sovrano ed indipendente e quindi un soggetto autonomo di diritto internazionale, ai cui organi istituzionali spetti pertanto la immunità penale. Il ministero, infatti, non ha potuto fornire alcun elemento da cui possa ricavarsi con certezza l'acquisizione dell'indipendenza e dell'effettività di governo, e quindi della sovranità, da parte del Montenegro, mentre i dubbi e le perplessità doverosamente espressi riguardano aspetti secondari e marginali, sicuramente inidonei di per sé alla configurabilità di uno Stato sovrano, e tendono tutt'al più a prospettare la possibilità di ipotizzare figure, per qualche aspetto più o meno rilevante, simili e la possibilità di ricorrere ad applicazioni analogiche delle norme relative agli Stati sovrani. Considerazioni queste inconferenti nel caso in esame perché, come già rilevato, in materia di immunità penale non sono consentite applicazioni analogiche.

Del tutto evidente è poi l'insussistenza della natura di Stato sovrano del Montenegro se si esamina la costituzione dell'Unione serbo-montenegrina, dalla quale emerge l'esclusione di qualsiasi soggettività di diritto internazionale dei singoli Stati.

Innanzitutto è già molto significativo il titolo che è quello di «Carta costituzionale dello Stato Unione di Serbia e Montenegro» e non già quello di Unione di Serbia e Montenegro, proprio a voler subito sottolineare che si tratta di un solo ed unico Stato e non di più Stati confederati. Vanno poi evidenziati l'art. 5 (che parla del territorio dello Stato Unione e del confine inviolabile), l'art. 6 (che prevede la capitale, o centro amministrativo, dello Stato Unione, un'assemblea, un consiglio dei ministri ed una corte dello Stato Unione), l'art. 7 (che prevede la cittadinanza dello Stato Unione), l'art. 19 (che disciplina l'assemblea dello Stato Unione ed i rapporti con le assemblee degli Stati membri), l'art. 26 (concernente il presidente dello Stato Unione), l'art. 33 (concernente il consiglio dei ministri dello Stato Unione), l'art. 46 (sulla corte dello Stato Unione), l'art. 54 (sull'esercito dello Stato Unione).

Ma è soprattutto rilevante l'art. 14 (concernente la soggettività internazionale), il quale, al 1° comma, dispone che «Serbia e Montenegro sarà una singola personalità di diritto internazionale e membro di organizzazioni internazionali globali e regionali che dispongono la personalità internazionale come requisito per l'insieme dei membri», mentre al 2° comma prevede che «Gli Stati membri possono essere membri di organizzazioni globali e regionali le quali non dispongono la personalità internazionale come requisito per l'insieme dei membri».

Disposizione questa ribadita sia dall'art. 15 (concernente la istituzione ed il mantenimento delle relazioni internazionali) secondo cui lo Stato Unione di Serbia e Montenegro instaurerà relazioni internazionali con altri Stati e con organizzazioni internazionali e concluderà trattati ed accordi internazionali, mentre (2° comma) gli Stati membri possono mantenere relazioni internazionali, concludere accordi internazionali e istituire loro uffici rappresentativi negli altri Stati, ma sempre se ciò non è in conflitto con i poteri dello Stato Unione di Serbia e Montenegro e gli interessi dell'altro Stato membro, sia dal successivo art. 19, secondo cui l'assemblea dello Stato Unione ha, tra l'altro, competenza sulle misure relative all'appartenenza dello Stato Unione come personalità di diritto internazionale ad organizzazioni internazionali e sui diritti e doveri che ne derivano.

È poi appena il caso di rilevare come sia frutto di un equivoco il richiamo fatto dall'ordinanza del giudice per le indagini preliminari e da quella dei tribunale del riesame all'art. 34 Cost. in esame, il quale non prevede affatto — come erroneamente ritenuto dalle due suddette ordinanze — che i singoli Stati membri siano rappresentati su basi paritarie e su un principio di rotazione nelle organizzazioni internazionali bensì prevede solo che i singoli Stati membri siano rappresentati, appunto su basi paritarie e su un principio di rotazione, nelle cariche rappresentative dello Stato Unione di Serbia e Montenegro nelle organizzazioni internazionali. Ossia, è ribadito che presso le organizzazioni internazionali la rappresentanza sia esclusivamente quella dello Stato Unione e non già degli Stati membri, ma che in tale carica rappresentativa unitaria siano poi chiamati su basi paritarie e con criterio di rotazione soggetti rappresentanti i due Stati membri. Principio analogo è poi posto dal 3° comma per la partecipazione di soggetti rappresentanti gli Stati membri nelle missioni consolari diplomatiche, missioni che però fanno capo non agli Stati membri ma unitariamente allo Stato Unione di Serbia e Montenegro.

Emerge quindi dalla Carta costituzionale dello Stato Unione di Serbia e Montenegro come l'unico soggetto che può assumere la personalità nel diritto internazionale e che può essere membro di organizzazioni internazionali che richiedano tale personalità come requisito è esclusivamente lo Stato Unione e non anche i due Stati membri, i quali possono sì mantenere relazioni internazionali, concludere accordi internazionali, istituire uffici di rappresentanza all'estero, partecipare ad organizzazioni globali e regionali, ma sempre che ciò non richieda o non comporti l'acquisto della personalità di diritto internazionale (riservata al solo Stato Unione) e comunque non sia in conflitto con i poteri dello Stato Unione o con gli interessi dell'altro Stato.

A fronte di tali decisivi elementi sono del tutto irrilevanti le circostanze, evidenziate invece dal giudice per le indagini preliminari e genericamente richiamate dal tribunale del riesame, della partecipazione della sola Serbia ai negoziati di Vienna relativamente al Kossovo e della richiesta fatta unitariamente dai due Stati di essere ammessi separatamente all'Interpol. Si tratta infatti di episodi marginali ed insignificanti, che non sono sicuramente idonei a far acquistare la soggettività di diritto internazionale, e che comunque rientrano in pieno in quelle relazioni internazionali che gli art. 14 e 15 Cost. dello Stato Unione riconoscono ai singoli Stati membri perché appunto non presuppongono la personalità di diritto internazionale e non sono in contrasto con i poteri dello Stato Unione e con gli interessi degli altri Stati membri.

Per gli stessi motivi sono parimenti irrilevanti altri accordi cui ha fatto riferimento la difesa nel corso del procedimento, quali un accordo tra il Montenegro e la Macedonia, tra il Montenegro e l'Albania, e tra un reparto di pubblica sicurezza del ministero dell'interno italiano ed un reparto di pubblica sicurezza del ministero dell'interno del Montenegro.

Anzi, a ben vedere, il fatto che l'indagato abbia potuto portare soltanto questi limitati e marginali esempi di relazioni internazionali facenti capo al Montenegro, costituisce una chiara conferma della mancanza di sovranità e di soggettività internazionale autonoma in capo a tale Stato.

In conclusione, secondo i dati di fatto acquisiti nel processo deve ritenersi che attualmente, nell'ambito della comunità internazionale, allo Stato del Montenegro non spetti la qualifica di Stato sovrano e di soggetto autonomo ed indipendente di diritto internazionale. Pertanto, non sussistono le condizioni perché nei confronti del Djukanovic, che riveste la carica di capo del governo del Montenegro, possa trovare applicazione la norma eccezionale di diritto internazionale consuetudinario, recepita nel nostro ordinamento ai sensi dell'art. 10, 1° comma, Cost., secondo cui spetta l'immunità dalla giurisdizione penale ai capi di Stato e di governo ed ai ministri degli esteri degli Stati sovrani e soggetti di diritto internazionale. (*Omissis*)

**COURT OF CASSATION;** Criminal Section III; Judgment of September 17, 2004; Presiding Judge SAVIGNANO, Reporting Judge FRANCO, Prosecutor FRATICELLI (concurring opinion); Appeal by the Public Prosecutor v. Djukanovic. *Sets aside the order of the Court of Naples dated May 18, 2004.*

**Public International Law — International Legal Personality of States — Constitutive Recognition — Necessity — Exclusion** (Const., Art. 10).

**Criminal Jurisdiction and Competence — Immunity of Foreign Heads of State — Organs of the Republic of Montenegro — Exclusion** (Constitution, Art. 10; Penal Code, Art. 3).

*For a State to be considered sovereign and thus possess international legal personality, recognition by other States is not necessary; rather, it must be endowed with a system of government that effectively and independently exercises its authority over a territorial community.* (1)

*Immunity from Italian criminal jurisdiction is granted to heads of state and government and to foreign ministers of states that are subjects of international law; this does not include states that are part of a federal union lacking autonomous sovereignty (in the present case, the court overturned the order of the review court, which—upholding the decision of the investigating judge—had rejected, on the grounds of such immunity, a request for a precautionary measure filed against the President of the Republic of Montenegro, on the premise that only the Union State of Serbia and Montenegro is a subject of international law). (2)*

---

(1-2) I. — The decision under review (also reported in **Dir. e giustizia**, 2005, issue 11, 28, with a note by MILLER, *"Personality of the State: A Refuted Doctrine; International Recognition Is Useless"*) stands in deliberate contrast to the line of case law that has at times affirmed, for the purposes of criminal immunity for top institutional officials, the necessity of recognition of the State's sovereignty by other state actors within the international community.

The body of the reasoning cites relevant precedents, noting that they express adherence—albeit in *obiter dictum*—to the opposing view. However, in the first of the decisions in question (Supreme Court, July 16, 1980, Bacchelli, **Foro ital.**, Rep. 1982, entry *"Criminal Law,"* no. 10, as well as **Giust. pen.**, 1981, II, 616), the international legal personality of the State was based on the fact that it is recognized by its peers so as to be able to autonomously establish, within the framework of international relations, binding relationships capable of giving rise to active and passive legal rights and obligations; in the second of the aforementioned rulings (Supreme Court, June 28, 1985, Arafat, **Foro it.**, 1986, II, 277), any constitutive effect of such recognition was, on closer inspection, denied. On that occasion, the court—in denying that the Palestine Liberation Organization could be identified as a subject of international law, with the consequent exclusion of its leader, Yasser Arafat, from immunity from criminal jurisdiction—was led to expressly deny "that recognition granted by certain state governments has constitutive value for international legal personality, since it belongs to the political sphere and is, therefore, having no legal consequences." This was, of course, a case in which there was partial and not generalized recognition by the community of states, but the court showed that it fully shared the opposing view, reiterating that, in order to speak of a legal entity in the context of the inter-state legal order, only the existence of the three classic elements—people, government, and territory—must be established, along with the characteristics of effectiveness and independence in the exercise of that sovereignty over the relevant territorial community.

In the 1990s, the Court of Cassation (March 17, 1997, Ghiotti, *id.*, Rep. 1998, cited entry, no. 10) instead referred to the view that the action of States aimed at recognizing another entity as a subject of international law is necessary for that entity to be considered as such (for the doctrine on this subject, see *below*, § III).

Furthermore, the same case law has noted that immunities under international law apply only to heads of state, so that further cases of exemption from criminal sanctions "can arise only from specific legislative provisions, which must not only establish the link between the official and his or her capacity as a representative of the foreign State, but must also specify whether the exemption is general or limited to acts committed in the exercise of their functions" (Supreme Court, March 17, 1997, Ghiotti, cit.).

II. — Immunities under international law, which ultimately result in the subject being exempt from the application of criminal sanctions and which, for this reason, are often described—as in the judgment under review—as exceptions to the mandatory nature of criminal prosecution (see, in



*Course of the proceedings.* - The public prosecutor at the Court of Naples requested the application of the pretrial detention measure against Djukanovic Milo, President of the Republic of Montenegro, in connection with the crimes of criminal association aimed at the importation and trafficking of contraband foreign manufactured tobacco and of complicity in multiple instances of smuggling of foreign manufactured tobacco.

The judge for preliminary investigations of the Court of Naples, by order dated June 19, 2003, rejected the request, holding

---

Pagliaro, *"Immunity* (Criminal Law)," entry *in the Encyclopedia of Law*, Milan, 1970, vol. XX, p. 113; and, most recently, in summary, Manzia, in *The Penal Code*, edited by Padovani, Milan, 2005, *under* Art. 3, 37), can be traced back to customary law or to specific conventions between states. In both cases, they are considered to serve the maintenance of international relations; therefore, whether they are regarded as grounds for justification (MANTOVANI, *Criminal Law*: General Part, Padua, 1988, 790) or evaluated as limitations on the exercise of jurisdiction (ROMANO, *Systematic Commentary on the Penal Code*, Milan, 1987, I, 79; FIANDACA-MUSCO, *Criminal Law*, General Part, Bologna, 1989, 120), they must be classified as rules of international law that are generally recognized and incorporated into the Italian legal system pursuant to Art. 10 of the Constitution (CASSESE, in Various Authors, *Fundamental Principles*, in *Commentary on the Constitution* edited by BRANCA, Bologna, 1975, *under* Art. 10, 498).

In addition to the immunities concerning heads of state, among the most significant are those pertaining to (other) foreign state organs, which are limited to their functions but continue after the termination of those functions (Art. 39 of the Vienna Convention of April 18, 1961; Art. 54 of the Vienna Convention of April 24, 1963, both incorporated by Law No. 804 of August 9, 1967); those of accredited diplomatic and consular agents, members of the administrative and technical staff of the mission, and cohabiting members of their families (Arts. 31 and 37 of the Vienna Convention of April 18, 1961, Art. 43 of the Vienna Convention of April 24, 1963), which, for agents, extend beyond the scope of their official duties but are intended to cease at the end of their assignment, and for officials are linked to the performance of their official duties (see, on this point, Court of Cassation, March 19, 2002, De Beausse, *Foro it.*, Rep. 2003, entry *"Criminal Jurisdiction,"* no. 14; November 12, 1993, Bevilacqua, *id.*, Rep. 1994, entry *"Diplomatic Agent,"* no. 1); those of the judges of the International Court of Justice in The Hague and the European Court of Human Rights, which are of a functional nature (Art. 2a of the Fourth Additional Protocol to the General Agreement on Privileges and Immunities of the Council of Europe of December 16, 1961, ratified by Law No. 350 of March 29, 1966; as well as Article 4 of the Sixth Additional Protocol to the General Agreement on Privileges and Immunities of the Council of Europe, ratified by Law No. 303 of August 28, 1997); those enjoyed by Members of the European Parliament (Article 10 of the Brussels Protocol of April 8, 1965, ratified by Law No. 437 of May 3, 1966), who enjoy in their country of origin the same immunities granted to national parliamentarians, and in other countries, exemption from all judicial proceedings; those pertaining to foreign NATO military units and detachments stationed in Italy, which, in the cases provided for by the London Convention of June 15, 1951, ratified by Law No. 1335 of November 30, 1955, are subject to the jurisdiction of their home state: the constitutionality of this provision was confirmed by the Constitutional Court on the grounds that our Constitution does not prohibit the waiver of jurisdiction for the purpose of achieving objectives of cooperation between States, even in criminal matters; thus, in this regard, the principle of the prior determination of the competent court, which governs only the allocation of jurisdiction within the legal system (Constitutional Court, October 12, 1990, No. 446, *id.*, 1991, I, 1314).

III. — In legal scholarship, three views are in contention regarding the attribution of international legal personality (most recently analyzed in TREVES, *International Law: Fundamental Issues*, Milan, 2005, 56 ff.).

According to a more traditional approach, international legal personality can only be based on an agreement—which must be reciprocal—in which such legal personality is established through mutual recognition; prior to such recognition, there would be only "the possibility of the personification of the State" (ANZILOTTI, *Course in International Law*, Rome, 1912, I, 84): A natural consequence of this assumption—which, moreover, is fraught with implications—is that legal personality would exist only within the framework of relations between States that have mutually acknowledged their capacity to establish international relations through acts capable of binding them, that is, acts endowed with binding force (in the same vein, from various perspectives, see, among others, KELSEN, *"Recognition in International Law: Theoretical Observations,"* in **American Journal of International Law**, 1941, 605; OTTOLENGHI, **Lezioni di diritto internazionale pubblico**, Turin, 1947, 101; GUGGENHEIM, **Traité de droit international public**, Geneva, 1953–1967, I, 188; VERHOEVEN, *"Relations internationales de droit privé en l'absence de reconnaissance d'un État, d'un gouvernement ou d'une situation,"* in **Recueil des Cours de l'Académie de Droit International de la Haye**, 1985, III, 9). In this context, see the Bolzano Court, May 21, 1971 (*Foro it.*, 1972, I,

the suspect, who enjoyed immunity as President of Montenegro, a constituent part of the international legal entity "Federal Republic of Yugoslavia."

The order was not appealed.

Subsequently, on January 23, 2004, after conducting further preliminary investigations, obtaining new opinions from the Ministry of Foreign Affairs and other documentation, and noting that the suspect's status had changed upon his appointment as President of the *Concepts of* the Council of Ministers of Montenegro*, the public prosecutor again requested the precautionary measure based on the same facts.

By order dated April 16, 2004, the preliminary investigations judge of the Court of Naples again rejected the request, recognizing the international immunity of the suspect as Prime Minister of Montenegro, who retained his international autonomy in the exercise of internal sovereignty.

226, with a note by BERNARDINI,*"So-called" foreign judgments or Italian "pseudo-judgments" of divorce*), according to which, since the German Democratic Republic was not recognized at the time, it followed that "an *Amtsgericht"*(court) as such did not exist, and therefore the divorce pronounced by it—for which recognition was sought in Italy—was also non-existent.

Scholars critical of this approach (see, for example, in Italy, CONFORTI, *International Law*, Naples, 2002, 16; CASSESE, *International Law. Outlines*, Bologna, 2003, I, 89, as well as TREVES, *International Law: Fundamental Issues*, op. cit., 60) points out that the purely declaratory nature of recognition for the purpose of acquiring international legal personality, on the other hand, finds various positive examples: in the context of the codification of international law undertaken by the American states, it is enshrined in the Convention on the Rights and Duties of States, adopted in Montevideo on December 26, 1933 (League of Nations, *Collection of Treaties and International Agreements Registered by the Secretariat of the League of Nations*, vol. 165, 19), and in the Charter of the Organization of American States (Art. 12), signed in Bogotá on April 30, 1948 (United Nations, *Recueil des traités*, vol. 119, 49); more generally, the same principle is affirmed by the Institute of International Law in Article 1 of its 1936 resolution on the recognition of new States and new governments (I.D.I., *General Table of Resolutions*, 1873–1956, Basel, 1957, 11). The same legal doctrine argues that the eminently political purpose of recognition—and thus its lack of connection to the acquisition of international legal personality—is also supported by cases in which the possibility of obtaining such recognition was contractually conditioned on certain requirements met by the new entity: this is the case of the declaration signed on December 16, 1991, by the foreign ministers of the then twelve members of the European Community (*Bulletin of the European Communities*, 1991, 1.4.5, as well as in *the European Journal of International Law*, 1993, vol. 4, 74–77), in whose guidelines on the recognition of new states in Eastern Europe and the Soviet Union—and, separately, regarding the emergence of states from the former Yugoslavia—it was established that, in order to be recognized by the Community, the provisions of the United Nations Charter, the Helsinki Final Act, and the Charter of Paris must be respected with regard to the rule of law, democracy, and human rights; furthermore, the rights of ethnic and national groups and minorities would have to be guaranteed, the inviolability of borders respected, obligations regarding nuclear nonproliferation, regional security, and stability accepted, as well as a commitment to resort to arbitration for disputes concerning state succession. Moreover, it should be noted that a portion of legal scholarship (DUPUY, *Droit international public*, Paris, 2002, 93), in relation to this point, has recently proposed the formation of a rule of international law under which recognition—no longer a discretionary act—would be prohibited in the absence of proof of compliance with the democratic characteristics of the domestic legal system and with international obligations. Conversely, however, it may be noted that the arbitral commission established by the aforementioned Declaration of the Twelve, in Opinion No. 10 of July 4, 1992 (*European Journal of International Law*, 1993, vol. 4, 90), specified: "While recognition is not a prerequisite for the creation of a State and has a purely declaratory effect, it is nonetheless a discretionary act that other States may perform in accordance with procedures established by those States, and is subject to the sole condition of complying with the peremptory norms of general international law, in particular those prohibiting the use of force in international relations or those designed to safeguard the rights of ethnic, religious, or linguistic minorities."

To overcome these doubts—and, more generally, those concerning the possibility of a relative legal personality (with respect to individual acts of recognition)—a second group of scholars has posited that international legal personality depends on a specific norm (see, among others, on this point, BISCARETTI DI RUFFIA, *Contributo alla teoria giuridica della formazione degli Stati*, Milan, 1938, *passim*; BISCOTTINI, *"On the Formation of the State,"* in *Riv. dir. internaz.*, 1939, 378; BALLADORE PALLIERI, *Public International Law*, Milan, 1962, 20; KELSEN, *Principles of International Law*, New York, 1967, 387; CRAWFORD, **The Creation of States in International Law**, Oxford, 1979, *passim*), or, according to what may be considered a variation of this approach, from the synergy of the body of general international norms (ZICCARDI, **The Constitution of the International Legal Order**, Milan, 1943, 264; PERASSI, *Lectures on International Law*, Padua, 1955, I, 57; REUTER, **Principles of Public International Law**, in **Recueil des Cours de l'Académie de Droit International de la Haye**, 1961, II, 499; MORELLI, *International Law*, Padua, 1967, 106; O'CONNELL, *International Law*, London, 1970, I, 80 and 165; ARANGIO RUIZ, *"States and Other Entities* (International Subjectivity)," entry in *the Novissimo Digesto*, Turin, 1972, XVIII, 22 ff.).

According to these arguments, therefore, the disputed legal personality is attributed by a fundamental norm—which should logically be presumed—or, in any case, by a comprehensive consideration of the international legal order.

More recent scholarship, however, drawing on this latter observation, tends to assert that it merely demonstrates that international rules presuppose the entities they seek to regulate: the emergence of the international legal person, in this way, is identified as an essentially political—that is, pre-legal—phenomenon (TREVES, *International Law: Fundamental Issues*, op. cit., 56), which reflects the significance attributed to the actual territorial sovereignty of a given organization for the purposes in question.

IV. — In *the ruling* set forth in the second principle, the Court of Cassation, after affirming that in order to speak of an international entity, there must be sovereign government over the individuals located within a given territory, rules out that such a determination can be deemed positive in the case of the Republic of Montenegro. In reaching this conclusion, however, the Court of Cassation denies autonomous international legal personality to the federated state, attributing it solely to the Union of Serbia and Montenegro, finding interpretive support in the latter's Constitution. Article 14 of the Serbian-Montenegrin Constitution, in fact, states that the Union of Serbia and Montenegro is "a single subject of international law," specifying in paragraph 2 that the constituent states may participate in supranational organizations that do not require "international legal personality as a prerequisite for all members."

There are no national case law precedents that *specifically* address the issue of the relationship between international legal personality and a federal state.

See - No one disputes that the relationships between a member state and the federation are governed by domestic law, just as the relationships between member states themselves are, even when the latter are regulated by reference to international norms (see, on this subject, BALLARINO, *"Subjects of International Law,"* entry*in the Treccani Legal Encyclopedia*, Rome, 1993, XXIX, 6).

An analysis of the federal state's constitutional structure is in any case necessary, given that it may allow member states to engage in autonomous international activity, thereby leaving room for scenarios involving distinct legal subjectivity. For example, Article 32, § 3, of the German Constitution (*Grundgesetz*) allows individual *Länder*—but only with the consent of the federal government—to conclude treaties in matters over which they have legislative authority. Similarly, the Swiss Federal Constitution permits the cantons—described in Article 2 as "sovereign"—to sign international agreements, within their own territorial jurisdiction, regarding public finance, local transportation, and public safety, in derogation from Article 8, which assigns such power "exclusively" to the federation; however, approval by the Federal Council remains necessary. By contrast, in the United States of America, the *treaty-making power* is the prerogative of the federal government, and in fact legal doctrine denies that the individual states of this union possess international legal personality: see TREVES, *International Law, Fundamental Issues*, op. cit., 69 ff., who points out—in general support of the thesis that this is always an internal matter of the federal state—that the Vienna Conference on the Law of Treaties (United Nations, *United Nations Conference on the Law of Treaties. Official Documents, 2nd Session*, New York, 1970, 5) rejected a proposal by the International Law Commission for an article intended to establish that member states of federal unions could "have the capacity to conclude treaties, if permitted by the federal constitution and within the limits provided for."

With specific reference to the Federal State of Serbia and Montenegro, it should finally be noted that the International Court of Justice, even recently, has recognized the union's international legal personality and, in reconstructing the relationships—in terms of succession or autonomy—with the former Socialist Federal Republic of Yugoslavia, has shown that it considers only the federation itself, and not the individual states comprising it, to be a subject of international law (International Court of Justice, February 3, 2003, *Yugoslavia v. Bosnia and Herzegovina*, in **Foro It.**, Rep. 2003, entry *"Public International Law,"* No. 89, and **Riv. dir. internaz.**, 2003, 467; the decision can also be found at <www.icj.cij.org>).

The public prosecutor filed an appeal, which was dismissed by the Court of Naples by order of May 18, 2004 (*Foro it.*, Rep. 2004, entry *"Criminal Jurisdiction,"* no. 11). The court observed that Djukanovic retained international immunity as Prime Minister of the Government of Montenegro, a constituent state of the Serbian-Montenegrin Union; that, in fact, each of the two states of this union maintained full governmental autonomy, as evidenced by the Union's Constitution and by the fact that each of the two governments could separately enter into international agreements; that in any case, given the time that had elapsed since the alleged events, there were serious doubts as to whether precautionary measures were currently necessary, also taking into account both the institutional position of the suspect in relation to the alleged offenses (which did not concern criminal offenses of universally recognized unlawfulness, but rather offenses aimed at protecting the financial interests of the individual State, and regarding whose unlawfulness another State may take a different position, especially if it pursues the goal of promoting international trade and economic integration) and the fact that the phenomenon of smuggling appeared to be on the decline.

The public prosecutor at the Court of Naples filed an appeal to the Court of Cassation, arguing:

*a)* lack of immunity. He notes, first of all, that the Ministry of Foreign Affairs had issued a series of opinions regarding the suspect's status; the earliest of these, from 2002, ruled out that Montenegro qualified as a subject of international law, whose activities were instead attributable solely to the Federal Republic of Yugoslavia, while the most recent ones, from 2003, although reiterating the previous opinion, pointed out that Montenegro's international legal personality might have been strengthened by a joint request from the two republics to be admitted to Interpol separately. He therefore emphasizes that it is undisputed that there is no international custom recognizing immunity for the head of government of a member state of a federal state. It further notes that, in the absence of a provision

The criterion of effectiveness, however, also governs the assessment of any potential subjective international legal capacity of a federal state, as demonstrated by the historical example of the republics that were part of the USSR, which were not considered subjects of international law despite the 1936 Soviet Constitution, as confirmed by the Constitution of October 7, 1977, granted them international *status*, including the right to exchange diplomatic and consular representatives, as well as the right to secede from the union (see, on this subject, BALLARINO, *Subjects of International Law*, op. cit., 6 ff.).

VI. — In addition to the federated states, another example of subnational entities regarding which the question of capacity under public international law has arisen—particularly in recent times—is that of the Italian regions. Constitutional Law No. 3 of October 18, 2001, profoundly altered the content of Article 117 of the Constitution, establishing in its final paragraph—with reference to matters in which regional legislative authority is recognized, either exclusively or concurrently—that "in matters within its jurisdiction, the region may conclude agreements with States and arrangements with territorial entities within another State, in the cases and in the forms governed by the laws of the State." The Constitutional Court (Constitutional Court Decision No. 238 of July 19, 2004, *Foro It.*, 2004, I, 2925, with a note by ROMBOLI), in examining the constitutionality of Law No. 131 of June 5, 2003, implementing the new framework, affirmed that "the new constitutional provisions do not deviate from the fundamental principles already set forth in the past by this Court: reservation of jurisdiction over foreign policy to the State; recognition of the regions' capacity for international activity; and the subordination of this capacity to the State's effective ability to exercise control over regional initiatives, in order to avoid conflicts with national foreign policy. The novelty arising from the changed regulatory framework is essentially the recognition at the constitutional level of a 'foreign power' of the regions—that is, the authority, within the scope of their own competences, to enter into not only agreements with counterpart entities of other States but also full-fledged agreements with other States, albeit in the cases and forms determined by State laws (Article 117, paragraph 9). This foreign power must, however, be coordinated with the state's exclusive jurisdiction over foreign policy; hence, the state has the authority to determine the "cases" and regulate the "forms" of this regional activity, so as to safeguard the unified interests expressed in national foreign policy. The regions, in exercising the powers granted to them, do not therefore act as "delegates" of the State, but rather as "autonomous entities that interact directly with foreign States, though always within the framework of safeguards and coordination provided by the powers of the State." Because of this persistent subordination, legal doctrine rejects any notion of the regions' international legal personality (see, most recently, TREVES, International Law: Fundamental Issues, op. cit., 71 and 683). [P. PORRECA]



As noted in the relevant literature, the rule providing for criminal immunity for heads of state and government derives from international custom, as also confirmed by the 1961 Vienna Convention on Diplomatic Relations. This is, however, an exceptional rule, in that it derogates from the principle of equality and applies exclusively to heads of state and government recognized as sovereign by the Italian State. Currently, however, Italy does not recognize the State of Montenegro as a sovereign state. It is, in fact, a federal state, and its institutional leaders cannot be granted immunity under international law. On the other hand, since this is a rule of customary law, any uncertainty regarding the existence of a generalized practice and the absence of evidence of such a practice inevitably result in the absence of a custom—and even more so of a custom that derogates from a fundamental rule of any legal system.

It further observes that, on the basis of international conventions, it must be ruled out that Montenegro can be recognized as a sovereign state by Italy and the international community. In fact, in all those international treaties and conventions establishing various intergovernmental organizations in which the states of Serbia and Montenegro are shown to have participated, they did so as the Serbo-Montenegrin Union, excluding any recognition of the individual member states. Furthermore, the lack of representativeness of the individual member states of the federation is also evident in the Constitutional Charter of the Serbo-Montenegrin Union, specifically in Articles 14, 5, 7, 6, 19, etc. To hold otherwise, in fact, would amount to establishing a new principle whereby a single State could be recognized as having three forms of representation on the international stage (in this case, that of the Serbo-Montenegrin Union, the Serbian State, and the Montenegrin State).

Therefore, in the absence of international custom establishing immunity for the suspect, Italian jurisdiction must be deemed to exist, and there is no procedural impediment to the adoption of the precautionary measure;

*b)* with regard to the need for precautionary measures, the Court observes that in this case there is a clear danger of a recurrence of i similar conduct and that special-preventive needs exist, as demonstrated by the suspect's ongoing criminal activity—carried out through his associates—in consistently providing logistical support to his accomplices, selecting smugglers based on their professional expertise in criminal activity, and aiding them by creating illegal monopolies. There is also a clear risk of evidence tampering, as evidenced by the preparation of false documents and the unscrupulous and insidious manner in which the suspect has acted to obtain information that could be used to ensure impunity. The requested measure is further necessitated by the transnational nature of the criminal organization and the ability of its individual cells to survive even in the face of events affecting individual members.

It is therefore observed that the arguments regarding the distinctive nature of the suspect's institutional position in relation to the alleged offenses are contradictory and illogical. Indeed, the distinctive nature of the institutional position is, on the contrary, such as to actualize the **periculum libertatis** in light of the indisputable capacity to interfere with and influence future criminal conduct. Furthermore, the argument that the legality of the conduct is debatable—as a factor that hypothetically negates the danger—is erroneous and irrelevant, since it is precisely a possible reduced awareness of the reprehensible nature of the conduct that increases the need for precautionary measures.

*Grounds for the Decision.* — The first ground is well-founded.

It is undisputed that there is a rule of international law that guarantees heads of state, heads of government, and foreign ministers of a sovereign state personal inviolability—that is, exemption from all measures restricting personal liberty—as well as immunity from criminal jurisdiction for any activity they undertake, whether or not in the exercise of their official duties. The *rationale* for this rule lies in the consideration that such measures would constitute an impediment to the performance of official duties, given that these necessarily involve frequent official trips abroad. Inviolability and immunity, moreover, also apply even when the aforementioned institutional bodies are located within the territory of their own State and not within that of the foreign State issuing the authoritative act. International law provides, however, that inviolability and

immunity apply provided that the entity qualifies as a sovereign organization, equivalent—in terms of structural requirements, personnel and territorial components, and characteristics of effectiveness—to a state. In other words, the triad of people, government, and territory must be present; consequently, the population and the government apparatus it has established must necessarily be situated in a location where that government exercises its authority and where the activities of its agents take place (June 28, 1985, Yasser Arafat, *id.*, 1986, II, 277).

The international norm in question is a customary norm; therefore, as a norm of general international law, it automatically becomes part of the Italian legal system and is immediately effective within it by virtue of the reference provided for in Art. 10, paragraph 1, of the Constitution, and gives effect, in the cases it provides for, to the exception to subjection to Italian criminal law established by Article 3 of the Criminal Code.

According to a long-standing decision of this Supreme Court, widely accepted by legal scholars, for an entity under international law to be considered sovereign—with the consequence of immunity from criminal jurisdiction for its institutional leaders and its foreign minister—it must possess what is known as international legal capacity, that is, it must be recognized by other States as an equal and independent entity, possess the power to dispose of its own constituent elements, and be capable of establishing, within the context of international relations, binding relationships that give rise to active or passive legal positions, with the corresponding ability, within the entity itself, to bind the entity and its components to such positions through acts having binding force (July 16, 1980, Bacchelli, *id.*, Rep. 1982, entry *"Criminal Law,"* No. 10).

It should be clarified, however, in this regard, that the opinion expressed—albeit *only incidentally*—in the two aforementioned decisions of this Supreme Court and reaffirmed by the Supreme Court on March 17, 1997, Ghiotti, *id.*, Rep. 1998, cited entry, No. 10 (an opinion also adopted by the appellant public prosecutor), according to which, for a State to be considered sovereign for the purposes of criminal immunity under our legal system with respect to its institutional leaders, it would be necessary for that State to be recognized as sovereign by the Italian State and by other States. According to the rules of general international law—which form part of the Italian legal system pursuant to Article 10, paragraph 1, of the Constitution, and whose existence is acknowledged by international legal doctrine—in fact, a governmental organization that effectively and independently exercises its power over a territorial community automatically becomes a subject of international law. A sovereign state, therefore, exists as an autonomous subject of international law when the triad of territory, people, and government is present, along with the requirements of effectiveness and independence. It is not, however, necessary for that governing body to be recognized by other states. The recognition of a state by another state, in fact, is an act devoid of legal consequences (just like non-recognition) and belongs to the realm of politics, as it reveals nothing more than the intention to establish friendly relations, exchange diplomatic representations, and initiate more or less intensive forms of cooperation through the conclusion of agreements. It therefore has no constitutive value with regard to legal personality under international law. As international law scholars observe, to hold otherwise would be to admit that, once a new governmental organization has established itself with the characteristics of effectiveness and independence, pre-existing states could exercise, through recognition, a sort of power to admit it into the international community.

In the case at hand, therefore, it is entirely irrelevant whether Italy (like other States) has recognized Montenegro as a sovereign State for the purpose of granting criminal immunity to its institutional leaders.

Also as a preliminary matter, it should be clarified, first of all, that immunity—which exempts certain individuals from the application of criminal sanctions and constitutes an exception to the principle of the mandatory nature of criminal law—cannot be applied extensively or by analogy, as Article 3 of the Criminal Code makes clear by limiting it solely to cases established by domestic public law and international law (Supreme Court, March 17, 1997, Ghiotti, cit.). Indeed, the appellant prosecutor observes that any uncertainty regarding the existence of a generalized practice and the absence of evidence of such a practice inevitably result in the absence of a customary—custom—and this is all the more true in the case of a custom that derogates from a general rule, which is the cornerstone of every legal system.

Second, it should be clarified that, since the statutory and customary rules governing the matter are undisputed, and since the presence or absence of an act of recognition of Montenegro by the Italian government and other governments is irrelevant, the question of whether the current suspect, as head of the government of Montenegro, is entitled to criminal immunity, is resolved by the factual question of whether Montenegro has the status of a sovereign state within the international community and under international law.

Although they do not in themselves constitute such legal personality or such status, both the Constitution of Montenegro and of the Serbian-Montenegrin Union, as well as the attitude adopted by other States toward Montenegro and vice versa, and in particular participation in international treaties or conventions or in intergovernmental organizations, as well as the opinions expressed by the authority that, under our legal system, is responsible for international relations and for monitoring and collecting data and relevant information in international law—namely, the Ministry of Foreign Affairs.

With regard to these opinions, it should be noted that, in a memorandum dated May 29, 2002, the Diplomatic Litigation Service reported that, as things stood, Montenegro did not qualify as a subject of international law—a status that belongs to the State—organization—because, when international subjectivity is linked to the criterion of effectiveness, that is, the actual exercise of governmental authority, consideration is given to the entirety of state organs. Indeed, it is state organs that contribute to the creation of international norms; it is to state organs that the content of substantive international norms is addressed, all of which are aimed at limiting or regulating governmental authority; and finally, it is state organs—and they alone—that, through their conduct, can give rise to the State's international legal personality. The note concluded by observing that international activities relating to the territory of Montenegro are attributable to the Federal Republic of Yugoslavia and its State organs.

In a note dated May 31, 2002, the Department of Diplomatic Litigation and Treaties reiterated that Montenegro is not a sovereign and independent State, but rather a constituent part of the international entity known as the Federal Republic of Yugoslavia, specifying, moreover, that in order to answer the question regarding the criminal immunities of members of the Montenegrin government, it was necessary to know their specific positions, as they may have acted in their capacity as organs of the Yugoslav federation.

It is worth noting that the doubts raised by this note are irrelevant to the case at hand, since Djukanovic has not been charged with conduct occurring in the exercise of official functions (which would require determining whether he acted in his capacity as an organ of Montenegro or of the federation) but rather with criminal activities that fall outside the scope of government duties. What is relevant for the purposes of immunity, therefore, is solely his position as head of the government of Montenegro and, consequently, the sovereign status of that country.

In a note dated June 30, 2003, the Diplomatic Litigation and Treaties Service further stated that international criminal immunity applies to individuals performing functions within independent and sovereign states, but not to members of state unions. It further clarified that Montenegro, although part of a federation with Serbia within the new Federal Republic of Yugoslavia, had assumed a distinct degree of independence, enshrined in its accession to the existing union. In fact, when the Constitution of the latter union reserves for the member states a capacity of an international nature—namely, the international representation of the union itself—the system of immunities could be considered extendable even to the heads of state and government of the union's member states.

It is therefore clear that no evidence in favor of the Djukanovics' alleged criminal immunity can be derived from this note, since it expresses only doubts and the possibility of applying by analogy the rule establishing international criminal immunity to certain cases involving member states of a union that reserve for themselves a form of international standing; whereas, as noted above, the customary rule providing for immunity—as an exceptional rule—is subject to strict interpretation and is not applicable by analogy or by extension to persons other than the heads of EU Member States—

and independent, even if they possess some element of an international nature.

In a subsequent note dated October 24, 2003, the same department confirmed its previous opinions, noting, however, that there had been certain factual elements that would appear to reinforce the international legal personality of each republic forming part of the Union of Serbia and Montenegro—namely, Serbia's exercise of its own rights and interests during negotiations regarding Kosovo and the joint request by the two republics to be admitted separately to Interpol.

It is clear that even this note provides no indication in favor of Djukanovic's criminal immunity, since it merely expresses some doubts regarding a possible "strengthening" of the international legal personality of the member states of the Union of Serbia and Montenegro, whereas recognition of immunity requires certain proof—which certainly cannot be derived from these doubts and mere possibilities, which, moreover, relate to simple negotiations and membership in an organization with specific purposes—that Montenegro has acquired the status of a sovereign and independent state under international law.

Finally, in a note dated December 7, 2003, the Ministry's Directorate General for European Countries merely forwarded a copy of the note dated October 24, 2003.

In conclusion, according to the assessment of the Ministry of Foreign Affairs—that is, the body competent in matters of international relations and institutionally tasked with gathering relevant information under international law—Montenegro is not a sovereign and independent state and therefore not an autonomous subject of international law, whose institutional bodies would consequently be entitled to criminal immunity. In fact, the Ministry was unable to provide any evidence from which one could conclusively infer that Montenegro had attained independence and effective governance—and thus sovereignty—while the doubts and concerns duly expressed pertain to secondary and marginal aspects, which are certainly insufficient in and of themselves to establish the status of a sovereign state, and tend, at most, to suggest the possibility of hypothesizing entities that are, in some more or less significant respect, similar, and the possibility of applying the rules governing sovereign states by analogy. These considerations are irrelevant to the case at hand because, as already noted, analogical applications are not permitted in matters of criminal immunity.

Furthermore, the lack of Montenegro's status as a sovereign state is entirely evident upon examining the constitution of the Serbian-Montenegrin Union, which excludes any legal personality under international law for the individual states.

First of all, the title itself—"Constitutional Charter of the Union State of Serbia and Montenegro"—rather than "Union of Serbia and Montenegro"—is highly significant, as it immediately underscores that this is a single, unified state and not a confederation of multiple states. Also worth noting are Article 5 (which addresses the territory of the Union State and its inviolable border), Article 6 (which establishes the capital—or administrative center—of the Union State, an assembly, a council of ministers, and a court of the Union State), Article 7 (which establishes citizenship of the Union State), Article 19 (which governs the Union State Assembly and its relations with the assemblies of the member states), Article 26 (concerning the President of the Union State), Article 33 (concerning the Council of Ministers of the Union State), Article 46 (on the Court of the Union State), and Article 54 (on the armed forces of the Union State).

But Article 14 (concerning international legal personality) is particularly significant; its first paragraph provides that "Serbia and Montenegro shall be a single subject of international law and a member of global and regional international organizations that require international legal personality as a prerequisite for all members," while the second paragraph provides that "Member States may be members of global and regional organizations that do not require international legal personality as a prerequisite for all members."

This provision is reiterated in both Article 15 (concerning the establishment and maintenance of international relations), according to which the State Union of Serbia and Montenegro shall establish international relations with other States and with international organizations and shall conclude international treaties and agreements, while (second paragraph) the Member States may maintain international relations, conclude international agreements, and establish their representative offices in other States, provided that this does not conflict with the powers of the State Union of Serbia and Montenegro or the interests of the other Member State, and by the subsequent Article 19, which provides that the Assembly of the Union State has, among other things, jurisdiction over measures relating to the Union State's membership, as a subject of international law, in international organizations and over the rights and obligations arising therefrom.

It is also worth noting that the reference made in the order of the judge for preliminary investigations and in that of the review court to Art. 34 of the Constitution in question, which does not at all provide—as erroneously held by the two aforementioned orders—that the individual member states are represented on an equal footing and on a rotational basis in international organizations; rather, it provides only that the individual member states are represented, precisely on an equal footing and on a rotational basis, in the representative positions of the Union State of Serbia and Montenegro within international organizations. In other words, it is reaffirmed that representation in international organizations is exclusively that of the Union State and not of the member states; however, representatives of the two member states are then appointed to this unified representative position on an equal footing and according to a rotation system. A similar principle is then established in paragraph 3 regarding the participation of representatives of the member states in diplomatic and consular missions; however, these missions are not under the authority of the member states but rather, as a single entity, under that of the State Union of Serbia and Montenegro.

It thus follows from the Constitutional Charter of the Union State of Serbia and Montenegro that the only entity capable of acquiring legal personality under international law and of becoming a member of international organizations that require such legal personality as a prerequisite is exclusively the Union State, and not the two member states. The latter may indeed maintain international relations, conclude international agreements, establish representative offices abroad, and participate in global and regional organizations—but only provided that such actions do not require or entail the acquisition of legal personality under international law (reserved solely for the Union State) and, in any case, do not conflict with the powers of the Union State or the interests of the other State.

In light of these decisive factors, the circumstances—highlighted by the judge for preliminary investigations and generally referred to by the review court—regarding Serbia's sole participation in the Vienna negotiations concerning Kosovo and the joint request by the two States to be admitted separately to Interpol are entirely irrelevant. These are, in fact, marginal and insignificant episodes that are certainly not sufficient to confer international legal personality and that, in any case, fall fully within the scope of those international relations that Articles 14 and 15 of the Constitution of the Union State recognize for individual member states—precisely because they do not presuppose international legal personality and do not conflict with the powers of the Union State or the interests of the other member states.

For the same reasons, other agreements referred to by the defense during the proceedings are equally irrelevant, such as an agreement between Montenegro and Macedonia, between Montenegro and Albania, and between a public security unit of the Italian Ministry of the Interior and a public security unit of the Montenegrin Ministry of the Interior.

Indeed, on closer inspection, the fact that the defendant was able to cite only these limited and marginal examples of Montenegro's international relations clearly confirms that this State lacks sovereignty and autonomous international legal personality.

In conclusion, based on the facts established during the trial, it must be held that, at present, within the international community, the State of Montenegro does not qualify as a sovereign state or as an autonomous and independent subject of international law. Therefore, the conditions do not exist for the exceptional rule of customary international law—incorporated into our legal system pursuant to Art. 10, paragraph 1, of the Constitution, according to which heads of state and government and foreign ministers of sovereign states and subjects of international law are entitled to immunity from criminal jurisdiction. (*Omissis*)