# EXHIBIT 4

III

*Fatto e diritto.* — Con sentenza 26 ottobre 1982 il Pretore di Napoli condannava Artiano Luigi e Siciliano Carlo alla pena di mesi due di arresto e lire 400.000 di ammenda ciascuno, per il reato di cui all'art. 718 c.p. in rel. al d.l. 14 aprile 1948 n. 496, per aver organizzato il giuoco d'azzardo delle scommesse clandestine sulle partite di calcio; acc. in Napoli il 18 aprile 1982.

Su appello degli imputati il Tribunale di Napoli con sentenza 26 aprile 1983 assolveva il Siciliano per insufficienza di prove, confermando la sentenza del pretore nei confronti dell'Artiano.

L'Artiano ricorre per cassazione deducendo che: il risultato della partita di calcio non è affidato all'alea in tutto o in parte, ma dipende dal volere dei giuocatori e perciò non ricorre, l'ipotesi di cui all'art. 718 c.p.; manca ogni motivazione sull'elemento costitutivo del reato, essendo state, le giocate, trovate in una abitazione privata; nel caso in esame era applicabile l'art. 88 l. p.s. modificata dalla l. 22 dicembre 1951 n. 1379 e dal d.l. 14 aprile 1948 n. 496.

Il ricorso nella triplice censura in cui si articola non è fondato.

Il giuoco clandestino calcio-scommesse rientra tra i giuochi d'azzardo previsti dall'art. 721 c.p., poiché sussiste il fine di lucro e la vincita o la perdita appaiono indipendenti dall'abilità del giuocatore ed in particolare perché l'esito è ricollegato ad operazioni ulteriori quali quelle di determinazione delle quotazioni delle partite e ad eventuali accordi per un risultato pilotato.

Di conseguenza non può ritenersi che detti giuochi si sostanzino in lotterie o in concorso pronostici riservati, dalla legge (14 aprile 1948 n. 496) allo Stato.

A nulla rileva che, nella specie, il giuoco « non » si sia svolto in una « casa da giuoco » posto che la casa privata adibita, sia pure occasionalmente, all'esercizio di giuco d'azzardo, deve ritenersi « circolo privato ».

Il ricorso deve essere, pertanto, respinto. (*Omissis*)

---

CORTE DI CASSAZIONE; sezione I penale; sentenza 28 giugno 1985; Pres. CARNEVALE, Est. VALENTE, P. M. (concl. parz. diff.); ric. Arafat e altro. *Annulla parzialmente Trib. Venezia, ord. 8 ottobre 1984.*

**Legge penale — Immunità di capi di Stato esteri — Capi di organizzazioni non statuali — Esclusione — Fattispecie** (Cost., art. 10; cod. pen., art. 3).

**Libertà personale dell'imputato — Mandato di cattura — Indizi di colpevolezza** (Cod. proc. pen., art. 252).

**Reato commesso in Italia o all'estero — Concorso di persone nel reato** (Cod. pen., art. 6, 110).

*Perché un ente di diritto internazionale possa ritenersi sovrano, con il conseguente riconoscimento al suo capo delle prerogative dell'inviolabilità personale e dell'immunità dalla giurisdizione penale, occorre che esso presenti requisiti di struttura, componenti personali e spaziali e connotati di effettività equivalenti al tipo statuale; in base al diritto internazionale, sono Stati solo quegli enti che, in piena indipendenza, esercitano il proprio potere di governo effettivo nei confronti di una comunità stanziata su di un territorio, onde è da ritenersi principio acquisito che la sintesi statuaria debba essere espressa dalla triade popolo-governo-territorio e che richieda, quindi, necessariamente che la componente della popolazione e l'apparato di governo da essa espresso ricadano su un luogo di esercizio di tale governo e dell'attività dei soggetti (nella specie, si è esclusa per l'Organizzazione per la liberazione della Palestina la qualifica di organizzazione sovrana equivalente al tipo statuale).* (1)

*Gli indizi di colpevolezza (che, nella specie, la corte ha ritenuto insufficienti a creare un apprezzabile* fumus *onde ha annullato senza rinvio il mandato di cattura e l'ordinanza confermativa), richiesti dall'art. 252 c.p.p. per l'emissione di un mandato o di un ordine di cattura, non devono avere lo stesso grado di concludenza e di certezza delle prove occorrenti per il rinvio a giudizio, essendo sufficiente che essi siano tali da far ritenere — nell'ambito di una valutazione effettuata allo stato degli atti — probabile la colpevolezza dell'imputato in ordine al reato a lui attribuito.* (2)

*In accoglimento del principio di ubiquità sancito dall'art. 6, 2° comma, c.p., non può distinguersi, ai fini della procedibilità a richiesta del ministro di grazia e giustizia, tra i concorrenti che hanno materialmente compiuto l'azione tipica — con realizzazione nel territorio dello Stato — e quelli che hanno operato esclusivamente all'estero nella fase ideativa e preparatoria dei reati ascritti; il reato concorsuale costituisce infatti un illecito unico con pluralità di autori e, quando una parte del suo processo causale si è verificata in Italia per opera di coautori, il reato si considera commesso in Italia da parte di tutti i concorrenti, anche se taluni di essi, straniero, abbia agito materialmente rimanendo all'estero.* (3)

Il giudice istruttore del Tribunale di Venezia, in data 4 settembre 1984, emetteva mandato di cattura nei confronti di Yasser Arafat e Kalaf Salah, imputati entrambi: *a*) del delitto di cui agli art. 110, 112, n. 1, c.p., 9 l. 14 ottobre 1974 n. 497, per avere, il primo quale capo e rappresentante dell'organizzazione O.l.p., agendo in concorso con il secondo e con altri non

---

(1) In senso conforme, Cass. 16 luglio 1980, Bacchelli, *Foro it.*, Rep. 1982, voce *Legge penale*, n. 10: perché un ente di diritto internazionale possa dirsi sovrano, con la conseguenza dell'esonero del suo capo dall'imperio della legge penale, occorre che abbia la c.d. « capacità giuridica internazionale », cioè sia riconosciuto dagli altri Stati come pari e indipendente, sia titolare di un potere di disposizione relativamente ai propri elementi costitutivi e possa porre in essere nell'ambito delle relazioni internazionali rapporti obbligatori tali da dar luogo a situazioni soggettive attive o passive, con la correlativa possibilità, nell'ambito dell'interno dell'ente stesso, di vincolare questo e le sue componenti alle dette situazioni con atti aventi forza cogente. Questa nozione di Stato rispecchia un principio recepito dalla dottrina costituzionalistica: per tutti, BARILE, *Istituzioni di diritto pubblico*[4], Padova, 1982, 10 s.; CRISAFULLI, *Lezioni di diritto costituzionale*[2], Padova, 1970, I, 49 s.; MORTATI, *Istituzioni di diritto pubblico*[9], Padova, 1975, I, 22 s. In una differente prospettiva, nella dottrina internazionalistica, G. ARANGIO-RUIZ, *Diritto internazionale e personalità giuridica*, Bologna, 1972, 43 s.; GIULIANO-SCOVAZZI-TREVES, *Diritto internazionale*[2], Milano, 1983, I, 37 s.; sul tema, v. anche ZICCARDI, *Ordinamento giuridico* (dir. internaz.), voce dell'*Enciclopedia del diritto*, Milano, 1980, XXX, 804 s.

Sull'immunità dei capi di Stato esteri — che deriva da norme di diritto internazionale generalmente riconosciute, le quali trovano riconoscimento all'interno del nostro ordinamento attraverso l'art. 10, 1° comma, Cost. — DOMINIONI, *Immunità, estraterritorialità e asilo nel diritto penale internazionale*, in *Riv. it. dir. e proc. pen.*, 1979, 379 s.; ESPOSITO, *Capo dello Stato*, voce dell'*Enciclopedia del diritto*, Milano, 1960, VI, 244 s.; MIELE, *L'immunità giurisdizionale degli organi stranieri*[2], 1961, 121 s. In riferimento alle immunità penali, nel diritto interno e internazionale, v. anche DELOGU, *L'immunità penale dei consiglieri regionali*, in *Riv. it. dir. e proc. pen.*, 1980, 621 s.; PAGLIARO, *Immunità* (dir. pen.), voce dell'*Enciclopedia del diritto*, Milano, 1970, XX, 213 s.; SEMINARA, *L'immunità penale dei membri del parlamento europeo*, in *Riv. it. dir. e proc. pen.*, 1982, 128 s.

Sull'art. 10 Cost., per tutti, CASSESE, in *Commentario della Costituzione*, a cura di BRANCA, Bologna-Roma, 1975, *sub* art. 10, 485 s. Cfr. inoltre Corte cost. 18 giugno 1979, n. 48, *Foro it.*, 1979, I, 1644 (commentata da CONDORELLI, *Le immunità diplomatiche e i princìpi fondamentali della Costituzione*, in *Giur. costit.*, 1979, I, 455 s.) che, in tema di immunità diplomatiche (si noti, a tale proposito, come una parte della dottrina tenda ad assimilare la posizione degli agenti diplomatici a quella dei capi di Stato esteri: tra gli altri, CAVALLARI, *La capacità dell'imputato*, Milano, 1968, 73 s.; v. però MIELE, *op. cit.*, 19 s.), ha affermato che il meccanismo di adeguamento automatico alle norme di diritto internazionale generalmente riconosciute, sancito dall'art. 10, 1° comma, Cost., non consente la violazione di princìpi fondamentali dell'ordinamento costituzionale, ma nella specie la immunità in questione si armonizza con le disposizioni di raffronto in quanto le deroghe alla giurisdizione in favore dell'agente diplomatico servono ad assicurare l'espletamento della missione diplomatica, istituto imprescindibile nel diritto internazionale garantito costituzionalmente.

(2) Principio pacifico in giurisprudenza: da ultimo, Cass. 3 dicembre 1984, De Caro, *Riv. pen.*, 1985, 921; 21 novembre 1984, Spagnoli, *id.*, 1986, 107; 6 novembre 1984, Vadalà, *ibid.*; 17 ottobre 1984, Costantino, *id.*, 1985, 737; 11 ottobre 1984, Antoniello *ibid.*, 600. Per ulteriori riferimenti, v. anche Cass. 14 gennaio 1983, Catanzariti, *Foro it.*, 1984, II, 137.

(3) Conf., da ultimo, Cass. 23 novembre 1983, Papadimitru, *Giust. pen.*, 1984, II, 641; 15 febbraio 1980, Vittor, *Foro it.*, Rep. 1981, voce *Concorso di persone nel reato*, n. 17; 30 ottobre 1972, Radici, *id.*, Rep. 1973, voce *Reato commesso in Italia o all'estero*, n. 5; 23 ottobre 1972, Orlando, *ibid.*, n. 4. In dottrina, v. ARAGONA, *Sulla rilevanza degli atti preparatori ai fini del principio di ubiquità nel concorso di persone nel reato*, in *Riv. it. dir. e proc. pen.*, 1969, 545 s.; DEAN, *Norma penale e territorio*, Milano, 1963, 268 s.; PAGLIARO, *Legge penale nello spazio*, voce dell'*Enciclopedia del diritto*, Milano, 1973, XXIII, 1061; SINISCALCO, « *Locus commissi delicti* », *id.*, 1974, XXIV, 1057; TREVES, *La giurisdizione nel diritto penale internazionale*, Padova, 1973, 213 s.

identificati, e previ contatti in territorio francese tra quest'ultimo, esponente della predetta organizzazione, e le Brigate rosse, approvato un comune programma di collaborazione ed in particolare autorizzato, per finalità eversive, la fornitura di un ingente quantitativo di armi e di munizioni (appresso specificate) che veniva introdotto, via mare, nel territorio della Repubblica italiana, in Venezia nel settembre 1979, da Mario Moretti, Riccardo Dura, Andrea Varisco, Sandro Galletta e Massimo Gidoni (tutti appartenenti alle Brigate rosse e sottoposti a separato giudizio), previa consegna del materiale in territorio libanese (150 fucili mitragliatori Sterling; 5 bazooka; 10 missili terra-aria; numerose bombe anticarro e antiuomo; vari chili di esplosivo plastico; fucili F.a.l.; migliaia di cartucce di vari calibri; accessori per armi); *b*) del delitto di cui agli art. 110, 112, n. 1, 81 c.p., 10 l. 14 ottobre 1974 n. 497, 21 l. 18 aprile 1975 n. 110, 1 l. 6 gennaio 1980 n. 15, perché, in esecuzione di un medesimo disegno criminoso, nelle rispettive qualità di presidente del comitato esecutivo dell'O.l.p. il primo, e di preposto ai servizi di sicurezza della fazione maggioritaria Al Fatah il secondo, concorrevano nell'illegale detenzione di parte delle armi di cui al capo che precede (missili terra-aria, mitra Sterling, razzi, ecc.), che venivano materialmente detenute dalla colonna veneta delle Brigate rosse, a disposizione — in territorio italiano — dell'O.l.p., e precisamente a Mestre e in seguito a Valpago del Montello, fino alla data del loro ritrovamento, nel febbraio 1982, da parte delle forze di polizia; commettendo il fatto per finalità di terrorismo e, in particolare, per compiere attentati in danno di cose e persone.

Con ordinanza in data 8 ottobre 1984, il Tribunale di Venezia, decidendo in sede di riesame, confermava il mandato di cattura nei confronti di entrambi gli imputati, rimasti latitanti.

Avverso detto provvedimento, i difensori hanno proposto ricorso per cassazione, deducendo un motivo riguardante la sola posizione processuale di Yasser Arafat e due motivi comuni ad entrambi gli imputati.

Per il solo Arafat si denuncia la violazione dell'art. 3 c.p., in quanto il mandato di cattura lederebbe l'immunità — o meglio l'inviolabilità personale — che all'imputato spetta quale presidente dell'Organizzazione per la liberazione della Palestina (O.l.p.), ente che ha soggettività di diritto internazionale e « concreta valenza di Stato », essendo riconosciuto dall'O.n.u. quale unico e legittimo rappresentante del popolo palestinese ed intrattenendo rapporti con molti Stati — tra i quali quello italiano —.

La censura non ha fondamento.

L'operatività della deroga alla sottoposizione alla legge penale italiana in virtù della norma consuetudinaria internazionale (immediatamente efficace nel nostro ordinamento per il disposto dell'art. 10, 1° comma, Cost.), che assicura ai capi di Stato esteri l'inviolabilità personale (ovvero la sottrazione a tutti i provvedimenti limitativi della libertà personale) e l'immunità dalla giurisdizione penale, postula che l'ente — a favore del cui capo è invocata la deroga — sia qualificabile come organizzazione sovrana, equivalente, per requisiti di struttura, componenti personali e spaziali e per connotati di effettività, al tipo statuale.

Ora, è noto che il diritto internazionale riconosce come Stati soltanto quegli enti che, in piena indipendenza, esercitano il proprio potere di governo effettivo nei confronti di una comunità stanziata su di un territorio, onde è da ritenersi principio acquisito che la sintesi statuaria debba essere espressa dalla triade popolo-governo-territorio e che richieda, quindi, necessariamente che la componente della popolazione e l'apparato di governo da essa espressa ricadano su un luogo di esercizio di tale governo e dell'attività dei soggetti.

Da ciò resta escluso che l'O.l.p. possa costituire un'organizzazione sovrana, che equivalga al tipo statuale, perché — come esattamente osservato dal giudice *a quo*, con prospettazione condivisa dalla puntuale requisitoria del procuratore generale presso questa corte — nella stessa difetta il requisito della sovranità territoriale, non surrogato da forme di controllo sui campi profughi, che si esercitano, pur sempre, con il consenso e sotto la sovranità dello Stato che li ospita.

D'altronde, com'è pressoché unanimemente riconosciuto dalla dottrina e come testimoniato dalla dottrina e come testimoniato dalla prassi degli Stati, i « movimenti di liberazione nazionali » — tra i quali è ricompresa l'O.l.p. — godono di una limitata soggettività internazionale. Agli stessi è riconosciuto un *locus standi* all'interno della comunità internazionale, al fine limitato di discutere, su basi di perfetta parità con gli Stati territoriali, i modi ed i tempi dell'autodeterminazione dei popoli da loro politicamente controllati; in applicazione del principio di autodeterminazione dei popoli, ritenuto norma consuetudinaria a carattere cogente. Cosí si spiega l'ammissione dell'O.l.p. ai lavori in seno alle Nazioni unite, certamente non in qualità di membro, ma neppure di semplice osservatore, bensí per trattare appunto questioni inerenti l'autodeterminazione del popolo palestinese negli organismi a ciò deputati. La limitata soggettività internazionale trova conferma anche nelle informazioni acquisite presso il ministero degli affari esteri circa i rapporti tenuti dalla Repubblica italiana con l'organizzazione in argomento, dalle quali risulta: *a*) che tali rapporti, sebbene siano regolari ed abbiano raggiunto i più alti livelli — in quanto il presidente dell'O.l.p. è stato ricevuto dal presidente della repubblica e si è intrattenuto con il presidente del consiglio e, in più occasioni, con il ministro degli affari esteri — mantengono « un carattere formale, diverso da quello di normali rapporti tra Stati »; *b*) che l'O.l.p. « pur essendo un'entità largamente rappresentativa delle istanze del popolo palestinese, non riveste (almeno nella fase attuale) le caratteristiche proprie di una organizzazione statuale: caratteristiche che sono generalmente richieste ai fini di un riconoscimento formale »; *c*) che, all'ufficio dell'O.l.p., istituito in Roma dal 1974, « non è riconosciuto uno *status* diplomatico in senso stretto, ma, in pratica, si è fatto in modo che i direttori dell'ufficio fossero ammessi a godere di tale *status*, consentendo che essi fossero accreditati da parte di una delle ambasciate arabe presenti nella capitale tra i membri del proprio personale ».

Quest'ultimo dato, confermando che l'O.l.p. non ha, nei confronti dello Stato italiano, il diritto di legazione attivo e passivo, né in forza del diritto internazionale generale, né in base ad una norma di diritto internazionale pattizio, è particolarmente significativo ai fini del presente ricorso, data la generale corrispondenza, nell'ordinamento dello Stato accreditatario, tra l'immunità dell'agente diplomatico e quella (storicamente modellatasi sulla prima) del capo dello Stato estero accreditato. Inconferente, a tal riguardo, è, poi, il richiamo ad un riconoscimento, sia esso *de iure* o *de facto* di tale organizzazione, concesso da qualche governo statale. È da negare, infatti, al riconoscimento valore costitutivo della personalità internazionale, appartenendo esso alla sfera della politica e risultando, quindi, privo di conseguenze sul piano giuridico. Accertato che l'O.l.p. non presenta, almeno nella fase attuale, le caratteristiche proprie di uno Stato, per cui a favore del suo capo non può essere invocata la norma internazionale consuetudinaria che assicura ai capi di Stato l'inviolabilità personale e l'immunità dalla giurisdizione penale, resta da accertare se i privilegi assicurati ai capi di Stato possano attribuirsi ad Arafat, in virtù della particolare soggettività internazionale riconosciuta all'O.l.p.

La risposta non può che essere negativa.

È ammissibile — seppure controverso — che, come logica conseguenza dell'ammissione di organizzazioni non riconducibili al tipo statuale in seno a comunità internazionali, possono essere riconosciute ai rappresentanti di tali organizzazioni le immunità che il diritto internazionale garantisce ai rappresentanti degli Stati; ciò, però, è assolutamente da escludersi come regola generale, non esistendo, allo stato attuale del diritto internazionale, nessun obbligo, in capo agli Stati, di riconoscere le immunità in parola.

La garanzia delle immunità a favore dei capi di Stato e di governo stranieri è, infatti, conseguente esclusivamente alla personalità internazionale completa dell'ente rappresentato.

Tali persone fisiche, perciò, potranno fruire di immunità solo in forza di particolari convenzioni internazionali o di norme liberamente introdotte dallo Stato nel proprio ordinamento interno. È noto, ad esempio, che i comitati costituiti durante la prima guerra mondiale dalle nazionalità soggette all'impero austro-ungarico (comitato polacco, cecoslovacco, jugoslavo) ottennero dalle potenze dell'intesa, per i loro rappresentanti, il trattamento riservato agli agenti diplomatici; ai governi in esilio (di Polonia, Norvegia, Olanda, Lussemburgo, Jugoslavia, Grecia), che durante il secondo conflitto mondiale presero sede in Gran Bretagna, il parlamento inglese provvide a definire lo *status* e ad estendere ai loro membri ed alti funzionari i privilegi e le immunità diplomatiche, con il *Diplomatic privileges (Extensions) Act* del 1941.

Nel nostro attuale ordinamento, fra le norme che stabiliscono immunità fuori delle ipotesi previste dal diritto internazionale consuetudinario, vanno individuate quelle relative allo *status* dei funzionari di organizzazioni internazionali, quali l'O.n.u., la F.a.o, la Comunità economica europea, accreditati presso lo Stato italiano, o, comunque, operanti nel territorio dello stesso; nessuna disposizione analoga si riscontra, però, quanto ai capi ed ai rappresentanti dell'O.l.p. ai quali l'immunità non risulta assicurata né da convenzioni internazionali vincolanti per lo Stato italiano e

rese esecutive all'interno, né da norme autonomamente poste dal nostro legislatore.

In mancanza di norme del genere, sembra ovvio che l'immunità non possa essere creata in virtù dei contatti ufficiali tra l'Arafat e le più alte autorità governative della repubblica, giacché anche tali contatti attengono alla sfera della politica e risultano privi di conseguenze sul piano giuridico. Né può assumere rilievo la circostanza — ripetutamente richiamata nella memoria difensiva dell'Arafat — che i contatti con le autorità governative italiane — ed in particolare, con quelle deputate ai rapporti internazionali, quali il presidente del consiglio ed il ministro degli affari esteri — si siano ripetuti anche dopo l'emissione del mandato di cattura, di cui si tratta, in quanto — come correttamente rilevato dal procuratore generale presso questa corte — il riconoscimento dell'immunità attiene alla determinazione della sfera di applicabilità di una norma interna e tale determinazione, quando anche ottenuta col riferimento alle norme di diritto internazionale, resta compito esclusivo dell'autorità giudiziaria. A questo punto, sembra opportuno prendere in esame il secondo dei motivi comuni ai due ricorrenti, per ragioni di logica sistematicità, apparendo evidente che l'eventuale accoglimento dello stesso rende superflua la trattazione dell'altro.

Con tale motivo, i ricorrenti deducono la nullità del provvedimento impugnato per difetto di motivazione circa gli indizi di colpevolezza, in quanto le accuse si fondano su testimonianze *de relato*, peraltro generiche ed inattendibili e su sibillini appunti manoscritti, contenenti nomi di battaglia e riferimenti in cifra: cioè, su dati ed elementi che, sebbene provengano da noti esponenti delle B.R. (quali Savasta, Sensani ed altri), non hanno alcuna consistenza e concludenza e sono del tutto inidonei a dimostrare la personale responsabilità degli imputati ed il coinvolgimento dell'una, piuttosto che dell'altra frazione o corrente dell'O.l.p.

In particolare, la difesa dell'Arafat sottopone a minuziosa ed elaborata critica sia le dichiarazioni del Savasta — il quale ha asserito di aver ricevuto dal Moretti confidenze ed informazioni circa le modalità dell'operazione e l'assenso che alla stessa sarebbe stato dato dal capo dell'O.l.p. —, sia l'interpretazione data dal tribunale agli appunti del Sensani — i quali, per esplicita ammissione del perito, sono di decifrazione incerta ed incompleta e, comunque, non contengono alcun riferimento preciso ed identificabile al presidente Arafat ed alla consegna delle armi —, per dedurre l'assoluta inconsistenza degli elementi posti a fondamento della personale responsabilità penale del ricorrente.

La difesa del Salah, a sua volta, svolge critica volta a sostenere l'arbitrarietà della identificazione del proprio assistito con la persona che, secondo l'accusa, avrebbe condotto le trattative e concluso l'accordo per conto dell'O.l.p.

Va, preliminarmente, rilevato che, con le dedotte censure, più che un vizio di motivazione, viene denunziata una violazione di legge e, specificamente, dell'art. 252 c.p.p., per essere stati posti a fondamento del provvedimento restrittivo della libertà personale elementi indiziari non concludenti ai fini della responsabilità penale dei ricorrenti, in ordine alle imputazioni loro ascritte.

Sotto tale profilo, osserva questa corte che, secondo un principio giurisprudenziale ormai consolidato — e ribadito anche dopo l'entrata in vigore della l. 12 agosto 1982 n. 532 —, gli indizi di colpevolezza, richiesti dall'art. 252 c.p.p. per l'emissione di un mandato o di un ordine di cattura, non devono avere lo stesso grado di concludenza e di certezza delle prove occorrenti per il rinvio a giudizio (e, tanto meno, delle prove richieste per la condanna), essendo sufficiente che essi siano tali da far ritenere — nell'ambito di una valutazione effettuata allo stato degli atti— probabilmente la colpevolezza dell'imputato in ordine al reato a lui attribuito. Alla stregua di tale principio, evidente appare l'infondatezza delle censure proposte nell'interesse del Salah.

Benvero, nei confronti di tale imputato, i giudici di merito hanno evidenziato molteplici e collegati elementi le numerose testimonianze *de relato*, peraltro indipendenti e concordi (Savasta, Galati, Busatti, Borso, Fenzi, Brogi) circa gli incontri in territorio francese tra esponenti B.R. del massimo livello e membri dell'O.l.p., per l'attuazione di un piano di reciproco interesse con appoggio materiale dell'O.l.p. (armi ed altro) ed appoggio logistico e politico da parte delle B.R. (armamento a disposizione dei palestinesi in Italia); i riscontri contenuti nel manoscritto compilato dal Sensani, che menziona, per la parte palestinese, Abu Iyad, esponente dei servizi di sicurezza di Al Fatah, altrimenti indicato — dai testi di cui innanzi — come « Al » o come ministro degli interni dell'O.l.p.; l'identificazione di tale personaggio con l'imputato Khalaf Salah, raggiunta sulla scorta delle indicazioni fornite dal capo-centro S.i.s.m.i. in Beirut; le dichiarazioni rese, in separati procedimenti, da Patrizio Peci e da Sergio Gaudino, circa la fornitura di ulteriori quantitativi di armi da parte dell'O.l.p.; le caratteristiche delle armi, attestanti, in modo sicuro, la provenienza delle stesse dall'O.l.p.; ecc.), certamente idonei, nel loro insieme, a rendere quanto meno probabile, nel grado richiesto dall'art. 252 c.p.p., il coinvolgimento e la personale implicazione del Khalaf Salah nell'operazione criminosa sussunta in imputazione.

Quanto, invece, all'imputato Yasser Arafat, questa corte ritiene che gli elementi evidenziati dai giudici di merito non abbiano l'idoneità — anche se considerati, come si impone, nel loro insieme — a creare l'apprezzabile *fumus* di colpevolezza in ordine alla sua partecipazione ai reati contestati, che, come si è visto, costituisce il presupposto indispensabile per la legittimità dei provvedimenti restrittivi della libertà personale.

In definitiva, a carico dell'imputato in esame sono stati posti due elementi fondamentali (tutti gli altri, invero, possono ben riferirsi all'altro imputato — pur egli rivestente un alto grado di dirigenza dell'O.l.p. — e prescindere del tutto dal necessario coinvolgimento del capo dell'organizzazione): uno di natura testimoniale (la notizia, fornita dal Moretti al Savasta e da quest'ultimo ribadita nel corso dei vari interrogatori, secondo la quale il perfezionamento dell'accordo di collaborazione tra l'O.l.p. e le B.R. fu subordinato all'approvazione, poi intervenuta, del presidente Arafat) e l'altro di natura logica (l'imponenza e l'importanza dell'accordo, coinvolgente temi di strategia internazionale e di natura militare, escludeva che esso si fosse potuto concludere al di fuori del comitato militare di Al Fatah, composto di cinque persone, comprendenti sia il Selah, che l'Arafat).

Ebbene, tali elementi, apprezzati nel loro corretto valore probatorio, non appaiono forniti di concludenza e certezza, per il fine che interessa, essendo il primo quasi evanescente e, comunque, scarsamente concreto ed il secondo sfornito di quella forza logica che, sola, consente, nel sillogismo indiziante, di pervenire ad un giudizio di concludenza in ordine al fatto da provare. E ciò tanto più se si tiene conto che la necessaria partecipazione di Arafat all'accordo e, quindi, all'operazione criminosa, appare contraddetta da alcuni accadimenti notori che hanno avuto come protagonisti l'O.l.p. ed i suoi rappresentanti, quali il tentativo di rovesciamento di Arafat da parte proprio del Khalaf-Salah e la posizione assunta dallo stesso Arafat, in occasione del sequestro dell'on. Moro, di aperto contrasto con quella sulla quale si attestava l'ala estremista facente capo al Khalaf. Il ricorso dell'Arafat va, pertanto, accolto, con l'annullamento senza rinvio, sia dell'ordinanza del tribunale, che del mandato di cattura emesso da quel giudice istruttore.

Con il primo dei motivi comuni ai due ricorrenti il cui esame va limitato alla sola posizione del Salah, è dedotta la violazione degli art. 7, 8, 9 e 128 c.p., sul rilievo che si è proceduto senza la richiesta del ministro della giustizia, pur trattandosi di imputati stranieri e di delitto politico commesso all'estero, non compreso tra quelli indicati nel n. 1 dell'art. 7 c.p. Più specificamente, si sostiene che, poiché, secondo l'imputazione contenuta nel mandato di cattura, le trattative tra O.l.p. e B.R. si sono svolte in territorio francese e la consegna delle armi è avvenuta in territorio libanese, ivi si sarebbe esaurita la rilevanza penale del fatto attribuito ai ricorrenti ed ivi avrebbe avuto termine l'operatività del loro concorso, del quale il Moretti, ottenute le armi, non aveva più bisogno per introdurre le stesse nel territorio italiano.

Tali censure — che la difesa del Salah limita espressamente al primo capo di accusa e che, peraltro, sono manifestamente incongrue rispetto al capo B — non possono trovare accoglimento perché le imputazioni ascritte al ricorrente riguardano fatti che, ai sensi dell'art. 6, 2° comma, c.p., devono considerarsi commessi in territorio italiano.

All'imputato è addebitato, a titolo di concorso morale, non la semplice consegna o cessione di materiale bellico alle Brigate rosse, bensí l'introduzione di tale materiale nel territorio dello Stato (capo A) e la successiva detenzione di una parte dello stesso, depositata in località veneta e tenuta, dalle B.R., a disposizione dell'O.l.p. in vista di futura utilizzazione per attentati palestinesi in Italia. La volizione dell'imputato, quindi, ha trasceso il momento della consegna ed ha investito la finale destinazione delle armi. A lui, infatti, si ascrive — sulla base degli elementi indiziati ampiamente enunciati nel mandato di cattura e nell'ordinanza di riesame — di avere previsto e voluto proprio l'illegale ingresso delle armi nel territorio italiano e la costituzione di una parte di esse in deposito, quale appoggio logistico alle azioni

dell'O.l.p., nel suddetto territorio; il tutto nell'ambito di un piano di ampia collaborazione operativa. La condotta attribuita all'imputato costituisce, in astratto, partecipazione ed apporto consensuale e causale alla realizzazione del reato contestato, posto in essere da altri concorrenti nel territorio dello Stato. Opera, dunque, nei riguardi di tutti i compartecipi, la norma del 2° comma dell'art. 6 c.p., che accogliendo il c.d. criterio dell'ubiquità ha esteso l'ambito della territorialità, valorizzando — al fine di far ricadere nella sfera territoriale il reato nella sua previsione tipica — cosí la condotta che l'evento e, all'interno della condotta (azione-commissione), anche una sola parte di essa.

Non è possibile, infatti, distinguere, ai fini della procedibilità a richiesta, tra i concorrenti che hanno materialmente compiuto l'azione tipica — con realizzazione nel territorio dello Stato — e quelli che hanno operato, esclusivamente, all'estero nella fase ideativa e preparatoria dei reati ascritti. Il reato concorsuale è un illecito unico con pluralità di autori e, quando una parte del suo processo causale si è verificata in Italia per opera di coautori, ricade per intero sotto la legge italiana: in tal caso, come è stato più volte affermato da questa corte (v., da ultimo, sez. III 30 ottobre 1972, ric. Radici, *Foro it.*, Rep. 1973, voce *Reato commesso in Italia o all'estero*, n. 5; 15 febbraio 1980, ric. Vittor, *id.*, Rep. 1981, voce *Concorso di persone nel reato*, n. 17), il reato si considera commesso in Italia da parte di tutti i concorrenti, anche se taluni di essi, straniero, abbia agito materialmente rimanendo all'estero.

---

CORTE DI CASSAZIONE; sezioni unite penali; sentenza 30 giugno 1984; Pres. MIRABELLI, Est. SATTA FLORES, P.M. (concl. conf.), ric. Vespoli. *Annulla Trib. Potenza, ord. 26 ottobre 1983.*

**Libertà personale dell'imputato — Provvedimenti istruttori — Appello — Tribunale della libertà — Parere del p.m. — Acquisizione — Necessità** (Cod. proc. pen., art. 76, 185, 263, 272 *bis*, 281; l. 12 agosto 1982 n. 532, disposizioni in materia di riesame dei provvedimenti restrittivi della libertà personale e dei provvedimenti di sequestro. Misure alternative alla carcerazione preventiva, art. 6, 13, 16).

*Il c.d. tribunale della libertà, prima di provvedere sull'appello avverso una ordinanza istruttoria in tema di libertà personale, deve acquisire, ai sensi dell'art. 76 c.p.p., il parere del pubblico ministero, anche qualora il giudizio di impugnazione sia stato attivato dallo stesso pubblico ministero.* (1)

---

(1) **Sul parere del pubblico ministero nei procedimenti di appello concernenti la libertà personale.**

1. - La presente decisione si segnala per il rigore delle argomentazioni e per l'ineccepibile soluzione del quesito, in relazione al quale si era ravvisata l'opportunità di una pronuncia a sezioni unite.

La questione riguarda la necessità o meno che il c.d. tribunale della libertà, prima di deliberare sugli appelli previsti dagli art. 263, 272 *bis*, 281 c.p.p., acquisisca il parere del pubblico ministero, ai sensi dell'art. 76 c.p.p. (per il quale, nel corso del procedimento penale, il giudice non può deliberare se non sentito il pubblico ministero, salvo i casi eccettuati dalla legge), ancorché l'impugnazione sia stata proposta dallo stesso pubblico ministero.

In primo luogo, va rilevato che, anteriormente all'introduzione del c.d. tribunale della libertà, non si riscontrano, in giurisprudenza, decisioni in ordine alla sussistenza (o meno) della necessità di acquisire il parere del pubblico ministero nei procedimenti incidentali di appello in materia di libertà personale, in quanto era pacifico che l'organo allora competente (il giudice istruttore o la sezione istruttoria) doveva acquisire obbligatoriamente il parere del pubblico ministero.

I problemi interpretativi hanno avuto origine — subito dopo l'entrata in vigore della l. 12 agosto 1982 n. 532 — dall'orientamento giurisprudenziale, ormai consolidato dopo alcune oscillazioni, secondo il quale non è necessario acquisire il parere del pubblico ministero nella procedura di riesame dei provvedimenti restrittivi della libertà personale, sia per l'inutilità di questo atto dato che il pubblico ministero ha già espresso il proprio parere con l'emissione del provvedimento sottoposto al riesame o con le obbligatorie conclusioni, ex art. 262, 1° comma, c.p.p., prima dell'emissione del provvedimento da parte del giudice istruttore, sia per le rigorose cadenze temporali, previste dall'art. 263 *bis* c.p.p., che non consentirebbero al pubblico ministero di requirere (v., per tutte, Cass. 17 gennaio 1983, P.m. c. Lo Giudice, *Cass. pen.*, 1983, 937 e *Foro it.*, Rep. 1983, voce *Libertà personale dell'imputato*, n. 137; 17 gennaio 1983, P.m. c. Pero, *id.*, 1983, II, 122; 17 gennaio 1983, P.m. c. Canzi, *ibid.*, 323; 13 giugno 1983, Veraldi, *Riv. pen.*, 1984, 88 e *Foro it.*, Rep. 1984, voce cit., n. 270; 23 giugno 1983, Bartolini, *Cass. pen.*, 1984, 1732, e *Foro it.*, Rep. 1984, voce cit., n. 268; 26 ottobre 1983, Cosmai, *ibid.*, n. 265; 15 febbraio 1984, Massini, *Giust. pen.*, 1985, III, 211; 27 giugno 1984, Arcidiacono, *Riv. pen.*, 1985, 326; e, in dottrina, DI NANNI, FUSCO, VACCA, *Il tribunale della libertà*, Napoli, 1983, 178; LEMMO, *Luci ed ombre nei primi orientamenti giurisprudenziali sul tribunale della libertà*, in *Tribunale della libertà e garanzie individuali*, a cura di GREVI, Bologna, 1983, 289. In senso contrario, si è pronunciata Cass. 26 novembre 1982, P.m. c. Kamel, *Foro it.*, 1983, II, 123, secondo la quale sarebbe indispensabile il parere del pubblico ministero in quanto, in difetto dello stesso, l'ordinanza decisoria del riesame risulterebbe viziata da nullità ex art. 185, n. 2, c.p.p. Per la necessità di acquisire il parere del pubblico ministero nella procedura di riesame si sono pure espressi, in dottrina, DEAN, *Il parere del pubblico ministero per il riesame dei provvedimenti restrittivi della libertà personale*, in *Giur. it.*, 1984, II, 205; GREVI, *Tribunale della libertà, custodia preventiva e garanzie individuali; una prima svolta oltre l'emergenza*, in *Tribunale della libertà e garanzie individuali*, cit., 33; GRILLI, *Il tribunale della libertà*, in *Giust. pen.*, 1982, III, 730; ILLUMINATI, in *Legislazione pen.*, 1983, 105; MAZZANTI, *La l. 12 agosto 1982 n. 532 sul riesame dei provvedimenti restrittivi della libertà personale e dei provvedimenti di sequestro*, in *Giust. pen.*, 1982, III, 597).

A prescindere, però, da ogni considerazione sulla necessità o meno di sentire il pubblico ministero prima di decidere sulla richiesta di riesame, deve ritenersi escluso ogni trasferimento di questa problematica nella materia degli appelli in tema di libertà personale. Ed invero, secondo il costante orientamento dottrinale e giurisprudenziale, il richiamo alla disposizione prevista dall'art. 263 *ter* c.p.p., contenuto nei testi novellati degli art. 263, 272 *bis* e 281 dello stesso codice, vale soltanto ad individuare il giudice competente (tribunale della libertà), ma non ha alcun riferimento al particolare rito ivi previsto e ai ristretti termini stabiliti dalla predetta disposizione. Conseguentemente, è indispensabile, per quanto concerne gli appelli istruttori in materia di libertà personale, l'osservanza delle disposizioni del codice di procedura penale dedicate alle impugnazioni in generale (cfr., per tutte, Cass. 2 marzo 1983, Chessa, *Giur. it.*, 1984, II, 127, e *Foro it.*, Rep. 1984, voce cit., n. 207; 4 febbraio 1983, Lo Iacono, *Cass. pen.*, 1984, 266 e *Foro it.*, Rep. 1984, voce cit., n. 383; 22 febbraio 1983, Tomasello, *Riv. pen.*, 1983, 1017 e *Foro it.*, Rep. 1984, voce cit., n. 284; 24 marzo 1983, Saya, *Riv. pen.*, 1983, 1018 e *Foro it.*, Rep. 1984, voce cit., n. 384; 3 maggio 1983, Magni, *Riv. pen.*, 1984, 80 e *Foro it.*, Rep. 1984, voce cit., n. 279; e, in dottrina, CHIAVARIO, *Tribunale della libertà e libertà personale*, in *Tribunale della libertà e garanzie individuali*, cit., 161; FATA, *Considerazioni sul procedimento di appello in tema di libertà personale*, in *Cass. pen.*, 1985, 128).

2. - Alla luce di queste considerazioni, successivamente alla riforma del 1982, la giurisprudenza in linea generale si è andata consolidando nel senso che, nei procedimenti incidentali di appello in materia di libertà personale (scarcerazione, per insufficienza di indizi o per decorrenza dei termini massimi di custodia cautelare, libertà provvisoria), il c.d. tribunale della libertà debba acquisire il parere del pubblico ministero presso la sede decidente (Cass. 13 giugno 1983, Veraldi, cit.; 11 luglio 1983, Ferrara, *Riv. pen.*, 1984, 80 e *Foro it.*, Rep. 1984, voce cit., n. 267; 30 novembre 1983, Musi, *ibid.*, n. 264; 10 gennaio 1984, Rizzoli, *id.*, 1984, II, 297; 10 maggio 1984, Mannella, *Giur. it.*, 1985, II, 320; 15 gennaio 1985, Ortolani, *Foro it.*, 1985, II, 105).

Il contrasto, risolto dalle sezioni unite con la sentenza che si annota e con altre due decisioni (ricorrenti Fazio e Rusconi) emesse in pari data, si è invece manifestato nell'ipotesi in cui il giudizio di impugnazione sia stato attivato dallo stesso pubblico ministero. Ed invero, mentre secondo un primo gruppo di decisioni, alle quali aderiscono le sezioni unite con la presente decisione, anche in questo caso il giudice non potrebbe deliberare senza aver acquisito il parere del pubblico ministero (Cass. 13 giugno 1983, Veraldi, cit.; 11 ottobre 1983, Canino, *Giust. pen.*, 1984, III, 72 e *Foro it.*, Rep. 1984, voce cit., n. 272; 30 novembre 1983, Musi, cit.; 10 maggio 1984, Mannella, cit.; 24 settembre 1984, Tovo, *Riv. pen.*, 1985, 599; 9 ottobre 1984, Eccher, *ibid.*), in altre decisioni (Cass. 14 marzo 1984, Antonov, *Foro it.*, 1984, II, 297; 20 marzo 1984, Manzo, *Riv. pen.*, 1985, 207) si è espresso parere contrario sotto il profilo che si potrebbe ritenere osservato il disposto dell'art. 76 c.p.p., mediante atti equipollenti alle richieste e alle conclusioni previste dalla disposizione stessa, quali le richieste formulate dal pubblico ministero con la dichiarazione di impugnazione e con i successivi motivi. In altri termini, non vi sarebbe alcuna necessità di acquisire il parere del pubblico ministero, in quanto tale



1. - Con ordinanza del 18 ottobre 1983, il giudice istruttore del Tribunale di Lagonegro concedeva a Vespoli Stefano, imputato di ricettazione, e in stato di carcerazione preventiva a seguito di ordine di cattura del pubblico ministero, la libertà provvisoria. Tale provvedimento veniva impugnato, con appello, dal procuratore della repubblica presso il Tribunale di Lagonegro.

Il Tribunale di Potenza, territorialmente competente (ex art. 263 *ter* c.p.p.), con ordinanza del 26 ottobre 1983 ha revocato il

III

*Facts and Law.* — By judgment of October 26, 1982, the Magistrate of Naples sentenced Artiano Luigi and Siciliano Carlo to two months' imprisonment and a fine of 400,000 lire each, for the offense under Art. 718 of the Criminal Code in relation Decree-Law No. 496 of April 14, 1948, for organizing illegal gambling in the form of clandestine betting on soccer matches; the case was heard in Naples on April 18, 1982.

Upon appeal by the defendants, the Court of Naples, in a judgment dated April 26, 1983, acquitted Siciliano due to insufficient evidence, while upholding the magistrate's judgment against Artiano. Artiano filed a petition for review with the Court of Cassation, arguing that: the outcome of a soccer match is not left to chance in whole or in part, but depends on the will of the players, and therefore the scenario described in Article 7/18 of the Criminal Code does not apply; there is a complete lack of reasoning regarding the constituent element of the offense, since the betting slips were found in a private residence; in the case at hand, Article 88 of the Public Security Law, as amended by Law No. 1379 of December 22, 1951, and Decree-Law No. 496 of April 14, 1948, was applicable.

The appeal, as articulated in its three grounds, is unfounded. Illegal soccer betting falls within the category of games of chance provided for in Article 721 of the Criminal Code, since the purpose of making a profit exists and the winnings or losses appear to be independent of the player's skill; in particular, because the outcome is linked to further operations such as the determination of match odds and any agreements to rig the result.

Consequently, such games cannot be considered lotteries or prediction contests reserved by law (Law No. 496 of April 14, 1948) to the State.

It is irrelevant that, in this case, the game "did not" take place in a "gambling house," since a private home used, even occasionally, for the purpose of gambling must be considered a "private club."

The appeal must therefore be dismissed. *(Omissis)*

---

**COURT OF CASSATION**; Criminal Section I; judgment of June 28, 1985; Presiding Judge CARNEVALE, Reporting Judge VALENTE, Public Prosecutor (partially dissenting opinion); appellants Arafat et al. *Partially overturns the order of the Venice District Court dated October 8, 1984.*

**Criminal Law — Immunity of Foreign Heads of State — Leaders of Non-State Organizations — Exclusion — Case in Point** (Constitution, Art. 10; Penal Code, Art. 3).

**Personal liberty of the defendant — Arrest warrant — Evidence of guilt** (Code of Criminal Procedure, Art. 252).

**Offense committed in Italy or abroad — Joint commission of the offense** (Penal Code, Art. 6, 110).

*For an entity under international law to be considered sovereign—with the consequent recognition of the prerogatives of personal inviolability and immunity from criminal jurisdiction for its head—it must meet structural requirements and possess personal and territorial components, as well as characteristics of effectiveness equivalent to those of a state; Under international law, only those entities that, in full independence, exercise their power of effective government over a community settled on a territory are considered states; hence, it is an established principle that the essence of statehood must be expressed by the triad of people, government, and territory and that it requires, therefore, necessarily that the population and the governing apparatus it expresses be situated in a place where such governance and the activities of the individuals are exercised (in this case, the Palestine Liberation Organization was excluded from the status of a sovereign organization equivalent to a state).*(1)

*The evidence of guilt (which, in this case, the court deemed insufficient to establish a reasonable basis for suspicion, and therefore quashed the arrest warrant and the confirmatory order without remand), required by Article 252 of the Code of Criminal Procedure for the issuance of an arrest warrant or order, need not possess the same degree of conclusiveness and certainty as the evidence required for committal to trial; it is sufficient that they be such as to lead one to believe—based on an assessment of the record as it stands—that the defendant's guilt with respect to the offense attributed to him is probable. (2)*

*In accordance with the principle of universality enshrined in Article 6, paragraph 2, of the Italian Penal Code, no distinction may be made—for the purposes of proceeding at the request of the Minister of Justice—between accomplices who physically carried out the characteristic act—within the territory of the State—and those who operated exclusively abroad during the planning and preparatory phases of the alleged offenses; the joint offense constitutes, in fact, a single offense with multiple perpetrators, and when part of its causal process has taken place in Italy through the actions of co-perpetrators, the offense is considered to have been committed in Italy by all the participants, even if some of them—being foreign nationals—acted physically while remaining abroad. (3)*

On September 4, 1984, the investigating judge of the Court of Venice issued an arrest warrant against Yasser Arafat and Kalaf Salah, both charged with: *a)* the crime referred to in Articles 110, 112, no. 1, of the Italian Criminal Code, and Article 9 of Law No. 497 of October 14, 1974, for having—the former as leader and representative of the PLO organization, acting in concert with the latter and with others not

---

(1) In the same vein, Court of Cassation, July 16, 1980, Bacchelli, **Foro It.**, Rep. 1982, entry *"Criminal Law,"* no. 10: for an entity under international law to be considered sovereign—with the consequence that its head is exempt from the application of criminal law—it must possess so-called "international legal capacity," that is, it must be recognized by other states as an equal and independent entity, possess the power to dispose of its own constituent elements, and be able to establish, within the context of international relations, legally binding relationships capable of giving rise to active or passive legal positions, with the corresponding ability, within the entity itself, to bind the entity and its components to such positions through acts having binding force. This concept of the state reflects a principle adopted by constitutional doctrine: see, among others, BARILE, *Institutions of Public Law*[4], Padua, 1982, 10 ff.; CRISAFULLI, *Lectures on Constitutional Law*[2], Padua, 1970, I, 49 ff.; MORTATI, *Institutions of Public Law*[9], Padua, 1975, I, 22 ff. From a different perspective, in international law doctrine, G. ARANGIO-RUIZ, *International Law and Legal Personality*, Bologna, 1972, 43 ff.; GIULIANO-SCOVAZZI-TREVES, *International Law*[2], Milan, 1983, Vol. I, pp. 37 ff.; on this topic, see also ZICCARDI, *Legal System* (International Law), entry*in the Encyclopedia of Law*, Milan, 1980, Vol. XXX, pp. 804 ff.

On the immunity of foreign heads of state—which derives from generally recognized rules of international law, which are recognized within our legal system through Art. 10, para. 1, of the Constitution—DOMINIONI, *"Immunity, Extraterritoriality, and Asylum in International Criminal Law,"* in *Riv. it. dir. e proc. pen.*, 1979, 379 ff.; ESPOSITO, *"Head of State,"* entry in*the Encyclopedia of Law*, Milan, 1960, Vol. VI, pp. 244 ff.; MIELE, *"The Jurisdictional Immunity of Foreign Bodies"*[2], 1961, 121 ff. Regarding criminal immunities in domestic and international law, see also DELOGU, *"The Criminal Immunity of Regional Councilors,"* in *Riv. it. dir. e proc. pen.*, 1980, 621 ff.; PAGLIARO, *"Immunity* (Criminal Law)," entry in*the Encyclopedia of Law*, Milan, 1970, vol. XX, pp. 213 ff.; SEMINARA, *"The Criminal Immunity of Members of the European Parliament,"* in *Riv. it. dir. e proc. pen.*, 1982, pp. 128 ff.

On Art. 10 of the Constitution, see generally CASSESE, in *Commentary on the Constitution*, ed. by BRANCA, Bologna-Rome, 1975, *under* Art. 10, 485 ff. See also Constitutional Court Decision No. 48 of June 18, 1979, *Foro it.*, 1979, I, 1644 (commented on by CONDORELLI, *"Diplomatic Immunities and the Fundamental Principles of the Constitution,"* in *Giur. costit.*, 1979, I, 455 ff.) which, on the subject of diplomatic immunities (note, in this regard, that a portion of the legal literature tends to equate the status of diplomatic agents with that of foreign heads of state: among others, CAVALLARI, *La capacità dell'imputato*, Milan, 1968, 73 ff.; see, however, MIELE, *op. cit.*, 19 ff.), has affirmed that the mechanism of automatic alignment with generally recognized rules of international law, enshrined in Art. 10, paragraph 1, of the Constitution, does not permit the violation of fundamental principles of the constitutional order; however, in the present case, the immunity in question is consistent with the relevant provisions, in that exemptions from jurisdiction in favor of diplomatic agents serve to ensure the fulfillment of the diplomatic mission—an indispensable institution in international law that is constitutionally guaranteed.

(2) A well-established principle in case law: most recently, Court of Cassation, December 3, 1984, De Caro, *Riv. pen.*, 1985, 921; November 21, 1984, Spagnoli, *id.*, 1986, 107; November 6, 1984, Vadalà, *ibid.*; October 17, 1984, Costantino, *id.*, 1985, 737; October 11, 1984, Antoniello, *ibid.*, 600. For further references, see also Supreme Court, January 14, 1983, Catanzariti, *Foro it.*, 1984, II, 137.

(3) See, most recently, Supreme Court, November 23, 1983, Papadimitru, *Giust. pen.*, 1984, II, 641; February 15, 1980, Vittor, *Foro it.*, Rep. 1981, entry *"Concorso di persone nel reato,"* no. 17; October 30, 1972, Radici, *id.*; Rep. 1973, entry *"Offense Committed in Italy or Abroad,"* no. 5; October 23, 1972, Orlando, *ibid.*, no. 4. In legal scholarship, see ARAGONA, *"On the Relevance of Preparatory Acts for the Purposes of the Principle of Universality in Joint Criminal Liability,"* in *Riv. it. dir. e proc. pen.*, 1969, 545 ff.; DEAN, *Norma penale e territorio*, Milan, 1963, 268 ff.; PAGLIARO, *"Criminal Law in Space,"* entry*in the Encyclopedia of Law*, Milan, 1973, XXIII, 1061; SINISCALCO,*"Locus commissi delicti," id.*, 1974, XXIV, 1057; TREVES, *Jurisdiction in International Criminal Law*, Padua, 1973, 213 ff.

identified, and following contacts on French territory between the latter—a member of the aforementioned organization—and the Red Brigades, a joint cooperation program was approved and, in particular, authorization was granted, for subversive purposes, for the supply of a large quantity of weapons and ammunition (specified below), which were smuggled by sea into the territory of the Italian Republic, specifically to Venice, in September 1979, by Mario Moretti, Riccardo Dura, Andrea Varisco, Sandro Galletta, and Massimo Gidoni (all members of the Red Brigades and subject to separate trials), following the delivery of the material to Lebanese territory (150 Sterling submachine guns; 5 bazookas; 10 surface-to-air missiles; numerous anti-tank and anti-personnel bombs; several kilograms of plastic explosives; F.A.L. rifles; thousands of cartridges of various calibers; and firearm accessories); b) the crime referred to in Articles 110, 112(1), and 81 of the Italian Penal Code; Article 10 of Law No. 497 of October 14, 1974; Article 21 of Law No. 110 of April 18, 1975; and Article 1 of Law No. 15 of January 6, 1980, because, in execution of the same criminal plan, in their respective capacities as chairman of the PLO Executive Committee (the former) and head of security services for the majority faction Al Fatah (the latter), they participated in the illegal possession of part of the weapons referred to in the preceding count (surface-to-air missiles, Sterling submachine guns, rockets, etc.), which were physically held by the Venetian column of the Red Brigades, at the disposal—on Italian territory—of the PLO, specifically in Mestre and subsequently in Valpago del Montello, until the date of their discovery in February 1982 by law enforcement; committing the offense for the purpose of terrorism and, in particular, to carry out attacks against property and persons.

By order dated October 8, 1984, the Court of Venice, ruling on a motion for reconsideration, upheld the arrest warrant against both defendants, who remained at large.

The defense counsel filed an appeal to the Court of Cassation against this order, raising one ground of appeal concerning only Yasser Arafat's procedural status and two grounds common to both defendants.

With regard to Arafat alone, the defense alleges a violation of Article 3 of the Criminal Code, on the grounds that the arrest warrant infringes upon the immunity—or rather, the personal inviolability—to which the defendant is entitled as president of the Palestine Liberation Organization (PLO), an entity possessing legal personality under international law and "concrete state status," as it is recognized by the UN as the sole and legitimate representative of the Palestinian people and maintains relations with many states—including Italy.

The objection is without merit.

The applicability of the exemption from Italian criminal law under customary international law (which is directly applicable in our legal system pursuant to Article 10, paragraph 1, of the Constitution), which guarantees foreign heads of state personal inviolability (i.e., exemption from all measures restricting personal liberty) and immunity from criminal jurisdiction, requires that the entity—on whose behalf the exemption is invoked—be classified as a sovereign organization, equivalent in terms of structural requirements, personnel and territorial components, and characteristics of effectiveness, to a state.

Now, it is well known that international law recognizes as states only those entities that, in full independence, exercise their power of effective government over a community settled on a territory; hence, it is an established principle that the essence of statehood must be expressed by the triad of people, government, and territory and that it therefore therefore, necessarily that the population and the governing apparatus it expresses be situated in a place where such governance and the activities of the individuals take place.

Consequently, it is impossible for the PLO to constitute a sovereign organization equivalent to a state, because — as correctly observed by *the referring* court, a view shared by the precise argument of the Attorney General before this Court — it lacks the requirement of territorial sovereignty, which is not substituted by forms of control over refugee camps, which are, after all, exercised with the consent and under the sovereignty of the host State.

Moreover, as is almost unanimously recognized by legal scholarship and as evidenced by the practice of States, "national liberation movements"—which include the PLO—enjoy limited international legal personality. They are granted a *locus standi* within the international community, for the limited purpose of discussing, on a basis of complete equality with territorial states, the manner and timing of self-determination for the peoples under their political control; this is in accordance with the principle of self-determination of peoples, considered a customary norm of...

**IL FORO ITALIANO** — 1986.

Thus is explained the admission of the PLO to participate in the work of the United Nations—certainly not as a member, nor even as a mere observer, but rather to address issues pertaining to the self-determination of the Palestinian people within the bodies designated for that purpose. This limited international legal standing is also confirmed by information obtained from the Ministry of Foreign Affairs regarding the relations maintained by the Italian Republic with the organization in question, from which it appears: *a)* that these relations, although regular and having reached the highest levels—since the PLO chairman was received by the President of the Republic and met with the Prime Minister and, on several occasions, with the Minister of Foreign Affairs—retain "a formal character, distinct from that of normal relations between states"; *b)* that the PLO, "while being an entity that is broadly representative of the interests of the Palestinian people, does not (at least at this stage) possess the characteristics of a state organization —characteristics that are generally required for the purposes of formal recognition"; *c)* that the PLO office, established in Rome in 1974, "is not granted diplomatic *status* in the strict sense, but, in practice, arrangements have been made so that the office directors are permitted to enjoy such *status*, allowing them to be accredited by one of the Arab embassies in the capital as members of its staff."

This last point, confirming that the PLO does not have, vis-à-vis the Italian State, the right to establish and receive diplomatic missions, neither under general international law nor under a provision of treaty-based international law, is particularly significant for the purposes of this appeal, given the general correspondence, within the legal system of the receiving State, between the immunity of a diplomatic agent and that (historically modeled on the former) of the head of the accredited foreign State. In this regard, the reference to any recognition—whether *de jure* or *de facto* —of that organization granted by any national government is irrelevant. Indeed, recognition cannot be considered a constitutive element of international legal personality, as it belongs to the sphere of politics and therefore has no legal consequences. Since it has been established that the PLO does not possess, at least at this stage, the characteristics proper to a state—and therefore the rule of customary international law ensuring heads of state personal inviolability and immunity from criminal jurisdiction cannot be invoked in favor of its leader—it remains to be determined whether the privileges granted to heads of state can be attributed to Arafat by virtue of the particular international legal personality recognized for the PLO.

The answer can only be negative.

It is conceivable—albeit controversial—that, as a logical consequence of the admission of organizations not classified as states into international communities, the immunities that international law guarantees to representatives of states may be recognized for the representatives of such organizations; however, this must be absolutely ruled out as a general rule, since, under the current state of international law, there is no obligation on the part of states to recognize the immunities in question.

The grant of immunities to foreign heads of state and government stems, in fact, exclusively from the full international legal personality of the entity **they represent**.

Such individuals, therefore, may enjoy immunities only by virtue of specific international conventions or provisions voluntarily incorporated by the State into its domestic legal system. It is well known, for example, that the committees formed during World War I by the nationalities subject to the Austro-Hungarian Empire (the Polish, Czechoslovak, and Yugoslav committees) obtained from the Entente Powers, for their representatives, the treatment reserved for diplomatic agents; for the governments-in-exile (of Poland, Norway, the Netherlands, Luxembourg, Yugoslavia, and Greece), which established their headquarters in Great Britain during World War II, the British Parliament defined their *status* and extended diplomatic privileges and immunities to their members and senior officials through the *Diplomatic Privileges (Extensions) Act* of 1941.

In our current legal system, among the provisions establishing immunity beyond the cases provided for by customary international law, one must identify those relating to *the status* of officials of international organizations—such as the UN, the FAO, and the European Economic Community—who are accredited to the Italian State or, in any case, operating within its territory; However, no analogous provision exists with regard to the heads and representatives of the OIP, for whom immunity is not guaranteed either by international conventions binding on the Italian State or

enforced within the country, nor by provisions autonomously enacted by our legislature.

In the absence of such provisions, it seems obvious that immunity cannot be established by virtue of official contacts between Arafat and the highest governmental authorities of the Republic, since even such contacts pertain to the political sphere and have no legal consequences. Nor can the circumstance—repeatedly cited in Arafat's defense brief—that contacts with Italian government authorities—and in particular, with those responsible for international relations, such as the Prime Minister and the Minister of Foreign Affairs—continued even after the issuance of the arrest warrant in question be considered relevant, since — as correctly noted by the Attorney General before this court — the recognition of immunity pertains to the determination of the scope of applicability of a domestic law, and such determination, even when based on rules of international law, remains the exclusive responsibility of the judicial authority. At this point, it seems appropriate to examine the second of the grounds common to both appellants, for reasons of systematic logic, as it is evident that if this ground is upheld, consideration of the other becomes superfluous.

With this ground, the appellants argue that the contested decision is null and void due to a lack of reasoning regarding the evidence of guilt, in that the charges are based on *hearsay* testimony— *which* is, moreover, generic and unreliable—and on cryptic handwritten notes containing nom de guerre and coded references: that is, on data and elements which, although they come from well-known members of the Red Brigades (such as Savasta, Sensani, and others), lack any substance or conclusiveness and are entirely unsuitable for proving the personal responsibility of the defendants or the involvement of one faction or current of the O.l.p. over another.

In particular, Arafat's defense subjects to a meticulous and detailed critique both the statements of Savasta—who claimed to have received from Moretti confidential information regarding the operation's details and the approval allegedly given to it by the leader of the O.l.p. — as well as the court's interpretation of Sensani's notes—which, by the expert's own admission, are unclear and incomplete and, in any case, contain no precise or identifiable reference to President Arafat or to the delivery of weapons—in order to demonstrate the absolute lack of merit in the evidence upon which the appellant's personal criminal liability is based.

Salah's defense, in turn, raises a criticism aimed at demonstrating the arbitrary nature of identifying their client with the person who, according to the prosecution, allegedly conducted the negotiations and concluded the agreement on behalf of the PLO.

It should be noted, as a preliminary matter, that the alleged grounds for appeal constitute not so much a defect in reasoning as a violation of the law—specifically, Article 252 of the Code of Criminal Procedure—since the order restricting personal liberty was based on circumstantial evidence that is inconclusive regarding the appellants' criminal liability with respect to the charges brought against them.

In this regard, this court observes that, according to a well-established principle of case law—which has been reaffirmed even after the entry into force of Law No. 532 of August 12, 1982—the evidence of guilt required by Article 252 of the Code of Criminal Procedure for the issuance of an arrest warrant or an arrest order—need not possess the same degree of conclusiveness and certainty as the evidence required for committal for trial (and, even less so, as the evidence required for conviction), since it is sufficient that they be such as to lead one to believe—based on an assessment of the case file as it stands—that the defendant is likely guilty of the offense attributed to him. In light of this principle, the groundlessness of the objections raised on behalf of Salah is evident.

Indeed, with regard to this defendant, the trial judges highlighted multiple and interconnected elements—the numerous *hearsay* testimonies, which were, moreover, independent and consistent (Savasta, Galati, Busatti, Borso, Fenzi, Brogi) regarding meetings on French territory between top-level Red Brigade (B.R.) representatives and members of the PLO, for the implementation of a plan of mutual interest with material support from the PLO (weapons and other supplies) and logistical and political support from the Red Brigade (weapons made available to Palestinians in Italy); the evidence contained in the manuscript compiled by Sensani, which mentions, on the Palestinian side, Abu Iyad, a member of Al Fatah's security services, otherwise referred to—in the aforementioned documents—as "Al" or as the PLO's Minister of the Interior; the identification of this individual as the defendant Khalaf Salah, based on information provided by the head of the SISMI center in Beirut; the statements made, in separate proceedings, by Patrizio Pecì and Sergio Gaudino regarding the supply of additional quantities of weapons by the PLO; the characteristics of the weapons, which reliably confirm their origin from the PLO; etc.), which, taken together, are certainly sufficient to render at least improbable—to the degree required by Article 252 of the Code of Criminal Procedure—the involvement and personal participation of Khalaf Salah in the criminal operation alleged in the indictment.

As for the defendant Yasser Arafat, however, this court finds that the evidence highlighted by the trial judges is not sufficient—even when considered, as required, in its entirety—to establish *a* reasonable *presumption* of guilt regarding his participation in the alleged crimes, which, as has been seen, constitutes the indispensable prerequisite for the legitimacy of measures restricting personal liberty.

Ultimately, two fundamental elements have been attributed to the defendant in question (all the others, in fact, may well pertain to the other defendant—even though he holds a high-ranking leadership position within the PLO—and are entirely independent of the necessary involvement of the organization's leader): one of a testimonial nature (the information provided by Moretti to Savasta and reiterated by the latter during various interrogations, according to which the finalization of the cooperation agreement between the PLO and the Red Brigades was contingent upon the approval, which was subsequently granted, by President Arafat) and the other of a logical nature (the magnitude and importance of the agreement, involving issues of international strategy and a military nature, precluded the possibility that it could have been concluded outside the five-member Al Fatah military committee, which included both Selah and Arafat).

However, these elements, when assessed according to their proper probative value, do not appear conclusive or certain for the purposes at hand, since the first is almost insubstantial and, in any case, lacking in concreteness, and the second lacks that logical force which, alone, allows one—in an inferential syllogism—to reach a conclusive judgment regarding the fact to be proven. This is all the more true when one considers that Arafat's necessary participation in the agreement—and, therefore, in the criminal operation—appears to be contradicted by certain well-known events involving the PLO and its representatives, such as the attempt by Khalaf-Salah himself to overthrow Arafat and the position taken by Arafat himself, during the kidnapping of Hon. Moro, which was in open conflict with that of the extremist faction led by Khalaf. Arafat's appeal must therefore be granted, with the annulment without referral of both the court's order and the arrest warrant issued by that investigating judge.

The first of the grounds common to both appellants—the examination of which must be limited solely to Salah's position—alleges a violation of Articles 7, 8, 9, and 128 of the Criminal Code, on the grounds that proceedings were initiated without a request from the Minister of Justice, even though the defendants are foreign nationals and the offense is a political crime committed abroad that is not included among those listed in Article 7(1) of the Criminal Code. More specifically, it is argued that, since, according to the charge contained in the arrest warrant, the negotiations between the PLO and the Red Brigades took place on French territory and the delivery of the weapons occurred on Lebanese territory, the criminal relevance of the act attributed to the appellants would have ended there, and their complicity would have ceased there, as Moretti, having obtained the weapons, no longer needed them to bring them into Italian territory.

These objections—which Salah's defense expressly limits to the first count and which, moreover, are manifestly incongruous with respect to Count B—cannot be upheld because the charges against the appellant concern acts which, pursuant to Article 6, paragraph 2, of the Italian Criminal Code, must be considered to have been committed on Italian territory.

The defendant is charged, as an accomplice, not merely with the delivery or transfer of military equipment to the Red Brigades, but rather with the introduction of such equipment into the territory of the State (Count A) and the subsequent possession of a portion thereof, which was stored in a location in the Veneto region and kept by the B.R., at the disposal of the PLO for future use in Palestinian attacks in Italy. The defendant's intent, therefore, extended beyond the moment of delivery and encompassed the final destination of the weapons. In fact, he is charged—based on the circumstantial evidence extensively set forth in the arrest warrant and the review order—with having planned and intended precisely the illegal entry of the weapons into Italian territory and the storage of a portion of them, as logistical support for the actions

of the O.L.P. within the aforementioned territory; all of this as part of a plan involving extensive operational collaboration. The conduct attributed to the defendant constitutes, in the abstract, participation and a consensual and causal contribution to the commission of the alleged crime, carried out by other accomplices within the territory of the State. Therefore, with respect to all co-participants, the provision of the second paragraph of Article 6 of the Criminal Code, which, by adopting the so-called "ubiquity" criterion, has expanded the scope of territorial jurisdiction, thereby—in order to bring the offense within the territorial sphere as defined by its typical elements—including not only the conduct constituting the event but also, within that conduct (the act of commission), even a single part thereof.

In fact, for the purposes of prosecution upon request, it is not possible to distinguish between accomplices who physically carried out the typical act —within the territory of the State—and those who operated exclusively abroad during the planning and preparatory phases of the alleged offenses. A joint offense is a single offense with multiple perpetrators, and when part of its causal process has occurred in Italy through the actions of co-perpetrators, it falls entirely under Italian law: in such a case, as this court has repeatedly affirmed (see, most recently, Section III, October 30, 1972, Radici case, *Foro It.*, Rep. 1973, entry *"Offense Committed in Italy or Abroad,"* No. 5; February 15, 1980, Vittor case, *id.*, Rep. 1981, entry *"Complicity in a Crime,"* no. 17), the crime is considered to have been committed in Italy by all the accomplices, even if some of them—being foreign nationals—physically carried out the act while remaining abroad.

1. - By order of October 18, 1983, the investigating judge of the Court of Lagonegro granted provisional release to Stefano Vespoli, who was charged

---

**COURT OF CASSATION;** Joint Criminal Divisions; Judgment of June 30, 1984; Presiding Judge MIRABELLI, Reporting Judge SATTA FLORES, Public Prosecutor (concluding opinion), appellant Vespoli. *Sets aside the order of the Potenza Court of First Instance dated October 26, 1983.*

**Personal liberty of the defendant — Pre-trial measures — Appeal — Court of Liberty — Opinion of the public prosecutor — Obtaining — Necessity** (Code of Criminal Procedure, Arts. 76, 185, 263, *272-bis*, 281; Law No. 532 of August 12, 1982, provisions regarding the review of measures restricting personal liberty and seizure orders. Alternative measures to pretrial detention, Art. 6, 13, 16).

*Before ruling on an appeal against a preliminary order concerning personal liberty, the so-called "freedom court" must, pursuant to Article 76 of the Code of Criminal Procedure, obtain the opinion of the public prosecutor, even if the appeal was initiated by the public prosecutor himself or herself.(1)*

---

(1) **On the opinion of the public prosecutor in appeal proceedings concerning personal liberty.**

1. - This decision is notable for the rigor of its reasoning and for its impeccable resolution of the issue, regarding which it had been deemed appropriate to issue a ruling by the full court.

The question concerns whether the so-called "freedom court," before ruling on the appeals provided for in Articles 263, *272-bis*, and 281 of the Code of Criminal Procedure, must obtain the opinion of the public prosecutor, pursuant to Article 76 of the Code of Criminal Procedure (which provides that, during criminal proceedings, the judge may not rule without hearing the public prosecutor, except in cases expressly provided for by law), even if the appeal was filed by the public prosecutor himself.

First, it should be noted that, prior to the introduction of the so-called "freedom court," there were no decisions in case law regarding whether or not it was necessary to obtain the opinion of the public prosecutor in incidental appellate proceedings concerning personal liberty, as it was undisputed that the then-competent body (the investigating judge or the investigative chamber) was required to obtain the opinion of the public prosecutor.

Interpretive issues arose—immediately after the entry into force of Law No. 532 of August 12, 1982 — from the judicial precedent, by then well-established after some initial fluctuations, according to which it is not necessary to obtain the opinion of the public prosecutor in proceedings for the review of measures restricting personal liberty, both because such a step is superfluous—since the public prosecutor has already expressed his or her opinion through the issuance of the measure subject to review or through the mandatory conclusions pursuant to Article 262, paragraph 1, of the Code of Criminal Procedure, prior to the investigating judge's issuance of the measure, and because of the strict time limits set forth in Art. *263-bis* of the Code of Criminal Procedure, which would not allow the public prosecutor to file a motion (see, among others, Cass. Jan. 17, 1983, Public Prosecutor v. Lo Giudice, *Cass. pen.*, 1983, 937 and *Foro it.*, Rep. 1983, entry *"Personal Liberty of the Defendant,"* no. 137; January 17, 1983, Public Prosecutor v. Pero, *id.*, 1983, II, 122; January 17, 1983, Public Prosecutor v. Canzi, *ibid.*, 323; June 13



with receiving stolen goods and was being held in pretrial detention pursuant to an arrest warrant issued by the public prosecutor. This decision was challenged on appeal by the public prosecutor at the Court of Lagonegro.

The Court of Potenza, having territorial jurisdiction (pursuant to Art. *263-ter* of the Code of Criminal Procedure), by order of October 26, 1983, revoked the

---

1983, Veraldi, *Riv. pen.*, 1984, 88, and *Foro it.*, Rep. 1984, cited entry, no. 270; June 23, 1983, Bartolini, *Cass. pen.*, 1984, 1732, and *Foro it.*, Rep. 1984, cited entry, no. 268; October 26, 1983, Cosmai, *ibid.*, no. 265; February 15, 1984, Massini, **Giust. pen.**, 1985, III, 211; June 27, 1984, Arcidiacono, **Riv. pen.**, 1985, 326; and, in legal scholarship, DI NANNI, FUSCO, VACCA, **Il tribunale della libertà**, Naples, 1983, 178; LEMMO, *"Lights and Shadows in the Early Case Law on the Court of Liberty,"* in **The Court of Liberty and Individual Guarantees**, edited by GREVI, Bologna, 1983, 289. To the contrary, the Court of Cassation ruled on November 26, 1982, *P.m. v. Kamel*, **Foro It.**, 1983, II, 123, which held that the opinion of the public prosecutor is indispensable because, in the absence thereof, the order granting the review would be null and void pursuant to Art. 185, no. 2, of the Code of Criminal Procedure. In legal scholarship, DEAN has also argued for the necessity of obtaining the public prosecutor's opinion in the review procedure: *"The Opinion of the Public Prosecutor for the Review of Measures Restricting Personal Liberty,"* in **Giur. it.**, 1984, II, 205; GREVI, *"The Court of Liberty, Pretrial Detention, and Individual Guarantees: A First Turning Point Beyond the Emergency,"* in **The Court of Liberty and Individual Guarantees**, op. cit., 33; GRILLI, *"The Court of Liberty,"* in *Giust. pen.*, 1982, III, 730; ILLUMINATI, in *Legislazione pen.*, 1983, 105; MAZZANTI, *"Law No. 532 of August 12, 1982, on the Review of Measures Restricting Personal Liberty and Seizure Orders, "* in *Giust. pen.*, 1982, III, 597).

Regardless, however, of any consideration regarding whether or not it is necessary to hear the public prosecutor before deciding on a request for review, any extension of this issue to the context of appeals concerning personal liberty must be ruled out. Indeed, according to established doctrinal and jurisprudential principles, the reference to the provision set forth in Article *263-ter* of the Code of Criminal Procedure, contained in the amended texts of Articles 263, *272-bis*, and 281 of the same Code, serves only to identify the competent court (the court for personal liberty), but makes no reference to the specific procedure provided therein or to the strict time limits established by that provision. Consequently, with regard to preliminary appeals concerning personal liberty, it is essential to comply with the provisions of the Code of Criminal Procedure governing appeals in general (see, among others, Court of Cassation, March 2, 1983, Chessa, *Giur. it.*, 1984, II, 127, and *Foro it.*, Rep. 1984, cited entry, No. 207; February 4, 1983, Lo Iacono, *Cass. pen.*, 1984, 266 and *Foro it.*, Rep. 1984, cited entry, No. 383; February 22, 1983, Tomasello, *Riv. pen.*, 1983, 1017 and *Foro it.*, Rep. 1984, cited entry, no. 284; March 24, 1983, Saya, *Riv. pen.*, 1983, 1018 and *Foro it.*, Rep. 1984, cited entry, no. 384; May 3, 1983, Magni, *Riv. pen.*, 1984, 80 and *Foro it.*, Rep. 1984, cited entry, no. 279; and, in legal scholarship, CHIAVARIO, *"Tribunale della libertà e libertà personale,"* in **Tribunale della libertà e garanzie individuali**, cited work, 161; FATA, *"Considerazioni sul procedimento di appello in tema di libertà personale,"* in **Cass. pen.**, 1985, 128).

2. - In light of these considerations, following the 1982 reform, case law has generally become established to the effect that, in incidental appeal proceedings concerning personal liberty (release from custody due to insufficient evidence or the expiration of the maximum terms for pretrial detention, or provisional release), the so-called "freedom court" must obtain the opinion of the public prosecutor at the court where the decision is to be rendered (Supreme Court, June 13, 1983, Veraldi, cit.; July 11, 1983, Ferrara, *Riv. pen.*, 1984, 80 and *Foro it.*, Rep. 1984, cited entry, No. 267; November 30, 1983, Musi, *ibid.*, No. 264; January 10, 1984, Rizzoli, *id.*, 1984, II, 297; May 10, 1984, Mannella, *Giur. it.*, 1985, II, 320; January 15, 1985, Ortolani, *Foro it.*, 1985, II, 105).

The conflict—resolved by the Joint Divisions in the judgment under discussion and in two other decisions (involving appellants Fazio and Rusconi) issued on the same date—arose, however, in cases where the appeal was initiated by the public prosecutor himself. Indeed, while according to an initial group of decisions—with which the Joint Divisions concur in the present decision—even in this case the judge could not render a decision without first obtaining the opinion of the public prosecutor. (Supreme Court, June 13, 1983, Veraldi, cit.; October 11, 1983, Canino, *Giust. pen.*, 1984, III, 72 and *Foro it.*, Rep. 1984, cited entry, no. 272; November 30, 1983, Musi, cited; May 10, 1984, Mannella, cited; September 24, 1984, Tovo, *Riv. pen.*, 1985, 599; October 9, 1984, Eccher, *ibid.*), while in other decisions (Supreme Court, March 14, 1984, Antonov, *Foro it.*, 1984, II, 297; March 20, 1984, Manzo, *Riv. pen.*, 1985, 207), the contrary opinion was expressed on the grounds that the provisions of Article 76 of the Code of Criminal Procedure could be deemed to have been observed through acts equivalent to the requests and conclusions provided for by that provision itself, such as the requests made by the public prosecutor in the notice of appeal and in the subsequent grounds for appeal. In other words, there would be no need to seek the opinion of the public prosecutor, since such