UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

NICOLÁS MADURO MOROS, and,
CILIA FLORES DE MADURO,

Defendants.

S4 11 Cr. 205 (AKH)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Kaylan E. Lasky
Henry L. Ross
Kevin T. Sullivan
Kyle A. Wirshba
Assistant United States Attorneys
*Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 2

I. Factual Background ........ 2

II. The Executive's Non-Recognition of the Defendants ........ 5

III. Venezuela's Non-Assertion of Immunity ........ 6

ARGUMENT ........ 7

I. The Defendants Are Not Immune From Prosecution ........ 7

A. Applicable Law ........ 8

1. Background ........ 8

2. Head-of-State Immunity ........ 10

3. Conduct-Based Immunity ........ 12

B. Discussion ........ 16

1. The Defendants Are Not Entitled to Head-of-State Immunity ........ 16

2. The Defendants Are Not Entitled to Conduct-Based Immunity ........ 23

II. Maduro Moros's Motion to Dismiss Count One Should Be Denied ........ 32

A. The Indictment Sufficiently Pleads Jurisdiction Under 21 U.S.C. § 960a ........ 32

1. Applicable Law ........ 32

2. Discussion ........ 36

B. Applying 21 U.S.C. § 960a to the Alleged Offense Conduct Does Not Violate Due Process ........ 39

1. Applicable Law ........ 39

2. Discussion ........ 41

C. Applying 21 U.S.C. § 960a to the Alleged Offense Conduct Does Not Exceed Congressional Authority Under the Foreign Commerce Clause ........ 44

1. Applicable Law ........ 44

2. Discussion ........ 46

CONCLUSION ........ 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
425 U.S. 682 (1976) ........ 16

*Alicog v. Kingdom of Saudi Arabia*,
860 F. Supp. 379 (S.D. Tex. 1994) ........ 12, 23

*Appel v. Hayut*,
No. 20 Civ. 6265 (JPC), 2021 WL 2689059 (S.D.N.Y. June 30, 2021) ........ 30

*Baker v. Carr*,
369 U.S. 186 (1962) ........ 10

*Belhas v. Ya'alon*,
515 F.3d 1279 (D.C. Cir. 2008) ........ 27

*Berizzi Bros. Co. v. The Pesaro*,
271 U.S. 562 (1926) ........ 16

*Broidy Cap. Mgmt. LLC v. Muzin*,
12 F.4th 789 (D.C. Cir. 2021) ........ 15, 26

*Doe 1 v. Buratai*,
318 F. Supp. 3d 218 (D.D.C. 2018) ........ 26, 27

*Cabiri v. Assasie-Gyimah*,
921 F. Supp. 1189 (S.D.N.Y. 1996) ........ 15, 30

*Costello v. United States*,
350 U.S. 359 (1956) ........ 33

*Devi v. Rajapaksa*,
No. 12-4081, 2013 WL 3855583 (2d Cir. Jan. 30, 2013) ........ 10

*Doe I v. State of Israel*,
400 F. Supp. 2d 86 (D.D.C. 2005) ........ 11, 23

*Doe v. De Leon*,
555 F. App'x 84 (2d Cir. 2014) ........ 13

*Doe v. Qi*,
349 F. Supp. 2d 1258 (N.D. Cal. 2004) ........ 15, 26, 30

*Dogan v. Barak*,
932 F.3d 888 (9th Cir. 2019) ........ 25

*Eliahu v. Jewish Agency for Isr.*,
919 F.3d 709 (2d Cir. 2019) ........ 30

*Fallahi v. Raisolsadati*,
No. 22 Civ. 7013 (JMF), 2022 WL 17832544 (S.D.N.Y. Dec. 21, 2022)........ 10, 23

*Filartiga v. Pena-Irala*,
630 F.2d 876 (2d Cir. 1980) ........ 29

*Flores v. S. Peru Copper Corp.*,
414 F.3d 233 (2d Cir. 2003) ........ 21

*Gibbons v. Ogden*,
22 U.S. 1 (1824)........ 44

Guaranty Trust Co. v. United States,
304 U.S. 126 (1938)........ 17, 20

*Habyarimana v. Kagame*,
696 F.3d 1029 (10th Cir. 2012) ........ 11, 23

*In re Doe*,
860 F.2d 40 (2d Cir. 1988) ........ passim

*In re Est. of Ferdinand Marcos, Hum. Rts. Litig.*,
25 F.3d 1467 (9th Cir. 1994) ........ 15, 27

*In re Investigation of World Arrangements*,
13 F.R.D. 280 (D.D.C. 1952)........ 19

*In re Sealed Case*,
936 F.3d 582 (D.C. Cir. 2019)........ passim

*In re Terrorist Attacks on Sept. 11*,
2001, 122 F. Supp. 3d 181 (S.D.N.Y. 2015) ........ 27

*Japan Line, Ltd. v. County of L.A.*,
441 U.S. 434 (1979)........ 44

*Kadic v. Karadzic*,
70 F.3d 232 (2d Cir. 1995) ........ 18

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019) ........ 16, 29

*Krantz v. United States*,
No. 98 Civ. 7218 (JG), 1999 WL 557524 (E.D.N.Y. July 27, 1999) ...................................... 34

*Lafontant v. Aristide*,
844 F. Supp. 128 (E.D.N.Y. 1994) ................................................................... 11, 18, 23

*Lehigh Valley R. Co. v. State of Russia*,
21 F.2d 396 (2d Cir. 1927) ................................................................................... 19

*Leutwyler v. Off. of Her Majesty Queen Rania Al-Abdullah*,
184 F. Supp. 2d 277 (S.D.N.Y. 2001) ...................................................................... 11, 23

*Manoharan v. Rajapaksa*,
845 F. Supp. 2d 260 (D.D.C. 2012)......................................................................... 11, 23

*Matar v. Dichter*,
500 F. Supp. 2d 284 (S.D.N.Y. 2007) ...................................................................... 15, 26

*Matar v. Dichter*,
563 F.3d 9 (2d Cir. 2009) ................................................................................ 9, 13, 15, 19

*Nankivel v. Omsk All-Russian Gov't.*,
237 N.Y. 150 (N.Y. 1923) ....................................................................................... 19

*Nat'l City Bank of New York v. Republic of China*,
348 U.S. 356 (1955)................................................................................................ 17

*Paquete Habana*,
175 U.S. 677 (1900)................................................................................................ 21

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945)............................................................................................. passim

*Republic of Peru*,
318 U.S. 578 (1943)...................................................................................... 8, 16, 21

*Republic of the Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988) .................................................................................. 15, 31

*Rosenberg v. Pasha*,
577 F. App'x ........................................................................................................ 13, 23

*Rosenberg v. Pasha*,
577 F. App'x 22 (2d Cir. 2014) ................................................................................ 13

*Samantar v. Yousuf*,
560 U.S. 305 (2010)........................................................................................ 8, 9, 20

*Schooner Exchange v. McFaddon*,
11 U.S. (7 Cranch) 116 (1812) .......... 8, 13

*Sikhs for Just. v. Singh*,
64 F. Supp. 3d 190 (D.D.C. 2014) .......... 19

State of the Netherlands v. Fed. Rsrv. Bank,
201 F.2d 455 (2d Cir. 1953) .......... 23

*Strassheim v. Daily*,
221 U.S. 280 (1911) .......... 45

*Tachiona v. Mugabe*,
169 F. Supp. 2d 259 (S.D.N.Y. 2001) .......... 11, 23

*Tawfik v. Al-Sabah*,
No. 11 Civ. 6455 (JCF), 2012 WL 3542204 (S.D.N.Y. Apr. 27, 2012) .......... 11, 23

*Trump v. United States*,
603 U.S. 593 (2024) .......... 30, 31

*Turkiye Halk Bankasi A.S. v. United States*,
598 U.S. 264 (2023) .......... 8, 9

*United States v. Al Kassar*,
582 F. Supp. 2d 488 (S.D.N.Y. 2008) .......... 40

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011) .......... 39, 40, 41, 44

*United States v. Alfonso*,
143 F.3d 772 (2d Cir. 1998) .......... 33, 34, 38

*United States v. Bankasi*,
120 F.4th 41 (2d Cir. 2024) .......... passim

*United States v. Belmont*,
301 U.S. 324 (1937) .......... 20

*United States v. Bout*,
No. 08 Cr. 365, 2011 WL 2693720 (S.D.N.Y. July 11, 2011) .......... 41, 43

*United States v. Conde*,
309 F. Supp. 2d 510 (S.D.N.Y. 2003) .......... 34

*United States v. Cordones*,
No. 11 Cr. 205 (AKH), 2022 WL 815229 n.2 (S.D.N.Y. Mar. 17, 2022) .......... passim

*United States v. Faison*,
393 F. App'x 754 (2d Cir. 2010) ........................................ 33

*United States v. Goodwin*,
141 F.3d 394 (2d Cir. 1997) ........................................ 33

*United States* v. *Hernandez*,
980 F.2d 868 (2d Cir. 1992) ........................................ 33

*United States v. Jamal Yousef*,
No. 08 Cr. 1213 (JFK), 2010 WL 3377499 (S.D.N.Y. Aug. 23, 2010)........................ 40, 43

*United States v. Kelly*,
91 F. Supp. 2d. 580 (S.D.N.Y. 2000) ........................................ 33, 43

*United States v. LaSpina*,
299 F.3d 165 (2d Cir. 2002) ........................................ 33

*United States v. Manaf*,
No. 25-41-CR, 2026 WL 2526273 (2d Cir. Aug. 27, 2026)........................................ 36

*United States v. Noriega*,
117 F.3d 1206 (11th Cir. 1997) ........................................ passim

*United States v. Noriega*,
746 F. Supp. 1506 (S.D. Fla. 1990) ........................................ passim

*United States v. Orena*,
32 F.3d 704 (2d Cir. 1994) ........................................ 34

*United States v. Pink*,
315 U.S. 203 (1942)........................................ 20

*United States v. Pinto-Mejia*,
720 F.2d 248 (2d Cir. 1983) ........................................ 39

*United States v. Saade*,
No. S1 11 Cr. 111(NRB), 2012 WL 2878087 (S.D.N.Y. July 11, 2012) ..................... 39, 40, 41

*United States* v. *Sabbeth*,
262 F.3d 207 (2d Cir. 2001) ........................................ 33

*United States v. Serrano*,
191 F. Supp. 3d 287 (S.D.N.Y. 2016) ........................................ 34, 38

*United States v. Smith*,
985 F. Supp. 2d 547 (S.D.N.Y. 2014) ........................................ 32

*United States v. Thomas*,
893 F.2d 1066 (9th Cir. 1990) .......... 44

*United States v. Varlack,*
225 F.2d 665 (2d Cir. 1955) .......... 34

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999) .......... 33, 34

*United States v. Wedd*,
993 F.3d 104 (2d Cir. 2021) .......... 32, 34, 38

*United States v. Weingarten*,
632 F.3d 60 (2d Cir. 2011) .......... 44

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) .......... 39, 40

*United States v. Yousef*,
750 F.3d 254 (2d Cir. 2014) .......... 39

Verlinden B.V. v. Cent. Bank of Nigeria,
461 U.S. 480 (1983) .......... 8

Wulfsohn v. Russian Socialist Federated Soviet Republic,
234 N.Y. 372 (N.Y. 1923) .......... 19

*Xuncax v. Gramajo*,
886 F. Supp. 162 (D. Mass. 1995) .......... 26

*Ye v. Zemin*,
383 F.3d 620 (7th Cir. 2004) .......... 11, 23

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) .......... 9, 10, 17, 35

**Statutes**

8 U.S.C. § 1189(a)(1)(C) .......... 45

18 U.S.C. § 10 .......... 44

21 U.S.C. § 841(a) .......... 34

21 U.S.C. § 960a .......... 32, 34, 39, 44

21 U.S.C. § 960a(a) .......... 34, 42

21 U.S.C. § 960a(b) .......... 35

21 U.S.C. §§ 959 .......... 37

U.S. Const. art. II .......... 10

U.S.C. § 960a(b)(1) .......... 38

U.S.C. § 960a(b)(5) .......... 36

**Rules**

Fed. R. Crim. P. 7(c) .......... 32

Fed. R. Crim. P. 12(b)(3)(B)(v) .......... 32

Fed. R. Crim. Pro. 12(b)(2) .......... 43

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendants Nicolás Maduro Moros's and Cilia Flores de Maduro's (the "defendants") motions to dismiss Superseding Indictment S4 11 Cr. 205 (AKH) (the "Indictment") on sovereign immunity grounds (*see* Dkts. 320, 324), and Maduro Moros's motion to dismiss Count One of the Indictment. (*See* Dkts. 322, 323).

The defendants claim to possess head-of-state immunity and conduct-based immunity shielding them from prosecution. The Executive Branch has determined that they are not entitled to such immunities; nor has Venezuela asserted immunity on their behalf. In light of the absolute deference afforded to the Executive Branch in matters of recognition and foreign immunities, the Executive Branch's determination—which predates the defendants' indictments and arrests in this case—is dispositive. In any event, even if this Court were to apply less than absolute deference to the Executive Branch with respect to the defendants' claims of conduct-based immunity, this Court should reject the defendants' immunity arguments for the same reasons it rejected those of their co-defendant, Clíver Alcalá Cordones, in 2022.

Maduro Moros also moves to dismiss Count One of the Indictment, which charges him and others with narco-terrorism conspiracy, in violation of 21 U.S.C. § 960a. Maduro Moros argues that Count One fails to plead required jurisdictional elements, violates due process by failing to allege any conduct aimed at the United States, and further exceeds congressional authority under the foreign commerce clause of the Constitution. These claims are without merit. Count One and the facts alleged in connection with it sufficiently plead a narco-terrorism offense, including

jurisdictional elements, to satisfy any requirements under both the due process clause and the foreign commerce clause.

The defendants' motions to dismiss should be denied.

## BACKGROUND

### I. Factual Background

On December 23, 2025, a grand jury sitting in this District returned the Indictment, charging Maduro Moros, Flores de Maduro, and several co-defendants with cocaine importation conspiracy, in violation of 21 U.S.C. § 963; and possession of machineguns and destructive devices and conspiracy to commit the same, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii), and 924(o); and also charging Maduro Moros and several co-defendants with narco-terrorism conspiracy, in violation of 21 U.S.C. § 960a.[1] (Dkt. 260). As alleged in the Indictment, the charges stem from the defendants' participation in a corrupt and violent conspiracy to traffic narcotics in partnership with narco-terrorists from the Fuerzas Armadas Revolucionarias de Colombia (the "FARC"), Ejército de Liberación Nacional (the "ELN"), the Sinaloa Cartel, the Zetas, and Tren de Aragua ("TdA"), from 1999 until 2025. (*Id.*).

Maduro Moros succeeded to the Venezuelan presidency in 2013 after the death of Hugo Chavez, having previously held a seat in Venezuela's National Assembly between 2000 and 2006. (*Id.* ¶ 5). Maduro Moros was the Venezuelan Minister of Foreign Affairs between 2006 and 2013, and the Vice President of Venezuela in 2013. (*Id.*). In 2019, Venezuela's National Assembly invoked the Venezuelan constitution and declared that Maduro Moros had usurped power and was not the legitimate President of Venezuela. (*Id.*). Nonetheless, Maduro Moros continued to claim

---

[1] Maduro Moros had been previously charged in the Second Superseding Indictment in this case, S2 11 Cr. 205 (AKH), returned in March 2020. (*See* Dkt. 11).

the powers of the Venezuelan presidency, causing more than 50 countries, including the United States, to refuse to recognize his government, including him as Venezuela's head of state. (*Id.*). In or about 2024, Venezuela held another presidential election that was again widely criticized by the international community, in which Maduro Moros declared himself the winner despite widespread condemnation. (*Id.*).

Prior to marrying Maduro Moros and becoming First Lady of Venezuela in 2013, Flores de Maduro was a Venezuelan politician for many years. (*Id.* ¶ 8). She acted as the President of the National Assembly (starting when Maduro Moros left that role to become Minister of Foreign Affairs) between 2006 and 2011, as the Attorney General of Venezuela between 2012 and 2013, and as a member of the illegitimate National Constituent Assembly starting in or about 2017 until its dissolution in 2020. (*Id.*).

Together with each other and their co-conspirators, Maduro Moros and Flores de Maduro corrupted once-legitimate institutions to facilitate the importation of tons of cocaine into the United States. (*Id.* ¶¶ 1-2). They thereby promoted a culture of corruption in which powerful Venezuelan elites enriched themselves through drug trafficking and the protection of their partner drug traffickers. (*Id.* ¶ 16). Those partners included designated foreign terrorist organizations ("FTOs")—the FARC, the ELN, the Sinaloa Cartel, and the Zetas (later known as the Cártel del Noreste), and TdA[2]—which dispatched processed cocaine from Venezuela to the United States via transshipment points in the Caribbean and Central America, such as Honduras, Guatemala, and Mexico. (*Id.* ¶¶ 4, 18). Maritime shipments were shipped north from Venezuela's coastline using

[2] Pursuant to Section 219 of the Immigration and Nationality Act, the State Department designated the FARC and ELN in 1997 (and removed the FARC in 2021); two FARC successor organizations, FARC-EP and Segunda Marquetalia, in 2021; and the Sinaloa Cartel, the Zetas, and TdA in February 2025. (Indictment ¶¶ 11-15).

go-fast vessels, fishing boats, and container ships. (*Id.* ¶ 18). Air shipments were often dispatched from clandestine airstrips, typically made of dirt or grass, and also from commercial airports under the control of corrupt government and military officials. (*Id.*). The FARC and the ELN controlled cocaine production in the mountainous regions of Colombia; the Sinaloa Cartel and Zetas controlled routes in Central America and the methods for crossing cocaine from Mexico into the United States. (*Id.* ¶ 20).

Maduro Moros, Flores de Maduro, and their co-conspirators provided law enforcement cover and logistical support for the transport of cocaine through Venezuela, with knowledge that their drug trafficking partners would move the cocaine north to the United States. (*Id.* ¶ 21). For example:

- Between approximately 2006 and 2008, while acting as Venezuela's Minister of Foreign Affairs, Maduro Moros sold Venezuelan diplomatic passports to individuals who Maduro Moros knew were drug traffickers, allowing them to move drug proceeds from Mexico to Venezuela under diplomatic cover. Maduro Moros also facilitated the movement of private planes, carrying drug proceeds from Mexico back to Venezuela, under diplomatic cover to ensure the flights did not receive any scrutiny from law enforcement or the military. On these occasions, Maduro Moros called the Venezuelan embassy in Mexico to advise that a diplomatic mission would be arriving by private plane. Then, while the traffickers met with the Venezuelan Ambassador to Mexico under the auspices of a diplomatic mission from Maduro Moros, their plane was loaded with the drug proceeds. The plane would then return to Venezuela under diplomatic cover. (*Id.* ¶ 21(a)).

- In approximately 2007, Flores de Maduro attended a meeting in which she accepted hundreds of thousands of dollars in bribes to broker a meeting between a large-scale drug trafficker and the director of Venezuela's National Anti-Drug Office, Néstor Reverol Torres. The drug trafficker later arranged to pay a monthly bribe to Reverol Torres, in addition to approximately $100,000 for each flight that was transporting cocaine to ensure the flight's safe passage, a portion of which was then paid to Flores de Maduro. (*Id.* ¶ 21(b)).

- Between approximately 2004 and 2015, Maduro Moros and Flores de Maduro worked together to traffic cocaine, much of which had been previously seized by Venezuelan law enforcement, with the assistance of armed military escorts. During this time, Maduro Moros and Flores de Maduro maintained their own groups of state-sponsored gangs known as *colectivos* to facilitate and protect their drug trafficking operation. Maduro Moros and Flores de Maduro also ordered

kidnappings, beatings, and murders against those who owed them drug money or otherwise undermined their drug trafficking operation, including ordering the murder of a local drug boss in Caracas, Venezuela. (*Id.* ¶ 21(d)).

- In approximately September 2013, Venezuelan officials dispatched approximately 1.3 tons of cocaine on a commercial flight from the Maiquetía Airport to Paris Charles de Gaulle Airport. French authorities seized the cocaine. Following the seizure, Maduro Moros convened a meeting, during which he told Cabello Rondón and Carvajal Barrios that they should not have used the Maiquetía Airport, and that they should instead use other well-established drug routes and locations to dispatch cocaine. (*Id.* ¶ 21 (i)).

On January 3, 2026, Maduro Moros and Flores de Maduro were apprehended and brought to the Southern District of New York to face the charges contained in the Indictment.

## II. The Executive's Non-Recognition of the Defendants

The United States has not recognized Maduro Moros as Venezuela's president or Flores de Maduro as Venezuela's first lady since January 2019. (Declaration of Juan Pablo Segura, Assistant Secretary for Western Hemisphere Affairs, dated October 2, 2026 ("Segura Decl.") ¶ 5).

On January 3, 2019, following the fraudulent presidential election orchestrated by Maduro Moros in 2018, the U.S. State Department recognized the 2015 National Assembly as "the last remaining democratic institution in Venezuela." (*Id.* ¶ 4). On January 23, 2019, the 2015 National Assembly declared the office of the presidency vacant and, consistent with the Venezuelan constitution, the President of the National Assembly, Juan Guaidó, was sworn in as Interim President of the country. (*Id.* ¶ 3). On that same day, President Trump issued a public statement recognizing Guaidó as the Interim President of Venezuela. (*Id.* ¶ 4). In recognizing the Guaidó government, the Executive Branch withdrew its recognition of Maduro Moros as the President of Venezuela and more than 50 other nations, "including most of Venezuela's neighbors and the majority of the European Union," joined the United States' non-recognition. *See* Fact Sheet, U.S. DEPARTMENT OF STATE, "Nicolas Maduro: Corruption and Chaos in Venezuela" (Apr. 15, 2019), *available at* https://2017-2021.state.gov/nicolas-maduro-corruption-and-chaos-in-venezuela/. At

no time thereafter did the Executive Branch, across the administrations of President Trump or President Biden, alter that position and recognize Maduro Moros as the President of Venezuela.

On January 3, 2026, Maduro Moros and Flores de Maduro were apprehended. Approximately two months later, on March 5, 2026, the United States issued a statement announcing the normalization of relations with Venezuela under interim President Delcy Rodriguez. (*Id.* ¶ 6). On March 7, 2026, President Trump confirmed the United States' formal recognition of Rodriguez's government. (*Id.*).

## III. Venezuela's Non-Assertion of Immunity

To date, Venezuela has not asserted that Maduro Moros or Flores de Maduro are immune from prosecution in this case or in any other proceeding currently pending in the United States.

The Venezuelan government has asserted the immunity of its current head of state—President Delcy Rodriguez—in other proceedings and the United States has confirmed that immunity. In a diplomatic note dated May 14, 2026, the Venezuelan Embassy conveyed a formal request from the Venezuelan government that the United States grant Rodriguez head-of-state immunity in *Kenemore v. Maduro*, 25 Civ. 23652 (S.D. Fla.), in which both Rodriguez and Maduro Moros are named defendants.[3] (Segura Decl. ¶ 8). Venezuela's diplomatic note requested immunity for Rodriguez "in accordance with well-established principles of customary international law and international sovereign courtesy, which provide that a recognized incumbent Head of State enjoys absolute immunity from judicial proceedings in foreign domestic courts." (*Id.*). On July 20, 2026, the United States filed a suggestion of immunity informing the court that Rodriguez was the head of state in Venezuela and therefore enjoyed immunity from that suit. (*Id.*).

[3] The plaintiffs in *Kenemore* alleged, among other things, narcotics trafficking, hostage-taking, and torture.

The Venezuelan government has not sought immunity on behalf of Maduro Moros in *Kenemore*. (*Id.*). The court granted default judgment against Maduro Moros on July 15, 2026. (*Id.*)

## ARGUMENT

### I. The Defendants Are Not Immune From Prosecution

In 2022, years before Maduro Moros and Flores de Maduro were apprehended and brought to the United States, this Court found, in assessing another former senior Venezuelan official's claim of immunity:

> The United States has no formal diplomatic relations with [the Maduro Moros regime] and . . . does not recognize Maduro [Moros] to be President. . . . I hold that a rogue official of a rogue state is not entitled to immunity against a criminal prosecution.

*United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *7 n.2 (S.D.N.Y. Mar. 17, 2022). This Court's assessment of the Executive Branch's non-recognition posture and resulting non-immunity was correct, and controls here: as the Executive Branch has determined, the defendants are former rogue officials of a formerly rogue state with no entitlement to immunity, either status-based or conduct-based, against prosecution.

As is described further below, the Executive Branch's determinations are entitled to absolute deference on claims of head-of-state immunity because that immunity is intertwined with the Executive Branch's exclusive constitutional authority in the recognition of foreign sovereigns, and near-conclusive deference on claims of conduct-based immunity. Accordingly, the Executive Branch's determination forecloses the defendants' claims of head-of-state immunity and the Court should likewise defer to the Executive Branch's determination on the defendants' claims of conduct-based immunity. Even if the Court were to independently analyze the defendants' conduct-based immunity claims, however, those claims would fail for substantially the same reasons they failed in *Cordones*: (i) the deference owed to the Executive Branch's determination;

(ii) the fact that exercising jurisdiction would not interfere with foreign policy—in particular, here, given Venezuela's decision not to assert immunity on the defendants' behalf; and (iii) the defendants' violations of Venezuelan law by committing narcotics trafficking and weapons offenses.

### A. Applicable Law

#### 1. Background

"[F]oreign sovereigns have no inherent right to immunity from the jurisdiction of U.S. courts." *United States v. Bankasi*, 120 F.4th 41, 46 (2d Cir. 2024) ("*Halkbank III*") (citing *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812)), *cert. denied*, 146 S. Ct. 97 (2025)). To the contrary, "foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). These common law principles, articulated in relation to foreign sovereigns, apply equally to the immunities of their officials and representatives. *See Samantar v. Yousuf*, 560 U.S. 305, 325 (2010).

As the doctrine of immunity for foreign sovereigns and their officials and representatives developed in U.S. courts as a matter of federal common law, *see Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 271 (2023) ("*Halkbank II*"), deference to the Executive Branch was a central feature of that common law. *See Halkbank III*, 120 F.4th at 47 ("[C]ourts 'consistently deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities.'" (quoting *Verlinden*, 461 U.S. at 486)); *Ex parte Republic of Peru*, 318 U.S. 578, 589 (1943) (holding that the Executive Branch's immunity determination "must be accepted by the courts as a conclusive determination by the political arm of the Government"); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) ("It is . . . not for the courts to deny an immunity which

our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize."); *id.* at 36 ("[I]t is an accepted rule of substantive law governing the exercise of the jurisdiction of the courts that they accept and follow the executive determination [regarding foreign sovereign immunity].").

Federal common law remains the touchstone of the head-of-state and foreign official immunity analysis in a criminal prosecution, notwithstanding Congress's statutory modifications to the immunity framework in certain civil contexts via its enactment of the Foreign Sovereign Immunities Act ("FSIA"). *See Samantar*, 560 U.S. at 308, 325. The Executive Branch therefore retains its authority to determine a foreign official's immunity from suit. *See id.* at 312 n.6 (noting the Executive Branch's role in determining head-of-state immunity); *see also Halkbank II*, 598 U.S. at 278-81; *Halkbank III*, 120 F.4th at 48 ("'[I]n the common-law context, [courts] still defer to the Executive's determination of the scope of immunity.'" (quoting *Matar v. Dichter*, 563 F.3d 9, 15 (2d Cir. 2009))). That deference applies "regardless of whether the Executive seeks to grant or . . . deny immunity." *Halkbank III*, 120 F.4th at 49; *see also Hoffman*, 324 U.S. at 38 ("[I]t is the duty of the courts, in a matter so intimately associated with our foreign policy and which may profoundly affect it, not to enlarge an immunity to an extent which the government . . . has not seen fit to recognize.").

"[B]y pursuing [the defendant's] capture and . . . prosecution, the Executive Branch has manifested its clear sentiment that [the defendant] should be denied . . . immunity." *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997); *see also Halkbank III*, 120 F.4th at 49 ("[T]he decision to bring federal criminal charges against [the defendant] reflects the Executive Branch's determination that [the defendant] is not entitled to sovereign immunity for the conduct at issue."); *Cordones*, 2022 WL 815229, at *5.

### 2. Head-of-State Immunity

The Executive Branch has sole authority to determine who is a foreign head of state. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015) ("The text and structure of the Constitution grant the President the power to recognize foreign nations and governments."); *Baker v. Carr*, 369 U.S. 186, 213 (1962) ("[I]t is the executive that determines a person's status as representative of a foreign government."). That authority flows from the Executive's recognition power, the exercise of which is "the *exclusive* prerogative of the Executive." *Zivotofsky*, 576 U.S. at 19 (emphasis added); *see also id.* at 14 ("Recognition is a topic on which the Nation must speak with one voice. . . . That voice must be the President's." (internal quotation marks omitted)); U.S. Const. art. II, § 3 (directing that the President "shall receive Ambassadors and other public Ministers."). "Legal consequences follow formal recognition," among them, immunities from suit—a paradigmatic incident of recognition. *Zivotofsky*, 576 U.S. at 11.

Consistent with these principles, federal courts have uniformly concluded that the Executive Branch's head-of-state immunity determinations are dispositive. In *Yousuf v. Samantar*, the Fourth Circuit held that the Executive Branch's "pronouncement as to head-of-state immunity is entitled to *absolute deference*," reasoning that, "[l]ike diplomatic immunity, head-of-state immunity involves a formal act of recognition, that is a quintessentially executive function for which absolute deference is proper." 699 F.3d 763, 772 (4th Cir. 2012) (emphasis added) (internal quotation marks omitted). The Second Circuit has recently quoted with approval *Yousuf*'s holding regarding absolute deference. *See Halkbank III*, 120 F.4th at 52. On at least one occasion, the Second Circuit has dismissed, as lacking any arguable basis in law or fact, an appeal of a district court's ruling that a civil defendant was entitled to head-of-state immunity because of the Executive Branch's suggestion of immunity. *Devi v. Rajapaksa*, No. 12-4081, 2013 WL 3855583, at *1 (2d Cir. Jan. 30, 2013) (citing *Matar*, 563 F.3d at 15).

Each court to confront the issue in the civil context has afforded absolute deference to the Executive Branch's determinations of head-of-state immunity or non-immunity. *See, e.g.*, *Fallahi v. Raisolsadati*, No. 22 Civ. 7013 (JMF), 2022 WL 17832544, at *3 (S.D.N.Y. Dec. 21, 2022) ("[The court] is compelled by centuries of precedent to defer to the Executive Branch's determination that [a head of state] is entitled to immunity from suit."); *Habyarimana v. Kagame*, 696 F.3d 1029, 1032 (10th Cir. 2012) ("We must accept the United States' suggestion that a foreign head of state is immune from suit[.]"); *Tawfik v. Al-Sabah*, No. 11 Civ. 6455 (JCF), 2012 WL 3542204, at *3 (S.D.N.Y. Apr. 27, 2012) (holding that Executive Branch's determination as to head-of-state immunity was "controlling" and "not subject to judicial review"), *report and recommendation adopted*, No. 11 Civ. 6455 (ALC), 2012 WL 3542209 (S.D.N.Y. Aug. 16, 2012); *Manoharan v. Rajapaksa*, 845 F. Supp. 2d 260, 263 (D.D.C. 2012) (holding that a suggestion of head-of-state immunity from the Executive Branch "is conclusive and not subject to judicial review"), *aff'd*, 711 F.3d 178 (D.C. Cir. 2013); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 111 (D.D.C. 2005) ("When . . . the Executive has filed a Suggestion of Immunity as to a recognized head of a foreign state, the jurisdiction of the Judicial Branch immediately ceases."); *Ye v. Zemin*, 383 F.3d 620, 626 (7th Cir. 2004) ("[A] determination by the Executive Branch that a foreign head of state is immune from suit is conclusive and a court must accept such a determination."); *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 296-97 (S.D.N.Y. 2001) ("[T]he FSIA does not serve to abrogate the [Executive Branch's] decisive role in the recognition of head-of-state immunity, nor to negate the head-of-state immunity invoked here by the State Department on behalf of [the defendants]."), *rev'd on other grounds*, 386 F.3d 205 (2d Cir. 2004); *Leutwyler v. Off. of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 280 (S.D.N.Y. 2001) (holding that the Executive Branch's head-of-state immunity determination was "entitled to conclusive deference

from the courts"); *Lafontant v. Aristide*, 844 F. Supp. 128, 133 (E.D.N.Y. 1994) ("Since determination of who qualifies as a head-of-state is made by the Executive Branch, it is not a factual issue to be determined by the courts."); *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379, 382 (S.D. Tex. 1994) ("Even if there were a dispute about the actual government in Saudi Arabia, this court must accept the recognition by the United States as conclusive."), *aff'd*, 79 F.3d 1145 (5th Cir. 1996). The only district court to consider a head-of-state immunity claim in the criminal context—as to Manuel Noriega, Panama's former *de facto* leader—likewise afforded absolute deference to the Executive Branch's determination that head-of-state immunity did not apply. *United States v. Noriega*, 746 F. Supp. 1506, 1520 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997) ("[D]eference to the Executive branch in matters concerning relations with foreign nations is the primary rationale supporting immunity for heads of state. . . . Since the only reason Noriega would be entitled to immunity as a head of state is because of such judicial deference to the Executive, his claim to a 'right' of immunity against the express wishes of the Government is wholly without merit.").

### 3. Conduct-Based Immunity

The Executive Branch is also "the most appropriate [branch] to define the scope of [conduct-based] immunity for heads-of-state" in light of, among other things, the structure of the Constitution and the Executive Branch's "greater experience and expertise in this area." *In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988).

In *Halkbank III*, a case about whether an instrumentality of a foreign sovereign was entitled to foreign sovereign immunity for alleged criminal conduct, the Second Circuit recognized that the Executive Branch's refusal to suggest that common law immunity applied is "*at least* a significant factor to be taken into consideration," and that "its *active* decision to *deny* immunity is . . . entitled to equal if not greater weight." 120 F.4th at 52 (emphasis added) (internal quotation

marks omitted). Although the Second Circuit did not express a view in *Halkbank III* as to what standard of Executive Branch deference applies to claims of conduct-based immunity, *id.* at 43, the Second Circuit's prior precedents strongly support the application of near-conclusive deference in the context of conduct-based immunity. In *Matar*, for example, the Second Circuit "defer[red] to the Executive's determination of the scope of immunity" as to foreign officials asserting conduct-based immunity in defending a civil action. 563 F.3d at 15. The Second Circuit declined to undertake an independent analysis of the defendants' immunity, holding instead: "[T]he Executive Branch has urged the courts to decline jurisdiction over appellants' suit [on the basis that the defendants are entitled to immunity], and under our traditional rule of deference to such Executive determinations, we do so." *Id.* That deference, the Circuit explained, flows from the recognition that cases in which foreign sovereign immunity is asserted "typically raise[ ] 'questions of policy rather than of law,'" and are "'for diplomatic, rather than legal discussion.'" *Matar*, 563 F.3d at 13 (alterations omitted) (quoting *The Schooner Exch.*, 11 U.S. at 146).

The Second Circuit later cited to *Matar* in affirming the application of near-conclusive deference to claims of conduct-based immunity. *See Doe v. De Leon*, 555 F. App'x 84, 85 (2d Cir. 2014) (quoting *Matar* and holding that the State Department's suggestion of immunity was "dispositive" under the Second Circuit's "traditional rule of deference to such Executive determinations"); *Rosenberg v. Pasha*, 577 F. App'x 22, 24 (2d Cir. 2014) ("*Matar* remains binding precedent in this Circuit, and in applying it, the District Court correctly determined that, in light of the Statement of Interest filed by the State Department recommending immunity for [the defendants], the action must be dismissed.").[4]

---

[4] In *Halkbank III*, the Second Circuit quoted the holding in *Yousuf*, including its affording "substantial weight" to the Executive Branch's determination regarding conduct-based immunity.

(*continued on next page*)

Even if the Court were "to reach the merits of the issue" without simply deferring to the Executive Branch's determination, the Second Circuit has observed that there is "respectable authority for denying . . . immunity to a former head-of-state for private or criminal acts in violation of American law." *In re Doe*, 860 F.2d at 45. In assessing whether a former foreign official is entitled to conduct-based immunity, this Court and others have considered, among other factors: (i) the determination of the Executive Branch; (ii) the views of the relevant foreign sovereign; and (iii) whether the charged acts of the official violated the domestic law of the foreign sovereign. *See, e.g.*, *Cordones*, 2022 WL 815229, at *5-7; *Noriega*, 117 F.3d at 1212.

As with Executive determinations of status-based non-immunity, courts must "defer to the Executive's determination of the *scope* of immunity." *Halkbank III*, 120 F.4th at 48 (emphasis added) (quoting *Matar*, 563 F.3d at 115). The Executive Branch's determination of non-immunity is—at a minimum—a "significant factor" in assessing whether conduct-based immunity shields a criminal defendant from prosecution. *Id.* at 52; *see also Cordones*, 2022 WL 815229, at *5 (finding "deference to the Executive Branch appropriate" where the Executive Branch manifested its determination of non-immunity through its "decision to bring criminal charges to enforce the laws of the United States"). This deference gives effect to the "'guiding principle' that, in foreign sovereign immunity cases, 'courts should not so act as to embarrass the executive arm in its conduct of foreign affairs.'" *Halkbank III*, 120 F.4th at 50 (quoting *Hoffman*, 324 U.S. at 35).

Courts have also considered the views of the foreign sovereign regarding whether a former foreign official was engaged in official acts on behalf of the sovereign and is therefore entitled to

---

*See* 120 F.4th at 52 (quoting *Yousuf*, 699 F.3d at 773). As described above, however, the Second Circuit continued to cite *Matar*'s deference rule following the Supreme Court's and Fourth Circuit's rulings in *Yousuf*. *See De Leon*, 555 F. App'x at 85; *Rosenberg v. Pasha*, 577 F. App'x at 24.

immunity. As the D.C. Circuit has explained, where the foreign sovereign "on whose behalf the defendant[ ] purportedly acted" does not "indicate[ ] any interest in th[e] case, whether by requesting a formal suggestion of immunity or otherwise," it "weighs heavily against immunity." *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 800 (D.C. Cir. 2021); *see also Noriega*, 117 F.3d at 1212 (citing, among other factors supporting the denial of immunity for Noriega, the fact that "Panama ha[d] not sought immunity for [him]"). Likewise, as the Ninth Circuit has recognized, a foreign government's agreement that a former official's alleged conduct was "outside the scope" of his official authority is evidence that legal action against the former official "does not implicate . . . foreign diplomatic concerns." *In re Est. of Ferdinand Marcos, Hum. Rts. Litig.*, 25 F.3d 1467, 1472 (9th Cir. 1994).

Courts deciding whether to grant foreign official immunity to a former foreign official distinguish between "official acts performed within the scope of his duty," for which he may be entitled to immunity, and "private acts where the officer purports to act as an individual and not as an official," for which he is not. *Yousuf*, 699 F.3d at 775 (alterations and internal quotation marks omitted). Where the alleged conduct violates the domestic law of the foreign sovereign, that fact weighs against a finding that an official was acting within the scope of his duty. *See Cordones*, 2022 WL 815229, at *7; *Noriega*, 746 F. Supp. at 1522; *Doe v. Qi*, 349 F. Supp. 2d 1258, 1287 (N.D. Cal. 2004); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996).[5] In that regard, "[o]ur courts have had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law." *Republic of the Philippines v. Marcos*, 862

[5] Before the Supreme Court in *Samantar* clarified that foreign official immunity is governed by the common law, courts also looked to the domestic law of the relevant sovereign nation when addressing the question in the context of the FSIA. See *Matar v. Dichter*, 500 F. Supp. 2d 284, 292 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009).

F.2d 1355, 1361 (9th Cir. 1988). Further, in the analogous context of the act-of-state doctrine, the Second Circuit has held that, "[t]o qualify as 'official,' an act must be imbued with some level of formality, such as authorization by the foreign sovereign through an official 'statute, decree, order, or resolution,'" and that "acts that flagrantly violate a foreign state's own laws cannot, at the same time, constitute official acts entitled to deference." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60-61 (2d Cir. 2019) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976)).

**B. Discussion**

**1. The Defendants Are Not Entitled to Head-of-State Immunity**

The Executive Branch's "pronouncement as to head-of-state immunity is entitled to absolute deference," *Yousuf*, 699 F.3d at 772, and the political branches of the United States have been consistent: since January 2019 Maduro Moros has not been Venezuela's head of state. (*See* Segura Decl. ¶ 5). The United States did not recognize Maduro Moros as President of Venezuela when Maduro Moros was initially indicted in March 2020; when Maduro Moros and Flores de Maduro were indicted in December 2025; when the defendants were arrested in January 2026; and when the defendants' instant motion was filed or at any time thereafter. Additionally, "by pursuing [the defendants'] capture and . . . prosecution, the Executive Branch has manifested its clear sentiment that [the defendants] should be denied head-of-state immunity." *See Noriega*, 117 F.3d at 1212.

"Absolute deference" is confirmed not only by the language of court decisions, *Yousuf*, 699 F.3d at 772, but also by the practice of the courts: neither defendant has identified a case in

which a court declined to defer to the Executive Branch's views on head-of-state immunity.[6] Here, the Executive Branch has spoken clearly and consistently since 2019—across U.S. presidential administrations—Maduro Moros is not and has not been Venezuela's head of state since January 2019.

Against a mountain of contrary authority, the defendants assert that "the Executive Branch's non-recognition of [their] status is irrelevant to the immunity question." (Dkt. 321 ("Maduro Moros Br.") at 21; *see also* Dkt. 325 ("Flores de Maduro Br.") at 14-15 (adopting Maduro Moros's analysis)).[7] They argue that immunity, unlike recognition, should be "determined *independently* by the judiciary based on *de facto* realities." (Maduro Moros Br. at 21). The defendants' attempt to divorce recognition from head-of-state immunity—a paradigmatic consequence of recognition—should be swiftly rejected, as it flies in the face of the longstanding principle that "[t]he status of [a foreign government] in our courts is a matter for determination by the Executive and is outside the competence of [the courts]."[8] *Nat'l City Bank of New York v.*

---

[6] Indeed, regarding immunity in general, the judiciary appears to have deferred to the Executive Branch's determination in every case that has come before it since 1926, *compare, e.g.*, *Hoffman*, 324 U.S. at 34-36 (1945); *Ex parte Peru*, 318 U.S. at 587-89 (1943), *with Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562 (1926) (holding that an Italian merchant vessel was entitled to sovereign immunity, notwithstanding the Executive Branch's contrary view).

[7] Because Maduro Moros lacks head-of-state immunity, Flores de Maduro has no claim to derivative head of state immunity.

[8] The defendants' citation to language in *Guaranty Trust Co. v. United States*, 304 U.S. 126 (1938), regarding courts' authority to determine the "legal consequences" of recognition decisions (*see* Maduro Moros Br. at 27), is highly misleading. In the same paragraph quoted by the defendants, the Supreme Court observed that "[w]hat government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government." 304 U.S. at 137. The "legal consequences" contemplated by the Supreme Court in *Guaranty Trust* as falling within the judiciary's purview involved the implications of recognition for, among other things, the authority of certain recognized representatives to receive formal notices and the application of the statute of limitations. *See id.* at 137-144.

*Republic of China*, 348 U.S. 356, 358 (1955); *see also Zivotofsky*, 576 U.S. at 11 ("Legal consequences follow formal recognition. Recognized sovereigns may sue in United States courts, . . . *and may benefit from sovereign immunity when they are sued*." (emphasis added)).

Indeed, the defendants have not identified a single case in which a federal court disregarded the Executive Branch's head-of-state immunity determination in favor of its own assessment of immunity based on "*de facto* realities" of who operated as the head of state. Rather, federal courts have repeatedly deferred to the Executive Branch's head-of-state immunity and non-immunity determinations even where the Executive's recognition and *de facto* control were indisputably at odds. *See Kadic v. Karadzic*, 70 F.3d 232, 237, 245, 248 (2d Cir. 1995) (holding that the *de facto* president of the Bosnian-Serb republic, who "possesse[d] ultimate command authority over the Bosnian–Serb military forces" and whose self-proclaimed republic had its own legislature and currency and "*in fact* exercise[d] *actual control* over large parts of the territory of Bosnia-Herzegovina," nonetheless lacked head-of-state immunity in light of the Executive Branch's non-recognition (emphasis added)); *Noriega*, 746 F. Supp. at 1520 ("[S]imply because Noriega may have *in fact* run the country of Panama does not mean he is entitled to head of state immunity, since the grant of immunity is a privilege which the United States may withhold from any claimant." (emphasis added)); *Lafontant*, 844 F. Supp. at 133 (deferring to the Executive Branch's suggestion of immunity on behalf of the exiled President of Haiti and stating that "[w]hether the recognized head-of-state has *de facto* control of the government is irrelevant; the courts must defer to the Executive determination"); *see also United States v. Saab*, Final Order on the Defendant's Motion to Dismiss the Indictment, No. 19 Cr. 20450 (S.D. Fla. Dec. 23, 2022), ECF No. 197 at 8 (holding that a Venezuelan criminal defendant with close ties to the Maduro Moros regime "at best, represented only a regime deemed illegitimate by the President," that the recognition power

is "vested exclusively in the Office of the President," and that the defendant therefore "could not have carried any cognizable diplomatic status" that might render him immune from prosecution).

The defendants seek to distinguish *Noriega* on the grounds that Maduro Moros, unlike Manuel Noriega in Panama, at one time served as *de jure* head of state and was recognized as such by the United States. (*See* Maduro Moros Br. at 27-28). That distinction is meaningless. Status-based immunity, including head-of-state immunity, depends on status at the time of court proceedings, not at some earlier time. *See Matar*, 563 F.3d at 14. By January 2019, and at the time he was charged, arrested, and prosecuted, Maduro Moros—like Noriega—was a *de facto* ruler who held no office in the eyes of the United States. Thus, any immunity Maduro Moros might have enjoyed as the head of state of Venezuela's recognized government has, for nearly eight years, been utterly irrelevant to the head-of-state immunity analysis.[9] *See, e.g.*, *Sikhs for Just. v. Singh*, 64 F. Supp. 3d 190, 194 (D.D.C. 2014) ("The day he [leaves] office . . . [the head of state] los[es] the absolute protection of status-based head-of-state immunity.").

The defendants further claim that "[e]arly American common law decisions" establish that "formal recognition by the Executive Branch was not a prerequisite to immunity." (Maduro Moros Br. at 21). But the only cases they cite in support of that proposition are two decisions from 1923 by the New York Court of Appeals regarding the immunity of the *de facto* government of Russia.[10]

---

[9] For the same reason, the Court should swiftly reject any suggestion that the United States' recognition of Delcy Rodriguez amounts to a retroactive recognition of Maduro Moros because Rodriguez's "position flows directly from" Maduro Moros's claimed election victories prior to the United States' recognition of Rodriguez. (*See* Maduro Moros Br. at 26). Additionally, the defendants' suggestion would imply that multiple individuals could serve as head of state and enjoy head-of-state immunity simultaneously, even when a government has only one head of state.

[10] The defendants also cite to a 1952 district court case that merely restates *Wulfsohn*'s holding without adopting it. (*See* Maduro Moros Br. at 22 (citing *In re Investigation of World Arrangements*, 13 F.R.D. 280, 290 (D.D.C. 1952)).

*See Wulfsohn v. Russian Socialist Federated Soviet Republic*, 234 N.Y. 372 (N.Y. 1923); *Nankivel v. Omsk All-Russian Gov't.*, 237 N.Y. 150 (N.Y. 1923). The defendants fail to note how thoroughly unpersuasive those decisions are in light of subsequent decisions by courts that—unlike the New York Court of Appeals—bind this Court with respect to questions of federal common law. *See Lehigh Valley R. Co. v. State of Russia*, 21 F.2d 396, 400 (2d Cir. 1927) (accepting the State Department's position that Russia was represented by the recognized provisional government, notwithstanding its lack of *de facto* control over Russia); *Guar. Tr. Co. of New York v. United States*, 304 U.S. 126, 138 (1938) (endorsing *Lehigh Valley* and holding that the Executive Branch's determination of Russia's recognized government was "conclusive" notwithstanding *de facto* control). Indeed, in *United States v. Pink*, 315 U.S. 203 (1942), the Supreme Court sided decisively with the Executive Branch over the New York Court of Appeals, "confirm[ing] the President's competence to determine questions of recognition" and providing "strong support for the conclusion that it is for the President alone to determine which foreign governments are legitimate."[11] *Zivotofsky*, 571 U.S. at 19 (discussing *Pink* and *United States v. Belmont*, 301 U.S. 324 (1937)).

More fundamentally, the defendants' invocation of "[e]arly American common law decisions" ignores the Second Circuit's own reading of early Supreme Court precedents in *Halkbank III*. *See* 120 F.4th at 47 (discussing *Schooner Exchange* and "[s]ubsequent cases applying [it] stress[ing] that the immunity afforded to foreign sovereigns and their instrumentalities depended on the consent of the Executive"). It likewise ignores more recent—

[11] Describing *Wulfsohn* in *Pink*, Justice Frankfurter commented that the case was part of a series of "contradictory and confusing rulings" that demonstrated courts' "struggl[es] to deal with [the] consequences of major international complications through the application of traditional judicial concepts." *Pink*, 315 U.S. at 235 (1942) (Frankfurter, *J.*, concurring).

and unambiguous—Supreme Court precedent that firmly establishes judicial deference to Executive Branch immunity determinations. *See, e.g.*, *Samantar*, 560 U.S. at 311 (describing pre-FSIA procedure whereby, if the State Department granted a suggestion of immunity, "the district court surrendered its jurisdiction"); *Hoffman*, 324 U.S. at 34-36 (1945); *Ex parte Peru*, 318 U.S. at 587-89 (1943).[12]

Finally, the defendants incorrectly assert that customary international law demands that this Court afford "sovereign immunity . . . to an effective head of state regardless of whether the forum state recognizes the defendant's status." (Maduro Moros Br. at 24). A district court recently rejected this very argument in denying status-based immunity to a member of the Maduro Moros regime, holding that the United States' non-recognition of the regime "did not run afoul of the United States' responsibilities under international law." *See Saab*, ECF No. 197 at 8 (denying diplomatic immunity claim of Alex Nain Saab Moran).

In arguing to the contrary, the defendants muster only a handful of decisions of French and Italian courts. (*See id.* at 24-25). Even assuming those decisions, which do not appear to present questions of recognition of governments and the immunities flowing therefrom, were analogous to the instant case, judicial decisions of two foreign countries' courts do not come close to establishing "international custom, as evidence of a general practice accepted as law." *See Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 251 (2d Cir. 2003) (quoting ICJ Statute, June 26, 1945,

---

[12] The defendants repeatedly describe *Hoffman*'s deference language as "*dicta*" (*see* Maduro Moros Br. at 46), but fail to note that the Second Circuit confronted this precise argument in *Halkbank III*. The Second Circuit concluded that, even if certain prior Supreme Court pronouncements on Executive deference were *dicta*, "it does not at all follow that [courts] can cavalierly disregard those descriptions of the deference afforded to the position of the Executive at common law." 120 F.4th at 48 n.5. The Second Circuit further stated that, in any event, the Second Circuit's own holding in *Matar* adopting those rules of deference constitutes "binding" precedent. *Id.*

art. 38, 59 Stat. 1055, 1060, U.S.T.S. 993); *cf. The Paquete Habana*, 175 U.S. 677, 701 (1900) (finding customary international law regarding immunity for fishing vessels to be "one determined by the general consent of civilized nations"). To the contrary, international law does not establish *any* particular circumstances under which countries are legally obligated to recognize governments (and corresponding head-of-state immunity for their leaders). *See, e.g.*, 2 M. Whiteman, Digest of International Law § 4 (1963) ("There is no well settled criterion with respect to the recognition of new governments."). Nor could the approach of a handful of foreign courts displace the constitutional authority of the Executive Branch in matters of recognition in U.S. courts and with respect to U.S. law.

Even if, as some scholars have suggested, such an international legal framework did exist, *de facto* control would not be the dispositive factor. Particularly so where, as here, (i) the foreign sovereign is not asserting immunity on behalf of the defendants, *see In re Doe*, 860 F.2d at 45 ("[T]he [foreign] state may . . . take back [the immunity] which it bestowed upon its erstwhile leaders."); and (ii) the former *de facto* regime's power arose from its violation of the foreign sovereign's constitution. (*See* Segura Decl. ¶ 3); *see also, e.g.*, Niko Pavlopoulos, "Identifying Governments in International Law," 119 AJIL UNBOUND 280, 283 (2025) (arguing that state practice demonstrates, "with considerable consistency, that autonomous effective control no longer suffices for a claimant to enjoy governmental status where there exists a rival autonomous 'constitutional' claimant").

International responses to Maduro Moros's own unconstitutional seizure of power in Venezuela in 2018-2019 demonstrate the absence of any such legal norm: the United States and more than 50 other countries recognized Juan Guaidó as Venezuela's constitutional leader, while others—such as Iran, North Korea, Russia, China, and Cuba—continued to recognize Maduro

Moros as Venezuela's head of state. Such international practice by the United States comports with other historical instances of refusing to recognize (and therefore to immunize) illegitimate and condemnable *de facto* rulers and regimes, dating at least as far back as its treatment of governments-in-exile following Nazi invasion. *See, e.g.*, *State of the Netherlands v. Fed. Rsrv. Bank*, 201 F.2d 455, 456 (2d Cir. 1953) (discussing recognition of the Netherlands' government-in-exile). This practice continues today. *See, e.g.*, Order Dismissing Complaint, *Weiss v. Sovereign Nation of Afghanistan*, 23 Civ. 2827 (N.D. Cal. Nov. 5, 2025), ECF No. 78 at 6-7 (deferring to Executive Branch views on lack of recognition of any government of Afghanistan, including the Taliban). Far from giving rise to an international legal principle shielding the defendants from prosecution, therefore, this recognition posture and its clear foreign policy implications only underscores the rationale for courts' absolute deference to Executive Branch determinations of head-of-state immunity. *See, e.g.*, *Noriega*, 746 F. Supp. at 1520; *Fallahi*, 2022 WL 17832544, at *3; *Habyarimana*, 696 F.3d at 1032; *Tawfik*, 2012 WL 3542204, at *3; *Manoharan*, 845 F. Supp. 2d at 263; *Doe I*, 400 F. Supp. 2d at 111; *Ye*, 383 F.3d at 626; *Tachiona*, 169 F. Supp. 2d at 297; *Leutwyler*, 184 F. Supp. 2d at 280; *Lafontant*, 844 F. Supp. at 133; *Alicog*, 860 F. Supp. at 382.

**2. The Defendants Are Not Entitled to Conduct-Based Immunity**

The defendants also do not enjoy conduct-based immunity for their narcotics-trafficking and weapons offenses. Just as this Court did in *Cordones*, the Court should reject the defendants' arguments for three independent reasons: "[1] the Executive Branch has manifested its intent that no immunity applies; [2] exercising jurisdiction will not interfere with foreign policy; and [3] [the] [d]efendant[s] [were] not engaged in 'official acts,'" as evidenced by the illegality of their conduct under Venezuelan law. *See* 2022 WL 815229, at *7.

#### a. The Court Should Defer to the Executive's Determination That the Defendants Are Not Entitled to Conduct-Based Immunity

Consistent with *Matar* and its progeny, this Court should "defer to the Executive's determination of the scope of immunity" as to foreign officials asserting conduct-based immunity. *See Matar*, 563 F.3d at 15; *De Leon*, 555 F. App'x at 85; *Rosenberg*, 577 F. App'x at 24. This Court therefore need not undertake an independent analysis of the defendants' immunity arguments. *See Matar*, 563 F.3d at 15 ("[T]he Executive Branch has urged the courts to decline jurisdiction over appellants' suit, and under our traditional rule of deference to such Executive determinations, we do so."); *Halkbank III*, 120 F.4th at 43 ("[D]eference applies regardless of whether the Executive seeks to grant or . . . deny immunity, and also applies equally to criminal and civil cases.").

Even if this Court were to apply a lesser degree of deference and analyze the defendants' claims of conduct-based immunity, it should reject them for the same reasons it rejected near-identical claims of immunity in *Cordones*. *See* 2022 WL 815229, at *7 (holding that Alcala Cordones was "not entitled to foreign official immunity because," among other reasons, "the Executive Branch has manifested its intent that no immunity applies"); *see also In re Doe*, 860 F.2d at 45 ("[W]ere we to reach the merits of the issue, we believe there is respectable authority for denying . . . immunity to a former head-of-state for private or criminal acts in violation of American law."). Indeed, in *Noriega*, the Eleventh Circuit interpreted *Doe* to require absolute deference, before concluding that "Noriega's immunity claim fails under either the *Doe* or [less deferential] standard" articulated by the Fifth Circuit. *See* 117 F.3d at 1212 ("[G]iven that the record indicates that Noriega never served as the constitutional leader of Panama, that Panama has not sought immunity for Noriega and that the charged acts relate to Noriega's private pursuit of

personal enrichment, Noriega likely would not prevail even if this court had to make an independent determination regarding the propriety of immunity in this case.").

Under any standard, the Executive Branch's determination of non-immunity remains, at the very least, a "significant factor" counseling in favor of the Court's exercise of jurisdiction. *See Halkbank III* 120 F.4th at 52. Here, the "decision to bring federal criminal charges against [the defendants] reflects the Executive Branch's determination that [the defendants are] not entitled to sovereign immunity for the conduct at issue." *See id.* at 49. Accordingly, the defendants' arguments that they "cannot be held to answer for [the charged] conduct in this Court . . . . [are] an insufficient basis for [the Court] to challenge or otherwise review the Government's decision to bring the instant charges." *Cordones*, 2022 WL 815229, at *5.

The defendants argue that the Supreme Court and Second Circuit's decisions in *Halkbank II* and *Halkbank III* undermine this Court's rationale in *Cordones*. (*See* Maduro Moros Br. at 40-41). Not so. The Second Circuit in *Halkbank III* expressly stated that *Matar*'s "traditional rule of deference" remained "binding [precedent] here." 120 F.4th at 48 n.5; *see also id.* at 48 ("'[I]n the common-law context, we still defer to the Executive's determination of the scope of immunity.'" (quoting *Matar*, 563 F.3d at 15)). *Halkbank III* in fact *extended* principles of Executive deference in ways that reinforce this Court's holding in *Cordones*, holding that deference applies to Executive Branch grants *and denials* of immunity, in both the civil *and criminal* context. *See* 120 F.4th at 43. Further, and in any event, this Court undertook an independent immunity analysis in *Cordones*, *see* 2022 WL 815229, at *4 ("I must decide for myself whether such immunity exists"), and concluded that "rejecting Defendant's claim to immunity is *wholly consistent with the underpinnings of the doctrine of foreign official immunity*." *See id.* at *6 (emphasis added). As discussed below, that decision was entirely correct.

**b. Venezuela's Non-Assertion of Immunity on Behalf of the Defendants Weighs Against Conduct-Based Immunity**

Despite the defendants' suggestions to the contrary, Venezuela has neither ratified the defendants' conduct nor attempted to assert immunity on their behalf. *See Dogan v. Barak*, 932 F.3d 888, 897 (9th Cir. 2019) (affirming grant of immunity as to an Israeli official based on, among other things, the fact that "the state of Israel subsequently ratified [the defendant's] conduct"); *Matar*, 500 F. Supp. 2d at 292 (distinguishing cases denying immunity because, in *Matar*, "the foreign government had expressly ratified the defendant's actions and affirmed that the defendant was acting pursuant to his official duties"); *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 233 (D.D.C. 2018) ("Nigeria's authorization and ratification establishes that the defendants acted in their official capacities."). Where neither the Executive Branch nor the relevant foreign government seeks immunity, only the grant of it could conceivably "'embarrass the executive arm in its conduct of foreign affairs.'" *See Halkbank III*, 120 F.4th at 50 (quoting *Hoffman*, 324 U.S. at 35). Venezuela's non-assertion therefore "weighs heavily against immunity."[13] *See Broidy Cap. Mgmt.*

---

[13] Similarly, the absence of any ratification by Venezuela of the defendants' conduct weighs heavily against immunity. The government of Venezuela has never formally ratified narcotics importation, narco-terrorism, or weapons offenses connected to those crimes. The absence of such a ratification supports the conclusion that the defendants' crimes were not official acts entitled to immunity. *See Qi*, 349 F. Supp. 2d at 1287 (holding that former foreign officials were not immune where their "alleged human rights violations" were "prohibited by" and "inconsistent with Chinese law," notwithstanding the fact that the Chinese government appeared "to have covertly authorized but publicly disclaimed" those actions); *Xuncax v. Gramajo*, 886 F.

(*continued on next page*)

*LLC*, 12 F.4th at 800; *Noriega*, 117 F.3d at 1212 (citing Panama's silence as a factor in rejecting immunity); *see also In re Est. of Ferdinand Marcos*, 25 F.3d at 1472 (finding Philippine government's agreement regarding Marcos's non-immunity to be evidence that the lawsuit involved conduct "outside the scope of [Marcos's] authority" that "d[id] not implicate . . . foreign diplomatic concerns").

Given the absolute dearth of precedent where immunity was granted in spite of an Executive Branch determination of non-immunity and silence on the part of the foreign sovereign, the defendants reach for an argument that Venezuela sought immunity here. But the cases the defendants cite in support of their arguments only highlight Venezuela's silence. (Flores de Maduro Br. at 35 (citing *Buratai*, 318 F. Supp. 3d at 234; *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 187-89 (S.D.N.Y. 2015); *Belhas v. Ya'alon*, 515 F.3d 1279, 1282, 1284 (D.C. Cir. 2008))). In each of these cases, the foreign state attempted to intervene to the Executive Branch on behalf of the defendants for that particular case. In *Buratai*, Nigeria sent a diplomatic note for the defendants requesting that they be granted immunity. 318 F. Supp. 3d at 224. In *In re Terrorist Attacks*, the Saudi Ambassador to the United States submitted a declaration to the district court requesting that the court grant the motion to dismiss on immunity grounds. 122 F. Supp. 3d at 187. And in *Belhas*, the defendant attached a letter from the Israeli Ambassador addressing his conduct,

---

Supp. 162, 176 & n.10 (D. Mass. 1995) (holding that acts of former foreign official "exceed[ed] anything that might be considered to have been lawfully within the scope of [his] official authority," in part because there was "no suggestion that either the past or present governments of Guatemala characterizes the actions . . . as officially authorized" (internal quotation marks omitted)).

stating that "anything General Ya'alon did in connection with the events at issue in the suit was in the course of his official duties, and in furtherance of official policies of the State of Israel. To allow a suit against General Ya'alon is to allow a suit against Israel itself." 515 F.3d at 1282-84 (brackets removed).

The defendants have mustered no such support. Instead, they cite speeches before the United Nations and decisions of Venezuelan domestic courts (Maduro Moros Br. at 5; Flores de Maduro Br. at 26, 35, 40). None of these sources are comparable to those in *Buratai*, *In re Terrorist Attacks*, or *Belhas*, and each only underscores how Venezuela did not request immunity *in this case*, despite every opportunity to do so. Indeed, there is no doubt that the current Venezuelan government knows how to request immunity. In the *Kenemore* civil litigation, Venezuela sought immunity on behalf of Delcy Rodriguez, and not Maduro Moros, just a few months ago. (*See* Segura Decl. ¶ 8). Venezuela has been silent here.

In attempting to substitute general proclamations for statements made directly to the relevant courts about the particular case, the defendants say only that "Venezuela's demand was delivered in the most formal diplomatic forum on earth"—*i.e.*, the United Nations.[14] (Flores de Maduro Br. at 35). But U.S. courts cannot be required to sift through public statements or foreign judicial decisions to divine a sovereign's position on immunity; such a burden could place courts in the untenable position of weighing different views from different foreign officials from the same nation. If Venezuela wished to assert its view that the defendants were entitled to immunity in this

[14] The cited statement was made January 5, 2025, months before the United States recognized the Rodriguez government. The individual who made that statement at the United Nations, Samuel Moncada, no longer serves as the Permanent Representative of Venezuela to the United Nations, having been replaced in April 2026.

case, it could have. The defendants' attempt to claim the contrary is an admission that such silence is devastating to their claims.

#### c. The Defendants' Violations of Venezuelan Domestic Law Weigh Against Conduct-Based Immunity

The defendants are not entitled to foreign official immunity because they engaged in "conduct directed at circumventing, rather than upholding, applicable law," including Venezuelan domestic law, when they engaged in the cocaine-trafficking, narco-terrorism, and weapons offenses alleged in the Indictment. *See Cordones*, 2022 WL 815229, at *7. The defendants argue that they are entitled to conduct-based immunity because they are alleged to have used their official (or *de facto*) power to commit the charged conduct. (*See* Maduro Moros Br. at 32-36; Flores de Maduro Br. at 29-31). But this Court squarely rejected this very argument in *Cordones*, where the defendant had "ma[de] much of the fact that his acts were taken pursuant to his high-ranking military position":

> It strains credulity to say that Defendant was engaged in official conduct—to the benefit of the state or in furtherance of some overriding national interest. . . . While Defendant's position of power may have enabled him to engage in the charged conduct, his mere status as a high-ranking general does not make his conduct official (or worthy of deference). Most charitably, Defendant argues that his conduct was an abuse of power, but this does not render his conduct "official" or immune from prosecution.

2022 WL 815229, at *7 (citing *Noriega*, 746 F. Supp. at 1522); *see also Samantar*, 699 F.3d at 775 (foreign official cannot assert immunity for "private acts that are not arguably attributable to the state, such as drug possession"); *Kashef*, 925 F.3d at 60-61 ("[A]cts that flagrantly violate a foreign state's own laws cannot, at the same time, constitute official acts entitled to deference."); *Filartiga v. Pena-Irala*, 630 F.2d 876, 889 (2d Cir. 1980) (discussing act-of-state doctrine and expressing "doubt whether action by a state official in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that nation's

government, could properly be characterized as an act of state").[15] Although illegality under foreign domestic law does not automatically defeat conduct-based immunity, *see Eliahu v. Jewish Agency for Isr.*, 919 F.3d 709, 712-13 (2d Cir. 2019), other federal courts have joined this one in looking to the illegality of an official's conduct under domestic law in assessing claims of conduct-based immunity. *See, e.g.*, *Qi*, 349 F. Supp. 2d at 1287 (holding that former foreign officials were not immune based on, among other things, the fact that the defendants' alleged crimes were "prohibited by" and "inconsistent with Chinese law"); *Cabiri*, 921 F. Supp. at 1198 (holding that former foreign official was not immune, in part because he did not "claim that the acts of torture he is alleged to have committed . . . are not prohibited by the laws of Ghana").[16]

Moreover, defendants vastly overstate the extent to which their actions could be construed as valid exercises of state authority. Maduro Moros, for example, attempts to cloak his meetings

[15] The defendants' argument that this Court erred in relying on *Kashef* (*see* Maduro Moros Br. at 41-42), is meritless. The defendants are correct that *Kashef* addressed the act-of-state doctrine. But this Court never suggested that it was bound by *Kashef* on questions of immunity. *See* 2022 WL 815229, at *7. Rather, this Court recognized the persuasive force of *Kashef*'s observation that domestically illegal conduct is not imputed to a foreign sovereign merely because governmental authority was used to commit it. *See id.* In doing so, this Court cited to *Noriega*, which supports its reliance by analogy on the act-of-state doctrine. *See id.*; *see also Noriega*, 746 F. Supp at 1522 (observing that "government officials are as capable of exploiting their positions of power for private, selfish ends as they are for public purpose," and explaining that "[t]he inquiry is not whether Noriega used his official position to engage in the challenged acts, but whether those acts were taken on behalf of Noriega instead of Panama").

[16] Cases against Israeli officials, including *Eliahu*, in which courts dismissed frivolous allegations of official misconduct do not undermine *Kashef*'s persuasive force. *See Eliahu*, 919 F.3d at 716 (per curiam) (affirming dismissal and anti-filing injunction against vexatious plaintiffs claiming that an Israeli judge and numerous other Israeli officials handling the plaintiffs' divorce proceedings had committed fraud and other offenses while acting under color of law); *see also Appel v. Hayut*, No. 20 Civ. 6265 (JPC), 2021 WL 2689059, at *5 (S.D.N.Y. June 30, 2021) (declining to consider Israeli law in dismissing as frivolous a lawsuit alleging that the defendants had partnered with Mossad to torture and attempt to kill her in retaliation for her exposure of judicial corruption). And, in any event, contrary to *Eliahu* and *Appel*, where the Executive Branch was silent, the Government has made a determination of non-immunity here.

with FARC leaders as "recognized act[s] of state diplomacy." (Maduro Moros Br. at 34). But the defendants were not indicted for their diplomatic negotiations with the FARC over hostages; they are accused of protecting and facilitating narcotics trafficking, the proceeds of which was not tucked safely away in the Venezuelan treasury, but instead distributed among co-conspirators engaged in illegal activity.

Likewise unavailing is the defendants' invocation of the Supreme Court's decision in *Trump v. United States*, 603 U.S. 593 (2024), which held that when the President of the United States is engaging in "official acts" through the exercise of his "core constitutional powers," he has "absolute immunity" from criminal prosecution in U.S. courts. (*See* Maduro Moros Br. at 39). The Supreme Court's immunity analysis in *Trump* was rooted in the powers vested by the Constitution in the President of the United States, *see id.* at 603 U.S. at 614; did not apply the deference to the Executive Branch that courts afford in the context of foreign relations; and articulated a broader immunity than exists in the context of immunity afforded to former heads of state under international law. *See* Philippa Webb & Daisy Peterson, "The 'Loaded Weapon' of Presidential Immunity: An International Law Perspective on *Trump v. United States*," 56 GEO. J. INT'L L. 877, 886 (2025). For the invocation of conduct-based immunity, the common law analysis is different and, under any standard, deference to the Executive Branch is afforded absent "derogation of the common law." *Halkbank III*, 120 F.4th at 52. The defendants have not cited a single case in which drug trafficking activity—the core of the conduct alleged in the Indictment—was found by any court (in the United States or elsewhere) to be protected by conduct-based immunity. In such circumstances, where the prosecution is not contrary to the common law, and especially where no foreign sovereign is asserting immunity, deference to the Executive Branch is particularly appropriate.

Accordingly, this Court should adhere to its decision in *Cordones* and join the other federal courts that have "had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law." *Marcos*, 862 F.2d at 1361; *see also Noriega*, 117 F.3d at 1212 (holding that Noriega was not entitled to immunity because, among other reasons, "the charged acts relate to Noriega's private pursuit of personal enrichment").

In sum, "rejecting [the defendants'] claim to immunity is wholly consistent with the underpinnings of the doctrine of foreign official immunity." *See Cordones*, 2022 WL 815229, at *6.

## II. Maduro Moros's Motion to Dismiss Count One Should Be Denied

Maduro Moros argues that Count One of the Indictment must be dismissed because the Indictment (1) fails to plead any of the jurisdictional elements under 21 U.S.C. § 960a, (2) violates the due process clause of the Constitution in failing to allege any conduct "aimed at the United States," and (3) charges conduct that is beyond congressional authority to regulate under the foreign commerce clause of the Constitution. (Dkt. 323 ("Maduro Moros Count One Br.") at 1, 6-13). As set forth below, these claims fail.

### A. The Indictment Sufficiently Pleads Jurisdiction Under 21 U.S.C. § 960a

#### 1. Applicable Law

##### a. Pleading Standard

Under Rule 12(b) of the Federal Rules of Criminal Procedure, a court may dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). Rule 7(c) of the Federal Rules of Criminal Procedure sets forth the minimal "notice" pleading standards that apply to indictments. Rule 7(c)(1) requires that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). It is well settled that "[a]n indictment is sufficient as long as it (1) contains the elements of the offense and

fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (internal quotation marks, alterations, and citations omitted). In light these minimal standards, "[a] defendant faces a high standard in seeking to dismiss an indictment." *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014); *see also Costello v. United States*, 350 U.S. 359, 408 (1956) (articulating the longstanding rule that an indictment returned by a legally constituted grand jury, "if valid on its face, is enough to call for trial of the charge on the merits"); *United States v. Kelly*, 91 F. Supp. 2d. 580, 583 (S.D.N.Y. 2000) ("[D]efendant may not challenge a facially valid Indictment prior to trial for insufficient evidence [but] must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary sufficiency").

Because the indictment's purpose is to "fairly inform[] a defendant of the charge against which he must defend," *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (internal quotation marks and citation omitted), the Second Circuit has "repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity," *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) (internal quotation marks and citation omitted). When determining whether a count sufficiently alleges an offense, the count should be read "in its entirety." *United States* v. *Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992). Moreover, an indictment must be "read . . . 'to include facts which are necessarily implied by the specific allegations' therein." *United States v. Faison*, 393 F. App'x 754, 757 (2d Cir. 2010) (quoting *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002)). "[A]n indictment need not be perfect," and in reading an indictment, "common sense and reason prevail over technicalities." *United States* v. *Sabbeth*, 262 F.3d 207 (2d Cir. 2001); *see also United States v. Goodwin*, 141 F.3d 394, 401 (2d Cir. 1997) ("The precision and

detail formerly demanded are no longer required, imperfections of form that are not prejudicial are disregarded, and common sense and reason prevail over technicalities" (internal quotation marks and citation omitted)).

The Second Circuit has held that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *Alfonso*, 143 F.3d at 776 (internal quotation marks and citation omitted); *accord Wedd* 993 F.3d at 120; *Walsh*, 194 F.3d at 44, and an indictment will be deemed sufficient "unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant was convicted," *United States v. Orena*, 32 F.3d 704, 714 (2d Cir. 1994) (citations and alterations omitted); *see also Krantz v. United States*, No. 98 Civ. 7218 (JG), 1999 WL 557524, at *2-3 (E.D.N.Y. July 27, 1999) ("Regardless of whether the indictment could have been made more 'definite or certain,' omissions may be challenged only if they 'so completely denude[ ] the charges of so much informative data as to deprive [a defendant] of his right to be apprised of the charge . . . .'" (quoting *United States v. Varlack,* 225 F.2d 665, 670 (2d Cir. 1955)).

Where a court finds that dismissal of a count for failure to plead an element of the offense is necessary, as with most pleading deficiencies, the appropriate remedy is dismissal without prejudice to bringing a superseding indictment. *See, e.g.*, *United States v. Serrano*, 191 F. Supp. 3d 287, 290 (S.D.N.Y. 2016) (dismissal of indictment without prejudice for failure to plead jurisdictional element); *United States v. Conde*, 309 F. Supp. 2d 510, 512 (S.D.N.Y. 2003) (dismissal of indictment without prejudice for pleading logically inconsistent counts).

**b. Jurisdictional Elements of 21 U.S.C. § 960a**

Count One of the Indictment charges Maduro and others with conspiracy to commit narcoterrorism, in violation of 21 U.S.C. § 960a. Subsection (a) of § 960a, titled "Prohibited acts," prohibits "engag[ing] in conduct that would be punishable under [21 U.S.C. § 841(a)] if committed

within the jurisdiction of the United States, or attempt[ing] or conspir[ing] to do so" while "knowing or intending to provide, directly or indirectly, anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity . . . or terrorism." 21 U.S.C. § 960a(a). Subsection (b) of § 960a, titled "Jurisdiction," provides, in relevant part, "[t]here is jurisdiction over an offense under this section" if any one of the following elements applies:

> (1) the prohibited drug activity or the terrorist offense is in violation of the criminal laws of the United States;
>
> (2) the offense, the prohibited drug activity, or the terrorist offense occurs in or affects interstate or foreign commerce;
>
> (3) an offender provides anything of pecuniary value for a terrorist offense that causes or is designed to cause death or serious bodily injury to a national of the United States while that national is outside the United States, or substantial damage to the property of a legal entity organized under the laws of the United States (including any of its States, districts, commonwealths, territories, or possessions) while that property is outside of the United States;
>
> (4) the offense or the prohibited drug activity occurs in whole or in part outside of the United States (including on the high seas), and a perpetrator of the offense or the prohibited drug activity is a national of the United States or a legal entity organized under the laws of the United States (including any of its States, districts, commonwealths, territories, or possessions); or
>
> (5) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States.

21 U.S.C. § 960a(b). "The government must find jurisdiction to prosecute [a defendant] under at least one of [the § 960a(b)] elements," and, indeed, the "facts in [a] case" can "fulfill" multiple of such elements, though "[t]he government need prove only one." *See In re Sealed Case*, 936 F.3d 582, 585, 589 (D.C. Cir. 2019).

**2. Discussion**

Maduro Moros argues that the Indictment fails to allege any of the jurisdictional elements under § 960a(b) for Count One and therefore must be dismissed. (Maduro Moros Count One Br. at 6-8). In particular, he asserts that the Indictment "only includes the substantive elements of § 960a(a)," "fails to track any of the jurisdictional language contained in § 960a(b)," and contains "nothing to establish that the grand jury considered whether there were grounds for extraterritorial jurisdiction or if it was presented with any evidence in support of extraterritorial jurisdiction." (*Id.* at 7-8). This argument fails based on the face of the Indictment and ignores the facts alleged in connection with Count One.

*First*, the Indictment sufficiently pleads jurisdiction under § 960a(b)(5) in alleging that one or more of the defendants and other co-conspirators "has been and will be first brought to and arrested in" the United States—specifically, "in the Southern District of New York." Paragraph 23 under Count One of the Indictment expressly states the following:

> From at least in or about 1999, up to and including in or about 2025, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, and RAMÓN RODRÍGUEZ CHACÍN, the defendants, and others known and unknown, at least one of whom has been and will be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 21, United States Code, Section 960a.

(Indictment ¶ 23). This plainly satisfies the jurisdictional requirement under § 960a(b)(5) that "after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States." 21 U.S.C. § 960a(b)(5). Maduro cannot credibly argue he lacks sufficient notice via the Indictment or otherwise of this jurisdictional element. Indeed, it is not in dispute that Maduro Moros himself, as

an offender under Count One, was brought into the United States following the charged conduct, and that, alone, is sufficient to plead the statutory predicate for jurisdiction. *See United States v. Ahmed*, No. 10 CR 131 PKC, 2011 WL 5041456, at *2 (S.D.N.Y. Oct. 21, 2011) (considering a jurisdictional element identical to § 960a(b)(1) and finding: "There is no dispute that the defendant was involuntarily brought into the United States after the offense conduct. Indeed, the indictment alleges that the defendant 'will be first brought to and arrested' in this district. This alone is a sufficient statutory predicate for jurisdiction."); *Cf. United States v. Manaf*, No. 25-41-CR, 2026 WL 2526273, at *2 (2d Cir. Aug. 27, 2026) (finding the parties' stipulation that defendant was transported to the Southern District of New York following the charged conduct "supplied a statutory basis for finding that jurisdiction exists" under § 960a(b)(5)).

Moreover, as pled in Count One and further set forth in the Indictment, other offenders in the same narco-terrorism conspiracy were also brought into the United States following certain offense conduct committed in furtherance of the conspiracy charged under Count One. Specifically, as pled in the overt acts alleged in furtherance of Count One, "[i]n or about 2007, at the direction of [then-director of Venezuela's military intelligence agency] [Hugo] Carvajal Barrios, Venezuelan General Cliver Alcalá Cordones delivered to FARC leadership four crates of weapons from the Venezuelan Government, which included 20 grenades and two grenade launchers." (Indictment ¶ 21(q)). Both Carvajal Barrios and Alcalá Cordones were charged, along with Maduro Moros and Cabello Rondón, among others, with the same narco-terrorism conspiracy in count one of the second superseding indictment in this case, S2 11 Cr. 205 (AKH). And, as the present Indictment details, both Carvajal Barrios and Alcalá Cordones were later brought into the United States. (Indictment ¶¶ 21(e), 21(q), 23).

*Second*, the Indictment sufficiently pleads jurisdiction under § 960a(b)(1). Section 960a(b)(1) provides that there is jurisdiction if "the prohibited drug activity or the terrorist offense is in violation of the criminal laws of the United States." In other words, jurisdiction exists over a narco-terrorism case if the facts of the offense support a drug charge under Title 21 or any of the terrorism crimes in Title 18. Here, Count Two of the Indictment charges Maduro Moros, among others, with conspiracy to import narcotics into the United States, in violation of 21 U.S.C. §§ 959 and 963, and the Indictment specifically pleads in paragraph 21 on pages 10-18, "overt acts in furtherance of the defendants' drug trafficking and narco-terrorism conspiracies." Even putting aside the express, statutory pleadings under Count Two in paragraphs 25-30, paragraph 21 sufficiently alleges "prohibited drug activity . . . in violation of the criminal laws of the United States." 21 U.S.C. § 960a(b)(1). Specifically, paragraph 21 alleges that "[t]he defendants, together and with others, engaged in a relentless campaign of cocaine trafficking throughout the time period charged in [the] Indictment, resulting in the distribution of thousands of tons of cocaine *to the United States*," and that Maduro Moros did so along with other co-conspirators and "*with knowledge that their drug trafficking partners would move the cocaine north to the United States*." (Indictment ¶ 21 (emphasis added); *see also id.* ¶ 2 ("[Maduro Moros] has partnered with his co-conspirators to use his illegally obtained authority and the institutions he corroded to transport thousands of tons of cocaine to the United States.").

As the above-described allegations plainly show, the Indictment sufficiently alleges jurisdiction under §§ 960a(b)(1) and (5). Demanding anything more on these jurisdictional elements at the motion-to-dismiss stage is misguided. *Alfonso*, 143 F.3d at 777 (finding a pretrial motion challenging the jurisdictional element of a Hobbs Act Indictment "not appropriately addressed on a pretrial motion to dismiss an indictment."). Maduro Moros's claims that there is

"nothing" in the Indictment to establish such jurisdiction (Maduro Moros Count One Br. at 8), and that the Indictment is so deficient as to not "fairly inform[ ] [the defendant] of the charge against which he must defend," *Wedd*, 993 F.3d at 120, are wholly without merit.[17]

**B. Applying 21 U.S.C. § 960a to the Alleged Offense Conduct Does Not Violate Due Process**

**1. Applicable Law**

Where Congress has stated an intent to apply a statute extraterritorially, as here under 21 U.S.C. § 960a, federal courts are "'bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment.'" *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (quoting *United States v. Pinto-Mejia*, 720 F.2d 248, 259 (2d Cir. 1983)), *overruled on other grounds as stated in United States v. Yousef*, 750 F.3d 254, 261 (2d Cir. 2014). Extraterritorial application of federal criminal statutes does not violate due process where there is "a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (internal quotation marks and citation omitted). With respect to foreign nationals who are acting "entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests" or when the "criminal activity . . . targets U.S. citizens or interests or threatens the security or government functions of the United States." *Al Kassar*, 660 F.3d at 118 (citation omitted).

[17] To the extent the Court finds that further recitation of the exact language of the jurisdictional elements under § 960a(b) is necessary—which it should not—the appropriate remedy is to dismiss Count One without prejudice to the Government bringing a superseding indictment that addresses any deficiency the Court finds. *See Serrano*, 191 F. Supp. 3d at 290.

In conspiracy offenses, "jurisdictional nexus is determined by the aims of the conspiracy, not by its effects." *Id.* at 119. Thus, the due process clause is satisfied where (i) the defendant conspires to cause harm to U.S. persons or property located overseas, *id.* at 118; *United States v. Saade*, No. S1 11 Cr. 111(NRB), 2012 WL 2878087, at *4 (S.D.N.Y. July 11, 2012); *United States v. Viglakis*, No. 12 Cr. 585 (KBF), 2013 WL 4477023, at *6 (S.D.N.Y. Aug. 14, 2013), or, as relevant here, (ii) where the drug offense involved a conspiracy to import narcotics into the United States, *Saade*, 2012 WL 2878087, at *4.

In cases involving dealings with foreign terrorist organizations, such as the FARC, the Second Circuit and courts in this District have repeatedly found a sufficient nexus to the United States to exercise jurisdiction over a defendant. For example, in *United States v. Al Kassar*, the Second Circuit affirmed the District Court's finding of jurisdiction where the defendants were charged with conspiring to provide material support to the FARC in the form of military-grade weapons, like anti-aircraft missiles, which, confidential sources said, would be used to attack Americans overseas. 660 F.3d at 118-20. There, the District Court, relying on *Yousef*, held that "[g]iven the substantial intended effect of [the crimes] on the United States and its citizens, it cannot be argued seriously that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." *United States v. Al Kassar*, 582 F. Supp. 2d 488, 494 (S.D.N.Y. 2008) (internal quotation marks omitted).

Likewise, the court in *United States v. Jamal Yousef* found jurisdiction over the charged narco-terrorism conspiracy based on an agreement made by the defendants with a confidential informant posing as a FARC representative, to exchange a cache of military-grade weapons, which had allegedly been stolen from the American military in Iraq, for thousands of kilograms of cocaine. *United States v. Jamal Yousef*, No. 08 Cr. 1213 (JFK), 2010 WL 3377499, at *1-2

(S.D.N.Y. Aug. 23, 2010). Although all of the co-conspirators' conduct occurred outside of the United States, Judge Keenan held that application of the narco-terrorism statute to the defendant was permitted under the "nexus test." *See id.* at *4-5 (internal quotation marks omitted) (citing, *inter alia*, *Yousef*, 327 F.3d at 112; *Al Kassar*, 582 F. Supp. 2d at 494). Judge Keenan acknowledged that the defendant might not have acted "with the specific purpose of harming interests of or related to the United States," but he nonetheless found that the defendant "was aware that the charged conduct would have such an effect," and that was sufficient to exercise jurisdiction over him. *Id.* at *4.

Finally, by way of further example, in *United States v. Bout,* Judge Scheindlin, finding jurisdiction in analogous circumstances involving a weapons deal with the FARC, held that "[t]o prove a sufficient nexus to the United States, the evidence need merely support the conclusion that [the defendant] was aware that the charged conspiracies would harm interests of or related to the United States," and an indictment's simple allegation of such knowledge is sufficient to withstand a motion to dismiss. *United States v. Bout*, No. 08 Cr. 365, 2011 WL 2693720, at *3-4 (S.D.N.Y. July 11, 2011) (internal quotation marks and alterations omitted) (indictment alleged that defendant "offered to sell . . . weapons to the FARC after acknowledging . . . his understanding that the FARC intended to use those weapons to kill U.S. forces in Colombia").

**2. Discussion**

Maduro Moros's motion to dismiss Count One on due process grounds also fails because he has fallen far short of demonstrating that the application of the statute in this case would be "arbitrary or fundamentally unfair." *See Al Kassar*, 660 F.3d at 118. And his claim that the facts alleged in connection with the narco-terrorism conspiracy charged in Count One "involve purely extraterritorial conduct without a nexus to the United States," (Maduro Moros Count One Br. at 9), is flatly contradicted by the allegations in the Indictment.

To make this argument, Maduro Moros asserts that the "gravamen of [the] offense" charged in Count One is "providing a pecuniary benefit to a terrorist organization," and then claims that the Indictment "fails to provide any connection between [his] alleged pecuniary support for terrorist organizations and the United States." (Maduro Moros Count One Br. at 10-11). This so-called "gravamen" analysis ignores half the offense conduct alleged in the Indictment that gives rise to a *narco*-terrorism charge. That charge is based not solely on the provision of a "pecuniary benefit to a terrorist organization" but rather (1) the engagement in prohibited drug activity—i.e., the distribution of, or possession with intent to distribute, a controlled substance (or conspiracy or attempt to do so) and (2) the intent to directly or indirectly provide something of pecuniary value to such a terrorist organization. *See* 21 U.S.C. § 960a(a); *see also* Sand, et al., *Modern Federal Jury Instructions: Criminal,* Instrs. 56-56, 56-57.

Here, and as set forth above, the Indictment plainly alleges that the prohibited drug activity had a nexus to and intended effect on the United States: "[t]he defendants, together and with others, engaged in a relentless campaign of cocaine trafficking throughout the time period charged in [the] Indictment, resulting in the distribution of thousands of tons of cocaine *to the United States*" and that Maduro Moros did so along with other co-conspirators and "*with knowledge that their drug trafficking partners would move the cocaine north to the United States*." (Indictment ¶ 21 (emphasis added); *see also id.* ¶ 2 (alleging that "[Maduro Moros] has partnered with his co-conspirators to use his illegally obtained authority and the institutions he corroded to transport thousands of tons of cocaine to the United States.")). The Indictment further describes the various U.S.-designated foreign terrorist organizations ("FTOs") with whom members of the narco-terrorism conspiracy dealt and those FTOs' harm to United States interests, (*id.* ¶¶ 10-15); how certain of them, like the FARC and *Ejército de Liberación Nacional* ("ELN"), control the

production of cocaine intended for the United States, while others control the trafficking routes into the United States, (*id.* at ¶ 20); and further, what kind of support Maduro Moros and other co-conspirators provided to such FTOs in the course of the conspiracy charged under Count One (*see, e.g.*, *id.* ¶¶ 21(g), (h), (m), (n), and (p)).

The defendant argues that the Indictment "fails to allege that [Maduro Moros] knew" about any "alleged impacts" of such FTOs on the United States or that he provided aid to such FTOs with the intent of causing harm inside the United States. (*See* Maduro Moros Count One Br. at 11). Even if that were accurate—and it is not—the latter regarding specific intent to cause harm, is, of course, not required, as courts in this District have repeatedly concluded. *See Bout*, 2011 WL 2693720, at *3-4; *Yousef*, 2010 WL 3377499, at *1-2. And here, Maduro Moros ignores the clear allegation in the Indictment that he was aware of the intended U.S. destination of the cocaine trafficked as part of the conspiracy. (*See* Indictment ¶¶ 2, 21). Moreover, the grand jury's determination that such prohibited drug activity that was a part of the narco-terrorism conspiracy was U.S.-directed and that Maduro Moros had knowledge of its U.S. effect is sufficient to withstand a motion to dismiss, which is not a vehicle to explore the sufficiency of the Government's proof. *See* Fed. R. Crim. Pro. 12(b)(2) (a defendant may submit a pretrial motion for "any defense, objection, or request that the court can determine without a trial on the general issue."); *Costello*, 350 U.S. at 408; *Kelly*, 91 F. Supp. 2d. at 583.

In *In re Sealed Case*, in rejecting a similar due process claim by the defendant—albeit as part of post-conviction relief regarding what the facts *established* as opposed to what an indictment *pleads*—the D.C. Circuit explained that "[the defendant] was a leader of an international drug trafficking organization that funded and provided weapons to terrorist groups that openly murdered and kidnapped civilians" and that, "[t]hese groups, moreover, were publicly designated by the

State Department as directly threatening U.S. nationals or the national security of the United States." *In re Sealed Case*, 936 F.3d at 594. The court concluded that the defendant "can find no refuge in the Due Process Clause." *Id.* So, too, here. Maduro Moros led a conspiracy that trafficked tons of cocaine bound for the United States, and which funded and provided support to violent terrorist organizations designated as FTOs by the State Department. The Indictment plainly alleges Maduro Moros knew the intended destination of the cocaine, and so, there is nothing "arbitrarily or fundamentally unfair" about the extraterritorial application of § 960a to the offense conduct charged under Count One. *See Al Kassar*, 660 F.3d at 118.

### C. Applying 21 U.S.C. § 960a to the Alleged Offense Conduct Does Not Exceed Congressional Authority Under the Foreign Commerce Clause

#### 1. Applicable Law

As set forth above, under § 960a(b)(2), the second jurisdictional provision, a court has jurisdiction over a narco-terrorism case if "the offense, the prohibited drug activity, or the terrorist offense occurs in or affects interstate or foreign commerce . . . ." Thus, the statute incorporates Congress's authority "to regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. "'Foreign commerce' is commerce between the United States and a foreign nation." *United States v. Thomas*, 893 F.2d 1066, 1069 n.2 (9th Cir. 1990); *see also Gibbons v. Ogden*, 22 U.S. 1, 193 (1824) (Congress's power to regulate foreign commerce "comprehend[s] every species of commercial intercourse between the United States and foreign nations."); *cf.* 18 U.S.C. § 10 ("The term 'foreign commerce', as used in this title, includes commerce with a foreign country."). Congress has broader authority to regulate foreign commerce than interstate commerce. *See Japan Line, Ltd. v. County of L.A.*, 441 U.S. 434, 448 (1979).

While there may be "[d]oubt . . . as to Congress's ability under the Foreign Commerce Clause to criminalize conduct with *no* effect on the United States," *In re Sealed Case*, 936 F.3d at

590 (emphasis in original), courts, including the Second Circuit, widely recognize that Congress may criminalize conduct under the Foreign Commerce Clause that has some nexus to or effect on the United States. *See, e.g.*, *United States v. Weingarten*, 632 F.3d 60, 67-68, 71 (2d Cir. 2011) (holding child sex trafficking statute applicable to extraterritorial conduct and its provision regarding "travel[] in foreign commerce" to require a territorial nexus to the United States"); *see also In re Sealed*, 936 F.3d at 591-92 (explaining that some courts have "concluded that Congress has broad power to regulate overseas commercial conduct that has a 'substantial effect' on commerce with the United States" while others permit the regulation of foreign conduct with less of an effect on the United States" (collecting cases)).

The court in *In re Sealed Case*, where the defendant was charged under § 960a, declined to "define . . . the precise level of 'effect' necessary" because the facts stipulated by the parties "place[d] his conduct abroad within Congress's reach under any version of the [effects] test." 936 F.3d at 591-92. The court explained as follows:

> [The defendant-appellant's crime] was not a minor offense, the effects of which were only tangentially related to the United States. Appellant was a leader of a large, transnational drug trafficking conspiracy that supported established and powerful terrorist groups. Those groups murdered and kidnapped civilians, and the State Department had publicly concluded that they threatened U.S. nationals and interests. Appellant's plea agreement does not specify where the drugs he trafficked were ultimately headed, but given the quantity of drugs, the involvement of Organization 1, and the nature of the Country A drug export markets in which Appellant participated, his actions had a significant effect on the drug trade between the United States and the countries in which he operated.

*Id.* The court further observed that the superseding information to which the defendant pled guilty stated that "Organization 1" and "Organization 2," another terrorist group with which the defendant had dealings, "were designated Foreign Terrorist Organizations by the United States Department of State during the period of the conspiracy." *Id.* at 592 (citing and quoting 8 U.S.C.

§ 1189(a)(1)(C) in noting its express requirement "that 'the terrorist activity or terrorism of' an organization named as a Foreign Terrorist Organization by the State Department 'threaten[ ] the security of United States nationals or the national security of the United States'"). The court concluded that such a fact "magnifies the effect of [the defendant's] conduct on commerce between the countries where [the defendant] was operating and the United States." *Id.* (citing *Strassheim v. Daily*, 221 U.S. 280, 285 (1911) ("Acts done outside a jurisdiction but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power.")).

**2. Discussion**

In support of his contention that application of § 960a to the offense conduct alleged in the Indictment exceeds congressional authority under the foreign commerce clause, Maduro Moros resorts to the same cherry-picking of § 960a elements as described above. He argues that the Indictment fails to allege that he provided any pecuniary benefit to FTOs with "the intent or aim that those organizations would harm the United States." (Maduro Moros Count One Br. at 12-13). Just as is described above on the due process challenge, the Court should reject this argument.

Here, the facts alleged in the Indictment are no different than those asserted in *In re Sealed*: Maduro Moros "was a leader of a large, transnational drug trafficking conspiracy that supported established and powerful terrorist groups . . . that murdered and kidnapped civilians, [and which] the State Department had publicly concluded . . . threatened U.S. nationals and interests." 936 F.3d at 591-92. Notably, the court in *In re Sealed*, even found the fact that there was no assertion of the defendant's knowledge of "where the drugs . . . were ultimately headed" to be of no consequence in its analysis because it could infer, that "given the quantity of drugs, the involvement of [one of the terrorist organizations], and the nature of the [subject country's] drug export markets in which [the defendant] participated, his actions had a significant effect on the

drug trade between the United States and the countries in which he operated." *Id.* While the same is true of the scale of narcotrafficking and the countries through which Maduro Moros and other co-conspirators facilitated the movement of drugs in partnership with the various FTOs (as the Indictment makes clear), here, the Indictment also alleges that Maduro Moros indeed knew the intended destination of the cocaine to be the United States. (*See* Indictment ¶¶ 2, 21). Accordingly, the Indictment supports that such prohibited drug activity, as part of the narco-terrorism conspiracy, "had a significant effect on the drug trade" with the United States. *See In re Sealed Case*, 936 F.3d at 591-92.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendants' motions to dismiss the Fourth Superseding Indictment on immunity grounds and Maduro Moros's motion to dismiss Count One.

Dated: New York, New York
October 2, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

By: /s/
Kaylan E. Lasky
Henry L. Ross
Kevin T. Sullivan
Kyle A. Wirshba
Assistant United States Attorneys