**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

NICOLÁS MADURO MOROS, *et al.*,

Defendants.

S5 11-CR-205 (AT)

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION OF NICOLÁS MADURO MOROS**
**TO DISMISS THE FIFTH SUPERSEDING INDICTMENT**
**BASED ON SOVEREIGN IMMUNITY**

## TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ... iii

PRELIMINARY STATEMENT ... 1

FACTUAL BACKGROUND AND ALLEGATIONS IN THE S5 ... 5

A. Mr. Maduro's Presidency ... 5

B. Procedural History ... 10

1. The S4 ... 10

2. The S5 ... 11

3. The S5 Concedes Mr. Maduro's Status as Venezuela's *De Facto* Head of State at the Time He Was Kidnapped and Brought Before the Court ... 12

4. The S5's Allegations Are Based on Mr. Maduro's Performance of Official Duties, His Official Acts, and His Use of State Instrumentalities. ... 12

i. The Count One and Three Narcotics Conspiracies, and the Related Count Four and Five Firearms Charges Rest on Allegations of Official Acts Carried Out Through State Authority. ... 13

ii. The Count Two Torture Conspiracy Charge Also Rests on Allegations of Official Acts Carried Out Through State Instrumentalities. ... 15

LEGAL STANDARD ... 16

ARGUMENT ... 18

I. DISMISSAL IS REQUIRED BECAUSE MR. MADURO IS ENTITLED TO HEAD-OF-STATE IMMUNITY. ... 19

A. Absolute Immunity for Heads of State Like Mr. Maduro Is a Long-Settled Principle of Common Law and International Customary Law. ... 20

B. Mr. Maduro's Status as Venezuela's Head of State at the Time He Was Kidnapped to Face Charges in the United States Is Undisputed. ... 23

C. Mr. Maduro's Immunity Is Assessed at the Time He Was Abducted and Forcibly Subjected to the Jurisdiction of this Court ... 33

D. Venezuela Has Not Waived Mr. Maduro's Immunity. ... 35

II. DISMISSAL IS INDEPENDENTLY REQUIRED BECAUSE MR. MADURO IS ENTITLED TO CONDUCT-BASED IMMUNITY ........ 36

A. Common Law Conduct-Based Immunity Shields Foreign Officials Acting in Their Sovereign Capacity. ........ 36

B. The Indictment Bases the Charges on Official Acts for Which Mr. Maduro Is Entitled to Conduct-Based Immunity. ........ 38

1. The Indictment Alleges Official Acts. ........ 38

2. The Indictment's Allegations of Unlawful Conduct, Criminal Intent, and *Jus Cogens* Violations Do Not Defeat Sovereign Immunity. ........ 46

C. The Court Should Not Extend to Mr. Maduro Judge Hellerstein's Denial of Immunity to Cordones. ........ 50

III. THE COURT SHOULD NOT DEFER TO THE EXECUTIVE BRANCH'S VIEWS ON MR. MADURO'S STATUS-BASED OR CONDUCT-BASED IMMUNITY ........ 52

CONCLUSION ........ 58

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
425 U.S. 682 (1976) .......... 57

*Appel v. Cohen*,
No. 22-170, 2023 WL 1431691 (2d Cir. Feb. 1, 2023) .......... 48

*Appel v. Hayut*,
No. 20 Civ. 6265 (JPC), 2021 WL 2689059 (S.D.N.Y. June 30, 2021) .......... 48

*Arnold v. Lucks*,
392 F.3d 512 (2d Cir. 2004) .......... 16

*Berizzi Bros. Co. v. The Pesaro*,
271 U.S. 562 (1926) .......... 55

*Bradley v. Fisher*,
80 U.S. 335 (1871) .......... 48

*Brzak v. United Nations*,
597 F.3d 107 (2d Cir. 2010) .......... 49, 50

*Celestin v. Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) .......... 52

*Coleman v. Tennessee*,
97 U.S. 509 (1878) .......... 20

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .......... 31

*Doe 1 v. Buratai*,
318 F. Supp. 3d 218 (D.D.C. 2018) .......... 48, 50

*Does 1-5 v. Obiano*,
138 F.4th 955 (5th Cir. 2025) .......... 35, 50

*Doğan v. Barak*,
932 F.3d 888 (9th Cir. 2019) .......... 44, 45, 50

*Dorman v. Higgins*,
821 F.2d 133 (2d Cir. 1987) .......... 48

*Dow v. Johnson*,
100 U.S. 158 (1879) .......... 20

*Eliahu v. Jewish Agency for Isr.*,
919 F.3d 709 (2d Cir. 2019)........................................................................ 16, 33, 48, 50

*Est. of Tov by Kedem v. United Nations Relief & Works Agency*,
807 F. Supp. 3d 208 (S.D.N.Y. 2025)........................................................................ 50, 56

*Ex parte McCardle*,
74 U.S. (7 Wall.) 506 (1868) ........................................................................ 16

*Filarsky v. Delia*,
566 U.S. 377 (2012)........................................................................ 44

*Franchise Tax Bd. of California v. Hyatt*,
587 U.S. 230 (2019)........................................................................ 20, 21

*Gregoire v. Biddle*,
177 F.2d 579 (2d Cir. 1949)........................................................................ 47

*Guaranty Trust Co. v. United States*,
304 U.S. 126 (1938)........................................................................ 31

*Hatch v. Baez*,
7 Hun. 596 (N.Y. Sup. Ct. 1876) ........................................................................ 37, 38, 51

*Heaney v. Gov't of Spain*,
445 F.2d 501 (2d Cir. 1971)........................................................................ 39, 48, 52

*In re Grand Jury Investigation of the Shipping Indus.*,
186 F. Supp. 298 (D.D.C. 1960)........................................................................ 56

*In re Investigation of World Arrangements*,
13 F.R.D. 280 (D.D.C. 1952)........................................................................ 25, 56

*In re Sealed Case*,
131 F.3d 208 (D.C. Cir. 1997)........................................................................ 16

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019)........................................................................ 51

*Lafontant v. Aristide*,
844 F. Supp. 128 (E.D.N.Y. 1994) ........................................................................ 35

*Libra Bank Ltd. v. Banco Nacional de Costa Rica*,
676 F.2d 47 (2d Cir. 1982)........................................................................ 35

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000)........................................................................ 5

*Malley v. Briggs*,
475 U.S. 335 (1986) ... 44

*Manoharan v. Rajapaksa*,
711 F.3d 178 (D.C. Cir. 2013) ... 54

*Matar v. Dichter*,
563 F.3d 9 (2d Cir. 2009) ... passim

*Nankivel v. Omsk All-Russian Gov't*,
237 N.Y. 150 (N.Y. 1923) ... 24, 26

*Nat'l City Bank of N.Y. v. Rep. of China*,
348 U.S. 356 (1955) ... 18

*People v. McLeod*,
25 Wend. 483 (N.Y. Sup. Ct. 1841) ... 37, 55

*Pernell v. Southall Realty*,
416 U.S. 363 (1974) ... 58

*Pierson v. Ray*,
386 U.S. 547 (1967) ... 44

*Quern v. Jordan*,
440 U.S. 332 (1979) ... 44

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
162 F.3d 748 (2d Cir. 1998) ... 18, 52

*Republic of Hungary v. Simon*,
604 U.S. 115 (2025) ... 20

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945) ... 31, 56

*Rubin v. Islamic Republic of Iran*,
583 U.S. 202 (2018) ... 20

*Ruggiero v. Compania Peruana de Vapores Inca Capac Yupanqui*,
639 F.2d 872 (2d Cir. 1981) ... 20

*Rusesabagina v. Republic of Rwanda*,
652 F. Supp. 3d 1 (D.D.C. 2023) ... 16

*Samantar v. Yousuf*,
560 U.S. 305 (2010) ... 19, 21

*Saudi Arabia v. Nelson*,
507 U.S. 349 (1993) ........ 41, 42, 43

*SEC v. Jarkesy*,
603 U.S. 109 (2024) ........ 57

*Tachiona v. Mugabe*,
169 F. Supp. 2d 259 (S.D.N.Y. 2001) ........ 22

*Tenney v. Brandhove*,
341 U.S. 367 (1951) ........ 49

*The Pesaro*,
277 F. 473 (S.D.N.Y. 1921) ........ 55

*The Schooner Exchange v. McFaddon*,
11 U.S. (7 Cranch) 116 (1812) ........ 20, 21, 55

*Trump v. United States*,
603 U.S. 593 (2024) ........ 41, 47, 49

*Turkiye Halk Bankasi A.S. v. United States*,
598 U.S. 264 (2023) ........ passim

*Underhill v. Hernandez*,
65 F. 577 (2d Cir. 1895) ........ 37, 38

*Underhill v. Hernandez*,
168 U.S. 250 (1897) ........ 24, 37

*Ungar v. Palestine Liberation Org.*,
402 F.3d 274 (1st Cir. 2005) ........ 32

*United States v. Bankasi*,
120 F.4th 41 (2d Cir. 2024) ........ 39, 43, 53

*United States v. Belfast*,
611 F.3d 783 (11th Cir. 2010) ........ 44

*United States v. Cordones*,
No. 11 Cr. 205 (AKH), 2022 WL 815229 (S.D.N.Y. Mar. 17, 2022) ........ 17, 51

*United States v. Khobragade*,
15 F. Supp. 3d 383 (S.D.N.Y. 2014) ........ 16, 17, 34, 55

*United States v. Noriega*,
117 F.3d 1206 (11th Cir. 1997) ........ 32

*United States v. Noriega*,
746 F. Supp. 1506 (S.D. Fla. 1990) ........................................................................ 32

*United States v. Pangang Grp. Co.*,
135 F.4th 1142 (9th Cir. 2025) .............................................................................. 54

*United States v. Polanco*,
145 F.3d 536 (2d Cir. 1998)...................................................................................... 42

*United States v. Smith*,
18 U.S. 153 (1820)................................................................................................... 58

*United States v. Texas*,
507 U.S. 529 (1993)................................................................................................. 44

*United States v. Toscanino*,
500 F.2d 267 (2d Cir. 1974)...................................................................................... 18

*United States v. Turkiye Halk Bankasi A.S.*,
16 F.4th 336 (2d Cir. 2021) ...................................................................................... 16

*Upper Skagit Indian Tribe v. Lundgren*,
584 U.S. 554 (2018)................................................................................................. 57

*Verlinden B.V. v. Central Bank of Nigeria*,
461 U.S. 480 (1983)................................................................................................. 57

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000)................................................................................................. 18

*Victory Transport, Inc. v. Comisaria General*,
336 F.2d 354 (2d Cir. 1964)...................................................................................... 39

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*,
493 U.S. 400 (1990)................................................................................................. 52

*Waltier v. Thomson*,
189 F. Supp. 319 (S.D.N.Y. 1960) .......................................................................... 47

*Wulfsohn v. Russian Socialist Federated Soviet Republic*,
234 N.Y. 372 (N.Y. 1923), *appeal dismissed*, 266 U.S. 580 (1924) ................................ 24, 27

*Wultz v. Bank of China Ltd.*,
32 F. Supp. 3d 486 (S.D.N.Y. 2014)......................................................................... 48

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015)..................................................................................................... 31

**Statutes**

18 U.S.C. § 2340 .......... 4, 36, 43

28 U.S.C. § 1350 .......... 45

42 U.S.C. § 1983 .......... 44

**International Cases**[1]

*Aguilar-Amory & Royal Bank of Can. Claims (Gr. Brit. v. Costa Rica)*,
1 R.I.A.A. 369 (1923) .......... 25

*Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.)*,
Judgment, 2002 I.C.J. 3 (Feb. 14) .......... 17, 22, 33, 34

*Bank of Ethiopia v. Nat'l Bank of Egypt and Liguori*,
31 Am. J. Int'l L. 742 (1937) .......... 26

Cass. pen. [Court of Cassation], sez. I, June 28, 1985, n. 1981,
109 Foro it. 277 (1986) (It.) .......... 27

Cass. pen. [Court of Cassation], sez. III, Sept. 17, 2004, n. 49666,
129 Foro it. 253 (2006) (It.) .......... 27

*Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France)*,
Judgment, 2008 I.C.J. 177 (June 4) .......... 22

Cour de cassation [Cass.] [supreme court for judicial matters] ass. plén.,
July 25, 2025, No. C 24-84.393 (Fr.) .......... 22, 26, 27

*Duke of Brunswick v. King of Hanover*,
[1848] 2 H.L. Cas. 1 .......... 46, 50, 51

*In re Suarez*,
[1918] 1 Ch. 176 (Eng. C.A.) .......... 26

*The Charkieh*,
[1873] L.R. 4 A. & E. 59 (Eng. High Ct. Adm.) .......... 25, 26

*Trendtex Trading Corp. v. Central Bank of Nigeria*,
[1977] Q.B. 529 (Eng. C.A.) .......... 21

[1] International cases not attached as exhibits to the Pollack Declaration are collected in the attached Appendix.

**Books, Articles, & Periodical Materials**

1 William Blackstone, Commentaries (1765) .......... 21, 22

4 William Blackstone, Commentaries (1769) .......... 21

A.B. Lyons, *The Conclusiveness of the Foreign Office Certificate*, 23 Brit. Y.B. Int'l L. 240 (1946) .......... 26

Alejandra Jaramillo & Chris Lau, *Six Americans Freed in Venezuela After Trump Envoy Meets with Maduro*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/02/01/americas/americans-freed-in-venezeuela-intl-hnk/index.html .......... 29

Angus Berwick, *Venezuela's Maduro Names Delcy Rodriguez as Vice President*, Reuters (June 14, 2018), https://www.reuters.com/article/world/venezuelas-maduro-names-delcy-rodriguez-as-vice-president-idUSKBN1JA2M7/ .......... 5

Babak Dehghanpisheh, *Nicolás Maduro Is Still the 'Legitimate President' of Venezuela, Acting Leader Delcy Rodríguez Says*, NBC News (Feb. 12, 2026), https://www.nbcnews.com/world/venezuela/maduro-legitimate-president-venezuela-delcy-rodriguez-interview-trump-rcna258687 .......... 9, 33

*Brazil to Resume Diplomatic Relations with Venezuela Under Lula*, Al Jazeera (Dec. 14, 2022), https://www.aljazeera.com/news/2022/12/14/brazil-to-resume-diplomatic-relations-with-venezuela-under-lula .......... 30

Camilo González Posso, *Negotiations with the FARC: 1982-2002*, Conciliation Resources, Accord Issue 14 (Feb. 2004), https://www.c-r.org/accord/colombia/negotiations-farc-1982-2002 .......... 40

Chase Harrison, *Map: Which Latin American Countries Have Restored Relations with Venezuela?*, Americas Soc'y/Council of the Ams. (June 21, 2023), https://www.as-coa.org/articles/map-which-latin-american-countries-have-restored-relations-venezuela. .......... 30

Chimène I. Keitner, *The Forgotten History of Foreign Official Immunity*, 87 N.Y.U. L. Rev. 704 (2012) .......... 55

*Colombia, Venezuela Restore Full Diplomatic Relations*, Al Jazeera (Aug. 29, 2022), https://www.aljazeera.com/news/2022/8/29/venezuela-colombia-restore-full-diplomatic-ties 30

*Contemporary Practice of the United States Relating to International Law*, 113:3 Am. J. Int'l L. 600 (Jean Galbraith ed., 2019) .......... 6

Dave Lawler, *U.S. No Longer Recognizes Guaidó as Venezuela's President, Biden Official Confirms*, Axios (Jan. 4, 2023), https://www.axios.com/2023/01/04/us-stops-recognizing-juan-guaido-venezuela .......... 7

*Delcy Rodriguez Formally Sworn In as Venezuela's Interim President*, Reuters (Jan. 5, 2026), https://www.reuters.com/world/americas/delcy-rodriguez-formally-sworn-venezuelas-interim-president-2026-01-05/ ........ 8

Elias Ferrer, *Exclusive Interview: Former NSC Senior Director Juan González Explains What Happened to U.S. Policy Toward Venezuela*, Guacamaya (Apr. 6, 2025), https://guacamayave.com/en/exclusive-interview-former-nsc-senior-director-juan-gonzalez-explains-what-happened-to-u-s-policy-toward-venezuela/ ........ 29

G. Edward White, *The Transformation of the Constitutional Regime of Foreign Relations*, 85 Va. L. Rev. 1 (1999) ........ 54

Hans Kelsen, *General Theory of Law and State* (Anders Wedberg trans., 1949) (1945) ........ 26

Henry Wheaton, *Wheaton's Elements of International Law* (Coleman Phillipson ed., 5th ed. 1916) ........ 21

Ingrid Wuerth, *Foreign Official Immunity Determinations in U.S. Courts: The Case Against the State Department*, 51 Va. J. Int'l L. 915 (2011) ........ 54, 55

Jasper Ward, *Trump Says Venezuela Agrees to Receive Illegal Migrants Captured in US*, Reuters (Feb. 1, 2025), https://www.reuters.com/world/americas/trump-says-venezuela-agrees-receive-illegal-migrants-captured-us-2025-02-01/ ........ 29

John O'Brien*, International Law* (2001) ........ 21

José Luis Granados Ceja, *Regional ALBA Bloc Backs Maduro Reelection, Rejects Foreign Interference in Venezuela*, Venezuelanalysis (Aug. 27, 2024), https://venezuelanalysis.com/news/regional-alba-bloc-backs-maduro-reelection-rejects-foreign-interference-in-venezuela ........ 7

*Maduro Offers to Engage in Direct Talks with Trump Envoy Grenell*, Reuters (Sept. 21, 2025), https://www.reuters.com/world/americas/maduro-offers-engage-direct-talks-with-trump-envoy-grenell-2025-09-20/ ........ 29

Owen Schalk, *As UN Recognizes Maduro, Canada Increasingly Isolated On World Stage*, Canadian Dimension (Dec. 16, 2021), https://canadiandimension.com/articles/view/as-un-recognizes-maduro-canada-is-increasingly-isolated-on-world-stage ........ 6

Ricardo Vaz, *Venezuela: Supreme Court Delivers Electoral Review Verdict, Confirms Maduro Victory*, Venezuelanalysis (Aug. 22, 2024), https://venezuelanalysis.com/news/venezuela-supreme-court-delivers-electoral-review-verdict-confirms-maduro-victory/ ........ 7

*Trump Confirms Conversation with Venezuela's Maduro*, Reuters (Dec. 1, 2025), https://www.reuters.com/world/americas/trump-confirms-he-spoke-with-venezuelas-maduro-2025-11-30/ ........ 29

*Venezuela's Interior Minister Says 100 People Died in U.S. Attack*, Reuters (Jan. 8, 2026) https://www.reuters.com/world/americas/venezuelas-interior-minister-says-100-people-died-us-attack-2026-01-08/ .......... 8

Vibhu Mishra, *Maduro Seized, Norms Tested: Security Council Divided as Venezuela Crisis Deepens*, U.N. News (Jan. 5, 2026), https://news.un.org/en/story/2026/01/1166706 .......... 9

*What are Colectivos? An Essential Clarification*, PSUV (Oct. 28, 2014), http://www.psuv.org.ve/opiniones/%C2%BFque-son-colectivos-una-aclaratoria-imprescindible/ .......... 14

**Other Authorities**

1 Op. Att'y Gen. 45 (1794) .......... 37

1 Op. Att'y Gen. 81 (1797) .......... 37

Clare Ribando Seelke, Cong. Rsch. Serv., IN11024, Venezuela: U.S. Recognizes Interim Government (2019) .......... 6

Comments from the United States On the International Law Commission's Draft Articles on Criminal Immunity of State Officials As Adopted by the Commission in 2022 on First Reading, https://legal.un.org/ilc/sessions/75/pdfs/english/iso_us.pdf .......... 23, 45, 50

Constitución de la República Bolivariana de Venezuela 1999 (as amended 2009) (Venez.) .......... 39, 40

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 .......... 44

Exec. Order No. 13857, 84 Fed. Reg. 509 (Jan. 30, 2019) .......... 28

Int'l Law Comm'n, Draft Articles on the Responsibility of States for Internationally Wrongful Acts, with Commentaries, U.N. Doc. A/56/10, (2001), https://untreaty.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf .......... 47

June S. Beittel, Cong. Rsch. Serv., R42982, Colombia's Peace Process Through 2016 (updated Dec. 31, 2016) .......... 40

*Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcomm. on Admin. Law and Governmental Relations of the H. Comm. on the Judiciary*, 94th Cong. 27 (1976) .......... 57

Leticia Chacon & Clare Ribando Seelke, Cong. Rsch. Serv., IN12354, Venezuela's 2024 Presidential Election (2024) .......... 7

Mark P. Sullivan, Cong. Rsch. Serv., R43239, Venezuela: Issues for Congress, 2013-2016 (2017) .......... 5

Media Note, U.S. Dep't of State, *Resumption of Operations at U.S. Embassy Caracas* (Mar. 30, 2026), https://www.state.gov/releases/office-of-the-spokesperson/2026/03/resumption-of-operations-at-u-s-embassy-caracas ............................... 9

Press Release, General Assembly, General Assembly Adopts Resolution Welcoming International Court of Justice Advisory Opinion on Israel's Obligations Related to Occupied Palestinian Territory, U.N. Press Release GA/12743 (Dec. 12, 2025)....................... 8

Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions the President of Venezuela* (July 31, 2017), https://home.treasury.gov/news/press-releases/sm0137 .................................. 5

Restatement (Second) of Foreign Relations Law § 66 (Am. L. Inst. 1965) ................................ 22

S. Exec. Rep. No. 101-30 (1990) ............................................................................ 44, 45

S. Rep. No. 102-249 (1991) ........................................................................................ 45

The Federalist No. 81 (Alexander Hamilton) ..................................................................... 21

Press Statement, Antony J. Blinken, U.S. Sec'y of State, *Revocation of the Terrorist Designations of the Revolutionary Armed Forces of Colombia (FARC) and Additional Terrorist Designations* (Nov. 30, 2021), https://2021-2025.state.gov/revocation-of-the-terrorist-designations-of-the-revolutionary-armed-forces-of-colombia-farc-and-additional-terrorist-designations/ ........................................................................................... 40

Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0001, Exp. No. 26-0001 (Jan. 3, 2026) (Venez.)............................................................................................... 8

U.N. Audiovisual Library, President of Venezuela Addresses General Assembly (70th Sess., Sept. 29, 2015), https://media.un.org/avlibrary/en/asset/d145/d1450718 ................................. 5

U.N. GAOR, 74th Sess., 51st plen. mtg., U.N. Doc. A/74/PV.51 (Dec. 18, 2019)....................... 6

U.N. GAOR, 80th Sess., 61st plen. mtg., U.N. Doc. A/RES/80/114 (Dec. 16, 2025) .................. 8

U.N. GAOR, 80th Sess., U.N. Doc. A/80/547 (Nov. 25, 2025) .................................................... 8

U.N. SCOR, 81st Sess., 10085th mtg., U.N. Doc. S/PV.10085 (Jan. 5, 2026) ............................. 9

U.S. Dep't of State, Bureau of Democracy, H. R. and Lab., Venezuela 2020 Human Rights Report (2021), https://www.state.gov/wp-content/uploads/2021/10/VENEZUELA-2020-HUMAN-RIGHTS-REPORT.pdf.......................................................................... 28

U.S. Dep't of State, *Secretary Kerry's Meetings with Colombian Government and FARC Negotiators* (Mar. 21, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/03/254896.htm ... 40

## PRELIMINARY STATEMENT

President Nicolás Maduro Moros has pled not guilty and vehemently denies the United States Government's allegations—including the torture allegations contained for the first time in the newly filed Fifth Superseding Indictment. If this case were to proceed to trial, it would be apparent that he has been falsely accused. However, as this Motion demonstrates, Mr. Maduro cannot be required to proceed to trial because he is protected by foreign sovereign immunity.

On September 2, 2026, Mr. Maduro moved to dismiss the Fourth Superseding Indictment, ECF 260 (the "S4") on sovereign immunity grounds. *See* ECFs 320-21. Rather than allow that motion to be litigated to a decision, the government obtained and unsealed a Fifth Superseding Indictment, ECF 342 (the "S5"), which "reallege[s] and incorporate[s]" the allegations in the S4 and adds a new Count Two charging conspiracy to commit torture under color of law in violation of 18 U.S.C. § 2340A. This charge, which relies on recycled allegations that in some instances are decades old, was filed more than *nine months* after Mr. Maduro was kidnapped and brought to this country, and more than *six years* after he was first charged in early 2020.

Mr. Maduro remains entitled to sovereign immunity on two independent grounds: (1) status-based immunity, because he was Venezuela's sitting head of state when the government unlawfully kidnapped him and subjected him to process in this Court; and (2) conduct-based immunity, because the charges are based on official acts Mr. Maduro allegedly performed as a high-ranking Venezuelan government official.

This Court cannot defer to the Executive Branch's belief that Mr. Maduro is not entitled to either form of immunity. The immunity asserted by Mr. Maduro is supported by the common law as it has existed continuously since prior to the founding of the United States. Although the Second Circuit has held that the Executive Branch is entitled to complete deference in immunity decisions

that *are consistent with* the common law, it has explicitly declined to hold, nor has any other court held, that courts must defer where the Executive Branch's immunity determination would be, as it would be here, in "derogation of common law." The Supreme Court, while not explicitly resolving the question, has suggested that deference is *not* owed in this circumstance. The government of Venezuela has not waived immunity for Mr. Maduro. Accordingly, the Executive Branch's decision to prosecute him must be rejected.

Further, even if immunity could attach only if Venezuela affirmatively invokes sovereign immunity, it has done so. Venezuela's acting government has forcefully and repeatedly asserted that Mr. Maduro was its head of state when he was abducted, the abduction was unlawful, and this prosecution violates Venezuela's sovereign immunity. Because this unprecedented prosecution violates the absolute immunity from criminal jurisdiction that heads of state and foreign officials acting in their official capacities have enjoyed for hundreds of years, the Executive Branch's position is entitled to no deference, and the case against Mr. Maduro must be dismissed.

**Head-of-State Immunity**

Complete immunity for sovereign heads of state is a bedrock principle of customary international law firmly embedded within the common law. This unprecedented prosecution is in flagrant violation of these common law principles. The S5 rests on the implicit contention that Mr. Maduro is not entitled to immunity because, since 2019, the Executive Branch has labeled him "illegitimate," even while acknowledging him as Venezuela's *de facto* head of state. The government's chilling belief that it can deprive any sitting head of state of immunity through the unilateral, political act of labeling him "illegitimate" has no merit. Under both early common law and present-day customary international law, formal recognition is not required for head-of-state immunity. This immunity flows not from goodwill that can be withdrawn on a whim, but from the

perfect equality and absolute independence of sovereigns. No court has *ever* held that a foreign leader recognized by his own country as the sitting head of state can be arrested to be subjected to jurisdiction because the forum has failed politically to recognize him. It is difficult to imagine a greater intrusion on another country's sovereignty than the arrest and removal of its recognized sitting head of state to face charges in a foreign forum. The only courts to address whether non-recognition by the forum's government is relevant to immunity have unequivocally answered in the negative.

For immunity purposes, it is enough that, as the S5 itself concedes, Mr. Maduro exercised the powers of the Venezuelan presidency as the *de facto* head of state when he was kidnapped, arrested, and subjected to this Court's jurisdiction. This Motion therefore does not ask the Court to second-guess the Executive Branch's *political views* on Venezuela's *de jure* head of state, nor does it conflict with the principle that the branches should speak with "one voice" on matters of diplomacy. It asks the Court to address the *legal consequences* of the S5's own allegations.

The new Count Two does not change the analysis. Head-of-state immunity is absolute and applies *without reference* to the nature or severity of the allegations. The Second Circuit has held that there is no exception to sovereign immunity for *jus cogens* violations (violations of fundamental principles of international law), such as torture. *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009). Nor did Congress intend § 2340A to affect immunities from criminal prosecution, and nothing in the statute's text suggests otherwise.

**Conduct-based Immunity**

Mr. Maduro is independently entitled to conduct-based immunity. By the S5's own telling, the charged acts were allegedly exercises of Mr. Maduro's official powers and state instrumentalities and undertaken "under the color of law." Under the common law, the principle

that courts may not adjudicate the sovereign acts of a foreign nation extends to officials acting *on the state's behalf*.

The S5 contains no allegation of private conduct by Mr. Maduro. To the contrary, the S5's core theory is that Mr. Maduro used state instrumentalities and powers afforded to him by his official positions, as a Member of the National Assembly, Foreign Minister, Vice President, and President of Venezuela, in an unlawful manner, including to maintain the power of his "regime." Indeed, with respect to the S5's new Count Two, the government *explicitly* alleges that Mr. Maduro acted "under the color of law" and, therefore, the alleged conduct falls within the ambit of § 2340A's prohibition, which extends only to torture committed using governmental authority. *See* 18 U.S.C. § 2340.

The government appears to contend that conduct-based immunity does not apply to any of the charges in the S5 because the S5 alleges Mr. Maduro's conduct was corrupt, self-interested, and unlawful. But under the common law, conduct-based immunity applies without evaluation of the lawfulness, motive, or intent of the official act.

That Mr. Maduro's actions were allegedly improperly motivated or illegal (under United States law, Venezuelan law, or international norms) does not change that these acts were allegedly undertaken by him as an agent of the sovereign Venezuelan state. He can no more be charged for improper motives or illegal acts undertaken in the name of the government than can the Venezuelan state. The very purpose of common law conduct-based immunity is to spare the sovereign and its officials from having to defend against allegations they undertook official actions for an improper or unlawful purpose. Because each act the S5 attributes to Mr. Maduro was an exercise of sovereign authority, this prosecution cannot proceed for this independent reason.

The Court should dismiss the charges against Mr. Maduro with prejudice.

## FACTUAL BACKGROUND AND ALLEGATIONS IN THE S5[2]

### A. Mr. Maduro's Presidency

As the S5 acknowledges, Mr. Maduro has occupied top-level positions within Venezuela's government for more than two decades. He held a seat in the National Assembly from 2000 to 2006, acted as Minister of Foreign Affairs from 2006 to 2013, and subsequently became Vice President. *See* S5 ¶ 7.[3]

On March 5, 2013, Mr. Maduro became interim President of Venezuela upon the death of President Hugo Chávez, by constitutional succession. *Id.* In April 2013, Mr. Maduro won the Presidency in a special election and was sworn in before the National Assembly. *See* Mark P. Sullivan, Cong. Rsch. Serv., R43239, Venezuela: Issues for Congress, 2013-2016, at 11 (2017). From 2013 to 2018, Mr. Maduro was recognized internationally, including by the United States, as the legitimate and uncontested Venezuelan head of state. *See, e.g.*, *id*. at 11, 30-37 (describing formal bilateral relations between the United States and Mr. Maduro's government); U.N. Audiovisual Library, President of Venezuela Addresses General Assembly (70th Sess., Sept. 29, 2015), https://media.un.org/avlibrary/en/asset/d145/d1450718; Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions the President of Venezuela* (July 31, 2017), https://home.treasury.gov/news/press-releases/sm0137 (describing Mr. Maduro as "President of Venezuela" even while imposing economic sanctions upon him).

In 2018, Mr. Maduro was re-elected and appointed Delcy Rodríguez as his Vice President. Angus Berwick, *Venezuela's Maduro Names Delcy Rodriguez as Vice President*, Reuters (June

---

[2] A court may rely on matter outside of the indictment in resolving a motion to dismiss for lack of jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

[3] Citations to S5 ¶ XX will refer to the S5 Indictment. Citations to S4 ¶ XX will refer to the S4 Indictment, the allegations of which "are realleged and incorporated" in the S5, "as though fully set forth" therein. *See* S5 ¶ 4 n.1.

14, 2018), https://www.reuters.com/article/world/venezuelas-maduro-names-delcy-rodriguez-as-vice-president-idUSKBN1JA2M7/. Juan Guaidó, who had been sworn in as leader of the National Assembly before Mr. Maduro's inauguration, then invoked Article 233 of Venezuela's Constitution, which provides for the temporary transfer of powers to the president of the National Assembly in the absence of a duly elected president, and declared himself interim president on January 23, 2019. Clare Ribando Seelke, Cong. Rsch. Serv., IN11024, Venezuela: U.S. Recognizes Interim Government, at 1-2 (2019).

The Venezuelan Supreme Court ruled that Mr. Guaidó and his party had acted outside the law and voided his actions. *Id.* at 2. That same day, the first Trump Administration formally recognized Mr. Guaidó as interim president, becoming the first nation to do so. *See Contemporary Practice of the United States Relating to International Law*, 113:3 Am. J. Int'l L. 600, 601 (Jean Galbraith ed., 2019). The United States' position was hardly universally followed. The United Nations General Assembly (UNGA), through its Credentials Committee, accepted the Maduro government's credentials as the legitimate representative of Venezuela at every relevant session from 2019 onward. *See, e.g.*, U.N. GAOR, 74th Sess., 51st plen. mtg., U.N. Doc. A/74/PV.51 (Dec. 18, 2019). In December 2021, for example, more than 170 countries voted to confirm those credentials or abstained, and only sixteen voted against. Owen Schalk, *As UN Recognizes Maduro, Canada Increasingly Isolated On World Stage*, Canadian Dimension (Dec. 16, 2021), https://canadiandimension.com/articles/view/as-un-recognizes-maduro-canada-is-increasingly-isolated-on-world-stage.

Throughout the period Mr. Guaidó claimed the presidency, Mr. Maduro retained governance of his country, or, as the S5 alleges, *de facto* control over Venezuela as President. Indeed, when the United States indicted Mr. Maduro in March 2020, it conceded that he was the

country's *de facto* ruler. ECF 11 ¶ 7; *see also* S5 ¶ 7; S4 ¶¶ 2, 5. During this period, the United States continued to deal with Mr. Maduro's government as the effective government of Venezuela. *See infra* at Point I.B.1 .

In December 2020, Mr. Guaidó lost his position as head of the National Assembly following Venezuela's legislative elections, and in December 2022 the National Assembly voted to dissolve his supposed "interim government," prompting the European Union, and eventually the United States, to concede that Mr. Guaidó could not be regarded as Venezuela's head of state. *See* Dave Lawler, *U.S. No Longer Recognizes Guaidó as Venezuela's President, Biden Official Confirms*, Axios (Jan. 4, 2023), https://www.axios.com/2023/01/04/us-stops-recognizing-juan-guaido-venezuela.

In July 2024, Mr. Maduro was again re-elected, with the results recognized by the government of Venezuela, the Tribunal Supremo de Justicia, and the National Electoral Council of Venezuela. Ricardo Vaz, *Venezuela: Supreme Court Delivers Electoral Review Verdict, Confirms Maduro Victory*, Venezuelanalysis (Aug. 22, 2024), https://venezuelanalysis.com/news/venezuela-supreme-court-delivers-electoral-review-verdict-confirms-maduro-victory/. Nonetheless, the United States continued to withhold formal recognition of Mr. Maduro on the basis that the results of the election were, it claimed, illegitimate. *See* Leticia Chacon & Clare Ribando Seelke, Cong. Rsch. Serv., IN12354, Venezuela's 2024 Presidential Election, at 3 (2024). A number of other countries and international bodies, however, endorsed the results and continued to recognize Mr. Maduro as Venezuela's *de jure* head of state. *See, e.g.*, José Luis Granados Ceja, *Regional ALBA Bloc Backs Maduro Reelection, Rejects Foreign Interference in Venezuela*, Venezuelanalysis (Aug. 27, 2024),

https://venezuelanalysis.com/news/regional-alba-bloc-backs-maduro-reelection-rejects-foreign-interference-in-venezuela (reporting ALBA-TCP bloc's support for Mr. Maduro's re-election).

Indeed, just weeks before the United States kidnapped Mr. Maduro, the UNGA again accepted the credentials submitted on behalf of his government. U.N. GAOR, 80th Sess., U.N. Doc. A/80/547 (Nov. 25, 2025); U.N. GAOR, 80th Sess., 61st plen. mtg., U.N. Doc. A/RES/80/114 (Dec. 16, 2025). Only four delegations—Ecuador, Argentina, Peru, and Paraguay—joined the United States in expressing unwillingness to recognize Mr. Maduro's government. Press Release, General Assembly, General Assembly Adopts Resolution Welcoming International Court of Justice Advisory Opinion on Israel's Obligations Related to Occupied Palestinian Territory, U.N. Press Release GA/12743 (Dec. 12, 2025).

On January 3, 2026, United States armed forces forcibly abducted Mr. Maduro and First Lady Cilia Flores de Maduro, killing at least 100 people. *See Venezuela's Interior Minister Says 100 People Died in U.S. Attack*, Reuters (Jan. 8, 2026) https://www.reuters.com/world/americas/venezuelas-interior-minister-says-100-people-died-us-attack-2026-01-08/. Vice President Delcy Rodríguez, whom Mr. Maduro had appointed in 2018 and again in 2024, was then sworn in as *acting* President pursuant to an order of Venezuela's highest court. The court did not find the office vacant but instead decided that, for continuity of government, in accordance with the Constitution of Venezuela, the Vice President should be provided the ability to govern during Mr. Maduro's forced absence. *See* Tribunal Supremo de Justicia, Sala Constitucional, Sentencia No. 0001, Exp. No. 26-0001 (Jan. 3, 2026) (Venez.) (original in Spanish and unofficial English translation attached as Exhibit 1 to the November 9, 2026 Declaration of Barry J. Pollack, attached as Exhibit A ("Pollack Decl.")); *Delcy Rodriguez Formally Sworn In as Venezuela's Interim President*, Reuters (Jan. 5, 2026),

https://www.reuters.com/world/americas/delcy-rodriguez-formally-sworn-venezuelas-interim-president-2026-01-05/.

After the kidnapping, Ms. Rodríguez and other Venezuelan officials made clear that Mr. Maduro remained the legitimate head of state and that the United States had violated Venezuela's sovereignty. *See, e.g.*, Babak Dehghanpisheh, *Nicolás Maduro Is Still the 'Legitimate President' of Venezuela, Acting Leader Delcy Rodríguez Says*, NBC News (Feb. 12, 2026), https://www.nbcnews.com/world/venezuela/maduro-legitimate-president-venezuela-delcy-rodriguez-interview-trump-rcna258687; Vibhu Mishra, *Maduro Seized, Norms Tested: Security Council Divided as Venezuela Crisis Deepens*, U.N. News (Jan. 5, 2026), https://news.un.org/en/story/2026/01/1166706. For example, during an emergency session of the U.N. Security Council, Venezuela's Permanent Representative, Ambassador Samuel Moncada, denounced the "kidnapping of the constitutional President of the Republic, Nicolás Maduro Moros," called this prosecution "a direct violation of an essential norm of the international legal order: the personal immunity of Heads of State in office," and asked that the United States "be required to fully respect the immunities of President Nicolás Maduro and First Lady Cilia Flores and ensure their immediate release and safe return to Venezuela." U.N. SCOR, 81st Sess., 10085th mtg. at 22-23, U.N. Doc. S/PV.10085 (Jan. 5, 2026). Accordingly, there is no doubt that when Mr. Maduro was abducted and arrested to face charges in this District, Venezuela recognized him as its *de jure* president. At no point since has Venezuela waived his immunity.

Following Mr. Maduro's abduction, the United States recognized Ms. Rodríguez as Venezuela's acting head of state and resumed diplomatic relations with Venezuela, even though Ms. Rodríguez's position flows directly from Mr. Maduro's appointment of her after the supposedly "illegitimate" 2018 and 2024 elections. *See* Media Note, U.S. Dep't of State,

*Resumption of Operations at U.S. Embassy Caracas* (Mar. 30, 2026), https://www.state.gov/releases/office-of-the-spokesperson/2026/03/resumption-of-operations-at-u-s-embassy-caracas (citing goal "to engage directly with Venezuela's *interim* government") (emphasis added).

The position of the United States in not recognizing Mr. Maduro as head of state since the 2018 election, yet recognizing Ms. Rodríguez, whom Mr. Maduro first appointed Vice President following that election, is illogical at best. Regardless, the United States has never contested, and the S5 concedes, that Mr. Maduro remained the *de facto* head of state continuously from 2013 until the United States kidnapped him in January 2026 and forcibly subjected him to the jurisdiction of this Court. The S4 (incorporated by reference in the S5) alleges that Mr. Maduro "is now, having remained in power despite losses in recent elections, the *de facto* but illegitimate ruler of the country," S4 ¶ 5, and the S5 separately alleges he "was previously the President of Venezuela, and later became the *de facto* but illegitimate ruler of the country." S5 ¶ 7.

### B. Procedural History

#### 1. The S4

This case was initiated in early 2011 with the filing of a sealed indictment that did not name Mr. Maduro as a defendant. *See* ECF 2. Mr. Maduro was first charged in a Second Superseding Indictment, filed in March 2020. *See* ECF 11.

Nearly six years later, on December 23, 2025, the grand jury returned the S4, which was unsealed on January 3, 2026 after Mr. Maduro was abducted from Venezuela and brought to the United States. ECF 258, 260. The S4 alleged that "for over 25 years, leaders of Venezuela," including Mr. Maduro, "abused their positions of public trust and corrupted once-legitimate institutions to import tons of cocaine into the United States." S4 ¶ 1.

The S4 charged Mr. Maduro with narco-terrorism conspiracy, cocaine importation conspiracy, possession of machineguns and destructive devices, and conspiracy to possess machineguns and destructive devices. *See id.* ¶¶ 22-35. It alleged that "[s]tarting in or about 1999, Venezuela became a safe haven for drug traffickers willing to pay for protection and support corrupt Venezuelan civilian and military officials, who operated outside the reach of Colombian law enforcement and armed forces bolstered by United States anti-narcotics assistance." *Id.* ¶ 17. It further alleged that Mr. Maduro and "corrupt members of the regime facilitated the empowerment and growth of violent narco-terrorist groups" by cooperating with and offering protection and support to these groups, who then "sent profits to high-ranking Venezuelan officials." *Id.* ¶¶ 19-20. The S4 also alleged that the narco-terrorist groups the defendants supported include five organizations that the State Department designated as foreign terrorist organizations, including organizations that the government did not designate until February 2025, more than twenty-five years after the alleged conspiracy began. *See id.* ¶¶ 11-15.[4]

**2. The S5**

Mr. Maduro moved to dismiss the S4 on sovereign-immunity grounds on September 2, 2026. *See* ECFs 320-21. Before that motion was fully briefed, on October 6, 2026, the grand jury returned the S5. The S5 incorporates the S4's allegations, S5 ¶ 4 n.1, and adds factual allegations and a new Count Two charging conspiracy to commit torture in violation of 18 U.S.C. § 2340A.

The S5 alleges that from 1999 through 2025, Mr. Maduro, Ms. Flores de Maduro, and others conspired to commit acts of torture intended to inflict severe pain and suffering on persons in their custody "under the color of law." *Id.* ¶ 44. The alleged object of the conspiracy was to

[4] The S4 also for the first time named Mr. Maduro's wife, Cilia Flores de Maduro, as a defendant, along with four other individuals. *See* S4 ¶¶ 5-10. The S5 dropped all defendants other than Mr. Maduro and Ms. Flores de Maduro.

"repress and punish political opposition" and "preserve and protect the power and authority" of Venezuelan leadership, *id.* ¶ 45, including through "the abuse of American citizens by Venezuelan authorities." *Id.* ¶ 36. All the alleged offense conduct occurred while Venezuela considered Mr. Maduro its *de jure* head of state and, as the S5 concedes, either its *de jure* head of state or its *de facto* head of state.

#### 3. The S5 Concedes Mr. Maduro's Status as Venezuela's *De Facto* Head of State at the Time He Was Kidnapped and Brought Before the Court.

The S5 alleges that Mr. Maduro legitimately "succeeded to the Venezuelan presidency," following years holding other top-level positions in Venezuela's government, "after former President Hugo Chávez [] died in or about 2013." *Id.* ¶ 7. The S5 characterizes Mr. Maduro as having "previously" been "the president of Venezuela," and later "the *de facto* but illegitimate ruler of the country." *Id*. That label flows from the S5's allegation that, following the contested 2018 election, the United States and certain other countries "refuse[d] to recognize [Mr. Maduro] as Venezuela's head of state." *Id*.

The S5 acknowledges, however, that even after 2019, Mr. Maduro continued to "exercise the powers of the Venezuelan presidency." *Id.* Likewise, by adopting the allegations of the S4, the S5 concedes that Mr. Maduro "sits atop" the Venezuelan government, led the "ruling regime," and leveraged his "government power" to commit his alleged crimes. S4 ¶¶ 2-3; *see also id.* ¶ 16 (describing a system run by those "at the top"); S5 ¶ 3.

#### 4. The S5's Allegations Are Based on Mr. Maduro's Performance of Official Duties, His Official Acts, and His Use of State Instrumentalities.

The S5's concession that Mr. Maduro was Venezuela's *de jure* or *de facto* head of state, and previously held other high-ranking positions, is unsurprising: the government's theory of liability on every count is *expressly premised* on Mr. Maduro's exercise of sovereign authority

through state instrumentalities. As to Count Two, the S5 explicitly alleges that the unlawful acts were committed "under the color of law." S5 ¶ 44.

The S5 alleges Mr. Maduro became a government official in 2000, when he joined the National Assembly, and served continuously as an official for the duration of the alleged conspiracy; it attributes no specific act to him before 2000. *Id.* ¶¶ 7, 9, 19-39; *see also* S4 ¶¶ 2, 5, 21.

Each of Mr. Maduro's alleged criminal acts flows from the official positions he held in Venezuelan government. Indeed, the S5 begins by alleging that the defendants improperly used their "positions of public trust" to carry out their alleged crimes, S5 ¶ 1; S4 ¶ 1, and its theory—including as to the alleged decades-long torture conspiracy—is that Mr. Maduro *misused* the official power of his government positions for criminal purposes.

#### i. The Count One and Three Narcotics Conspiracies, and the Related Count Four and Five Firearms Charges Rest on Allegations of Official Acts Carried Out Through State Authority.

The allegations underlying the Count One narco-trafficking conspiracy and the Count Three cocaine importation conspiracy (which are primarily set forth in the S4 and incorporated into the S5) are based on official conduct. The S5 charges that Mr. Maduro "use[d] his . . . authority and the [state's] institutions" to carry out the conspiracies through "public office[s] he has held":

> *As a member of Venezuela's National Assembly*, MADURO MOROS moved loads of cocaine under the protection of Venezuelan law enforcement. *As Venezuela's Minister of Foreign Affairs*, MADURO MOROS provided Venezuelan diplomatic passports to drug traffickers and facilitated diplomatic cover for planes used by money launderers to repatriate drug proceeds from Mexico to Venezuela. *As Venezuela's President and now-de facto ruler*, MADURO MOROS allows cocaine-fueled corruption to flourish . . .

S4 ¶ 2 (emphasis added).

Each of the alleged overt acts involving Mr. Maduro in connection with the Count One and Three conspiracies relate to him undertaking official actions through his official position:

- Paragraph 21(a) alleges that, "[b]etween approximately 2006 and 2008, while acting as Venezuela's Minister of Foreign Affairs," Mr. Maduro "sold Venezuelan diplomatic passports" and "facilitated the movement of private planes under diplomatic cover" to assist illegal activity. It further alleges that as Minister of Foreign Affairs, Mr. Maduro "called the Venezuelan embassy in Mexico to advise that a diplomatic mission would be arriving by private plane" and used his diplomatic cover to return the plane to Venezuela. *Id.* ¶ 21(a).

- Paragraph 21(d) covers 2004-2015, when Mr. Maduro served as a Member of the National Assembly, Minister of Foreign Affairs, Vice President, and President, *id.* ¶ 5, and Ms. Flores de Maduro served as a Member and President of the National Assembly, Attorney General, and First Lady, *id.* ¶ 8. It alleges that they, "with the assistance of armed military escorts," trafficked narcotics "which had been previously seized by Venezuelan law enforcement," and that they maintained "*colectivos*" and "ordered" attacks against others as part of their illegal activity. *Id.* ¶ 21(d).[5]

- Paragraph 21(i) alleges that in September 2013, as President (and recognized as such by the United States), Mr. Maduro "convened a meeting with" the then-President of the National Assembly and the then-director of the General Directorate of Military Counterintelligence, and that shortly afterwards Mr. Maduro "and others authorized the arrests of certain Venezuelan military officials." *Id.* ¶ 21(i).

- Paragraph 21(m) alleges that Mr. Maduro, as (at minimum, *de facto*) President, met with FARC leaders, including "at Miraflores, the presidential palace in Caracas, as well as at Fuerte Tiuna, the chief military complex in Caracas and headquarters of Venezuela's Ministry of Defense." *Id.* ¶ 21(m).

- Paragraph 21(n) alleges that Mr. Maduro, as (at minimum, *de facto*) President, announced at a "videotaped press conference . . . that the FARC and its leaders were welcome in Venezuela." *Id.* ¶ 21(n).

The Count Four and Five firearms offenses rest on the allegation that, "during and in relation to . . . the controlled substance offenses charged in Counts One and Three," the defendants

---

[5] The PSUV, Venezuela's governing party since 2007, describes "colectivos" as "organized groups of people who work to preserve, enforce, and expand the rights enshrined in the Constitution" that can be "guided by the government" and are "defenders of . . . the revolutionary government of President Maduro." *See What are Colectivos? An Essential Clarification*, PSUV (Oct. 28, 2014), http://www.psuv.org.ve/opiniones/%C2%BFque-son-colectivos-una-aclaratoria-imprescindible/ (unofficial English translation attached as Exhibit 2 to the Pollack Decl.).

and their unnamed co-conspirators used or conspired to use firearms. *See* S5 ¶¶ 53, 56. Thus, these allegations similarly stem from quintessentially official conduct, *i.e.*, the alleged possession and use of firearms by military, security, and intelligence personnel to carry out official functions of the state. *E.g.*, S4 ¶ 21(d); S5 ¶¶ 11, 19, 22-24.

**ii. The Count Two Torture Conspiracy Charge Also Rests on Allegations of Official Acts Carried Out Through State Instrumentalities.**

The S5 alleges that Mr. Maduro "commanded the law enforcement and military units and officers" said to have committed torture, S5 ¶ 6, and that, as (at a minimum, *de facto*) President, he "authorized" and "oversaw" a system of detention run largely through Venezuela's military intelligence agency, *id.* ¶ 19, including by: ordering the arrests of suspected coup plotters and an opposition leader, *id.* ¶¶ 20, 22, 24; receiving briefings from security officials and deciding whether detainees would be released or prosecuted, *id.* ¶¶ 23, 25; and creating an "Anti-Coup Command" following the cancellation of a planned presidential recall election, *id.* ¶ 27.

The S5 also alleges that, in response to protests, Mr. Maduro announced on television a widening of efforts aimed at "maintaining 'internal order'" and avoiding a potential coup. *Id.* ¶ 29. The S5 further alleges that Mr. Maduro and his co-conspirators used "the judiciary to suppress political opposition," *id.* ¶ 16, and "relied on the law enforcement or military resources available to them by virtue of their official positions," *id.* ¶ 11, to consolidate power and engage in corrupt contracting practices as "*state policy*," *id.* ¶ 13 (emphasis added).

No act Mr. Maduro allegedly took, or *could have taken*, in connection with Count Two was as a private citizen. Count Two describes only the exercise of public power through the levers of government, such as the National Guard, *id.* ¶¶ 10-11; military and police protective details, *id.* ¶¶ 11, 19; the state oil company, *id.* ¶ 13; the office of the General Counsel of the National Assembly, *id.* ¶ 15; the intelligence services, *id.* ¶¶ 22-24; and a presidential commission on the judiciary, *id.*

¶ 16. Its alleged *goal* was to "repress and punish political opposition" and "preserve and protect the power and authority" of Venezuelan leadership—*i.e.*, to maintain official power. *Id.* ¶ 45.

## LEGAL STANDARD

Foreign sovereign immunity, including foreign official immunity (which encompasses both head-of-state and conduct-based immunities), raises a threshold jurisdictional question "distinct from the merits of the charges at issue." *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 344 (2d Cir. 2021) ("*Halkbank I*"), *aff'd in part, vacated in part, remanded*, 598 U.S. 264 (2023) ("*Halkbank II*"). Two types of foreign sovereign immunity are applicable here: status-based immunity (specifically, head-of-state immunity) and conduct-based immunity.

**Head-of-State Immunity**

Head-of-state immunity, a status-based immunity "*ratione personae*," is absolute. It attaches by virtue of the official's role and divests a court of jurisdiction regardless of whether the alleged acts were official or private.

A finding of foreign official immunity deprives the court of jurisdiction to resolve the merits of any claims against a defendant. *See, e.g.*, *Eliahu v. Jewish Agency for Isr.*, 919 F.3d 709, 712 (2d Cir. 2019); *Rusesabagina v. Republic of Rwanda*, 652 F. Supp. 3d 1, 6 (D.D.C. 2023). A federal court must assure itself of its own jurisdiction at all times, *Arnold v. Lucks*, 392 F.3d 512, 517 (2d Cir. 2004), and must examine its "own subject-matter jurisdiction in criminal cases as well as civil cases." *In re Sealed Case*, 131 F.3d 208, 210 (D.C. Cir. 1997). If jurisdiction is lacking, "the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *United States v. Khobragade*, 15 F. Supp. 3d 383, 387 (S.D.N.Y. 2014) ("[C]riminal immunity precludes the exercise of jurisdiction by the

courts over an individual whether the incident occurred *prior to* or during the period in which such immunity exists.").

Head-of-state immunity protects the person of the sovereign "against any act of authority of another State which would hinder him or her in the performance of his or her duties," including, quintessentially, arrest. *Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.)*, Judgment, 2002 I.C.J. 3, ¶¶ 54-55 (Feb. 14). Indeed, dismissal is required if head-of-state immunity applies at the time of any "relevant procedural acts" pursuant to which the court obtains jurisdiction, even if the defendant *subsequently* is divested of immunity. *See, e.g.*, *Khobragade*, 15 F. Supp. 3d at 387 (collecting cases and holding that dismissal for lack of jurisdiction was required because the defendant had full immunity at the time she was indicted and when she moved to dismiss, even assuming she had subsequently lost immunity); *Arrest Warrant*, 2002 I.C.J. 3, ¶¶ 70-71 (immunity as of the time of the *issuance* of arrest warrant rendered arrest warrant void, notwithstanding that efforts to effectuate arrest did not occur until the target of the warrant "no longer held ministerial office.").

**Conduct-based Immunity**

Conduct-based immunity "*ratione materiae*" protects officials, even after the official is no longer in office, for official acts, which are attributed to the state. *See, e.g.*, *United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *4 (S.D.N.Y. Mar. 17, 2022) ("Customary international law has long distinguished between two types of immunities: status-based immunity, afforded to sitting heads of state, and conduct-based immunity, afforded to other foreign officials, past or present, acting on behalf of a foreign government.").

**Impact of Sovereign Immunity**

Sovereign immunity, whether status-based or conduct-based, protects an individual from having to defend himself against allegations of wrongdoing and precludes a court from requiring him to participate in litigation raising such allegations. *See Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) ("Sovereign immunity is an immunity from trial *and the attendant burdens of litigation*.") (emphasis added); *Nat'l City Bank of N.Y. v. Rep. of China*, 348 U.S. 356, 358 (1955) (a foreign sovereign's immunity protects it "from being haled into court.").[6]

It is because sovereign immunity protects them from prosecution and the burdens of litigation that Mr. Maduro and Ms. Flores de Maduro requested Judge Hellerstein to issue a bifurcated motions schedule. Mr. Maduro has sovereign immunity. The case against him should be dismissed without requiring him to litigate other motions.[7]

**ARGUMENT**

The application of common law sovereign immunity for foreign officials in criminal proceedings has never been abrogated or restricted by any statute—including 18 U.S.C. § 2340A, the statute on which the S5's Count Two torture conspiracy charge is based. While some courts

[6] Even if the Court were to consider sovereign immunity as raising a question of personal jurisdiction rather than subject matter jurisdiction, *see Halkbank II*, 598 U.S. at 282 (Gorsuch J., concurring), the result would be the same, because "jurisdiction over the person (as opposed to subject-matter jurisdiction) is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 779 (2000) (cleaned up).

[7] Mr. Maduro anticipates filing a second round of motions based in part on the government's discovery, which is not yet complete. *See* ECFs 316, 352. Discovery concerning the outrageous circumstances of the violent abduction of Mr. Maduro and Ms. Flores de Maduro through a military invasion resulting in mass casualties is relevant to a jurisdictional challenge on that independent basis, *see United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), which Mr. Maduro is not raising now but fully preserves.

previously analyzed foreign officials' claims of immunity from criminal prosecution through application of the Foreign Sovereign Immunities Act (FSIA), the Supreme Court has now clarified that claims of sovereign immunity by individual government officials, and from criminal prosecution, are governed by common law. *Samantar v. Yousuf*, 560 U.S. 305, 324 (2010); *Halkbank II*, 598 U.S. at 281.

Applying common law principles, Mr. Maduro is entitled to both: (1) absolute status-based immunity by virtue of his position as Venezuela's, at a minimum, *de facto* head of state at the time he was kidnapped, arrested, and subjected to process in this Court; and (2) conduct-based immunity, because the S5 alleges criminal conduct by Mr. Maduro in his official capacity as a Venezuelan official.

## I. DISMISSAL IS REQUIRED BECAUSE MR. MADURO IS ENTITLED TO HEAD-OF-STATE IMMUNITY.

Under foundational common law and international law principles, heads of state are entitled to *absolute immunity* from civil and criminal suits in the courts of a foreign nation. This unprecedented prosecution is in flagrant contravention of that immunity.

The government cannot dispute that head-of-state immunity is a bedrock principle of international law. Instead, the S5 appears to be premised on the idea that Mr. Maduro has no immunity because the Executive Branch has unilaterally deemed him and his government "illegitimate," even though the S5 concedes he came to power lawfully and "continued to exercise the powers of the Venezuelan presidency," S5 ¶ 7, and even though the Executive Branch now recognizes the Vice President Mr. Maduro appointed as acting *de jure* head of state. That argument defies the common law and the customary international law into which the common law is incorporated. Consequently, dismissal for lack of jurisdiction is mandated.

### A. Absolute Immunity for Heads of State Like Mr. Maduro Is a Long-Settled Principle of Common Law and International Customary Law.

1. The absolute immunity owed to foreign sovereigns is older than the Nation itself. The Founders believed sovereign immunity shielded sovereigns "from being amenable to process in any court without their consent." *Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230, 238 (2019). In The Federalist No. 81, Alexander Hamilton wrote: "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind." *Id*. Thus, during its early history, "the United States adhered to the 'classical' or 'absolute' theory of foreign sovereign immunity. Accordingly, 'foreign states were generally granted complete immunity from suit' in United States courts." *Republic of Hungary v. Simon*, 604 U.S. 115, 119 (2025); *see also Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018) ("[F]oreign states enjoyed absolute immunity from *all* actions in the United States.") (emphasis added); *Ruggiero v. Compania Peruana de Vapores Inca Capac Yupanqui*, 639 F.2d 872, 879 (2d Cir. 1981) (Friendly, J.) ("[U]nder the common law in 1791," "a suit against a foreign government . . . could not be maintained at all.").

Sovereign immunity extended to criminal as well as civil cases. *See The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812); *Dow v. Johnson*, 100 U.S. 158, 165 (1879); *Coleman v. Tennessee*, 97 U.S. 509, 515, 516 n.1 (1878). In *Schooner Exchange*—the seminal early United States decision on foreign sovereign immunity—Chief Justice Marshall held that even though "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute," every sovereign waives the exercise of its jurisdiction for certain classes of cases involving foreign sovereigns. 11 U.S. at 136-37. The first of these classes was "the exemption of the *person of the sovereign from arrest or detention* within a foreign territory." *Id.* at 137 (emphasis added). This exception to jurisdiction was necessary, Chief Justice Marshall wrote, to avoid

subjecting a foreign sovereign to a "jurisdiction incompatible with his dignity, and the dignity of his nation." *Id.* Following *Schooner Exchange*, United States courts uniformly recognized a sovereign's absolute immunity from this nation's territorial jurisdiction. *Samantar*, 560 U.S. at 311 (the rule from *Schooner Exchange* was "virtually absolute immunity to foreign sovereigns").

2. In fact, sovereign immunity is older than the common law itself, because it is embodied in the general "law of nations," *i.e.*, customary international law. *See* John O'Brien*, International Law* 294 (2001); Henry Wheaton, *Wheaton's Elements of International Law* 261 (Coleman Phillipson ed., 5th ed. 1916). Blackstone described the notion that "[t]he king can do no wrong"—from which sovereign immunity is derived—as an "ancient and fundamental maxim." 1 William Blackstone, Commentaries *238-39 (1765); *see also id.* at *235 ("[N]o suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him."). The Founders agreed—they believed that sovereign immunity derived from both "the common law" *and* the "law-of-nations" *Franchise Tax Bd.*, 587 U.S. at 238; *see also* The Federalist No. 81 (Alexander Hamilton) (describing sovereign immunity as "the general sense, and the general practice of mankind."). As Blackstone explained, the "law of nations" is embodied in modern common law. 4 William Blackstone, Commentaries *67 (1769) ("The law of nations . . . is here adopted in its full extent by the common law, and is held to be a part of the law of the land."); *see also Trendtex Trading Corp. v. Central Bank of Nigeria*, [1977] Q.B. 529, 553-54 (Eng. C.A.). The Supreme Court has likewise long sought to ensure that the federal common law of foreign sovereign immunity reflects the law of nations and "the usages and received obligations of the civilized world." *See Schooner Exch.*, 11 U.S. at 137.

3. As a personification of the sovereign, a head of state is treated as the state itself and entitled to the same immunities. "Both doctrinally and in practice, because the sovereign and the

head-of-state were deemed to be the same, the fusion translated into a principle of immunity that, under customary international law, developed and was recognized as similarly unitary and coextensive." *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 269 (S.D.N.Y. 2001); *see also, e.g.*, Restatement (Second) of Foreign Relations Law § 66 (Am. L. Inst. 1965) ("The immunity of a foreign state under the rule stated in § 65 extends to . . . its head of state."). In fact, the broader doctrine of sovereign immunity traces its roots to head-of-state immunity, not the other way around. 1 Blackstone, Commentaries *238.

Thus, absolute immunity applies to foreign heads of state in criminal as well as civil cases. *See Arrest Warrant*, 2002 I.C.J. 3, ¶ 51 ("[I]n international law it is firmly established that . . . certain holders of high-ranking office in a State, such as the Head of State . . . enjoy immunities from jurisdiction in other States, both civil and criminal."); *Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v. France)*, Judgment, 2008 I.C.J. 177, ¶ 170 (June 4).

4. Head-of-state immunity is absolute. It applies without regard to the character of the alleged offense, including alleged war crimes or other *jus cogens* violations. *See, e.g.*, Cour de cassation [Cass.] [supreme court for judicial matters] ass. plén., July 25, 2025, No. C 24-84.393, ¶ 32 (Fr.) (official English translation available at https://www.courdecassation.fr/getattacheddoc/68836da7c6072b5ce8fd57b5/e3460c517b35deb55fd71a3dc9e0011f) ("[I]nternational law does not recognise any exception to personal immunity on the grounds that the crime in question is prohibited by such a peremptory norm."); *Arrest Warrant*, 2002 I.C.J. 3, ¶ 58 (finding no grounds to conclude "that there exists under customary international law any form of exception to the rule according immunity from criminal jurisdiction" where the defendant is "suspected of having committed war crimes or crimes against humanity."). It is the position of the United States Government that immunity *ratione personae* "covers *all*

acts." *See* Comments from the United States On the International Law Commission's Draft Articles on Criminal Immunity of State Officials As Adopted by the Commission in 2022 on First Reading ("ILC Comments"), at 7, https://legal.un.org/ilc/sessions/75/pdfs/english/iso_us.pdf (emphasis added).

Head-of-state immunity has never been abrogated by any statute, including the Torture Act, 18 U.S.C. §§ 2340-2340B. As discussed more fully *infra* at Point II.B.1.b, the Torture Act does not mention, much less eliminate, head-of-state immunity (or any other immunity), and the legislative history of the Act demonstrates that it was enacted on the understanding that it would *not* impact immunities long-recognized in international law.

**B. Mr. Maduro's Status as Venezuela's Head of State at the Time He Was Kidnapped to Face Charges in the United States Is Undisputed.**

The government cannot dispute that Mr. Maduro was, in every real-world sense, Venezuela's head of state when he was forcibly kidnapped, arrested, and brought to the United States to face prosecution in this Court. The S5 acknowledges that he was legitimately elected in 2013 and, even after 2019, "exercise[d] the powers of the Venezuelan presidency." S5 ¶ 7. It nonetheless characterizes him as having "previously" been "the President of Venezuela," *id.*, because the United States questioned his re-election victories and refused to recognize him as *de jure* head of state. That non-recognition is irrelevant, because under both early common law and present-day customary international law (which is incorporated into federal common law), the sovereign status of states and their officials was determined *independently* by the judiciary based on *de facto* realities rather than *de jure* recognition by the forum's Executive Branch. Indeed, no national court in the United States or in any other country has *ever* presided over the criminal trial of a foreign leader who was recognized by their own country as the sitting head of state and

undisputedly exercised *de facto* control as head of state of their country at the time charges were brought.

1. Early American common law decisions reflect that formal recognition by the Executive Branch was not a prerequisite to immunity where the putative sovereign's *de facto* governmental power was not reasonably disputed (or, as here, was conceded). In *Wulfsohn v. Russian Socialist Federated Soviet Republic*, the New York Court of Appeals held the Soviet Republic immune from suit even though "it ha[d] not been recognized by the government of the United States." 234 N.Y. 372, 374 (N.Y. 1923), *appeal dismissed*, 266 U.S. 580 (1924). The plaintiff—like the government here—conceded that the Soviet Republic was "the existing de facto government of Russia" but argued that suit could proceed "because of nonrecognition by the United States." *Id.* at 374-75. The court squarely rejected the argument:

> The result we reach depends upon more basic considerations than recognition or nonrecognition by the United States. Whether or not a government exists, clothed with the power to enforce its authority within its own territory, obeyed by the people over whom it rules, capable of performing the duties and fulfilling the obligations of an independent power, able to enforce its claims by military force is a fact, not a theory.

*Id.* at 375. The court went on to explain that a foreign sovereign could not be subject to the court's jurisdiction except on consent, and that "recognized or not, the evil of [] an attempt" to hale a foreign sovereign into court "would be the same." *Id.* at 376; *see also Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) (the principle that "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory" cannot "be confined to lawful or recognized governments"); *Nankivel v. Omsk All-Russian Gov't*, 237 N.Y. 150, 157 (N.Y. 1923) ("[L]ack of recognition obviously was pleaded on the theory that immunity comes only with recognition, and the analogy is fallacious.").

Subsequent immunity decisions, including by federal courts, have likewise observed that "[f]oreign governments have been held immune from suits *even though they had never been recognized by the Government of the United States.*" *In re Investigation of World Arrangements*, 13 F.R.D. 280, 290 (D.D.C. 1952) (recognizing immunity of sovereign instrumentality in criminal investigation; citing *Wulfsohn* and *Nankivel*) (emphasis added).

Similarly, in an early international arbitration, Chief Justice (and former President) Taft concluded that an Executive Branch's non-recognition of a foreign government has little probative value on the question of sovereignty when—as here—it rests on a normative belief that the government is "illegitimate" rather than on an analysis of its "*de facto* sovereignty and complete governmental control." *Aguilar-Amory & Royal Bank of Can. Claims (Gr. Brit. v. Costa Rica)*, 1 R.I.A.A. 369, 381 (1923) (unrecognized Costa Rican government "was an actual sovereign government"); *see id.* at 378 (collecting scholarly authorities). These decisions have never been overturned or rejected by any court.

Likewise, under early English common law, recognition of status entitling a defendant to sovereign immunity by the forum's Executive Branch was regarded as, at most, of evidentiary value, rather than as conclusively dictating whether a sovereign or its head of state was entitled to immunity. For example, in *The Charkieh*, [1873] L.R. 4 A. & E. 59 (Eng. High Ct. Adm.), the English High Court of Admiralty, Sir Robert Phillimore, considered whether it had jurisdiction to entertain a suit against a vessel—The Charkieh—belonging to the Khedive of Egypt. The court heard evidence that The Charkieh was not entitled to immunity because the Khedive of Egypt was "without many of the powers and rights usually possessed by sovereigns." *Id.* at 70. Ultimately, the court engaged in its own extensive investigation of the extent of the Khedive's *de facto* control over Egypt. Pointing to the public law of the Ottoman Empire "whose authority upon this point

appears to be paramount," the court concluded that Egypt was merely a province of the Ottoman Empire and that the Khedive had no power to control an independent army or navy, to impose taxes in the name of Egypt itself, or to maintain independent diplomatic relations. *Id.* at 83-84. Although the court noted that the Foreign Office did not regard the Khedive as sovereign, it did so only as an afterthought. *Id.* at 86; *cf. also In re Suarez*, [1918] 1 Ch. 176, 195 (Eng. C.A.) (Warrington, L.J.) (referring to letter from Foreign Office regarding status of foreign diplomat as "evidence" on question of immunity).

While English courts later began to treat formal Executive recognition as capable of mandating immunity, *see generally* A.B. Lyons, *The Conclusiveness of the Foreign Office Certificate*, 23 Brit. Y.B. Int'l L. 240 (1946), they continued to hold that a recognized *de facto* Government "must for all purposes, while continuing to occupy its *de facto* position, be treated as a duly recognized foreign sovereign state." *Bank of Ethiopia v. Nat'l Bank of Egypt and Liguori*, 31 Am. J. Int'l L. 742, 746 (1937).

Similarly, under customary international law (part of the common law), sovereign immunity is owed to an effective head of state regardless of whether the forum state recognizes the defendant's status. That is because, under customary international law, "[t]he political act of recognition . . . has no legal effect whatsoever," because "a national legal order begins to be valid as soon as it has become—on the whole—efficacious." Hans Kelsen, *General Theory of Law and State* 220-22 (Anders Wedberg trans., 1949) (1945). Consequently, "the distinction between *de jure* and *de facto* recognition has no importance." *Id.* at 226.

For example, the French Cour de cassation (France's highest court) recently considered a motion to quash an arrest warrant issued against former Syrian President Bashar al-Assad for complicity in 2013 chemical weapons attacks. *See* Cass. ass. plén., No. C 24-84.393. Addressing

the exact question at issue here, the court squarely rejected the argument that Assad had lost head-of-state immunity because France ceased to recognize him as legitimate head of state before the warrant was issued:

> The purpose of personal immunity, thus defined, requires that it not be linked to the recognition of the status of Head of State by the *forum* State or to the existence of diplomatic relations between the two States. The recognition of a government is a unilateral, political act by which a State grants that government rights in their bilateral relations. *Customary international law does not prescribe an obligation of recognition and does not regulate either the conditions or the effects on immunities of such a discretionary act*. If personal immunity were to be made conditional on recognition, the result would be to confer on each State, whether democratic or not, the discretionary power to authorise criminal proceedings in its courts against a foreign Head of State. This would undermine the very substance of personal immunity.

*Id.* ¶¶ 16-18 (emphasis added). As discussed *infra* at Point III, permitting nations such "discretionary power" over immunity questions would be flatly contrary to common law.

Recent decisions of other national courts are in accord. For instance, Italy's highest court recently held that with respect to immunity "[r]ecognition of a state by another state is, in fact, an act devoid of legal consequences (*just like non-recognition*)." *See, e.g.*, Cass. pen. [Court of Cassation], sez. III, Sept. 17, 2004, n. 49666, 129 Foro it. 253, 259 (2006) (It.) (emphasis added) (original Italian decision and unofficial English translation attached as Exhibit 3 to Pollack Decl.). Rather, "[a]ccording to the rules of general international law . . . a governmental organization that effectively and independently exercises its power over a territorial community automatically becomes a subject of international law. . . ." *Id.*; *cf. also* Cass. pen. [Court of Cassation], sez. I, June 28, 1985, n. 1981, 109 Foro it. 277 (1986) (It.) (original Italian decision and unofficial English translation attached as Exhibit 4 to Pollack Decl.) (assessing Yasser Arafat's claim of immunity based on *de facto* considerations).

2. In *Wulfsohn*, it was both "admitted by the [government]" and "a matter of common knowledge," 234 N.Y. at 374, that the defendant was *de facto* the sovereign despite United States

non-recognition. The same is true here. The S5 concedes Mr. Maduro "exercise[d] the powers of the Venezuelan presidency." S5 ¶ 7; *see also* S4 ¶ 2 (describing Mr. Maduro as Venezuela's "*de facto* ruler" at the time that the S4 was unsealed immediately following his abduction).

This concession that Mr. Maduro remained, at a minimum, the *de facto* head of state at the time he was kidnapped and brought before this Court is likewise a matter of common knowledge. The Executive Branch itself has, since 2019, acknowledged Mr. Maduro as *de facto* head of state in a variety of ways.

For example, a January 2019 Executive Order (13857) issued by President Trump defined "Government of Venezuela" to include "the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof . . . and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, *including as a member of the Maduro regime*." Exec. Order No. 13857, 84 Fed. Reg. 509 (Jan. 30, 2019) (emphasis added). A 2021 report by the State Department conceded that Mr. Maduro remained in power despite supposedly lacking democratic legitimacy. U.S. Dep't of State, Bureau of Democracy, H. R. and Lab., Venezuela 2020 Human Rights Report (2021), https://www.state.gov/wp-content/uploads/2021/10/VENEZUELA-2020-HUMAN-RIGHTS-REPORT.pdf.

[redacted]

In March 2022, President Biden's senior advisor for Latin America, Juan González, "was involved in talks with the government of Nicolás Maduro, which involved visits to Caracas to free American prisoners and secret negotiations in Doha, Qatar." Elias Ferrer, *Exclusive Interview: Former NSC Senior Director Juan González Explains What Happened to U.S. Policy Toward Venezuela*, Guacamaya (Apr. 6, 2025), https://guacamayave.com/en/exclusive-interview-former-nsc-senior-director-juan-gonzalez-explains-what-happened-to-u-s-policy-toward-venezuela/.

In January 2025, President Trump's special envoy, Richard Grenell, met with Mr. Maduro in Caracas, securing the release of six detained Americans. Alejandra Jaramillo & Chris Lau, *Six Americans Freed in Venezuela After Trump Envoy Meets with Maduro*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/02/01/americas/americans-freed-in-venezeuela-intl-hnk/index.html. The talks reportedly resulted in an agreement by Mr. Maduro to receive Venezuelan migrants detained in the United States, a result praised by President Trump. *See* Jasper Ward, *Trump Says Venezuela Agrees to Receive Illegal Migrants Captured in US*, Reuters (Feb. 1, 2025), https://www.reuters.com/world/americas/trump-says-venezuela-agrees-receive-illegal-migrants-captured-us-2025-02-01/.

These discussions led to a direct executive-to-executive phone call between Mr. Maduro and President Trump after Mr. Maduro offered to engage in direct discussions with the Trump administration. *Maduro Offers to Engage in Direct Talks with Trump Envoy Grenell*, Reuters (Sept. 21, 2025), https://www.reuters.com/world/americas/maduro-offers-engage-direct-talks-with-trump-envoy-grenell-2025-09-20/; *Trump Confirms Conversation with Venezuela's Maduro*, Reuters (Dec. 1, 2025), https://www.reuters.com/world/americas/trump-confirms-he-spoke-with-venezuelas-maduro-2025-11-30/. *See also* Memorandum of Law of Cilia Flores de Maduro in Support of Motion to Dismiss, at Background C.2 (describing extensive dealings between the

Executive Branch and Mr. Maduro's government between 2019 and 2026, all of which presupposed that Mr. Maduro's government spoke for Venezuela).

Further, as noted above, numerous other countries have also engaged in diplomatic relations with Mr. Maduro's government since 2019, and many countries and international bodies have formally recognized Mr. Maduro as *de jure*, as well as *de facto*, head of state. *See, e.g.*, *Colombia, Venezuela Restore Full Diplomatic Relations*, Al Jazeera (Aug. 29, 2022), https://www.aljazeera.com/news/2022/8/29/venezuela-colombia-restore-full-diplomatic-ties; *Brazil to Resume Diplomatic Relations with Venezuela Under Lula*, Al Jazeera (Dec. 14, 2022), https://www.aljazeera.com/news/2022/12/14/brazil-to-resume-diplomatic-relations-with-venezuela-under-lula; Chase Harrison, *Map: Which Latin American Countries Have Restored Relations with Venezuela?*, Americas Soc'y/Council of the Ams. (June 21, 2023), https://www.as-coa.org/articles/map-which-latin-american-countries-have-restored-relations-venezuela.

The United States itself has resumed diplomatic relations with Venezuela since Mr. Maduro was abducted—contradicting the Executive Branch's purported basis for not formally recognizing Mr. Maduro's government after the 2018 elections. The United States has also recognized Ms. Rodríguez as acting President, first informally and then formally, even though her position flows directly from Mr. Maduro's re-election to the presidency in 2018 and his subsequent re-election in 2024, each of which the Executive Branch claims was "illegitimate."

In sum, the S5 concedes as it must: long after the United States ceased recognizing him as *de jure* president, Mr. Maduro remained the *de facto* head of state and was plainly so when he was kidnapped and subjected to process in this Court. These concessions are fatal to any argument that Mr. Maduro lacks status-based immunity.

3. A ruling that Mr. Maduro is entitled to immunity as Venezuela's *de facto* head of state would not constitute a judicial intrusion on any Executive Branch function. *Cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 22 (2015). In *Zivotofsky*, the Supreme Court held (in a case not involving sovereign immunity) that the Executive Branch has the exclusive power formally to recognize foreign governments. *Id.* at 28. This doctrine flows from "the importance of speaking 'with one voice'" on certain questions of foreign affairs. *Id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000)). But neither the power to extend formal recognition nor the "one voice" principle is at issue here. This Court is not being asked to decide what foreign governments should receive formal recognition by the United States, an Executive Branch function. While it is the Executive Branch's prerogative to determine who the United States will recognize *politically* as head of state, it is this Court's responsibility to make the judicial determination of the legal consequences, or lack thereof, of formal recognition and the legal consequences of a defendant's *de facto* status. Mr. Maduro's status as Venezuela's *de facto* head of state is *conceded* in the S5, *i.e.*, Mr. Maduro's government "is the effective government" of Venezuela. *Id.* at 11.

A determination that Mr. Maduro is entitled to immunity poses no risk of "embarrass[ing] the executive arm in its conduct of foreign affairs." *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945). Determining the legal consequences that flow from that concession is squarely the domain of the judiciary. *See, e.g.*, *Guaranty Trust Co. v. United States*, 304 U.S. 126, 138 (1938) (courts "are free to draw for themselves" the "legal consequences" of Executive Branch recognition decisions). A decision granting immunity here would neither be "an official position on behalf of the United States with respect to the political recognition of" Mr. Maduro's status, "nor amount[] to the usurpation of a power committed to some other branch of government."

*Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 280 (1st Cir. 2005) (assessing the PLO's entitlement to immunity as a sovereign state notwithstanding the United States' non-recognition).

4. As noted above, this prosecution is unprecedented. Possibly the closest historical analogy for such a prosecution might be the prosecution of Manuel Antonio Noriega Moreno. Anything more than passing scrutiny of that prosecution, however, only reinforces why the outcome must be different here. Noriega was a military officer who took power in a military coup, not an election. He never occupied either of the two executive positions under Panama's constitution. *United States v. Noriega*, 746 F. Supp. 1506, 1519 (S.D. Fla. 1990). Noriega ruled *through* the elected Panamanian heads of state, not *as* a head of state. Noriega therefore had to concede that "he [did] not fit within traditional notions of a head of state as defined by customary international law." *Id.* at 1520.

The Eleventh Circuit confirmed that the Executive Branch's determination that Noriega was not a head of state and therefore not entitled to immunity was supported by extant legal norms, not just the Executive Branch's say-so, explaining that if the court were to "make an independent determination regarding the propriety of immunity in this case," the immunity claim would fail. *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997). On appeal, the Eleventh Circuit was not asked to address whether the Executive Branch could deprive a sovereign head of state of immunity by declaring him "illegitimate" and refusing to recognize his government politically. *See id.* As the Eleventh Circuit explained, it was *undisputed* that "Noriega never served as the constitutional leader of Panama," and that Panama itself had not taken the position that Noriega was head of state. *Id.* at 1212. Noriega had sought to craft a claim to immunity on novel grounds that had never been recognized under international law.

By contrast, the S5 recognizes that Mr. Maduro was *de jure* leader of Venezuela from 2013 through 2019. S5 ¶ 7; S4 ¶ 5. It also recognizes Mr. Maduro remained the *de facto* head of state after the United States ceased recognizing him as such. These distinctions alone warrant a different result than *Noriega*.

These distinctions, however, do not stand alone. Unlike the Panamanian government, which throughout recognized someone other than Noriega as its constitutional leader, the Venezuelan government did not recognize anyone other than Mr. Maduro as the head of state. Venezuela's acting leader and other high-ranking Venezuelan government officials publicly confirmed that Mr. Maduro was President when he was abducted to face charges and forcibly subjected to criminal process in this Court. *See, e.g.*, Babak Dehghanpisheh, *Nicolás Maduro Is Still the 'Legitimate President' of Venezuela, Acting Leader Delcy Rodríguez Says*, NBC News (Feb. 12, 2026), https://www.nbcnews.com/world/venezuela/maduro-legitimate-president-venezuela-delcy-rodriguez-interview-trump-rcna258687.

The question in this case—unlike in *Noriega*—is whether the United States' unilateral political act of refusing to recognize Mr. Maduro's government based on his purported illegitimacy can strip him of immunity. *Noriega* did not even attempt to answer that question. Unlike Noriega's novel sovereign immunity claims that would have required expanding common law beyond any immunity previously recognized, as set forth above, Mr. Maduro's claims fall squarely within hundreds of years of settled common law.

### C. Mr. Maduro's Immunity Is Assessed at the Time He Was Abducted and Forcibly Subjected to the Jurisdiction of this Court.

As noted above, a finding of sovereign immunity deprives the court of jurisdiction, *see, e.g.*, *Eliahu*, 919 F.3d at 712, and protects a foreign official "against *any* act of authority of another State which would hinder him or her in the performance of his or her duties." *Arrest Warrant*,

2002 I.C.J. 3, ¶¶ 54-55 (emphasis added); *see also Khobragade*, 15 F. Supp. 3d at 387. The forcible kidnapping and arrest of a head of state to face criminal process in a foreign nation's is, without question, an "act of authority" that "hinder[s]" a foreign leader from performing his sovereign duties. *Arrest Warrant*, 2002 I.C.J. 3, ¶¶ 54-55.[8]

Accordingly, the fact that the S5 was returned months after Mr. Maduro was illegally kidnapped and after Venezuela had—by necessity—installed Mr. Maduro's appointed Vice President Delcy Rodríguez as acting President (*see supra* at Background A), does not change the fact that Mr. Maduro retains head-of-state immunity. Indeed, it would defeat the purpose of an immunity that prevents an arrest from hindering a foreign leader from his sovereign duties if the government could claim that *because* its arrest of Mr. Maduro on the S4 he no longer had sovereign duties, he no longer has immunity. *See Khobragade*, 15 F. Supp. 3d at 387 (immunity "at the time of the relevant procedural acts, such as service of process, render[s] those acts void" such that dismissal for lack of jurisdiction is required even if the defendant subsequently lost immunity); *Arrest Warrant*, 2002 I.C.J. 3, ¶¶ 70-71 (immunity as of the time of the *issuance* of arrest warrant rendered arrest warrant void, notwithstanding that efforts to effectuate arrest did not occur until the target of the warrant "no longer held ministerial office.").

Thus, even assuming *arguendo* it were accurate that Mr. Maduro is no longer Venezuela's sitting President (*de jure* or *de facto*), and that Vice President Rodríguez is not an interim acting President but rather is Venezuela's only head of state, that fact would not reinstate the Court's jurisdiction. Because Mr. Maduro was unlawfully kidnapped, arrested, and brought before this

---

[8] Indeed, the International Court of Justice has held that the mere *issuance* of an arrest warrant is a violation of immunity, even if no efforts to enforce the warrant are undertaken. *Arrest Warrant*, 2002 I.C.J. 3, ¶ 71.

Court to face prosecution at a time he had head-of-state immunity, even if he subsequently lost that immunity, this Court lacks jurisdiction over him.

**D. Venezuela Has Not Waived Mr. Maduro's Immunity.**

Foreign official immunity can be lost only through an "explicit" waiver by the foreign sovereign. *See, e.g.*, *Lafontant v. Aristide*, 844 F. Supp. 128, 134 (E.D.N.Y. 1994) (waiver of immunity cannot be "inadvertent, implied or constructive" (quoting *Libra Bank Ltd. v. Banco Nacional de Costa Rica*, 676 F.2d 47, 49 (2d Cir. 1982)). Consequently, courts have recognized foreign officials' entitlement to sovereign immunity even where there has been no affirmative invocation of immunity or request for a suggestion of immunity by the foreign sovereign through which the defendant's immunity derives. *See, e.g.*, *Does 1-5 v. Obiano*, 138 F.4th 955, 959 (5th Cir. 2025). The S5 does not allege, nor could it, that Venezuela has waived Mr. Maduro's immunity.

In any event, even if the absence of a waiver were somehow insufficient to preserve Mr. Maduro's immunity, which it is, and Mr. Maduro were entitled to immunity only if Venezuela has affirmatively asserted he is entitled to it, Venezuela has done precisely that. As noted *supra* at Background A, in the wake of Mr. Maduro's abduction to the United States, Venezuela forcefully asserted that Venezuela's sovereignty had been violated, that Mr. Maduro remained President when he was abducted, and that he was entitled to immunity.

* * *

Under common law and customary international law, the S5's premise that Mr. Maduro, who it concedes was Venezuela's lawfully elected president, did not remain head of state "legitimately" is irrelevant. A contrary rule would permit any nation to withdraw political recognition based on a claimed lack of "legitimacy" (or any other reason) and then arrest and prosecute a foreign head of state, rendering head-of-state immunity in criminal cases a nullity.

That is why the few national courts to address whether the forum's non-recognition deprives a head of state of immunity have held—unequivocally—that it does not.

If the Executive Branch's non-recognition were dispositive, courts would have no need to analyze status-based immunity in criminal cases; they would simply declare it unavailable whenever the Executive decides to prosecute. That would be contrary to centuries of common law and the customary international law imported into it. *See infra* at Point III. No court has taken this approach, and this Court should not be the first.

This country would not tolerate another country charging our head of state with abuse of office in their national court—much less the other country abducting our head of state to bring him to their country to face such charges. Mr. Maduro's entitlement to status-based head-of-state immunity warrants immediate dismissal of the Indictment against Mr. Maduro, with prejudice.

## II. DISMISSAL IS INDEPENDENTLY REQUIRED BECAUSE MR. MADURO IS ENTITLED TO CONDUCT-BASED IMMUNITY.

Even if Mr. Maduro were not entitled to absolute status-based immunity, he would be entitled to conduct-based immunity. The S5 makes clear that the alleged acts were performed in his official capacity through state instrumentalities—and, as to Count Two, *explicitly* alleges conduct "under the color of law" (S5 ¶ 44), as the Torture Act's definition of "torture" requires. *See* 18 U.S.C. § 2340(1). Because such acts are attributable to the Venezuelan state, this prosecution violates the axiomatic principle that courts may not adjudicate a foreign nation's sovereign acts, and the S5 must be dismissed with prejudice for that independent reason.

### A. Common Law Conduct-Based Immunity Shields Foreign Officials Acting in Their Sovereign Capacity.

Common law foreign sovereign immunity extends to current and former foreign officials where the conduct that forms the basis of the allegations against them was undertaken on the sovereign's behalf. This "conduct-based immunity" is, like head-of-state immunity, older than this

country: Early in the Nation's history, opinions of the Attorney General recognized the principle "that a person acting under a commission from the sovereign of a foreign nation is not amenable for what he does in pursuance of his commission, to any judiciary tribunal in the United States." 1 Op. Att'y Gen. 81 (1797) (discussing suit brought against privateer acting under a commission from the British government); *see also* 1 Op. Att'y Gen. 45, 46 (1794) (discussing suit brought against former Governor of Guadeloupe; "[I]f the seizure of the vessel is admitted to have been an official act, done by the defendant by virtue, or under color, of the powers vested in him as governor, that it will of itself be a sufficient answer to the plaintiff's action . . . the defendant ought not to answer in our courts for any mere *irregularity* in the exercise of his powers").

Thus, both current and former officials enjoy "immunity from suits brought in foreign tribunals for acts done within their own States, in the exercise of sovereignty thereof." *Hatch v. Baez*, 7 Hun. 596, 600 (N.Y. Sup. Ct. 1876) (former Dominican president's immunity "springs from the capacity in which the acts were done, and protects the individual who did them"); *see also Underhill v. Hernandez*, 65 F. 577 (2d Cir. 1895), *aff'd*, 168 U.S. 250 (1897) (Venezuelan military general accused of false imprisonment, assault, and battery entitled to "[t]he immunity of public agents from suits brought in foreign tribunals for acts done within their own states in the exercise of the sovereignty thereof"); *accord Matar*, 563 F.3d at 14 ("Common law recognizes the immunity of former foreign officials . . . for acts performed in [their] official capacity.").

Conduct-based immunity applies to criminal as well as civil cases. *See People v. McLeod*, 25 Wend. 483, 598 & a1 (N.Y. Sup. Ct. 1841) (letter from Secretary of State Daniel Webster noting that criminal defendant was entitled to conduct-based immunity because his alleged offense was "a public transaction, authorized and undertaken by the British authorities," such that "by the

principles of public law, and the general usage of civilized states" he could not "be holden personally responsible in the ordinary tribunals of law.").

The rationale for conduct-based immunity is simple: "the acts of the official representatives of the state are those of the state itself," such that a suit targeting official acts is equivalent to a suit against the sovereign directly. *Underhill*, 65 F. at 579; *see also Hatch*, 7 Hun. at 599 ("To make [former head of state] amenable to a foreign jurisdiction for [official] acts, would be a direct assault upon the sovereignty and independence of his country."). The same considerations of international comity and sovereign equality underlying status-based immunity thus apply to conduct-based claims. *See Underhill*, 65 F. at 579 ("Considerations of comity" require that the conduct of states "should not be called in[to] question by the legal tribunals of another jurisdiction.").

### B. The Indictment Bases the Charges on Official Acts for Which Mr. Maduro Is Entitled to Conduct-Based Immunity.

#### 1. The Indictment Alleges Official Acts.

The S5's theory of liability rests on Mr. Maduro's exercise of sovereign authority through state instrumentalities—*i.e.*, official acts attributable to the Venezuelan state—and he is therefore entitled to conduct-based immunity. That is so notwithstanding allegations that his conduct was illegal, corrupt, or motivated by self-enrichment or political self-preservation, because, as discussed *infra* at Point II.B.2, conduct-based immunity spares foreign officials from defending against such allegations, no matter how inflammatory.

##### a. The Count One and Three Narcotics Conspiracies and the Count Four and Five Firearms Charges Predicated on Them Rest on Allegations of Official Conduct.

1. The S5's allegations underlying the narco-trafficking conspiracy alleged in Count One and the cocaine importation conspiracy alleged in Count Three rest on Mr. Maduro's exercise of sovereign authority as a Venezuelan official. Indeed, an examination of the overt acts allegedly

taken by Mr. Maduro in connection with the narcotics conspiracies demonstrates that the conduct charged is inextricably bound to, and follows from, Mr. Maduro's exercise of sovereign authority. *See* S4 ¶ 21(a), (d), (i), (m), and (n) and incorporated into S5 ¶ 4 n.1; *see also* Background B.4.

*First*, S4 ¶ 21(a) relates to issuing diplomatic passports, coordinating diplomatic missions, directing an embassy, and routing aircrafts under diplomatic cover. Each are functions that Mr. Maduro could perform only by virtue of his official position as Minister of Foreign Affairs. These "acts concerning diplomatic activity" are categorically political acts attributable to the sovereign and thus entitled to immunity. *United States v. Bankasi*, 120 F.4th 41, 56 (2d Cir. 2024) ("*Halkbank III*") (quoting *Victory Transport, Inc. v. Comisaria General*, 336 F.2d 354, 358 (2d Cir. 1964)); *see also Heaney v. Gov't of Spain*, 445 F.2d 501, 503 n.3 (2d Cir. 1971) (the term "diplomatic" in *Victory Transport* is "obviously intended in the broad sense" and "not meant to be limited to the activities of diplomatic missions").

*Second*, S4 ¶ 21(d) alleges unlawful conduct that necessarily involves the exercise of state authority, namely, the "assistance of armed military escorts." *See Halkbank III*, 120 F.4th at 56 ("acts concerning the armed forces" are "strictly political or public acts"). Paragraph 21(d) further alleges that Mr. Maduro maintained "*colectivos*" as part of the illegal activity. As explained above, these organizations help to effectuate the goals of *the Venezuelan government*.

*Third*, S4 ¶ 21(i) alleges that Mr. Maduro, as the President of Venezuela, "convened a meeting with" high-ranking government officials (*i.e.*, the President of the National Assembly and director of the General Directorate of Military Counterintelligence), and that shortly afterwards Mr. Maduro "authorized the arrests" of certain "military officials." These alleged acts are quintessentially presidential. *See, e.g.*, Constitución de la República Bolivariana de Venezuela 1999 (as amended 2009), art. 236 (Venez.), §§ 2 (granting President broad duty to "direct the

activity of the Government"), 5, 6 (President serves as Commander in Chief of National Armed Forces, can direct and "exercise supreme command" over its activities, including with regard to personnel decisions), 16 (granting President authority to "remove [] officials") (English translation available at https://www.constituteproject.org/constitution/Venezuela_2009).

*Fourth*, S4 ¶ 21(m) alleges that Mr. Maduro met with FARC leaders at the presidential palace and the chief military complex. Such meetings, held on state property, under color of authority as the President of Venezuela are inherently official acts. As head of state, Mr. Maduro was empowered to meet with foreign political actors, to direct foreign policy, and to address matters of national security. *See, e.g.*, Venez. Const. art. 236, § 4 (granting President duty to "direct the international relations of the Republic").

Indeed, throughout the charged period, meeting with FARC leaders was a recognized act of state diplomacy. Colombia's president met personally with the FARC's supreme commander. Camilo González Posso, *Negotiations with the FARC: 1982-2002*, Conciliation Resources, Accord Issue 14 (Feb. 2004), https://www.c-r.org/accord/colombia/negotiations-farc-1982-2002. From 2012 through 2016, Cuba and Norway hosted FARC leadership for peace negotiations with Colombia that Venezuela was formally designated to "accompany." June S. Beittel, Cong. Rsch. Serv., R42982, Colombia's Peace Process Through 2016, at Summary, 19 (updated Dec. 31, 2016) (Venezuela "actively supported" the peace process, a role which countries in the region lauded).

In March 2016, the United States Secretary of State personally met with FARC leaders in Havana, U.S. Dep't of State, *Secretary Kerry's Meetings with Colombian Government and FARC Negotiators* (Mar. 21, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/03/254896.htm, a step that eventually led the United States to remove the FARC from its list of foreign terrorist organizations, S4 ¶ 11; Press Statement, Antony J. Blinken, U.S. Sec'y of State, *Revocation of the*

*Terrorist Designations of the Revolutionary Armed Forces of Colombia (FARC) and Additional Terrorist Designations* (Nov. 30, 2021), https://2021-2025.state.gov/revocation-of-the-terrorist-designations-of-the-revolutionary-armed-forces-of-colombia-farc-and-additional-terrorist-designations/. When other foreign heads of state and the United States Secretary of State received FARC leaders, they were exercising diplomacy in their official capacities; Mr. Maduro's alleged meetings were likewise an exercise of sovereign authority.

*Fifth*, S4 ¶ 21(n) relates to statements made by Mr. Maduro regarding the FARC, as President, during a "videotaped press conference." A presidential press conference providing the public with information regarding the nation's diplomatic relationships is unambiguously an exercise of official authority—it is a public declaration of national policy made by the head of state on behalf of the state itself. *See Trump v. United States*, 603 U.S. 593, 629 (2024) ("[M]ost of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities.").

The S5's new allegations related to Counts One and Three likewise rest on Mr. Maduro's sovereign powers. The S5 alleges that the defendants used "officers in the Venezuelan Directorate of Military Intelligence ('DGCIM')" "to coordinate the movement of drug loads," S5 ¶ 10, and "relied on the law enforcement or military resources available to them by virtue of their official positions," *id.* ¶ 11. Exercising control over police, military, and intelligence apparatus is quintessentially sovereign. *Cf. Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) ("The conduct boils down to abuse of the power of its police by the Saudi Government, and however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood . . . as peculiarly sovereign in nature."). The S5 explicitly ties the alleged narcotics conspiracies to political and foreign policy goals, alleging that drug trafficking financed "groups

that aligned with Chávez's and MADURO MOROS's goals of inflicting harm on Colombia and the United States." S5 ¶ 12.[9]

2. As discussed *supra* at Background B.4.i, the Count Four and Count Five firearms offenses do not rest on private conduct by Mr. Maduro. The carrying of firearms by military, police, and intelligence personnel in connection with official conduct is self-evidently *also* attributable to the state, rather than to Mr. Maduro in his personal capacity. *See, e.g.*, *Nelson*, 507 U.S. at 361. In any event, the dismissal of the Count One and Three predicate counts requires dismissal of the Count Four and Five firearms offenses. *See, e.g.*, *United States v. Polanco*, 145 F.3d 536, 540 (2d Cir. 1998) (dismissal of predicate requires dismissal of derivative 18 U.S.C. § 924(c) count).

Each of these alleged acts, on their face, constitutes an act taken in Venezuela, through someone in his capacity as a government official acting under color of Venezuelan law.

**b. The Torture Conspiracy Rests on Alleged Official Conduct.**

Mr. Maduro vehemently denies the newly added allegations related to torture. But putting to the side the question whether these alleged acts occurred—a question the Court may not reach in resolving a claim of immunity, *see infra* at Point II.B.2—the torture allegations, like the rest of the S5, rest on Mr. Maduro's alleged exercise of the powers of the Venezuelan presidency.

As explained *supra* at Background B.4, the S5 alleges that Mr. Maduro, as President, "authorized" and "oversaw" a system of detention operated through Venezuela's military

[9] The S5 also alleges that Mr. Maduro used the state oil agency, PDVSA, to finance and facilitate drug trafficking, resulting in what the S5 calls a "*state policy*" of corruption, S5 ¶ 13 (emphasis added), and that he and Ms. Flores de Maduro used their influence over "the Venezuelan legal system" to engineer the dismissal of charges against FARC members, *id.* ¶ 15. Influencing state agencies and the criminal justice system are quintessentially sovereign acts.

intelligence agency, S5 ¶ 19, and "commanded the law enforcement and military units and officers" alleged to have committed the abuses, *id.* ¶ 6. It alleges that he ordered arrests carried out by that agency, *id.* ¶¶ 20, 24-25; and decided, "on a case-by-case basis, whether an individual who had been abused would be released or subjected to criminal prosecution." *Id.* ¶ 25.

The S5 further alleges that Mr. Maduro created an "Anti-Coup Command" at a "televised cabinet meeting" following the cancellation of a presidential recall referendum, *id.* ¶ 27, and announced on television, "as Commander-in-Chief," a plan coordinated by that command with the objective of maintaining "internal order," *id.* ¶ 29. It alleges that the detentions at issue took place in state prisons and at the headquarters of state intelligence agencies. *Id.* ¶¶ 28, 33-34. The stated object of the alleged conspiracy was to "preserve and protect the power and authority" of Venezuela's leadership, *id.* ¶ 45, including in response to perceived threats of a coup or military uprising, *id.* ¶¶ 22, 29.

Directing a nation's military, intelligence, and law enforcement apparatus to address perceived threats to the stability of its government is quintessentially sovereign conduct. *Cf. Halkbank III*, 120 F.4th at 56. Whatever the S5 claims about the *manner* in which that authority was supposedly exercised, the charged conduct is attributable to the Venezuelan state, and, as explained *infra* at Point II.B.2, under the common law, allegations of wrongdoing or abuse of power do not divest a defendant of immunity. *See, e.g.*, *Nelson*, 507 U.S. at 361 (wrongful arrest, imprisonment, and torture by the Saudi government "boils down to abuse of the power of [the] police" which is sovereign in nature).

Indeed, that Mr. Maduro acted in his official capacity *is a central and necessary premise* of Count Two. The Torture Act, 18 U.S.C. §§ 2340-2340A, proscribes only torture "committed by a person *acting under the color of law*." 18 U.S.C. § 2340(1) (emphasis added). Congress enacted

the Act to implement the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT"), *see United States v. Belfast*, 611 F.3d 783, 801-02 (11th Cir. 2010), which limits "torture" to conduct inflicted by or with the acquiescence of "*a public official or other person acting in an official capacity*," CAT, art. 1(1) (emphasis added). Congress understood "under the color of law" in § 2340(1) to be coextensive with CAT's "official capacity" definition. *See* S. Exec. Rep. No. 101-30, at 14 (1990); *Belfast*, 611 F.3d at 808 ("[T]here is no distinction between the meaning of the phrases 'under the color of law' and in 'an official capacity.'"). By alleging that Mr. Maduro acted "under the color of law" (S5 ¶ 44), the S5 necessarily alleges that he acted in his official capacity as a Venezuelan official.[10]

Critically, the Torture Act *does not* purport to abrogate conduct-based immunity. Interpreting the Act *sub silentio* to deviate from bedrock immunity principles would contravene the Supreme Court's admonition that courts "proceed on the assumption that common-law principles of . . . immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so." *Filarsky v. Delia*, 566 U.S. 377, 389 (2012); *see also Malley v. Briggs*, 475 U.S. 335, 339 (1986). "In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *Matar*, 563 F.3d at 14 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)). The Torture Act does not even mention sovereign immunity, much less clearly speak directly to it.

---

[10] Similarly, 42 U.S.C. § 1983, which reaches "[e]very person who, under color of" state law deprives another of a constitutional right, did not "abolish wholesale all common-law immunities." *See Pierson v. Ray*, 386 U.S. 547, 554 (1967); *see also Quern v. Jordan*, 440 U.S. 332, 340 (1979) (§ 1983 "does not abrogate the States' Eleventh Amendment immunity."); *cf. also Doğan v. Barak*, 932 F.3d 888, 895 (9th Cir. 2019) (relying on interpretations of § 1983 to hold that the Torture Victim Protection Act ("TVPA") does not abrogate sovereign immunity).

Lest there be any doubt, the Senate Report recommending ratification of CAT demonstrates Congress understood 18 U.S.C. § 2340A would *not* abrogate such immunities:

> The application of immunities from criminal prosecution, such as those immunities enjoyed by diplomats under the Vienna Convention on Diplomatic Relations, was not expressly discussed during the negotiation of [CAT]. Article 7(2), however, implicitly recognizes that *such immunities are not affected by [CAT]*, by stating that the authorities "shall take their decision in the same manner as in the case of any ordinary offense of a serious nature."

S. Exec. Rep. No. 101-30, at 21-22.

The United States government has the same understanding of the Torture Act:

> The United States has also adopted the extraterritorial criminal torture statute and War Crimes Act . . . Neither statute addresses or explicitly abrogates the functional immunity of foreign officials. Any such prosecution in the future would be addressed by prosecutors and courts on a case- and fact-specific basis rather than by application of a categorical rule denying immunity.

ILC Comments at 10.

Interpreting § 2340A to leave foreign official immunity intact does not "render the statute a nullity." *Doğan*, 932 F.3d at 895. In *Doğan*, the Ninth Circuit confronted and rejected that exact argument with respect to the TVPA, holding that Congress enacted the statute with the expectation that "foreign states would *generally*" waive immunity as to torture charges, such that an official sued "would never receive common-law immunity in the first place, thereby making abrogation unnecessary." *Id.* (emphasis added). As discussed above, Venezuela has not waived immunity.[11]

[11] In *Matar*, the Second Circuit rejected the argument that the TVPA—which, like the Torture Act, was enacted to "carry out the intent of [CAT]," S. Rep. No. 102-249, at 3 (1991), and requires that the defendant acted "under actual or apparent authority, *or color of law*," 28 U.S.C. § 1350 note (emphasis added)—abrogated foreign sovereign immunity. *Matar*, 563 F.3d at 15. While *Matar* noted, in *dicta*, that "because the extension of common-law immunity is discretionary, the TVPA will apply to any individual official whom the Executive declines to immunize." 563 F.3d at 15, that statement preceded subsequent Supreme Court and Second Circuit decisions that it remains, at minimum, an open question whether courts should defer to Executive Branch decisions declining to apply foreign sovereign immunity where such decisions contravene common law. *See infra* at Point III.

### 2. The Indictment's Allegations of Unlawful Conduct, Criminal Intent, and *Jus Cogens* Violations Do Not Defeat Sovereign Immunity.

The S5 alleges that, although Mr. Maduro acted on behalf of the state using state privileges and apparatus, his conduct was "corrupt," self-interested, intended to maintain his governmental power, and undertaken with criminal intent and purpose. *See supra* at Background B.4; S5 ¶¶ 9-10, 13, 15, 19; S4 ¶¶ 24, 27-30, 32, 35. Under the common law, such allegations are irrelevant. No court has ever held that sovereign immunity is unavailable in criminal cases, and conduct-based immunity would be meaningless if it protected only officials not accused of wrongdoing.

a. Any civil or criminal action against a foreign official necessarily challenges the lawfulness of that official's acts. To find that an allegation of unlawfulness renders the official's conduct inherently unofficial would thus eviscerate the immunity.

Under English common law, the official act inquiry turns on attribution, not lawfulness. The 1848 decision by the U.K. House of Lords in *Duke of Brunswick v. King of Hanover* is instructive. [1848] 2 H.L. Cas. 1. There, the House of Lords held that the defendant, who was both a private citizen of Britain and a foreign official, was exempt from jurisdiction for "an act done in his sovereign character in his own country; whether it be an act right or wrong, whether according to the constitution of that country or not." *Id*. at 17. The House of Lords concluded that the alleged improper conduct "could not have been done . . . in any private character" but instead arose from "acts of persons claiming to have the right so to act by virtue of their sovereign authority." *Id*. at 18-20.

The principle that the conduct of an individual official is attributable to the state even when it was unlawful or unauthorized is also embodied in international customary law. In 2001, the International Law Commission adopted the Draft Articles on the Responsibility of States for Internationally Wrongful Acts ("Articles of Responsibility"), which offer guidance on the

attribution of official acts to foreign sovereigns. *See* Int'l Law Comm'n, Draft Articles on the Responsibility of States for Internationally Wrongful Acts, with Commentaries, U.N. Doc. A/56/10, (2001), https://untreaty.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf. Article 4 of the Articles of Responsibility provides that the "conduct of any State organ"—which includes "any person or entity which has status in accordance with the internal law of the State"—"shall be considered an act of that State." *Id.* at 40. Commentary 13 to this Article illustrates the point:

> It is irrelevant for this purpose that the person concerned may have had ulterior or improper motives or may be abusing public power. Where such a person acts in an apparently official capacity, or under colour of authority, the actions in question will be attributable to the State.

*Id.* at 42. Likewise, Article 7 instructs that an individual official's conduct is attributable to the state "even if [the official] exceeds [his] authority or contravenes instructions." *Id.* at 45.

b. American courts have likewise held that allegations of unlawful acts do not defeat immunity. *See Waltier v. Thomson*, 189 F. Supp. 319, 321 n.6 (S.D.N.Y. 1960) (rejecting argument that conduct was outside official's duties "since wrongdoing is never authorized") (citing *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand, C.J.) (such a reading "cannot be the meaning of the limitation without defeating the whole doctrine")); *cf. Trump*, 603 U.S at 619 ("Nor may courts deem an action unofficial merely because it allegedly violates a generally applicable law."). Moreover, the Second Circuit has squarely rejected the notion that violation of the *foreign sovereign's* own law defeats immunity. *See Eliahu*, 919 F.3d at 713 ("Even assuming the officials' challenged conduct was improper under Israeli law, there is no doubt that the conduct was official in nature."); *Appel v. Hayut*, No. 20 Civ. 6265 (JPC), 2021 WL 2689059, at *5 (S.D.N.Y. June 30,

2021) ("[I]t is not relevant that the actions allegedly taken may have been illegal under Israeli law."), *aff'd sub nom. Appel v. Cohen*, No. 22-170, 2023 WL 1431691 (2d Cir. Feb. 1, 2023).

The application of conduct-based immunity to official acts without regard to their propriety is consistent with the purpose of foreign sovereign immunity. It would be incongruous for a doctrine designed to "offer[] broad protection from a district court's jurisdiction" to depend on judicial determinations of the propriety of the alleged conduct. *Wultz v. Bank of China Ltd.*, 32 F. Supp. 3d 486, 496 (S.D.N.Y. 2014); *see also Heaney*, 445 F.2d at 504 ("[T]o condition a foreign sovereign's immunity on the outcome of a preliminary judicial evaluation of the propriety of the political conduct . . . would frustrate the very purpose of the doctrine itself."). To permit an exception to the immunity for criminal conduct would thus "eviscerate any protection that foreign official immunity affords" because it would require "the merits [to] be reached." *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 234 (D.D.C. 2018).

Courts have long held that *motive* is also generally irrelevant to the application of absolute immunities that attach to performance of official acts. In *Bradley v. Fisher*, for example, the Supreme Court made clear that judicial immunity "cannot be affected by any consideration of the motives with which the acts are done." 80 U.S. 335, 354 (1871). The Court reasoned that, because an "allegation of malicious or corrupt motives could always be made," any inquiry into such motive would subject the defendant "to the same vexatious litigation" that the immunity is designed to prevent. *Id.*; *see also Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987) ("[S]ince absolute immunity spares the official any scrutiny of his motives, an allegation that an [official] act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity."); *cf. Tenney v.*

*Brandhove*, 341 U.S. 367, 377 (1951) ("claim of an unworthy purpose does not destroy [legislative] privilege," otherwise "[t]he privilege would be of little value").

The Supreme Court recently upheld this principle in the context of Presidential immunity for official acts. *Trump*, 603 U.S. at 618. The Court held that "courts may not inquire into the President's motives" when distinguishing between official and unofficial conduct, as this inquiry "risk[s] exposing . . . official conduct to judicial examination on the mere allegation of improper purpose." *Id*. The same reasoning applies with equal force here. Accordingly, this Court must determine whether Mr. Maduro is entitled to conduct-based immunity "without judging whether the underlying conduct actually occurred, or whether it was wrongful." *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010) (former diplomatic officials entitled to functional immunity).

There is no divergence between conduct-based immunity as interpreted by United States courts and the English common law and principles of international law that United States courts routinely apply. It is the nature of the acts alleged, not the purported motive or intent behind them, that dictates that conduct-based immunity attaches.

c. The Indictment unambiguously proceeds on the theory that Mr. Maduro is criminally liable for the *manner* in which he allegedly used public positions and state instrumentalities. The S5 does not allege Mr. Maduro was acting purely in a private capacity. Quite the opposite, the S5 alleges Mr. Maduro used his "control over Venezuela's military, judiciary, and law enforcement agencies" (S5 ¶ 3) to "remain in power" (*id.* ¶ 15) and "suppress political opposition," *id.* ¶ 16. *See also supra* at Background B.4.

The S5 decidedly does not allege that these were the *ultra vires* acts of a rogue public official. To the contrary, it alleges that the Venezuelan state was permeated by a "culture of corruption" endorsed not only by Mr. Maduro, but also by President Chávez before him. S5 ¶ 9;

S4 ¶ 16. These alleged acts, *whether right or wrong*, are attributable to the state, such that immunity attaches. *See Duke of Brunswick*, 2 H.L. Cas. at 21 ("It is true, the bill states that the instrument was contrary to the laws of Hanover and Brunswick, but, notwithstanding that it is so stated, still if it is a sovereign act, then, whether it be according to law or not according to law, we cannot inquire into it."); *accord Eliahu*, 919 F.3d at 712-13.

d. Neither the gravity of the allegations nor the fact that Count Two charges a violation of *jus cogens* are sufficient to defeat immunity. The Second Circuit, like most other courts to address the question, has squarely held that "[a] claim premised on the violation of *jus cogens* does not withstand foreign sovereign immunity." *Matar*, 563 F.3d at 15; *see also Est. of Tov by Kedem v. United Nations Relief & Works Agency*, 807 F. Supp. 3d 208, 228 (S.D.N.Y. 2025) (rejecting *jus cogens* exception to immunity). Consistent with *Matar*, courts have granted conduct-based immunity in the face of allegations no less grave than those in the S5, including ethnically motivated murder and torture, and the extrajudicial killing of protestors. *See Buratai*, 318 F. Supp. 3d at 232-33, *Obiano*, 138 F.4th at 956; *Doğan*, 932 F.3d at 896-97. Because conduct-based immunity is a threshold bar to jurisdiction, it turns on whether the alleged acts were performed in an official capacity, not on the gravity of the alleged offenses. *See Brzak*, 597 F.3d at 113; *see also* ILC Comments at 9 (the United States government stating that a *jus cogens* exception to immunity "does not reflect customary international law").

### C. The Court Should Not Extend to Mr. Maduro Judge Hellerstein's Denial of Immunity to Cordones.

Judge Hellerstein previously denied the motion of Cliver Antonio Alcalá Cordones to dismiss an earlier indictment based on conduct-based immunity. *See Cordones*, 2022 WL 815229. That decision and its reasoning should not be extended to Mr. Maduro.

*First*, *Cordones* rested in large part on Judge Hellerstein's holding that *Halkbank I* required the Court to defer to the Executive Branch's implicit determination that no immunity applied to Mr. Cordones. *Id.* at *5 ("[T]he Government has brought charges against Defendant and his coconspirators, thereby manifesting its view that Defendant is not entitled to immunity. . . . under [*Halkbank I*], I must reject . . . immunity"). As explained more fully below, however (*see infra* at Point III), since Judge Hellerstein decided *Cordones*, both the Supreme Court and the Second Circuit have made clear—in *Halkbank II* and *Halkbank III*—that they have *not* held that deference is owed to the Executive Branch where the Executive Branch's sovereign immunity determination is in "derogation of the common law." If anything, as discussed *infra* at Point III, the Supreme Court's remand in *Halkbank II* indicates that, were the Court to decide the issue, it would hold that no deference is owed where the Executive Branch's immunity determination would violate common law principles. The Executive Branch's decision to prosecute Mr. Maduro on the theory that he "exercise[d] the powers of the Venezuelan presidency" for illegal purposes, S5 ¶ 7, is squarely within the scope of conduct that common law conduct-based immunity is designed to protect, *see, e.g.*, *Hatch*, 7 Hun. at 599; *Duke of Brunswick*, 2 H.L. Cas. at 21. Accordingly, the Executive Branch's determination to prosecute Mr. Maduro is not entitled to deference.

*Second*, subsequent case law also demonstrates Judge Hellerstein's reliance in *Cordones* on *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60-61 (2d Cir. 2019), was misplaced. *Kashef* does not support a finding that alleged violations of United States and Venezuelan law do not constitute "official acts" for purposes of conduct-based sovereign immunity. *Kashef* was decided based on the act of state doctrine and did not address a government official's entitlement to sovereign immunity. As the Second Circuit explained subsequent to *Cordones*, the act of state doctrine is "not a principle of abstention, [or] a grant of immunity." *Celestin v. Caribbean Air Mail, Inc.*, 30

F.4th 133, 137-39 (2d Cir. 2022). Unlike sovereign immunity, the act of state doctrine operates *on the merits*—it "does not shield foreign official conduct from being 'impugned' . . . in the courts," "[n]or does it bar an inquiry into the 'motivation' for . . . a foreign sovereign act.'" *Id*. at 138-39 (quoting *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 407-08 (1990)). Sovereign immunity, in contrast, is "an immunity from trial and the attendant burdens of litigation," *Rein*, 162 F.3d at 756 (quotations and alterations omitted). As discussed above, sovereign immunity (unlike the act of state doctrine) does not permit "judicial evaluation of the propriety of its political conduct." *Heaney*, 445 F.2d at 504.

The S5 expressly alleges Mr. Maduro "acted under the color of law" in connection with the alleged torture conspiracy. S5 ¶ 44. And as explained *supra* at Background B.4.i, each overt act in connection with the narcotics conspiracies involved the exercise of authority within the scope of Mr. Maduro's delineated executive powers. The Count Four and Five firearms counts predicated on the narcotics conspiracies are, for the same reasons, based on official acts. Because Mr. Maduro is alleged to have acted under the color of law, such conduct is attributable to the state and subject to immunity—regardless of Mr. Maduro's alleged improper motivations or the allegedly "corrupt" nature of his "regime." The allegations on their face show entitlement to immunity. *See Heaney*, 445 F.2d at 504 (plaintiff's concession that defendant was "at all relevant times 'an employee and agent of the . . . Spanish Government'" sufficient to dispose of the claim against him pursuant to conduct-based immunity).

## III. THE COURT SHOULD NOT DEFER TO THE EXECUTIVE BRANCH'S VIEWS ON MR. MADURO'S STATUS-BASED OR CONDUCT-BASED IMMUNITY.

The Court should not permit this unprecedented prosecution to proceed based on deference to the Executive Branch's position, as evidenced by attempting to prosecute him, that Mr. Maduro is not entitled to immunity. That position is in derogation of the venerable common law principles

discussed above that, absent waiver by the foreign sovereign (which has not occurred), heads of state—including *de facto* heads of state—and other foreign officials acting in their official capacity are immune from suit in a foreign nation's national courts. As a result, with respect to the issue of immunity, the Court should not defer to the Executive Branch's decision to prosecute Mr. Maduro.

1. Although the Second Circuit has held that courts should *generally* defer to the Executive Branch's "determination as to whether a party should" receive criminal immunity, it has explicitly declined to hold—and there would be no basis for holding—that deference should "apply to the Executive's determination regarding foreign sovereign immunity *if that determination in a particular case were in derogation of the common law*." *Halkbank III*, 120 F.4th at 44, 46 (emphasis added). That is plainly the case here.[12]

Moreover, the Supreme Court, were it to decide the issue, would likely hold that an Executive Branch immunity determination is owed no deference if it is in derogation of common law immunity principles. In *Halkbank II*, after the Supreme Court held that the FSIA did not provide the defendant with immunity, it remanded for further consideration of whether common law immunity applied *even though the government had argued that* "the common law does not provide for foreign sovereign immunity when, as here, the Executive Branch has commenced a federal criminal prosecution." *Halkbank II*, 598 U.S. at 280. The Supreme Court's remand would have been utterly unnecessary if the Executive Branch was owed complete deference on the

[12] When the *Halkbank III* defendant sought *certiorari* following the Second Circuit's decision in that case, the government explicitly took the position that *certiorari* was not warranted because the Second Circuit "repeatedly refused to decide whether it would apply the same deference if the Executive Branch's position were not in fact consistent with the substance of the common law." Brief for the United States in Opposition to *Certiorari* at 8, *Bankasi v. United States*, No. 24-1144 (U.S. Aug. 6, 2025).

immunity question, because the Executive Branch's position that the defendant was not immune was manifest in the prosecution itself.

Courts that have reached the issue have declined to hold that the Executive Branch is entitled to deference with respect to a decision to deny immunity in contravention of common law. *See United States v. Pangang Grp. Co.*, 135 F.4th 1142, 1161 n.8 (9th Cir. 2025); *Manoharan v. Rajapaksa*, 711 F.3d 178, 180 n.* (D.C. Cir. 2013). Indeed, the suggestion that the Executive Branch is entitled to absolute deference in criminal immunity decisions—even where the Executive Branch's immunity determination is, as here, clearly contrary to the common law—defies common sense. If that were true, then a criminal defendant could *never* raise sovereign immunity as a defense, because the government's decision to prosecute would be conclusive evidence of the position of the Executive Branch. No court has *ever* endorsed that extreme position.

2. Rather than merely deferring to the Executive Branch, federal courts have a long history of resolving issues of foreign state and foreign official immunity. As *Halkbank II* makes clear, the Supreme Court has *never* held that courts must conclusively defer to Executive Branch immunity decisions that contravene the common law. Rather, "nineteenth-century foreign sovereign immunity decisions took as a given that courts could make independent determinations on whether a foreign sovereign was immune from suit in a particular set of circumstances." G. Edward White, *The Transformation of the Constitutional Regime of Foreign Relations*, 85 Va. L. Rev. 1, 134-35 (1999); *see also* Ingrid Wuerth, *Foreign Official Immunity Determinations in U.S. Courts: The Case Against the State Department*, 51 Va. J. Int'l L. 915, 924-25 (2011) ("During the nineteenth and early twentieth centuries, both state and federal courts generally made immunity

determinations by relying in part on customary international law. . . . [They] did not view themselves as bound by the executive's suggestion of immunity.").[13]

As a leading academic has explained, the notion of complete deference to the Executive Branch is inconsistent with *Schooner Exchange* itself. *See* Wuerth, *supra*, at 926. In *Schooner Exchange*, Chief Justice Marshall considered the Executive Branch's views, but only after he defined foreign sovereign immunity as "a principle of public law," which he explained he was independently "appl[ying] to the case at bar." 11 U.S. at 145-47. And in *Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562 (1926), the Supreme Court afforded the defendant sovereign immunity, *id.* at 576, notwithstanding that the Executive Branch took the position that the defendant was *not* immune, *The Pesaro*, 277 F. 473, 479 n.3 (S.D.N.Y. 1921) (lower court decision noting the State Department's view that The Pesaro was not immune); *cf. McLeod*, 25 Wend. at 598 & a1 (refusing to dismiss prosecution against British sheriff despite the Executive Branch's position that "by the principles of public law" and "the law of nations," the defendant was immune).

As Justice Gorsuch explained in his *Halkbank II* partial concurrence, "the strong deference cases didn't appear until the 20th century." 598 U.S. at 286 (Gorsuch, J., concurring in part). Even in more recent criminal cases, however, courts have declined to defer blindly to Executive Branch decisions regarding foreign official immunity. *E.g.*, *Khobragade*, 15 F. Supp. 3d at 387 (dismissing indictment based on defendant's immunity over the government's objection "that the Indictment should not be dismissed because Khobragade did not have diplomatic immunity at the time of her arrest, and has no immunity at the present time."); *In re Investigation of World Arrangements*, 13

[13] Cases dating back to the late 1790s show that courts were not bound by Executive Branch immunity determinations regarding foreign officials, and the Executive Branch frequently *disclaimed* any ability to bind the judiciary. *See* Chimène I. Keitner, *The Forgotten History of Foreign Official Immunity*, 87 N.Y.U. L. Rev. 704, 713-49 (2012).

F.R.D. at 291 ("[T]he interpretation of the correspondence [asserting immunity] is a judicial function and does not depend for finality upon advice or interpretation from the executive."); *In re Grand Jury Investigation of the Shipping Indus.*, 186 F. Supp. 298, 318-20 (D.D.C. 1960) (reserving decision on motion to quash subpoena and requiring the government to make a more fulsome showing that immunity did not apply, notwithstanding that "[t]he State Department refused to recognize or allow the [foreign sovereign's] claim of immunity."); *cf. Kedem*, 807 F. Supp. 3d at 219 (declining to defer to Executive Branch determination regarding immunity).

3. *Hoffman*, 324 U.S. at 32, 36, is not to the contrary. There, the Supreme Court analyzed the question whether a merchant vessel was entitled to "immunity from a suit in rem." *Id.* at 31. The Court held the defendant was not immune and noted "an important reason" to deny immunity was "that the State Department has declined to recognize it." *Id.* at 35 n.1. The Court also observed that "the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction." *Id.* at 35.

The Court did not, however, conclude that the judiciary had no role in immunity determinations. Rather, the Court merely noted, in *dicta*, that courts should not "deny an immunity which our government has seen fit to allow, or [] allow an immunity *on new grounds which the government has not seen fit to recognize*." *Id.* (emphasis added). The Court did not say, even in *dicta*, that the Executive Branch has complete discretion to withdraw immunities that have long

been recognized in the United States and elsewhere under common law and customary international law.[14]

3. Nor would it accord with basic principles of fairness or separation of powers to defer conclusively to the Executive Branch in a criminal case. "[C]oncentrat[ing] the roles of prosecutor, judge, and jury in the hands of the Executive . . . is the very opposite of the separation of powers that the Constitution demands." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024). Granting absolute deference to the Executive Branch "risks relegating courts to the status of potted plants, inconsistent with their duty to say what the law is." *Halkbank II*, 598 U.S. at 286 (Gorsuch, J. concurring in part).

Granting conclusive deference to the Executive Branch would flout the separation of powers upon which our government is based. It is antithetical to our system of divided government for courts to "abdicate their judicial duty to decide the scope of . . . immunity." *Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 574 (2018) (Thomas, J., dissenting). Granting conclusive

[14] A few years after *Hoffman*, in 1952, the State Department in the "Tate Letter," announced the United States' adoption of a narrower approach to sovereign immunity for commercial conduct: "It is realized that a shift in policy by the executive *cannot control the courts* but it is felt that the courts are *less likely* to allow a plea of sovereign immunity where the executive has declined to do so." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 714 (1976) (reproducing the Tate Letter) (emphases added). Congress subsequently repudiated *Hoffman*'s questionable *dicta* when it enacted the FSIA, whose purpose was "to free the Government from the case-by-case diplomatic pressures" and "to assure litigants that decisions are made on purely legal grounds." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983) (cleaned up). The State Department, which supported the FSIA, explained: "In virtually every other country in the world, *sovereign immunity is a question of international law decided exclusively by the courts* and not by institutions concerned with foreign affairs." *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcomm. on Admin. Law and Governmental Relations of the H. Comm. on the Judiciary*, 94th Cong. 27 (1976) (statement of Monroe Leigh, Legal Adviser, U.S. Dep't of State) (emphasis added).

deference to the Executive Branch would also invade on the functions of Congress. Sovereign immunity is part of the customary international law that courts have traditionally interpreted and applied. *See United States v. Smith*, 18 U.S. 153, 160 (1820) ("[T]he law of nations . . . may be ascertained by consulting . . . the general usage and practice of nations . . . .").

It is the job of Congress, not the Executive Branch, to decide if, and when, to diverge from the law of nations. In our "fair-minded system of justice . . . courts were never intended to serve as rubber stamps." *Pernell v. Southall Realty*, 416 U.S. 363, 385 (1974). This Court should reject the government's claim that the Executive Branch is entitled to complete deference with respect to Mr. Maduro's claim of immunity in the face of centuries of law to the contrary. Under that body of law, Mr. Maduro is entitled to immunity. Accordingly, the charges against Mr. Maduro must be dismissed.

## CONCLUSION

Mr. Maduro is entitled to sovereign immunity. The S5 concedes he exercised the powers of several official positions including Venezuela's Presidency and remained, at minimum, the country's *de facto* head of state, notwithstanding the Executive Branch's subsequent political non-recognition of his *de jure* status. The alleged conduct on which the charges rest consists of acts attributable to Mr. Maduro's official positions and state powers, including diplomatic functions, military and law-enforcement authority, control over the judiciary, use of state facilities, and public statements regarding national policy. Indeed, in the S5's new torture conspiracy count, the government specifically alleges that Mr. Maduro's conduct was "under the color of law."

Common law sovereign immunity deprives the Court of jurisdiction to adjudicate charges against Mr. Maduro as both a sovereign head of state and a foreign official prosecuted for acts attributable to the sovereign. The Executive Branch's decision to bring this unprecedented

prosecution derogates long-settled principles of common law and of the customary international law on which it is based. The Court lacks jurisdiction over Mr. Maduro because he is entitled to status-based sovereign immunity as head of state. It also lacks jurisdiction because Mr. Maduro is entitled to conduct-based sovereign immunity because the S5 is premised on his official governmental acts. The Court must dismiss the S5 against him, with prejudice.

Dated: November 9, 2026

Respectfully submitted,

*/s/ Barry J. Pollack*

Barry J. Pollack
HARRIS TRZASKOMA LLP
1300 19th Street, NW, Suite 700
Washington, D.C. 20036
(934) 667-3824
bpollack@harristrz.com

Anna Estevao
HARRIS TRZASKOMA LLP
125 Broad Street, 10th Floor
New York, NY 10004
(212) 970-6465
aestevao@harristrz.com

*Counsel for Nicolás Maduro Moros*